## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SARAH LAZOR, GRACE JOHNSON, | ) | Civil Action |
| MAGDALENE MLYNEK, LAURA | ) | |
| BRADDICK, EMILY JONES, BAILEY | ) | |
| HARRIS, MOLLY O'NEILL, TERESA | ) | Case No. _____ |
| NOBLES, EMMA PINCKNEY, | ) | |
| JOSEPHINE LUBY, GAYANE | ) | |
| GAVORKYAN, and JORDAN NANAI, | ) | |
| Individually and on behalf of all those | ) | |
| similarly situated, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNIVERSITY OF CONNECTICUT, | ) | |
| | ) | |
| UConn. | ) | April 28, 2021 |

## CLASS ACTION COMPLAINT

Plaintiffs are female student and varsity rowing athletes ("Plaintiffs") at UConn University of Connecticut ("UConn" or "UConn"). The Plaintiffs each file this action individually and on behalf of a class of all other similarly situated females. The Plaintiffs bring this class action lawsuit to challenge UConn's failure to provide equitable athletic opportunities for its female students, benefits and treatment and athletic financial assistance to its female athletes, including UConn's announced decision to eliminate the women's rowing team-- a viable female sport team, with a successful history and strong support.

## STATEMENT OF THE CASE

1.      On June 24, 2020, UConn President Thomas Katsouleas told the UConn Board of Trustees that UConn was eliminating its women's rowing, men's cross country, men's swimming and driving, and men's tennis teams, to save money for UConn. This lawsuit challenges the legality of that action.

2.      The Plaintiffs file this case as a class action on behalf of themselves and on behalf of a class of current, prospective, and future female students at UConn who participate, seek to participate, and/or are or were deterred from participating in athletics at UConn because UConn:

      a.   does not or will not offer the sport in which they want to participate,

      b.   does not or will not offer a sufficiently high level of treatment and benefits in the sport in which they participate or want to participate in, or

      c.   does not or will not offer a sufficiently high level of financial assistance to the sport in which they participate or want to participate.

3.      UConn discriminates on the basis of sex by, among other things, providing male students with a greater opportunity to participate in varsity intercollegiate athletics than it provides to female students and by providing superior treatment and benefits and financial assistance to male athletes than to female athletes.   This sex discrimination violates Title IX of the Education Amendments of 1972 (20 U.S.C. §1681 et seq.) and the regulations adopted pursuant thereto (34 C.F.R. Part 106) (collectively, "Title IX").

4.      The Plaintiffs file this action to stop UConn from discriminating against them and all others similarly situated students.   Plaintiffs seek to prevent UConn from discriminating against them based on their gender by providing, when compared to male student athletes: an unequal opportunity to participate in varsity intercollegiate athletics; unequal treatment and benefits; and unequal athletic financial assistance. More specifically, Plaintiffs seek a Court Order to prevent UConn from cutting its women's established rowing program, and, further, to require UConn to add women's varsity athletic opportunities until such time as  its male and female undergraduate students are provided, in amounts proportionate to the male and female full time undergraduate student body,  full opportunities to participate in varsity athletics, full benefits and treatment, and full athletic financial assistance to women athletes.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3), and 1343(4) because Plaintiffs' legal claims arises under 20 U.S.C. §1681 et seq. and its interpreting regulations.

6.      Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b).  These claims arose in Storrs, Connecticut, which is within the jurisdiction of this Court.

## THE PARTIES

8.      Plaintiff Sarah Lazor is a sophomore female student at Defendant University of Connecticut. She is a pre-med psychology major. Ms. Lazor is a member of the UConn women's varsity rowing team. If UConn carries through with its recently-announced termination of its sponsorship of its women's rowing program next school year or thereafter, Ms. Lazor will be irreparably harmed by the gender discrimination that will cause her to lose the opportunity to compete during the remainder of her fleeting college years.  As a high school senior, Ms. Lazor was accepted to her dream school, Boston University ("BU"), on the condition that she attend another school for her freshman year. Ms. Lazor chose to attend UConn where she walked on to the women's rowing team. She had never rowed before, but loved the sport so much she chose to turn down the opportunity to transfer to BU in May 2020, shortly before UConn announced its shocking decision to cut the rowing team. Ms. Lazor would not have turned down the opportunity to transfer to BU had she known the team was going to be cut. During the school year, Plaintiff resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

9.      Plaintiff Grace Johnson is a sophomore female student at Defendant University of Connecticut. She is an engineering major and receives a merit scholarship.  Ms. Johnson is a member

of the UConn women's varsity rowing team, having walked-on, without a scholarship. UConn's unexpected announcement that it would not sponsor a rowing program next school year or thereafter, unless reversed, will irreparably harm her by foreclosing her opportunity to compete in intercollegiate rowing during her fleeting college years and by making her the target of UConn's intentional gender discrimination. She wants to transfer to another university to continue with varsity rowing, but she is unsure if she will be able to join another Division I women's rowing team as a walk-on; even if she were able to find such an opportunity, she would not likely be able to afford paying out of state tuition. During the school year, Plaintiff resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

10.     Plaintiff Maggie Mlynek is a fifth-year female graduate student at Defendant University of Connecticut. She is studying for her master's degree in statistics.  She receives an athletic scholarship to participate on the women's varsity rowing team, and she is its captain. UConn's recent and unexpected announcement that it would not sponsor a rowing program next school year, if allowed to stand, will cause Ms. Mlynek to suffer irreparable harms, both by denying her the opportunity to compete during the fleeting college years by making her a target of intentional gender discrimination.  Ms. Mlynek was devastated to learn of UConn's surprising decision to cut the rowing team.  Ironically, earlier, in June of 2020, thinking that the women's rowing team was safe from any team-cutting-decisions by UConn administrators, she had worked with other student athletes to try to save other teams that appeared to be in danger of termination by putting together a letter in opposition to such cuts. That letter, signed by 282 current student athletes across 18 teams, was addressed to UConn's President and Athletic Director; no response was ever received. During the academic year, Plaintiff resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

4

11.     Plaintiff Laura Braddick is a freshman female student at Defendant University of Connecticut. She is a business major, and she receives an athletic scholarship. As a prospective college student, Ms. Braddick turned down athletic scholarships at the University of San Diego and Loyola Marymount University to row at UConn.  She has been an active and successful member of the women's varsity rowing team.  In response to UConn's unexpected termination decision, Ms. Braddick she may be forced to transfer to another university that sponsors women's varsity rowing, but she does not want to move away from her friends, further away from her family, and to an institution where, very likely, she will be required to pay more money for tuition.   If UConn's termination decision is not reversed, Ms. Braddick will be irreparably harmed by UConn's intention act of gender discrimination.  During the school year (except this semester due to COVID), Plaintiff resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

12.     Plaintiff Emily Jones is a freshman female student at Defendant University of Connecticut, where she is a social work major, receiving a full athletic scholarship in support of her membership on the women's varsity rowing team. Ms. Jones is a member of the UConn women's varsity rowing team. UConn's unexpected announcement that it would be terminating the women's rowing program has been particularly upsetting to Ms. Jones.  She is concerned that without her rowing team's membership, her motivation and discipline in other areas of her education will fall apart.  Ms. Jones believes she will be irreparably harmed if the termination decision, one involving intentional gender discrimination, is not reversed because she will be caused to lose the ability to compete during the fleeting college years.  Ms. Jones resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

13.     Plaintiff Bailey Harris is a freshmen female student at Defendant University of Connecticut.  Ms. Harris was awarded a full athletic scholarship to support her membership on UConn women's varsity rowing team. She is a psychology major with a minor in human

5

development. UConn recently announced decision to terminate her team, an action involving intentional gender discrimination, is causing her harm that will become irreparable if the action is not reversed. Ms. Harris would not have been able to attend UConn without her scholarship; she is afraid if she transfers, so that she might continuing with the rowing sport on a varsity level, she will have to pay a lot more for school and possibly lose credits.  During the school year, Plaintiff resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

14.    Plaintiff Molly O'Neill is a freshmen female student at Defendant University of Connecticut.  Ms. O'Neill is a psychology major and receives a full athletic scholarship to participate on the women's varsity rowing team. UConn's sudden decision to terminate that team caused her to suffer harm already; she is transferring to the University of Massachusetts ("UMass") for fall 2021, so that she might continuing with varsity rowing but she would rather have stayed at UConn, where she has established important friendships and relationships with her coaches. She is concerned that, upon her transfer to UMass, not all of her academic credits will be recognized and she will need to take additional courses to stay on-track with her academic major. During the school year, Plaintiff resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

15.    Plaintiff Teresa Nobles is a freshman female student at Defendant University of Connecticut.  Ms. Noble is a nutrition major. Unfortunately, due to an injury during her senior year of high school, the UConn coaching staff were not able to offer her an athletic scholarship for her freshman year but told her they might offer her an athletic scholarship at the start of her sophomore year.  Those promises caused Ms. Noble to apply to, and to attend, UConn, and no other college or university.  There, since arriving on campus, she has been an active member of the women's varsity rowing team, she has established important friendships with team members, and she has created important mentoring relationships with her coaches.  Ms. Noble will be irreparably harmed by losing the ability to compete during the fleeting college years, and from gender discrimination, if Defendant

is not restrained from eliminating the women's varsity rowing program. She resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

16.     Plaintiff Emma Pinckney is a freshman female student at Defendant University of Connecticut. A communications major, Ms. Pinckney receives free tuition because her mother works for UConn Health Center. Ms. Pinckney is a member of the UConn women's varsity rowing team. UConn's recent announcement that it would not sponsor a varsity women's rowing program next school year or thereafter, an act of intentional gender discrimination, if unchecked, will cause Ms. Pinckney to suffer irreparable injury as an athlete, as a valued member of the team and as a student at UConn.  If she were to transfer to another school to continue her rowing career, she will lose her free tuition at UConn, without any assurance of athletic scholarships to be offered to her as a transferring student.  During the school year, Plaintiff resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

17.     Plaintiff Josephine Luby is a freshmen female student at Defendant University of Connecticut, where she is majoring in engineering and industrial design and where she is a member of the UConn women's varsity rowing team.  Ms. Luby specifically chose to attend UConn because it was the only university where she could pursue both degrees and be a Division I rower. UConn's recent, sudden announcement that it would not sponsor a rowing program next school year or thereafter, an act of intentional gender discrimination, will irreparably harm Ms. Luby if it is not reversed. It threatens to end or diminish her rowing athletic career; it disrupts her academic programs of study; it injures her relationships with fellow team members, students; and it impairs her relationships with her coaches.   Such harms will be irreparable if UConn is not restrained from eliminating the women's varsity rowing program. During the school year, Plaintiff resides in Storrs, Connecticut (except this semester due to COVID), which is within the jurisdiction of this Court.

18.     Plaintiff Gayane Gevorkyan is a sophomore female student at Defendant University

7

of Connecticut, where she is a member of the women's varsity rowing team. Ms. Gevorkyan is a management and engineering-for-manufacturing major and, but-for the disruptions caused by UConn sudden decision to terminate the women's varsity rowing team, she had been on-track to earn a joint bachelor's degree in business and engineering. There are few universities that offer joint degree-earning programs in her chosen fields of study and fewer-still that offer, in addition, opportunities to participate in varsity women's rowing programs.    She is considering transferring to another university but finds that the options are limited.  Plaintiff will be irreparably harmed by losing the ability to compete during the fleeting college years, and from gender discrimination, if Defendant is not restrained from eliminating the women's varsity rowing program. During the school year, Plaintiff resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

19.    Plaintiff Anne Jordan Nanai is a sophomore female student at Defendant University of Connecticut. A recipient of an academic scholarship, Ms. Nanai majors in biomedical engineering while also participating as a member of the UConn women's varsity rowing team. UConn's recent announcement that it would not sponsor a rowing program next school year or thereafter has placed Ms. Nanai in a very difficult and harmful predicament. On the one hand, she does not know if she wants to transfer because she is unsure if she could afford out-of-state tuition.  On the other hand, she does not want to give up UConn's great engineering program.  Finally, she does not want to move farther away from her family and the friends she has made at UConn or disrupt the relationships she has established with team members and coaches.  These, and related, irreparable harms will flow from UConn's intentional gender-based discrimination if it is not required to reverse its decision to terminate the women's varsity rowing team.  During the school year, Ms. Nanai resides in Storrs, Connecticut, which is within the jurisdiction of this Court.

20.    UConn University of Connecticut ("UConn") is a public university of higher education located in Storrs, Connecticut, which is within the jurisdiction of this Court.

21.     UConn receives federal financial assistance and the benefits therefrom.  Therefore, all programs at UConn, including intercollegiate athletics, are subject to the requirements of Title IX.

## CLASS ALLEGATIONS

22.     The named Plaintiffs bring this action on behalf of themselves and, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all present and future UConn female athletes – including currently enrolled and prospective students—who participate, seek to participate, or have been deterred and prevented from participating in or obtaining the benefits of intercollegiate athletics sponsored by UConn. In particular, the Plaintiffs seek to represent a class of all present, prospective, and future female students at UConn who want to participate in the soon-to be- eliminated varsity sport of women's rowing.

23.     Each of the named Plaintiffs is a member of the proposed class and has been or will be injured by UConn's sex discrimination, failure to provide female students: an equal opportunity to participate in varsity intercollegiate athletics at UConn; equal treatment and benefits: and equal athletic financial aid.

24.     The Plaintiffs seek to represent the proposed class because joinder of all class members and all persons harmed by UConn's failures, as described herein, is not just impracticable, but impossible.

25.     The proposed class is known to exist, but the identity of its members is and will continue to be fluid and unidentifiable during the course of this litigation because of the nature of college enrollment and student athletic participation.  In particular, UConn is a college with a student body whose members graduate approximately four years from their respective dates of matriculation. Its varsity student athletes are allowed only four years of athletic eligibility under the rules of the National Collegiate Athletic Association ("NCAA"). Accordingly, the members of the class harmed

by UConn's discriminatory actions constantly change as each class of students graduates and as another class of graduating high school students enrolls as freshmen at the university.

26.     Not all members of the proposed Plaintiff class are currently identifiable, because the class includes prospective and future students who will enroll at UConn during the course of this litigation or who will be deterred from enrolling at UConn because of UConn's failure to provide equal athletic participation opportunities to female students, including varsity opportunities in those sports in which they want to participate, and equal treatment and benefits and financial assistance to female athletes.

27.     Not all members of the plaintiff class are currently identifiable because it includes not just rowers, but also all present, prospective, and future female students who want to participate in a varsity intercollegiate sport not offered at UConn, and those who want better treatment and benefits and athletic financial assistance provided to UConn female athletes.

28.     It is unknown how many present, prospective, or future female students would enroll at UConn or would participate in athletics at UConn if UConn: stopped discriminating against women; did not cut the women's rowing program; added more sports opportunities for women; provided better treatment and benefits to women athletes; and provided more athletic financial assistance to female athletes. The potential of hundreds of additional class members who might apply to UConn, if they were to be recruited by UConn coaches to attend UConn, and who, if recruited, might well participate in athletics at UConn if the university complied with Title IX, as described herein, are too numerous to make joinder practicable.

29.     The Plaintiffs satisfy the "commonality" requirement of Fed. R. Civ. P. 23(a)(2), because they share questions of law and fact in common with the proposed class, particularly whether UConn's policies and practices violate Title IX by failing to provide female students with an equal opportunity to participate in intercollegiate athletics and failing to provide female athletes at

UConn equal treatment and benefits and financial assistance in comparison to male athletes. Because Title IX athletics claims require comparison of the sex-segregated men's and women's athletic opportunities as a whole, the issues are inherently class-based.

30.     Plaintiffs satisfy the "typicality" requirement of Fed. R. Civ. P. 23(a)(3), because their claims are typical of those of the proposed class.  The sex discrimination which the Plaintiffs have suffered, including (a) pending exclusion from opportunities to participate in UConn's rowing program and athletics program, (b) unequal treatment and benefits in UConn's athletics program, and (c) unequal athletic financial assistance in UConn's athletics program, are typical of the sex discrimination which members of the Class have suffered, are suffering, and, unless this Court grants relief, will suffer. All want the Court to restrain UConn from eliminating any women's varsity sports opportunities – particularly rowing– and to require UConn to add more women's varsity sports' opportunities and to provide equal treatment and benefits and athletic financial assistance to female athletes at UConn. Plaintiffs' hope is that UConn will not eliminate any sport, women's or men's, and will instead pursue other more reliable and supported ways to reduce UConn's budget deficit, such as making cuts across the board as the UConn athletes from all the teams have suggested.

31.     President Thomas Katsouleas has announced that, in addition to cutting the four above-named sports, UConn is already making a 15% across-the-board cut in athletics and is lowering the amount of scholarship awards to meet the deficit. Based on the relatively low amount of money that would be saved by cutting these four sports, including women's rowing, UConn could retain those sports and, instead, make additional cuts across-the-board as more than one hundred UConn athletes from a majority of the UConn athletic teams have strongly recommended.  This approach would allow UConn to further its educational mission by providing additional opportunities for its students to participate in varsity athletics and educational activities rather than by reducing them.

32.     Plaintiffs are members of the proposed class and will fairly and adequately represent the interests of the class pursuant to Fed. R. Civ. P. 23(a)(4).  They intend to prosecute this action vigorously to secure fair and adequate remedies, including injunctive relief, for the entire class.

33.     The undersigned class counsel is experienced in federal civil rights litigation and class actions, especially under Title IX, and will adequately represent the interests of the class in this action.

34.     Plaintiffs satisfy the class certification requirements of Fed. R. Civ. P. 23(b)(2), because UConn has acted or refused to act on grounds generally applicable to the class - denying female students an equal opportunity to participate in intercollegiate athletics and equal treatment and benefits in athletics- thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## GENERAL ALLEGATIONS
## THE REQUIREMENTS OF TITLE IX

35.     Title IX, enacted in 1972, provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . .

20 U.S.C. § 1681(a).  The Civil Rights Restoration Act of 1987 made plain Congress' intent that the terms "program or activity," as used in Title IX, mean any program or activity so long as any part of the public institution receives federal financial assistance.  20 U.S.C. §1687.  Thus, UConn is subject to Title IX even if none of the funding for either its men's or women's athletic program comes from federal sources.

36.     In 1975, the Department of Health, Education and Welfare ("HEW" - the predecessor of the United States Department of Education ("DOE")) adopted regulations interpreting Title IX. These regulations (the "Regulations") are codified at 34 C.F.R. Part 106.  (The DOE regulations

adopting the HEW regulations are at 45 C.F.R. Part 86.)  The Regulations are enforced by the Office

for Civil Rights ("OCR") within DOE.

37.     With regard to athletic programs, 34 C.F.R. § 106.41(a) provides that intercollegiate

and club athletics are included within the "program or activity" requirements of Title IX:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

38.     34 C.F.R. § 106.41(c) specifies ten (10) non-exclusive factors that may be

considered in the determination of equal athletic opportunity:

1.     Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

2.     The provision of equipment and supplies;

3.     Scheduling of games and practice time;

4.     Travel and per diem allowance;

5.     Opportunity to receive coaching and academic tutoring;

6.     Assignment and compensation of coaches and tutors;

7.     Provision of locker rooms, practice and competitive facilities;

8.     Provision of medical and training services;

9.     Provision of housing and dining facilities and services; and

10.     Publicity.

Other factors to be considered are a school's "failure to provide necessary funds for teams for one

sex," and recruiting.  34 C.F.R. § 106.41(c).

39.     In 1979, OCR issued a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics.  This policy interpretation is found at 44 Federal Register 71,413 (1979) (the "Policy Interpretation").

40.     In 1996, OCR issued the Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "1996 OCR Clarification"). 44 Fed. Reg. at 71417.

41.     In determining "whether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of both sexes," the 1996 OCR Clarification sets forth that compliance with the effective accommodation regulation is assessed by examining:

> a. The determination of athletic interests and abilities of students;
> b. The selection of sports offered; and
> c. The levels of competition available, including the opportunity for team competition.

42.     Subpart "a" concerns how institutions are required to determine athletics interests and ability set forth below; subpart "b" concerns issues that schools should consider when selecting which sports they should offer; and subpart "c" has two parts: the three-part "participation" test, set forth below, and the "competition test" that requires institutions to provide proportionally similar quality of competition opportunities.

43.     Subpart (a) provides in pertinent part:

**How schools must assess the interests and abilities of their students.**

[3] Application of the Policy - Determination of Athletic Interests and Abilities Institutions may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing **provided**:

> a.     The processes take into account the nationally increasing levels of women's interests and abilities;
> b.     The methods of determining interest and ability do not disadvantage the members of the under-represented sex;
> c.     The methods of determining ability take into account team performance records; **and**
> d.     The methods are responsive to the expressed interests of

14

> students capable of intercollegiate competition who are
> members of the under-represented sex.

44 Fed. Reg. at 71417

44.     In its 2010 Dear Colleague letter, OCR has also provided extensive guidance to institutions on non-discriminatory assessment methods which should be used to assess interest and ability. Specifically, OCR will examine in pertinent part whether:

    a.    viable teams have been previously eliminated from the program;
    b.    any requests have been made by students and admitted students that a particular sport be added; . . .
    g.    previous interscholastic sports and current club and intramural sports in which admitted underrepresented students have participated have been examined;
    h.    the participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws or recruits its students have been examined; . . .
    j.    competitive opportunities in sports offered by other schools against which the institution competes exist;
    k.    competitive opportunities in sports offered by other schools in the institution's geographic area, including those offered by schools against which the institution does not now compete; . . .
    n.    opinions of coaches, administrators, and athletes at the institution have been solicited regarding whether interested student and admitted students have the potential to sustain an intercollegiate team. . . .

45.     Regarding subpart (c) and the three-part test, the Policy Interpretation provides that, in order to comply with Title IX and 34 C.F.R. § 106.41(c) and the three-part test, schools must provide equal athletic opportunities in three general areas: (1) equal athletic participation opportunities (34 C.F.R. §106.41 (c)(1)); (2) equal treatment and benefits to those with participation opportunities (34 C.F.R. §106.41(c)(2)-(9)); and (3) equal athletic financial assistance (34 C.F.R. §106.37). At the present time, all three prongs are at issue in this case. These fall under 34 C.F.R. §106.41(c)(1).

46.     According to the Policy Interpretation, compliance in the area of the first prong of equal athletic participation opportunities is determined under the following three-part test:

1) whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;

2) where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

3) where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

See 44 Fed. Reg. 71,418.

47.     This three-part test was further clarified after notice and comment in OCR's 1996 OCR Clarification, making clear that "participation opportunities must be real, not illusory."

48.     The 1996 OCR Clarification considers opportunities to be substantially proportionate when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team.

49.     Every federal court of appeals that has considered the three-part test has upheld it as valid and has given it substantial deference in applying Title IX or in assessing Title IX compliance.

50.     The Regulations require that sponsors of intercollegiate athletics (such as UConn) take such remedial actions as are necessary to overcome the effects of sex discrimination in violation of Title IX.  *See* 34 C.F.R. §106.3(a).  UConn has not taken any recent remedial actions to satisfy its obligations under Title IX.

16

51.     The Regulations also require that federal fund recipients like UConn adopt nondiscrimination policies and grievance procedures, appoint and train Title IX officers to receive and investigate sex discrimination complaints, and disseminate this information to all students, faculty, and employees.  34 C.F.R. §§106.8 & 106.9. The Regulations further require that recipients promise and confirm compliance by filing an Assurance of Compliance with DOE each time they apply for or receive federal financial assistance.  34 C.F.R. §106.4.

52.     The Regulations further require that sponsors of interscholastic athletics comply with the athletics regulations within three years of their effective date (which was July 21, 1975).  UConn did not comply with the athletic regulations more than forty years later, prior to cutting the women's rowing team.

## FACTUAL ALLEGATIONS

53.     Plaintiffs allege the following upon personal knowledge as to their own acts and upon information and belief as to all other matters as follows:

## I.     Background

54.     UConn currently sponsors a broad varsity intercollegiate athletic program with 10 sports for men and 12 teams for women. Those sports are men's football and women's rowing, men's and women's basketball, men's and women's ice hockey, men's and women's soccer, men's baseball and women's softball, men's and women's cross country, men's and women's indoor and outdoor track and field, men's and women's swimming and diving, men's and women's tennis, men's golf, women's volleyball, women's lacrosse, and women's field hockey. In choosing which sports to offer to which sex of students, UConn chooses how many varsity athletic participation opportunities to provide to male students and how many athletic participation opportunities to provide to female students.

55.     UConn is a member of the NCAA, and all sports participate in Division I, the highest level of intercollegiate competition, and all but football, men's and women's ice hockey and women's rowing participate in the Big East Conference.   As such, UConn offers athletic scholarships to members of its varsity athletic teams.

56.     Like other Division I schools, UConn recruits high school students to apply to and to enroll at UConn for the purpose of participating in UConn's varsity athletic teams.

57.     On information and belief, for at least the last 13 years, UConn has provided its male students with proportionally more opportunities to participate in its varsity intercollegiate athletic programs than it has offered to its female students, thus denying female students an equal opportunity to participate in this educational program.

58.     On information and belief, UConn has always offered its male students better treatment and more benefits in its varsity intercollegiate athletic programs than it has offered to its female students, thus denying female students comparable athletic opportunities and equal treatment and benefits in this educational program.

59.     On information and belief, for all of its athletic department's history, UConn has provided its male students more athletic financial assistance in its varsity intercollegiate athletic programs than it has offered to its female students, thus denying female students equal athletic financial assistance in this educational program.

60.     Despite the discriminatory treatment of its female athletes, UConn women's sports have enjoyed great success, notably the recent successes in women's field hockey and basketball.

### History of Rowing USA

61.     The first US women's collegiate rowing program was established by Wellesley College in 1875. Women's rowing initially competed in its intercollegiate championships as part of the National Women's Rowing Association Championship in 1967. In 1974, Women's Rowing was

a collegiate sport.  In 1976, Women's Rowing was added to the Olympic Games program at a distance of 1000m (later adding 2000m.). In 1981-82, the first NCAA statistics were compiled for rowing, which reflected 28 women's teams, 862 female athletes and an average squad size of 30.82 of female collegiate rowers.

62.     In the 1996-97 season, most women's intercollegiate rowing programs elected to join the NCAA as a "Championship" sport. In 1997-98, rowing was an official NCAA championship sport with 63 women's teams and 3,471 female athletes.  In 2017-18, women's rowing continued to grow in the NCAA with 145 women's teams and 7,277 female athletes. There are currently at least 620 female rowing teams at the high school and club level in the United States.

### UConn Women's Rowing Accomplishments

63.     Since its inception in 1997, UConn women's rowing has a long list of accomplishments in its competitions as a varsity sport, individual athlete's academic achievements, and community service.

64.     The team has become increasingly competitive since 1997. Between 2014 and 2019, the UConn rowing team had two third place finishes, a second-place finish, and a first-place finish at the American Athletic Conference Championship. The team has won first place in several competitions over the last few years, including the Knecht Cup (2018), Head of Riverfront Regatta (2018), Cherry Hill Invitational (2019), and the 1969 Cup (2019). In addition, the team had three top five finishes at Head of Schuylkill (2017), five top five finishes at Hadley Chase (2018), two top five finishes at Head of Schuylkill (2018), and three top ten finishes at Head of Schuylkill (2019). Every year, two to four athletes from the rowing team are named to the All-Conference First or Second Teams. Finally, since 2002, three student athletes were selected to participate in the national team Freshman Camp, a rowing camp where college athletes with "elite level potential" participate in a national team training experience at Cornell University.

65.     Overall, the women on the UConn rowing team have been some of the most academically successful student athletes. Every year the Collegiate Rowing Coaches Association ("CRCA") recognizes UConn rowers as National Scholar Athletes. UConn rowers have received numerous other student athlete awards over the years including the American Scholar-Athlete Sport Excellence Award (Kathryn Hughes, 2015; Julia Roth, 2013)  (for this award the AAC recognizes one student athlete per sport out of the entire league); the National Student-Athlete Week Award (Brittany DePoi, 2013)  (this UConn award recognizes its own student-athletes for academic success);  and UConn Club Outstanding Senior Scholar Athletes (Kaitlyn Clarke, Brittanie Reinold, Sara Trevisani, Diana Filipek; 2012; Charlotte Kelley, Julia Roth, Ashley West, Chelsea Zabel; 2014) (four of fifteen were honored from women's rowing, more than any other sport at UConn).

66.     The women of UConn rowing are not only dedicated students and athletes, but they are also committed to giving back to their school and their community. Each year, UConn women's rowing has won or been runner up for the Husky Cup, an award given each year to the varsity team that has the most points based on a system that awards points for community outreach, academic achievement, leadership, and more. UConn Women's Rowing practices and competes on Coventry Lake. To show their appreciation of the town's support, among other things, the team ran a food drive and for many years participated in the Homework Club for the G. H. Robertson Intermediate School, in an after-school mentoring program at Coventry grammar school, and in the AHA Jump Rope for Heart Fundraiser with Coventry public school system in to benefit Coventry, Connecticut residents. The members of the team also work with the East Hartford Middle School where athletes meet with students for day to talk to them and give them advice. Team members also do community service outside of the team setting. For example, in 2014, Natalie Carlone was honored by the NCAA for her extensive volunteer work including spending a month in Capetown, South Africa as part of Projects Abroad where she worked in preschools, and working regularly in local shelters, the

Husky Reach Program, UConn Goal Line Program, Jumpstart Reading Program, and Big Brothers-Big Sisters.

## Budget Cuts Spring 2020

67.      In 2020, Coach Jennifer Sanford, UConn's head rowing coach since its inception in 1997, had her best recruiting class ever. Despite spring sports season's ending early due to Covid-19, she, Coach Kathy Les (an assistant coach and alumnus of the rowing program), the staff, and her team were looking forward to the fall 2020 season.

68.      On May 22, 2020, the UConn athletic department announced that at the Board of Trustees meeting the UConn Athletic Department was directed "to create a plan to reduce its University subsidy by 25 percent by 2023."

69.      Rowing is the second largest sport at UConn after football. It is commonly understood in the U.S. college rowing community and within the UConn athletic department that rowing, due to its large numbers, was the comparable sport to football regarding Title IX compliance and was needed to maintain equitable participation opportunities. As such, Coach Sanford and others in the athletic community generally did not envision that rowing would be cut.

70.      As uncertainty increased about the future of athletics at UConn with news in the media raising the specter of sport programs being cut, on June 12, 2020, UConn student athletes bonded together in support and wrote to President Katsoluleas, Athletic Director David Benedict ("AD Benedict"), Chairman Toscano and the members of the Board of Trustees. See Letter dated June 12, 2020 attached hereto as Exhibit 1. In the letter, the student athletes addressed the risk of elimination of sports at UConn, calling the elimination of sports a temporary short-sighted solution that will not solve athletics' goal of financial self-sufficiency.  Two hundred and eighty-three student athletes from 16 of the UConn sport teams signed the letter, including football, women's rowing, men's basketball, women's lacrosse, women's track and field, men's baseball, women's field

hockey, men's golf, women's soccer, women's softball, men's swimming and diving, women's swimming and diving, men's tennis, women's tennis, men's track and field, and women's volleyball. Football and women's rowing student athletes did not believe they were at risk of being eliminated but wanted to support the other sports, and 22 football players and 34 rowing athletes signed in support. Noting the unique and lifelong benefits of participating in college athletics and the value that all student athletes brought to the UConn community, the students presented a "unified front" and asked UConn to work with them "to reevaluate the spending structure in order to improve the longevity and success of all 24 varsity programs" including that they were willing to "make sacrifices to preserve all of our 24 varsity athletic teams, including working with you to find ways to help reduce operating costs."

71.     No one responded to this letter.

72.     On the morning of Tuesday, June 23, 2020, Coach Sanford received her annual performance evaluation. Her evaluation included the below comments:

• "Unfortunately, the team's spring season was cancelled due to the COVID-19 pandemic. The team had a solid fall season, with three Top 10 finishes at the Head of the Schuylkill and a first-place finish for the Third Varsity 8 at the 1969 Cup.

• "The team had another outstanding year academically, with most s/a's earning A's and B's in their classes. Especially impressive given the transition from in-person to online classes in the spring. Sanford and the staff do an excellent job promoting the importance of academic success."

• "Sanford is well-respected in her field and is a leader in the rowing community. She was instrumental in the transition to the Colonial Athletic Association, as she brought this opportunity to the athletic administration when UConn exited the American Athletic Conference for

22

the Big East, and we needed to find a home for Rowing since the Big East does not sponsor the sport."

- "Rowing represents the second largest team in the department, and as such, is not always easy to manage and please so many student-athletes. Sanford does a good job of administering the operation of the program and delegating tasks to her assistants. She is also mindful of the budget challenges we are facing and took steps to identify areas for savings in the budget."

- "Sanford played an instrumental role in our entry into the Colonial Athletic Association, which was well received by the staff and student-athletes like. The opportunity to compete more locally and have a conference championship event in New Jersey is outstanding for the student-athletes. With this change, it is our expectation that Sanford and the staff will be able to lead the team to more successes on the water."

73.     After the performance evaluation, Coach Sanford, with her best recruiting class ever to enter UConn in the Fall 2020, was excited about the future of rowing and went back to her office to continue with her duties.

### The Unexpected Announcement of the Elimination of Rowing

74.     Two hours later, on June 23, 2002, Coach Sanford received a call from AD Benedict during which he told her that the proposal from Athletics to be voted upon the next day included eliminating women's rowing.   June 23, 2020 was the 48th anniversary of Title IX.

75.     Coach Sanford met with Board of Trustees the morning of June 24, 2020 to advocate for her team.

76.     On June 24, 2020, after the Board of Trustees met that day, President Katsoulas announced that UConn was cutting the women's rowing team in May 2021.

II.     **UConn Intentionally Discriminated Against Female Athletes by Cutting Rowing**

77.     UConn announced that it will no longer sponsor women's rowing starting May 2021, which will eliminate 61 athletic opportunities for women based on UConn's report in the 2018-2019 annual Equity in Athletics Disclosure Act ("EADA"). UConn already discriminated against its female students by offering too few athletic opportunities, as set forth below. By eliminating rowing, UConn will make this discrimination worse.

78.     UConn's decision to reduce the size of its athletic program was, to a significant extent, intended to improve the competitiveness of its men's sports programs at the expense of the women's program.

**A.      UConn's Reasons for Cutting the Rowing Team are Pretextual**

79.     The reasons given for cutting women's rowing are pretextual to cover the discrimination.

80.     AD Benedict said one reason UConn was cutting rowing was because UConn athletics had moved to the Big East Conference and rowing was not a member of the Big East Conference. This is a pretext because UConn football and men's and women's ice hockey teams are not in the Big East and are not being cut. Moreover, UConn rowing had successfully transitioned to the Colonial Athletic Association from the American Athletic Conference with approval from the UConn Athletic Department.

81.     AD Benedict also said that rowing was being cut because it was not as successful as other sports. That reasoning only underscores the discriminatory manner in which UConn has treated women athletes. UConn does not and has not provided the women's rowing program with the resources to be as successful as other sports that have been given more resources, as AD Benedict admitted when he said that rowing was being cut because it would cost UConn too much money to bring it into Title IX compliance.

82.     Further, rowing has been successful. This success was despite its unequal treatment,

benefits and athletic financial assistance with respect to men's sports, as shown in the following examples:

    a.    The rowers' boathouse is out of date, and the boathouse has no heat, no place to stretch, no locker rooms, and no usable bathrooms forcing the athletes to use portlets, and has rodents, mice, spiders, and is not cleaned.

    b.    Women's rowing has not been given full scholarships. UConn only increased rowing's scholarships when it provided an advantage to UConn's men's sports teams in an attempt to comply with Title IX. Rowing was given 4 scholarships from 1997 through 2015-2016.  UConn only permitted women's rowing to increase to 14 scholarships in 2015-2016 to offset the addition of 18 scholarships being given to men's ice hockey to effectively participate in the Hockey East Conference to present the appearance of equity and compliance with Title IX.  This was despite that the NCAA permits 20 full scholarships for rowing at D-1 and D-2 schools. Even the 14 scholarships do not permit UConn rowing to compete equally with other D-1 schools which have 6 more full scholarships to attract recruits.

    c.    UConn has paid the women's rowing coaches much less than their male counterparts and given them less administrative and financial resources, such as for marketing and recruiting.

83.    The reason given by UConn President Thomas Katsouleas that these cuts were necessary to address the deficits in the budget is similarly suspect. A local newspaper reported that:

> UConn President Thomas Katsouleas told the school's Board of Trustees Wednesday that the school will reduce the number of sports it supports from 22 to 18, eliminating its men's cross country, men's swimming and driving, men's tennis and women's rowing teams. He said eliminating those programs, along with mandating a 15% cut in the operating budget of all sports and cutting some scholarships, should result in a requested savings of $10 million, or 25% of the school's subsidy to the Division of Athletics over the next three years. That subsidy was $42 million in 2019.

84.    Women's rowing, however, accounts for only a small percentage of total expenses at

25

UConn, on average about 1%.  The three men's teams that are being cut are the three teams with some of the lowest operating costs, further undermining that these cuts will significantly advance UConn's interest in addressing the budget deficit.

85.     UConn explained in the press that football was not cut or moved to the FCS lower-level competition that permits only 63 scholarships –22 less scholarships than its current classification of FBS-- because football brings in a large revenue. To the contrary, however, while football generated $3.3 million in revenue in 2019, it cost UConn $16.6 million in expenses in 2019, overall costing UConn $13.3 million dollars. In 2020, while football generated $2.3 million in revenue, it cost UConn $17.2 million in expenses, overall costing UConn $14.9 million dollars. In terms of losses to UConn, the men's football program costs UConn more than any other sport to operate. There are many other ways to more effectively address the deficit, such as cutting 22 scholarships by moving to FCS, which would result in significant savings in scholarships alone per year and prevent the elimination of any sport.

86.     While UConn has maintained that it is in compliance with Title IX and therefore these cuts will not affect its compliance with Title IX, that is simply a pretext. In fact, AD Benedict admitted that rowing was being cut because it would cost UConn too much money to bring it into Title IX compliance.

B.     **The Cuts Discriminate Further Against Women**.

87.     Cutting rowing or any women's sport team discriminates against women because UConn was already out of compliance with Title IX in participation opportunities.

88.     Before making the decision to cut these sports in June 2020, UConn's participation gap (the number of women athletes UConn would need to add to be compliant with Title IX) was large enough to field a viable women's team, and, as such, UConn was out of compliance with Title IX to begin with and cannot cut any women's sports until it is compliant.

26

89.     Even after making these cuts, the participation gap for females will be even greater. Because UConn was not in compliance before it made these cuts, the fact that it is cutting more women slots than men magnifies this discrimination.

90.     Further, the cuts disadvantage female athletes' programs more than males' programs. While there is no men's rowing team, there is a women's counterpart to each of the other men's teams cut.  Cutting women's rowing eliminates one female head coach and three female assistant coaches' jobs for women's sports and for women. Cutting the three men's sports eliminates at most only one assistant coach position for men's sports.  This is because the men's cross-country team is coached by the same staff that coaches the women's cross-country team, and the men's and women's indoor and outdoor track and field teams, which sports have not been eliminated. The men's swimming and tennis teams are coached by the same staff that coaches the women's swimming and tennis teams with the exception of one assistant coach designated for men's tennis alone.

91.     These cuts will eviscerate the women's rowing program, including its facilities and the resources provided to it. To the contrary, the facilities and resources provided for the men's sports that were cut will still need to be provided and maintained due to the continued existence of the women's cross country, the men's and women's track and field, the women's swimming, and the women's tennis programs. These cuts therefore result in a much bigger cut and impact on women's sports at UConn and less money being spent on women's teams than men's teams after the cuts, which magnifies the already unequal treatment and benefits provided to UConn's female athletes in violation of Title IX.

92.     Further, cutting men's cross country does not eliminate real participation opportunities for male cross-country runners, all of whom have and will be able to continue to participate in indoor and outdoor track middle- and long-distance events.  All will have the opportunity to continue to run year-round in track and field and even run cross country meets as

unattached runners. Accordingly, while these cuts eliminate all 55 athletic participation opportunities at UConn for women based on the 2018-19 web rosters, they only eliminate 36 real participation opportunities for men because men can still participate in the existing year-round track and field programs. Based on the web rosters for 2019-20, again not counting the cross-country runners that also can participate in track and field, 47 women will be cut compared to 36 men; and for 2020-21, 41 women will be cut compared to 25 men.  UConn's actions therefore adversely affect more female athletes compared to male athletes.

93.     Cutting women's rowing results in 14.83 athletic scholarships being cut for female athletes and cutting the three men's sports results in cutting 5.86 scholarships, thereby disadvantaging women's sports with these cuts more than men's sports.

94.     Cutting women's rowing perpetuates the gender discrimination that already exists at UConn. UConn has used the women's rowing program, as the women's team with the largest numbers, to counteract the large number of football players that populate its teams in an effort to comply with Title IX.  It is no exaggeration to say that at UConn, like at many other universities, for Title IX compliance purposes, for a number of years, women's rowing has "saved" UConn's football program.  To meet Title IX compliance standards over the years, UConn has directed the rowing coaches to keep no less than 60 female athletes on the roster until the first day of competition, which occurs in the Fall, and which is the day that UConn counts the numbers of athletes which it uses to report to the federal government EADA that it provides equal athletic opportunities to its female athletes.  From that Fall counting-day, until the end of the rowing season, which happens largely in the Spring months, women rowers have been cut from or have chosen to leave the program after that Fall date—for every year since 2003.  As a result of this UConn-administrator-induced practice— with only one exception--the EADA numbers have significantly overreported the numbers of rowers when compared to those published in the web rosters.

95.     While treating the rowing program as comparable to football for Title IX numbers, however, UConn has not treated rowing comparably to football in almost every other, if not every, respect.  For example:

   a.  According to the 2019-2020 UConn website and publicly available information, football has one head coach who has the help of 24 assistant coaches, averaging 4 players per coach. For rowing, there is one head coach, who has the help of 3 assistant coaches for 61 players, averaging 20.3 players per coach.

   b.  With respect to compensation (salary and special payments), based on the UConn website information and publicly available information regarding compensation in 2019-2020, the football head coach receives total annual compensation of $1,713,111 while Coach Sanford receives $95,788. The 24 assistant coaches for football received total compensation of $2,903,967.00, with an average of $120,998.63 per assistant coach compared with the three assistant coaches for rowing who received total compensation of $120,040.00, with an average of $40,013.33 per coach.

   c.  With respect to recruiting budgets, based on the 2018 NCAA reports, UConn spent $432,480.00 on football recruiting and $6,759 on rowing recruiting.

   d.  With respect to overall average expense budgets, based on the 2018 NCAA reports, UConn spent $15,766,540.00 in total or $157,665.40 per athlete for football and $1,387,476.00 in total or $22,745 per athlete for rowing.

   e.  With respect to locker rooms, since 1997 and up until two years ago, rowers have had the use of one small locker room and were required to share a locker. Two years ago, rowing was given access to a second small locker room and only then did players have their own locker. There is no locker-room at the Boathouse, which is where the team practices. Based on the website and publicly available information, the football team enjoys a cavernous state of the art locker room. It includes: a video display of each player above their individual locker, which includes the top compartment, which drops down for shoulder pads, knee braces and is all ventilated; the second compartment that has a virtual combination lock with a helmet compartment for privacy; the third compartment for cleats and gloves fully ventilated for drying purposes; the fourth large compartment opens up to hang clothes and dry with ventilation and in the bottom has a storage compartment to store stuff /clothes securely for the winter; and the fifth compartment is just for shoes- all ventilated.

   f.  With respect to indoor practice facility, since 1997, rowing was provided a small storage closet.  There was insufficient space to have equipment to run one practice. On days of indoor practice, typically three practices per day needed to be run for all rowers to be able to practice due to space limitations.  In January 2020, UConn provided the rowing team access to an upstairs room in the old recreation center.  For the first time, the rowing team was able to run a full erg practice as a team.  Based on

the website and publicly available information, football' on campus home is the Burton Family Football Complex. The Burton Football Family Complex houses coaches' offices and includes an academic resource center, team meeting rooms, a team locker room, a state-of-the-art sports medicine area, video facilities, a team dining hall, a student-athlete lounge and an equipment room. In January 2019, UConn football received a $1 million donation to renovate and upgrade the Burton Family Football Complex and Mark K. Shenkman Training Center. The Mark K. Shenkman Training center features a 120-yard-long state-of-the-art Field Turf playing surface, an 18,000-square-foot strength and conditioning area, and state-of-the-art video capabilities and this indoor training center provides UConn's football team with the most technologically advanced training equipment.

g.  With respect to the facilities, the Boathouse is not big enough for 45 rowers; there is no heat and there are holes in the buildings through which animals enter and exit. The bathrooms are in such terrible condition that the team uses porta-lets outside. The docks are the original docks and are outdated and athletes are unable to put the boats in the water without getting their feet wet, which is unsafe in extremely cold weather in March. Requests for new docks in the past few years have been denied. Based on the website and publicly available information, UConn football plays at Pratt & Whitney Stadium at Rentschler Field, which opened in 2003 and was the first stadium used primarily by an NCAA Division I-A (now FBS) team to open in the 21st century. The permanent stadium capacity is 40,000, consisting of 38,066 permanent seats with a standing-room area in the scoreboard plaza that can accommodate up to 1,934 people. It also has a game-day capability to add approximately 2,000 temporary seats. Prior to the 2013 season, a new 28 feet high by 73 feet wide and a 15HD pixel video display was installed replacing the stadiums original scoreboard and more land was obtained for parking in July 2015. Football's own strength and conditioning facility was upgraded on August 23, 2019.

h.  With respect to scholarships, football is provided with the full number of NCAA allowable scholarships of 85. The NCAA permits 20 scholarships for women's rowing. Rowing was given 4 scholarships from 1997 through 2015-2016. UConn permitted women's rowing to increase to 14 scholarships in 2015-2016 to offset the addition of 18 scholarships being given to men's ice hockey to present the appearance of equity and compliance with Title IX.

## C.    The Cuts Widen the Already Discriminatory Gap for Female Athletic Participation Opportunities

96.    After cutting the women's rowing, and men's cross country, swimming and tennis teams, UConn continues to offer proportionally more opportunities to male than to female athletes compared to the undergraduate population in violation of Title IX and continues to engage in intentional gender discrimination.

97.     Many of the Plaintiffs were recruited to participate on the women's rowing team. All are currently on the team; all expected to row during each of their years at UConn and planned their academic, personal and financial lives accordingly.  Many would not have enrolled at UConn but for the opportunity to participate in rowing and in many cases the receipt of an athletic scholarship.

98.     Alumnae of the rowing program have offered to provide money to support the rowing program, and along with the rowers' parents and Coach Sanford, have complained to the Board of Trustees, President Katsouleas, AD Benedict and others about the elimination of rowing.   UConn, in turn, has affirmed its intent to eliminate the program and informed Coach Les and Sanford that their jobs will end May 30 and July 2021, respectively.

99.     The Athletic Department attempted to support the athletic staff during the fall of 2020 as it worked its way through an uncertain time with the pandemic and poured salt on a wound by selecting a book for the staff to read and engage in discussion over for the month of October. An announcement went out about the department's excitement about the next staff read "The Boys in the Boat," a book that commemorates a **men's** rowing team as the women's rowing team was facing its last season as a UConn sport.

100.    On April 12, 2021, Plaintiffs' counsel sent a letter to UConn complaining about the elimination of the women's rowing program, explaining why the elimination of the program constituted sex discrimination and requesting a discussion about the continuation of the rowing program. See Exhibit F to Plaintiffs Memorandum in Support of a TRO and Preliminary Injunction ("Duffy Declaration ¶3). Defendant failed to respond by providing requested data before the articulated deadline of April 19, 2021.  Plaintiffs are of the good-faith belief that the data will not, in fact, be provided to Plaintiffs in a timely manner until and unless this lawsuit is filed, and then, only pursuant to the terms and conditions of a Protective Order.   On April 24, 2021, Plaintiffs' counsel

informed UConn's counsel that Plaintiffs would be filing this complaint, and motions for a temporary restraining order and preliminary injunction.   Ex. F, ¶8.

### INJUNCTIVE RELIEF

101.    Plaintiffs are entitled to injunctive relief that restrains UConn from continuing to discriminate on the basis of sex; restrains UConn from selling or disposing of the rowing equipment, leasing the Boathouse for other purposes, and eliminating the women's varsity rowing program; and requires UConn to provide its female students with an equal opportunity to participate in varsity intercollegiate athletics by sponsoring additional women's varsity athletic opportunities based upon the interests and abilities of UConn's present, prospective, and future students as well as equal benefits and treatment and financial assistance for all present, prospective, and future students.

102.    Failure to grant the requested injunctive relief will cause irreparable harm to the Plaintiffs by continuing UConn's discrimination against them and UConn's present, prospective, and future female students, and by forever denying them an equal opportunity to participate in varsity intercollegiate athletics.   The decision to eliminate the rowing team has had an immediate and detrimental impact on the student athletes and coaches and staff members who are responsible for assuring that UConn provides female student athletes with equal athletic opportunities to male athletes at UConn, including that Plaintiffs will lose a crucial part of their education in May 2020 by being unable to compete in varsity rowing;  rowers have transferred and others may which will negatively affect the strength and morale of the team; Plaintiffs who remain at UConn will face additional burdens and expenses they did not face when they enrolled at UConn; facing elimination in June 2020 has stopped the ongoing operation of the rowing program which is needed to continue without disruption to ensure continued opportunities, such as scheduling game competition, and recruiting; and incoming and future students are being and will be adversely affected.

103.    If UConn is not restrained from eliminating women's rowing, Plaintiffs will never again have the opportunity to participate in this valuable educational experience during the fleeting college years– one that provides academic, physical, psychological, social, and even economic benefits for the rest of the participants' lives.   There is no adequate remedy at law for this harm.

104.    The continuing, irreparable harm caused by UConn's discriminatory actions far outweighs any possible harm that granting the injunctive relief might cause UConn.  Preliminarily enjoining UConn's elimination of the varsity women's rowing program in particular merely ensures retention of the status quo during the course of this litigation, because these athletes have limited (if any) opportunities to pursue their interests and abilities elsewhere – especially at this late date in the midst of a national public health concern.   UConn will suffer no harm by reinstating the women's varsity rowing program, other than the monetary cost of the program that it has already borne for more than 20 years.

105.    If not enjoined by this Court, UConn's elimination of rowing will violate Title IX by allowing UConn to cut any women's team where there is already a failure to comply with Title IX.

106.    The lifelong harm caused to Plaintiffs by UConn's discrimination is irreparable and can never be adequately compensated with money.  This harm far outweighs any monetary cost incurred by UConn to continue the rowing program or to add athletic opportunities for women.  Importantly, UConn could choose to allocate its budget and athletic opportunities more equitably merely by shifting its longstanding favoritism toward men to a more equal allocation between men and women.  Meanwhile, UConn will gain public relations and enrollment advantages by coming into compliance with Title IX and by offering more opportunities for its female students.

107.    The injunctive relief that Plaintiffs request will promote the public interest in that it will increase educational opportunities for female students, will end sex discrimination at UConn, and will promote compliance with federal law.  Congress decided that such nondiscrimination is in

the public interest when it enacted Title IX.  It has reaffirmed that public interest over the past 48

years by defeating each and every attempt that has been made to weaken Title IX.  Equal opportunity

for all students – male and female – is at the core of this case, is at the core of American identity, and

is clearly in the public interest.

## ATTORNEYS' FEES

108.     Plaintiffs have been required to retain attorneys to prosecute this action.  Plaintiffs

are entitled to recover reasonable attorneys' fees and expenses pursuant to 42 U.S.C. § 1988.

## FIRST CLAIM FOR RELIEF:  TITLE IX-UConn
### (Unequal Athletic Participation Opportunities)

109.     Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through

108 of this complaint.

110.     UConn has, by its conduct, discriminated against female student athletes at UConn,

including Plaintiffs, by failing to provide female students an equal opportunity to participate in

varsity intercollegiate athletics in violation of Title IX and 34 C.F.R. §106.41(c)(1).

111.     The Plaintiffs brings this claim as a class action as set forth in the Class Allegations.

112.     UConn's decision to reduce the size of its athletic department was, to a significant

degree, intended to improve the competitiveness of its men's programs at the expense of its women's

programs, resulting in a greater disadvantageous effect on women's sports and athletes and is

continuing discrimination against the rowing team and female athletes.

113.     By offering certain opportunities to male students to participate in intercollegiate

athletics, UConn has demonstrated its belief that athletic opportunities provide educational benefits

that should be supported by UConn.  Plaintiffs agree that athletic opportunities provide valuable

educational benefits.  For this very reason, the Plaintiffs - and the class they represent - should have

equal access and opportunity to receive the benefits that the male students at UConn receive from

intercollegiate athletics.  UConn historically has not provided and currently does not provide its female students with such equal access and opportunity.

114.    UConn determines the number of athletic participation opportunities that it will provide to male and female students by choosing which sports it will offer to each sex and by deciding how many athletes it will allow to participate on each sports team.

115.    UConn fails to comply with each prong of the three-part test described above.  In particular:

      (1)    The ratio of female to male athletes at UConn is not substantially proportionate to the overall ratio of female to male undergraduate students at UConn.

      (2)    UConn does not have a history or continuing practice of athletics program expansion for women.

      (3)    UConn has failed to fully and effectively accommodate the athletic interests and abilities of its female students by, among other things, eliminating their opportunity to participate in varsity rowing.

First Prong:    UConn Fails to Provide Substantially Proportionate Athletic Participation Opportunities to Female Students

116.    UConn has discriminated, and continues to discriminate, against female students at UConn by failing to provide them with equal athletic participation opportunities, despite female students' demonstrated athletic interests and abilities to participate in sports, specifically rowing.

117.    According to information provided by UConn to the federal government in its most recent 2018-2019 EADA report, which numbers are not accurate and artificially inflate the number of student athletes using different counting methodologies from Title IX, UConn has historically failed to provide female students with varsity athletic participation opportunities in a number proportionate to female undergraduate enrollment, including 11 of the last 16 years.

**Even Using Less Accurate EADA Numbers,**
**The Cuts Discriminate Against Female Athletes**

118.    Even based on the most recent EADA reported numbers in 2018-2019, which are not accurate, after the cuts that UConn announced it is making, in order to achieve athletic participation opportunities for female students that are substantially proportionate to their representation in UConn student body, UConn would need to add approximately 11 additional female athletes, which is an unacceptable female participation gap of 11.

119.    UConn does not have varsity women's golf team. The NCAA average team size for women's golf is 8.2, women's golf is a sponsored sport in the Big East Conference, and UConn already has a men's golf team. Therefore, women's golf is a viable sport to add to UConn's athletic department. UConn's restructuring does not comply with Title IX because 11 opportunities are enough to sustain a viable team, such as women's golf.

**The EADA Numbers Are Inaccurate**

120.    Upon information and belief, UConn's EADA number are not accurate for numerous reasons, including that EADA does not follow Title IX counting instructions and the EADA overcounts female athletes more than males resulting in undercounting the female participation gap. As an example, UConn's EADA uses numbers based only on the first day of competition, which does not account for athletes that join or drop off teams after the first day of competition, and UConn manipulates its team numbers to be able to report higher numbers than the actual number of female varsity athletic participants for its EADA report.

121.    For example, UConn has directed the rowing coaches to keep at least 60 female athletes on the roster until the first day of competition, which is the day that UConn counts the numbers of athletes to report to the federal government in its EADA that it provides the equal athletic opportunities to its female athletes. Rowers are cut after that date, and in 2018-19, UConn

listed 61 on its EADA report but had 55 on its rowing roster; in 2019-2020, UConn had 47 on its rowing roster, and in 2020-21, UConn had 41. Since 2003, except for one year, the EADA has always listed higher numbers than the rosters. Over the years the average team size reported on the EADA is 66.1 compared to the average team size listed on the rosters of 46.3.

122.    A reasonable NCAA Division 1 varsity rowing team size is 45.

123.    Coach Sanford needs 40-42 rowers to have a successful competitive Division 1 varsity rowing team at UConn.

124.    UConn women's rowing budget supports overnight travel for 42-45 rowers.

125.    UConn's direction to rowing to carry at least 60 for counting purposes results in the appearance of a greater number of female athlete participant opportunities reported on its EADA to comply with Title IX but is clearly not accurate for Title IX purposes since 60 rowers ultimately do not stay on the team after the first day of competition.

126.    Upon information and belief, historically UConn has directed and encouraged women's teams to have a minimum floor for their rosters and keep higher number of female athletes on their teams than the team needs while directing and encouraging men's teams to have caps for their rosters for the purposes of artificially inflating the number of female athletes' participation opportunities for EADA and Title IX.

127.    Upon information and belief, UConn uses male practice players on its women's basketball and women's volleyball teams and counts them as female players, which contributes to overcounting female athletes and resulting in an undercalculation of the female participation gap.

**UConn's Web Rosters Are More Accurate and Show a Higher**
**Participation Gap Than the EADA**

128.    Counting the sport team members based on UConn's web rosters shows that the EADA number are inaccurate and artificially inflate the number of female participants. For example,

UConn reported in the EADA for 2018-2019 that rowing had 61 rowing participants. When looking at the roster for rowing in 2018-2019, the women's rowing team only had 55 rowers.  There is no published EADA report for 2019-2020 yet but the number of eligible rowers on the first day of competition in 2019-2020 was about 61. When looking at the roster for rowing in 2019-2020, the women's rowing team only had 47 rowers.

129.    When using UConn's team web rosters numbers for 2018-19 rather than the reported EADA numbers, the participation gap is 20 rather than the 6 as shown by the numbers UConn reported to the EADA.

130.    When using UConn's web rosters numbers for 2019-20, the participation gap is 32.

131.    When using UConn's web rosters numbers for 2020-21, the participation gap is 34.

132.    The rosters provide more accurate numbers for participation opportunities than the EADA, and roster gaps for 2018-2019, 2019-2020 and 2020-21 are well over the size of a viable team, demonstrating that UConn is out of compliance with Title IX.

**The Web Roster Gap is Higher When Adjusting for Inflation for Women's Rosters**

133.    Upon information and belief, UConn has inaccurately counted male and female athletes and improperly inflated its web team rosters resulting in undercounting of its female participation gap.

134.    For example, in addition to inflating its EADA rowing numbers, UConn is also inflating (padding) its rowing roster numbers.  Based on team sizes of successful varsity rowing programs and the structure of the NCAA competition and the Colonial Conference (in which UConn's rowing program participates), a reasonable size of an NCAA Division 1 varsity rowing team is no more than 45 rowers. Any rowers over 45 exceed the reasonable size of a varsity rowing team and do not reflect real genuine varsity participation opportunities.

135.    Since 2012-13, UConn's web rosters show well over 45 rowers.  For example, in 2018-2019, the UConn rowing web roster size was 55. This is ten rowers more than the size a reasonable varsity Division I rowing team, representing padding of 10 female participation opportunities.

136.    Upon information and belief, UConn also appears to be padding women team rosters in the UConn cross-country program. There is no difference between men's and women's cross-country programs and competitions that would provide a basis for women's teams to be larger than men's teams. Yet, UConn keeps more athletes on its women's cross-country team than it does for its men's team. Since 2003, UConn's average women's cross country squad size is has 4.5 to 5 more female athletes than men's cross country.   In 2018-2019, UConn had 20 male cross-country runners and 29 female runners in 2018-2019 on its web rosters.  Women had 9 more cross country runners than men and well above the NCAA average team size of 17.2 for women's' cross country.  This artificial inflation creates at least 9 athletic slots for women that are not genuine participation opportunities, that should not be counted for Title IX equity purposes.

137.    The above inflating discrepancies have a significant impact on the computation of prong one proportionality and disproportionately affect the number of real athletic participation opportunities that that UConn give to female athletes.

138.    When accounting for the above padding or inflation, the participation gap for 2018-2019 (the most recent year that both EADA and web rosters were available) is much larger than the participation gap of 20 based on the 2018-2019 web rosters and even larger than the 2018-2019 EADA participation gap of 6, as follows:

a.    In 2018-2019, the rowing web roster size was 55. This is ten rowers more than 45 – the size of a reasonable varsity Division I rowing team for UConn given its regular season,

conference championship and NCAA championship competitions structures, representing an overcount of 10 female participation opportunities.

      b.   In 2018-2019, the women's cross-country rosters listed 29 females, which exceeded the men's cross-country rosters by 9, the NCAA average team size by 12, and the size of a reasonable cross-country squad by 15.

      c.   Adjusting for this inflation of these numbers translates to inflation in just these two sports of 19-25 female athletes in 2018-19, which increases the female participation gap in 2018-2019 to 39-45.

<b>Post Cut Analysis:<br>UConn's Participation Gap for Female Athletes Remains Unacceptable</b>.

139.    UConn eliminated one women's sport – rowing, and three men's sports – tennis, cross country and swimming/diving. Based even on UConn's 2018-2019 EADA report, after cuts, UConn would need to add approximately 11 additional female athletes, which is an unacceptable female participation gap in excess of the size of a viable team such as golf.

140.    Based on the more reliable web rosters, assuming the athletes on these rosters reflect genuine athletic participation opportunities, the gap after cuts in 2018-19 is 17; in 2019-2020 it is 25, and in 2020-21, it is 38. These gaps are before adjusting the gap upward to account for overcounting or inflation of female participant opportunities on the web rosters. These gaps are calculated using the web roster sizes, including for the sports that are cut: women's rowing (55 in 2018-19; 47 in 2019-2020; 41 in 2020-21) and the men's swimming and diving (29 in 2018-19; 28 in 2019-2020; 13 in 2020-21), tennis (7 in 2018-19; 8 in 2019-2020; 8 in 2020-21) and cross-country teams (20 in 2018-19; 16 in 2019-2020; 14 in 2020-21).

141.    Upon information and belief, UConn is cutting the men's cross-country team as another use of roster manipulation to appear to be in compliance with Title IX.

142.    UConn's Division I cross-country runners are the same runners as the middle- and long-distance runners on the indoor and outdoor track team, and they have the same coaches, facilities and budgets, and the same services are provided for each team.

143.    UConn's cross country, indoor and outdoor track and field program operates as one year-round sport similarly to all other UConn Division I varsity sports that have year-round programs, like football that has fall, winter and spring seasons. There are 12.6 NCAA scholarships for men's track, whether they have a cross country program or not, and even if there is only an indoor or outdoor track program.    Thus, UConn's cross-country runners practice year-round together with the track and field distance runners, with the same coaches and use the same resources, and any scholarship received by them counts for track and field as well.

144.    After eliminating the cross-country team, the cross-country runners that are cut will still be able to participate in indoor and outdoor track and field and will also be able to run in cross-country races as unattached runners. Cutting cross country will not change any scholarships these runners receive.

145.    Because the men's cross-country runners can also participate indoor and outdoor track and field runners participating in a year-long track program, these male runners receive genuine athletic opportunities and, as such, should not be counted as cut participation opportunities.

146.    Using the 2018-2019 web rosters numbers without including the cross-country runners as part of the cuts ("the unduplicated count")-- using 36 male participation opportunities rather than the 56 -- results in an even higher participation gap of female athletes than before the cuts of 38.

147.    When using the 2019-2020 web rosters to calculate the unduplicated count without including the cross-country runners that also ran track and field as part of the cuts, the female participation gap is 40.

41

148.    When using the 2020-2021 web rosters to calculate the unduplicated count, the female participation gap is 53.

149.    After cuts, each of these have an unacceptable gap well over the size of a viable team, such as women's golf. These large gaps have not been adjusted for inflation of female rosters and any athletes that do not qualify as Title IX participants, which would result in a much higher female participation gap.

150.    Counting indoor and outdoor track and field and cross-country athletes more than once (referred to as using the "duplicated numbers") artificially inflates the number of female athletes because generally, and specifically at UConn, the women's cross-country team is intentionally larger than the men's cross-country team over above the NCAA average team size and the inflated women's numbers are not genuine participation opportunities.

151.    Using the unduplicated number of athletes in track and field and cross country (meaning counting athletes that participate in track and field and cross-country only once since they are one sport) to calculate participation opportunities before will result in even larger participation gaps than set forth above.

152.    Because UConn was discriminating against female athletes by failing to provide equal participation opportunities before deciding to cut sports, UConn cannot cut any female sports participation opportunities, including the women's rowing team.

### More Reasons the EADA and the Roster Numbers Underreport the Actual Female Participation Gap

153.     There are additional reasons to believe that the EADA numbers are not accurate. It is a commonly known practice at some colleges for men's teams to carry less athletes on the day that colleges count their numbers for EADA and add more participants after that date that will not be counted for the purposes of underreporting male athletes' participation opportunities.  In addition to

this roster manipulation, another known practice is for colleges to underreport to EADA actual male participation.

154.    Upon information and belief, UConn underreports its football players. UConn's 2018-2019 EADA reports 100 participants for football, and its 2018-19 web roster lists 100, and its 2019-2020 reports 99.  Football is an Independent FBS team.  FBS permits 85 scholarships and is the more challenging and competitive league.   FCS is a lower-level competitive division and has 63 scholarships. The NCAA data for 2018-19 show that the average football squad has 121.8 participants for the FBS football teams, while the average for FCS is 108.  UConn's number of 100 (or 99) is well below the NCAA average for FBS football and even FCS, which has 22 less scholarships with a less challenging schedule and program, making the 100 participants number suspect. Any underreporting of football players would make the participation gap for female athletes even higher.

155.    Upon information and belief, UConn has women athletes listed on its track and field and cross-country rosters that do not participate in genuine athletic opportunities in cross country, indoor or outdoor track, which artificially inflates the female participation numbers.

156.    Plaintiffs are informed and believe, and based thereon allege, that the ratio of female to male athletes at UConn is not substantially proportionate to the overall ratio of enrolled female to male students at UConn and in a much larger gap than is shown by using the EADA numbers and the web rosters and its female participation gap will be even larger after cuts.

157.    This failure to provide women with substantially proportionate genuine participation opportunities, despite their interests and abilities to participate, has occurred without justification or defense by UConn.

Prong Two:   UConn Does Not Have a History or Continuing Practice of Program Expansion in Response to the Developing Interests and Abilities of Female Students.

158.    Further, with respect to the second part, UConn cannot show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of UConn's female students. Rather, female students have historically been, for the most part, and continue to be, underrepresented in the UConn athletics program.

159.    UConn failed to meet the 1978 regulatory deadline for compliance with Title IX's requirement for equity in athletic participation opportunities.  UConn has never met its compliance obligations and has not added any new female varsity sports in over 20 years.  UConn cannot show a history or continuing progress of program expansion for women.  Instead, by eliminating women's varsity rowing, the UConn has gone backwards.

Prong Three:    UConn Has Failed to Fully and Effectively Accommodate the Athletic Interests and Abilities of Its Female Students

160.    Finally, with respect to prong three, Plaintiffs have the interest and ability to participate in women's varsity rowing.  High school students (the source of UConn's incoming, prospective, and future students) also have the interest and ability to participate in rowing. Competition exists in rowing, because it is a major NCAA sport and UConn has offered the sport for many years – as have other schools in the United States.

161.    If an institution has recently eliminated a viable team from the intercollegiate program, OCR will find that there is sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport unless an institution can provide strong evidence that interest, ability, or available competition no longer exists.

162.    Here, part three-- fully and effectively accommodating interests and abilities of the underrepresented sex—does not apply because there are undoubtedly concrete and viable interests in rowing by females at UConn as evidenced by the 23-year history of the sport at UConn and rowing's

growth and recognition for many years by the NCAA, IOC, and college, high school and club organizations.

163.    Upon information and belief, UConn has failed to assess the athletic interests and abilities of its student at all--let alone in a nondiscriminatory manner, has added new female sports with the last one added in 2000 when it chose to add them rather than when females demonstrated interest in them, and added the sports it chose not its female students, especially with respect to rowing and lacrosse, all of which led to discrimination against women.

164.    UConn cannot show that it has effectively accommodated the needs of its female students.

165.    UConn will exacerbate its existing pattern and practice of sex discrimination in its allocation of athletic participation opportunities if it is not restrained from eliminating female athletic participation opportunities in varsity rowing.

166.    UConn's failure to provide adequate participation opportunities and the full range of teams for women's sports severely limits female students' participation in the UConn athletics program and discourages interested women from participating in sports.

167.    As a proximate result of these unlawful acts, Plaintiffs and the Class have suffered and continue to suffer irreparable injury.

168.    Plaintiffs seek a declaration that UConn discriminates on the basis of sex by failing to offer female students an equal opportunity to participate in intercollegiate athletics.

169.    Plaintiffs seek expedited preliminary and permanent injunctive relief requiring UConn to stop discriminating in the operation of its athletic department and ordering UConn not to eliminate rowing or any women's varsity athletic team or opportunity.

170.    Plaintiffs seek a declaration that UConn discriminates on the basis of sex by failing to offer female students an equal opportunity to participate in intercollegiate athletics.

171.   As a result of UConn's discriminatory actions, the Plaintiffs have been denied and/or imminently will be denied their civil right to pursue an equal opportunity to participate in varsity intercollegiate athletics.   They have been denied the educational, economic, physical, psychological, and social benefits of athletic participation. They have incurred or imminently will incur economic and non-economic damages associated with, among other things, lost opportunities, applying/transferring to other schools, moving to other schools, transferring/losing graduation credits, loss of future educational and employment opportunities, emotional distress, lost self-esteem, humiliation, and the denial of equal opportunity because of sex.

172.   If UConn is not restrained from ending the gender discrimination, current, incoming, prospective, and future female athletes at UConn will forever lose the opportunity to participate in intercollegiate sports – an opportunity that lasts only four years in a lifetime but has lifelong educational, economic, physical, psychological, and social benefits.

### SECOND CLAIM FOR RELIEF: TITLE IX-UConn
#### (Discrimination Equal Benefits and Treatment)

173.   Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 172 inclusive of this complaint.

174.   As set forth above, a school's provision of equal treatment and benefits to those with participation opportunities is assessed based on an overall comparison of the male and female student athletic programs.

175.   Upon information and belief, UConn has unlawfully discriminated against female student athletes in violation of Title IX with respect to athletic treatment and benefits in many areas including, but not limited to: (1) provision of equipment and supplies; (2) scheduling of games and practice times; (3) travel and per diem allowance; (4) opportunity to receive coaching and academic tutoring (5) assignment and compensation of coaches; (6) provision of locker rooms, practice and

competition facilities; (7) Provision of medical and training facilities and services; (8) **Provision of housing and dining facilities and services;** (9) funding and fundraising opportunities; (10) publicity; (11) recruiting; and (12) support services.

176.    For example, UConn provides male athletes with greater access to coaching. UConn provides female athletes with fewer numbers of and more overburdened coaches than male athletes.

177.    UConn provides more full-time coaches and more assistant coaches to its male athletes than female athletes. UConn reported to the EADA (2018-2019) that it has 38 coaches of men's sports and 35 coaches of women's sports.  According to the public website, UConn employs 59 coaches to coach ten men's sports and 35 coaches to coach 12 women's sports.  As reported on the 2018-19 EADA report, there are 24 assistant coaches for female athletes, 19 are full-time and 8 are part-time, while there are 29 assistant coaches for male athletes, 21 are full-time and 8 are part-time.  Public data for the same year show, however, that UConn paid 19 assistant coaches for female athletes, all fulltime; while UConn paid 41 assistant coaches for male athletes, 40 of whom are fulltime and 1 part time.

178.    UConn provides coaches of male athletes more and better resources and benefits than coaches of female athletes, attracting better and more qualified coaches of males.

179.    For example, the 2018-19 EADA report appears to reflect salaries without special payments. As reported on the 2018-19 EADA report, UConn pays it coaches of men's teams an average annual salary of $524,375, while it pays it head coaches of women's teams an average annual salary of $368,236. In 2018-19, UConn paid its head coaches of men's teams in total $4,457,187.00, as compared to the head coaches of women's teams in total $3,866,478.00.

180.    Public information for the same year show that UConn compensates (salary and

special payments) head coaches of women's teams an average annual compensation of $452,754 and head coaches of men's' teams an average annual compensation of $928,430.00. This shows that UConn coaches of women's team are compensated 42% percent of coaches of men's teams.   When removing men's and women's basketball salaries from the equation, UConn pays its head women's coaches on average $112,577 and its men's coaches $551,030, compensating coaches of women's team 20.4% of coaches of men's teams.

181.    As reported on the 2018-19 EADA report, UConn pays it assistant coaches of women's teams an average annual salary of $81,581 while it pays it assistant coaches of men's teams an average annual salary of $155,101. In 2018-19, UConn paid its assistant coaches of men's teams in total $3,644,865 as compared to the assistant coaches of women's teams in total salary $1,794,792, compensating assistant coaches of women's team 49% percent of coaches of men's teams.

182.    Per the 2018-19 EADA report, UConn pays it coaches of men's teams total compensation of $8,102,052 for coaching 49.3% of the total athletes, while it pays it coaches of women's teams total compensation of $5,661,270 for coaching 50.7% of the total athletes, resulting in coaches of female athletes being paid 70% of what coaches of male athletes are paid while coaching more athletes.

183.    When reviewing the publicly available information on the web, for 2018-19, UConn pays it coaches of men's teams total compensation of $10,609,192.00 for coaching 49.3% of the total athletes while it pays it coaches of women's teams total compensation of $5,757,366.00 for coaching 50.7% of the total athletes, resulting in coaches of female athletes being paid 54.2% of what coaches of male athletes are paid while coaching more athletes.

184.    When removing men's and women's basketball compensation from the equation, coaches of women's team are compensated 24% percent of coaches of men's teams.

185.     Per UConn's reported EADA numbers for 2018-2019, the recruiting expenditures are not close to matching the percentage of males and females in the program. UConn provided $963,944 to the men's teams and $426,622 for the women's teams, giving 69.3% of the monies to the male athletes who comprise 49.3% of the total athletes and only 30.7% to women's teams, who comprise 50.7% of the total athletes.

186.     UConn's failure to provide female athletes with equal benefits and treatment violates Title IX.

187.     As a proximate result of these unlawful acts, Plaintiffs and the Class have suffered and continue to suffer irreparable injury. Each day that goes by that the athletes suffer gender discrimination in the form of unequal treatment and benefits they are deprived of an equal educational opportunity that they will never get back and future athletes are deprived of the opportunity to receive equal benefits and treatment, which cannot be compensated with money.

### THIRD CLAIM FOR RELIEF:  TITLE IX-UConn
#### (Discrimination in Financial Assistance)

188.     Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 187 inclusive of this complaint.

189.     Title IX requires that male and female athletes receive total scholarship dollars equal to their athletic participation. However, for example, in the last three years the female athlete participation did not meet UConn's Part One Title IX obligation (percent female athletes equal to percent female in the undergraduate population) and will not in the future after cutting these sports– thus shortchanging female athletes with regard to what should have been their athletic scholarship entitlement.  In 2018-2019, even based on EADA numbers, UConn provided $9,327,124 to male athletes and $8,345,300 to female athletes for ratio of 48.9 male to 51.1% female resulting in a

shortfall of $683,515 in the provision of athletic scholarships to female athletes. When looking behind the EADA numbers, the shortfall is even higher.

190.    UConn's failure to provide female athletes with equal athletic financial assistance violates Title IX.

191.    As a proximate result of these unlawful acts, Plaintiffs and the Class have suffered and continue to suffer irreparable injury. The Plaintiffs have been deprived of the opportunity to receive scholarships as well as row with other skilled athletes that may have chosen UConn if scholarships were available and achieve greater success on the water. Current, future and prospective female student athletes as well have not received and do not have the opportunity to receive the scholarships that would enhance their sport experience or provide a pathway for them to attend UConn, which cannot be compensated with money.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A. Certify the claims as a class action for declaratory and injunctive relief on behalf of all present, prospective, and future female students at UConn, who participate, seek to participate, or have been deterred from participating in or obtaining the benefits of varsity intercollegiate sports sponsored by UConn and varsity intercollegiate sports not offered at UConn, and on behalf of all present, prospective, and future female athletes at UConn who seek to receive equal treatment and benefits and equal athletic financial assistance in varsity intercollegiate sports at UConn.

B. Enter an order declaring that UConn has engaged in a past and continuing pattern and practice of discrimination against female students on the basis of sex in the operation of its athletic program, in violation of Title IX and the regulations promulgated thereunder;

C. Issue a temporary restraining order to prevent UConn from cutting the women's rowing team, selling rowing equipment and ending the lease or leasing the Boathouse for other purposes until a hearing for a preliminary injunction can be held;

D. Issue a preliminary and permanent injunction restraining UConn from eliminating the women's varsity rowing team as a University sponsored team, to provide the rowing team with funding, staffing, and other benefits commensurate with their status as an intercollegiate team, and prohibiting UConn from eliminating any other UConn sponsored intercollegiate team unless both before and after elimination, equality of opportunity and benefits for women has been achieved;

E. Issue a preliminary and permanent  injunction restraining UConn from continuing to discriminate against female students on the basis of sex, and requiring UConn to provide females with an equal opportunity to participate in varsity intercollegiate athletics by sponsoring additional women's varsity athletic opportunities based upon the interests and abilities of UConn's present, prospective, and future students; and requiring UConn to provide female athletes with equal treatment and benefits and financial assistance in varsity intercollegiate athletics;

F. Maintain jurisdiction over this action to monitor UConn's compliance with the Court's orders;

G. Award the Plaintiffs compensatory damages and other monetary relief as permitted by law, including punitive damages,

H. Award Plaintiffs their reasonable attorneys' fees and expenses; and

I. Order such other and further relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL ISSUES TRIABLE BY A JURY.**

Dated: April 28, 2021

Respectfully submitted :

By:  /s/  Felice M. Duffy
    Felice M. Duffy
    Duffy Law, LLC
    129 Church Street, Suite 310
    New Haven, CT 06510
    Tel.: (203)946-2000
    Email: felice@duffylawct.com
    Federal Bar No.:  ct21379

    James C. Larew*
    Claire M. Diallo*
    504 E. Bloomington St.
    Iowa City, Iowa 52245
    Tel: 319.337.7079
    Email: James.Larew@LarewLawOffice.com
    Email: Claire.Diallo@LarewLawOffice.com
    * Applications for Admission Pro Hac Vice
    Pending

    ATTORNEYS FOR PLAINTIFFS