# EXHIBIT B

# Report by
# DONNA LOPIANO, PH.D.


**Sarah Lazor, Grace Johnson, Magdalene Mlynek, Laura Braddick, Emily Jones, Bailey Harris, Molly O'Neill, Teresa Nobles, Emma Pinckney, Josephine Luby, Gayane Gevorkyan, and Jordan Nanai**

**v.**

**UNIVERSITY OF CONNECTICUT**

## I.  SCOPE OF OPINIONS TO BE RENDERED

This report addresses the issues raised in Plaintiffs' motion for preliminary injunction. Those issues include whether the University of Connecticut ("UConn") equally and effectively accommodates the interests and abilities of female students in varsity intercollegiate athletics and whether UConn's proposed elimination of the women's rowing team will cause the female rowers and the program itself irreparable harm.  Based upon my review of publicly available data from UConn's athletic department, I conclude that (1) UConn does not equally or effectively accommodate the interests and abilities of female students in varsity intercollegiate athletics; (2) UConn's proposal to eliminate some of its varsity teams in 2021-2022 will harm females more than males; and (3) UConn's elimination of the women's rowing team will cause the team members and the program irreparable harm.

I expect to supplement this report if/when I receive additional information, including UConn's NCAA[1] squad/eligibility lists, NCAA Hour-Limitation Records,[2] and UConn athlete competition participation records during the course of discovery.  I also expect to provide a supplemental report that addresses other claims in this case or issues in UConn's athletic department (i.e., equity in the allocation of athletic scholarships and benefits) during the normal course of the litigation once I have received and reviewed additional information after the parties have engaged in discovery.

---

[1]  NCAA is the commonly used acronym for the National Collegiate Athletic Association, the national governing body for many college athletic programs.  UConn is a member at the highest level of competition – Division I.

[2]  The *NCAA 2020-21 Division I Manual* at pg. 259, describes these records: **17.1.7.3.4 Hour-Limitation Record.** Countable hours must be recorded on a daily basis for each student-athlete regardless of whether the student athlete is participating in an individual or team sport. Any countable individual or group athletically related activity must count against the time limitation for each student athlete who participates in the activity but does not count against time limitations for other team members who do not participate in the activity.

## II.     QUICK SUMMARY OF OPINIONS

This section summarizes the opinions I set forth in this report.  The opinion section further states and explains the bases for these opinions.

In order to assess whether UConn equally and effectively accommodates the athletic interests and abilities of its male and female students I first reviewed UConn's roster athletic participation data to determine whether it currently provides and historically provided substantially proportional opportunities.  Accepting all of UConn's roster data as true, I discovered that UConn does not now and has not historically provided female students with a substantially proportionate opportunity to participate in varsity intercollegiate athletics.

Specifically, as I discuss in detail later, based on UConn's web roster data, in the last three years, including when the decision to eliminate the women's rowing team was made, UConn shorted females of athletic opportunities by 20 (2018-2019), 32 (2019-2020), and 34 (2020-2021). These conservative numbers represent more than the size of a viable team, and therefore demonstrate noncompliance with the substantial proportionality requirement of Title IX. I believe, based on the data I have reviewed and my experience, that there is also likely inflation of the women's rosters, and therefore the participation gap is even larger. I also found that UConn does not have a history and continuing practice of expanding women's athletic opportunities as it had not added a women's team for more than 20 years, since 2000. And now it proposes to cut women's rowing, a viable women's team. Women's interests and abilities are not being fully and effectively accommodated. In fact, they are being trampled upon with this proposed elimination. Further, the proposed cuts to women's rowing and three men's teams does not remedy this participation gap. More women than men are proposed to be cut, which would bring UConn even further out of compliance with the substantial proportionality requirement.

It is important not to accept any institution's claimed athletic participation as true.   After many years of reviewing participation data, I have learned that it is often inaccurate or skewed to appear to show greater gender equity than actually exists.   Therefore, the participation data should be audited more closely, especially when an institution proposes to eliminate one of the teams of the under-represented sex (women at UConn).   One must examine whether the claimed athletes actually existed and regularly participated in practice, whether they competed, whether they qualified as participants under the Title IX definition of "participant," whether they participated at the same level of competition, and whether they received the same nature of opportunities.   Not all opportunities are the same and not all opportunities should be counted the same.   I review these factors when assessing which athletes count as participants under Title IX.

To conduct a thorough review of UConn's athletic opportunities, I would like to see more information, such as the NCAA squad lists, the NCAA hour limitations records, travel records, and competition records.   However, based upon my years of experience and knowledge of intercollegiate athletics, I can make some initial assessments of the opportunities that UConn provides.   I conclude that UConn inflates some of its women's rosters to squad sizes greater than required by the needs of the sport.   This roster inflation creates very different types of opportunities than those enjoyed by the male athletes.   Some women on these inflated rosters do not receive genuine varsity opportunities and some compete at sub-varsity levels (if they compete at all.   There must be equity at each level and kind of opportunity.   Roster inflation artificially reduces the female participation gap.

Effective accommodation is about more than counting the number of athletic participation opportunities.   As explained in more detail later in this report, the Title IX athletics

regulation talks about the effective accommodation of athletic interests and abilities.  The 1979 Policy Interpretation explains what that means.  It examines the assessment of athletic interests, the selection of sports, and the levels of competition offered.  It requires that they be provided in a nondiscriminatory manner.  I examine these factors in this report.

UConn proposes to eliminate both men's and women's teams.  I considered the consequences of this proposal.  I reviewed roster participation data as a means of estimating what next year's participation could be without those teams.   Neither UConn nor I can predict next year's squad sizes.   We must make our most educated projections based upon the existing squad sizes and the athletes who are there.   My review of UConn's own data shows that after eliminating the proposed teams, UConn will still have a female participation gap.   Thus, UConn's plan will not solve its historical athletic participation problems.

My review also shows that UConn's plan will harm women more than men.  In fact, it appears that UConn selected which men's teams to cut in a manner that minimizes the harm to men.   The male cross country athletes will not be eliminated at all in that they will be able to continue long distance running as part of the track program and thus will continue to retain their athletic scholarships.   The male tennis athletes do not receive athletic aid, so no men will lose aid by the elimination of this team.   Only the male swimmers who receive 5 to 6 athletic scholarships will lose their aid. Meanwhile, more than 14 female rowers will lose their athletic aid.   As a result, of these selections, UConn's proposal will effectively eliminate more female athletes from the athletic program and will eliminate more female athletic scholarships.

UConn claims it is must eliminate teams to save money.  But its selection of the male teams to eliminate belies this claim.  Eliminating men's cross country eliminates no athletes, no recruiting, no facilities, no coaches, no practice dates, and no scholarships.   Eliminating men's

swimming does not eliminate any coaches, because they will continue to coach the women.   It does not eliminate any facilities, because the pool already exists.   Eliminating men's tennis eliminates no scholarships.   It eliminates no facilities, because the tennis courts already exist. Because the men's and women's tennis teams share the same head coach, eliminating men's tennis at most cuts one assistant/associate coach.   Had UConn instead selected men's golf, which has a similarly small squad size, it would actually eliminate those male athletes, eliminate their scholarships, eliminate their coaches, and eliminate that team's sport operating expenses.   This would save substantially more money.   There is no women's golf team, so eliminating that sport would make the men's and women's programs more alike.   Also, UConn's reported recruiting expenditures indicate that it spends the least amount of recruiting money on men's tennis. UConn would save more money by eliminating other men's teams.   Its decision appears designed to minimize the harm to men.

Finally, because UConn proposes to eliminate a women's team at a time when it already fails to effectively accommodate them and already fails to provide them with substantially proportionate athletic participation opportunities, it is important to make the court aware of the significant, lifelong harm that the female rowers will face if they lose their team – harm they will endure because of their sex.   No amount of money can compensate these women for their loss.

## III.  NATURE OF PARTICIPATION OPPORTUNITIES MATTER

The Title IX athletics regulations and the 1979 Policy Interpretation both require athletic participation equity, but they do not focus on participation numbers.   As set forth below, the Three-Part Test that so many institutions focus on is merely one part of an effective

accommodation analysis.[3]   One must look at the interests and abilities of students.   One must examine which sports an institution chooses to provide – and why.   One must look at the levels of competition and the nature of opportunities provided.    One must look at whether there are different rules for male and female teams (or whether they are disproportionately applied).   One must look at the structure of the athletic program to see whether it is manipulated to appear to provide equity when it actually does not.   These are means of different treatment within the context of athletic participation.

This review is especially important at a NCAA Division I school like UConn.   It is not equitable to provide male athletes with Division I varsity opportunities to compete but female athletes with junior varsity or novice competition (if they compete at all).   It is not equitable to provide male athletes with reasonable squad sizes and an opportunity to become a team starter but to provide female athlete with inflated squad sizes that include athletes without the ability to participate at the Division I level of competition and that deplete resources away from the varsity athletes who do.   It is not enough for an institution to claim its numbers are proportionate.   It must actually provide proportional opportunities of each type.

This deeper analysis has become more important in recent years as more institutions want to appear to provide equity whether they actually do or not.   We are no longer in the early years of Title IX enforcement when the disparities were obvious.   Now more institutions look for perceived loopholes to appear to be equitable on the surface. Instead of adding more women's

---

[3]   The 1996 Clarification merely explains and clarifies one part of the effective accommodation requirements set forth in the 1979 Policy Interpretation.  It came about at a time when some groups were claiming the Three Part Test was a quota.  OCR issued the Clarification to explain why sex segregated programs are different from co-ed programs and thus why they do not involves quotas.  For many years, this was the basis for Title IX litigation until it became clear that all appellate courts had recognized the validity of the Three Part Test.   The 1996 Clarification did not displace the broader assessment of effective accommodation and participation equity detailed in the 1979 Policy Interpretation.

sports to increase participation, some institutions inflate the rosters of existing women's teams, creating disparities in the types of opportunities offered.  UConn itself listed 330 women on its rosters in 2011-2012.  By 2018-19 (the last year before covid), UConn listed 382 women.  That's an increase of 52 women without adding any new women's teams.  See Exhibit J roster participation chart.  We must look behind the purported numbers to determine whether the opportunities they represent are indeed equitable in fact.  For this report, I did the basic analysis that so many cases address.  I then did a more thorough review to determine whether the basic analysis told the full story.  Below I describe some of the information I reviewed and considered regarding the number and nature of opportunities at UConn.

I gathered, organized, and reviewed the publicly available information about the athletic participation opportunities that UConn itself claims to provide.  I gathered this information from (1) the athletic participation data that UConn provided to the U.S. Department of Education ("DOE") pursuant to the Equity in Athletics Disclosure Act ("EADA") and (2) the athletic team rosters on UConn's athletic department website. I found EADA data for 2003-2004 through 2018-2019 on the DOE's website.[4]   I found the athletic team rosters on UConn's athletic department website.[5]  I found most of the rosters under the roster tab for each team.  For rosters that were not posted there, I looked at UConn's athletics archives page.  There I found old rosters and old media guides that listed the names of team members.

I gathered the athletic participation information described above and organized it into charts that show the data all in one place for the available academic years.   I then reviewed the number of athletic participation opportunities listed in that data and calculated the participation

---

[4]   United States Department of Education Equity in Athletics Disclosure Act Database. Retrieved from: http://ope.ed.gov/athletics/#/
[5]   University of Connecticut Athletic Department.  UConn.  Retrieved from:  https://uconnhuskies.com/

gap for each school year. The participation gaps show the number of additional athletic opportunities that UConn should have provided to the under-represented sex in order to achieve actual, proportional equity.

During this initial process I relied on the data published by UConn. I did not assess (yet) whether the named athletes actually participated in practices, whether the named athletes competed, whether the named athletes qualified as participants under Title IX, or whether UConn provided men and women the same nature of the athletic opportunities. I accepted UConn's website roster data as true and used it to calculate the participation gaps. That analysis showed a female participation gap – too few athletic opportunities for UConn's female students.

As already noted, in my experience, a deeper analysis often shows that an institution's basic data overcounts female athletes, as such institutions try to show – at least on paper – that they provide female students with a substantially proportionate number of athletic opportunities. Therefore, I conducted a deeper dive into UConn's published athletic participation opportunities. I tried to assess whether the claimed athletic opportunities actually existed, whether the named athletes qualified as participants under Title IX, and whether men and women received the same kinds of opportunities. Some of this additional analysis can be done by reviewing publicly available information and some requires more fact specific information that I expect to obtain during discovery. For example, discovery should provide NCAA squad/eligibility lists, athlete practice/meeting/competition attendance lists, competition statistics, and testimony by coaches and athletes that shed light on whether named athletes actually participated on a team and actually showed up for practice on a regular basis (as required by Title IX's definition of participant). Meanwhile, my experience and expertise regarding athletic norms and the NCAA

allow me to draw some conclusions from publicly available information, such as squad sizes and championship rules.

I also reviewed how UConn structures its athletic program and teams to assess whether it does so in a manner that advantages one sex over the other – or is designed to minimize the harm to one sex over the other.   I reviewed the number of athletic participation opportunities on each team to assess whether it suggests that UConn sets ceilings/maximums on the number of male athletes allowed on men's teams and floors/minimums on the number of female athletes allowed on women's teams.   I looked at the data to determine whether UConn structures its athletic program so that its women's participation opportunities – but not its men's opportunities - are allocated to a few teams with unusually large rosters rather than to more teams with more reasonable rosters sizes that would allow more women to start, compete, and receive athletic scholarships.  A structure with unusually large roster sizes can be problematic if the large squad sizes exceed the needs of the specific sport or if the teams do not receive more coaches to coach the additional athletes, more recruiting resources to recruit additional athletes who have the ability to compete at UConn's Division I level of competition, more scholarships to entice more qualified athletes to join the team, and more resources to pay for additional athletic benefits for the additional athletes.   It can also be problematic if the athletes on the large squad sizes are never expected to compete but instead exist solely to meet a roster minimum.   These problems show sex discrimination if women endure them disproportionately.

Throughout this case I expect to review information to assess the nature of the athletic opportunities that UConn provides.   This review is separate and apart from looking at the allocation of athletic benefits.   I do this to assess whether athletic opportunities that exist on paper are in fact varsity athletic opportunities and are fundamentally the same kinds of

10

opportunities for both sexes.  Athletic opportunities are not fungible. They are not just numbers to move around a chart to reach a certain percentage of women's opportunities. Some opportunities are so fundamentally different from others that they should not be assessed within the same category.  For example, being an athlete who competes as a varsity athlete against other NCAA Division I teams is not the same as being an athlete who has never played a sport before and competes as a novice against other novices (when an opponent has novices available). Varsity, junior varsity, novice, and club opportunities are different levels of competition.  An institution should not provide varsity opportunities to men and novice or club opportunities to women.   The allocation of opportunities must be proportional at each level of competition.

Different types of opportunities can also exist within the same team.  Being one of the seven athletes who are designated to qualify as one of the five scorers in a cross country meet is not the same as being athlete #20 on that same cross country team who is never expected to compete, is not allowed to travel to away meets, or is one of the extra athletes allowed to run but not score – especially if that athlete only is allowed to participate as a non-scoring extra in local meets.  At best, that athlete is junior varsity – not varsity.  If cross country athlete #20 does not compete and if athlete #20 does not clock times that show a Division I athletic ability, then is that athlete really a Division I participant?   Does she really receive all the benefits of a varsity athletic opportunity under Title IX's definition of participant?  Or is that athlete there to meet a roster minimum/floor designed to inflate the size of some existing teams rather than to add new sports teams with new varsity opportunities?   The nature of these athletic opportunities are fundamentally different.  If so, then those opportunities must be compared to those on the men's teams.

Similarly, being athlete #20 on a team that plays few athletes in varsity competition is not the same as being the #1 starter – or any starter or top reserve -- on a team.   Being athlete #20 on a basketball roster is not the same as being the #1 starter on that same roster.[6]   Athletes #1 through #5 play in every game, receive daily coaching, travel to away games, receive uniforms, receive all the benefits of varsity status, receive preferential athletic training, were recruited to attend this institution for the purpose of participating in varsity athletics, and most likely receive some athletic aid.   Top reserves may also receive the same benefits.   Other reserves may be developed for bigger roles as upperclassmen.   But athlete #20 usually does not have those kinds of opportunities.   She does not compete and does not even travel to away games.   She may not even receive a uniform.  She receives less practice time and coaching.   In women's basketball (as well as volleyball and even soccer), male practice players often practice and scrimmage with the female starters -- ahead of the female reserves.   The male practice players must be cleared through NCAA eligibility.   They practice every day, receive practice apparel and gear, and even receive coaching.   They get more court time than the female reserves.   Ultimately, female athletes #1 through #5 receive a fundamentally different kind of opportunity than athlete #20 who receives less than even the male practice players.

Women's basketball is a head-count sport that allows schools to offer only 15 scholarships to 15 different athletes.[7]   Any additional students on the team above 15 cannot

---

[6]   I use women's basketball as an example, because most people understand the participation needs of the sport and because it is the sport that most commonly uses male practice players.   In prior years, UConn's EADA reports counted as many as 30 people on its women's basketball team.   With such a high number, UConn either carried too many female athletes or used male practice players.   Rosters suggest the latter.

[7]   *Head-count* sports are those in which an athlete is counted as receiving a full scholarship whether she receives one dollar or the full scholarship.   If NCAA rules limit the number of scholarships on a team to 15 full scholarships, then a maximum of 15 athletes can receive aid, even if each receives less than a full scholarship. In *equivalency* sports, coaches can award the designated amount of aid to as many athletes as they want.   If a full scholarship is $50,000, then 15 full scholarships would be worth $750,000.   The coach could distribute full or partial scholarships to any number of athletes so long as they did not total more than $750,000.

receive athletic aid.  However, if instead of adding five women to the basketball team (as athletes 16-20) a school recruited five women for a new golf team, all five of those women could compete and all five would be eligible for athletic aid.  Those new golf athletes would receive fundamentally different – and better – opportunities than the final five athletes on the basketball team.  This holds true if the school adds the five athletes to an already over-sized cross country team or any already existing team instead of a new golf team.   If any athlete is added to a team solely to fill an arbitrary roster management minimum/floor that is not related to the actual needs of the sport and if that athlete is not expected to ever compete or score for the varsity team (even as an upperclassman), then that athlete receives a fundamentally different opportunity than the others -- so different that it may not qualify as a varsity opportunity at all.

In the end, if all of the male basketball players and all of the female basketball players in my example receive the same kind of opportunities, then there likely is no sex discrimination. But if only the first 10 athletes on the women's basketball team receive the same kind of opportunities as the men while the additional female athletes do not, then that is a difference based upon sex.  That difference lies in the nature of the opportunities provided.  The same concept applies to all sports (not just basketball or cross country).

Some institutions structure their athletic programs this way in an effort to save money – not because it is best for the programs or athletes who endure larger teams.  They save that money by skimping on the women's programs.  Most of the men's teams existed before Title IX and before any women's teams existed. Men's sports were selected because they were the most popular sports for men.  Their roster sizes were set based upon the needs of the sport to provide optimum team success or coach-to-athlete instructional ratios. When providing women's opportunities, institutions must first meet the NCAA Division I minimum sport requirements.

After that, it is usually less expensive for an institution to add 10 extra female soccer players instead of a new women's golf team or 20 extra female long-distance runners instead of a new women's water polo team.   But these opportunities are fundamentally different.  Being an extra athlete on the inflated roster of an existing team is not the same as being a starter or top reserve on a new sports team.   If only women experience this participation difference, or if proportionally more women than men experience it, then this is a difference based upon sex that harms women.  If, on the other hand, the institution has an open-door policy so that all teams are structured like this, then inequity may not exist. But Division I athletic programs do not usually have such open door policies.  They recruit athletes with Division I skills to the institution for the purpose of participating in athletics.  Those recruited athletes do not want to be on oversized teams with less skilled athletes who take time, attention, and resources away from the core team. Whenever an institution with a history of such inequities cuts a women's team, it is important to examine whether that institution can truly meet equity after doing so or if it is cutting that team and reallocating those opportunities to already existing – and often already oversized – women's teams where the new, extra athletes will not receive the same kind of opportunities the varsity athletes had on the team that was eliminated.

Another common sex-based athletic program decision involves restructuring an athletic program so that the institution sponsors all three track seasons for women but not for men.   The men still exist in the track program and they still participate and receive athletic benefits the entire school year, but institutions count them differently.  As explained in more detail below, UConn's proposal to eliminate men's cross country falls into this sex-based restructuring.

At the present time, based upon publicly available information, I have reached some conclusions about the nature of opportunities in UConn's athletic program.     Because this

14

analysis is fact specific, these conclusions may evolve as I receive more information during discovery.

## IV.  EXPERT QUALIFICATIONS

I am the president of Sports Management Resources, LLC ("SMR"), a consulting practice that focuses on helping educational institutions and sport organizations solve sports program integrity, equity, growth, and management challenges.  My practice includes an emphasis on the development and implementation of model policies governing the management of sports programs conducted by educational and open amateur sport organizations.  I conduct Title IX reviews of college athletic programs and make suggestions about how to better meet their gender equity obligations.

Before founding SMR in 2008, I was the Chief Executive Officer of the Women's Sports Foundation, a national 501(c)(3) not-for-profit education organization located in East Meadow, New York (1992-2007).  I previously served as a coach, assistant professor, and athletics director at various NCAA institutions, including 18 years as Director of Women's Athletics at the University of Texas at Austin (1975-1992). I also served as president of the Association of Intercollegiate Athletics for Women, the organization that formerly regulated women's intercollegiate athletics before the NCAA  and the National Junior College Athletic Association began sanctioning women's sports in the 1980s. I have received many national and international awards recognizing my work in gender equity and sports management.

I am considered one of the foremost national experts on gender equity in athletics. I have testified several times about gender equity before congressional committees and state and federal administrative commissions.  I also have reviewed and testified in numerous gender equity law

suits over more than 25 years.  This experience has enabled me to see how institutions have responded to increased Title IX enforcement and publicity.

At the Women's Sports Foundation, I oversaw the production of numerous research projects related to gender equity and sports participation of girls and women, including a comprehensive study of the Title IX athletics enforcement efforts of the U.S. Department of Education's Office for Civil Rights ("OCR"). I also have served as a gender equity consultant to state education agencies, school districts, and institutions of higher education, and I continue to do so as President of SMR.

I am also considered an expert in athletics administration and sports management. I have taught a wide range of graduate and undergraduate courses involving the management of non-school open amateur and Olympic club, professional, interscholastic and intercollegiate sport. I have assisted open amateur sport organizations, colleges, and universities in dealing with management challenges and in assessing their organizational climates with regard to gender and racial diversity, and have spoken at numerous conferences on these subjects.  I am currently an adjunct professor at Southern Connecticut State University, where I teach both undergraduate and graduate courses in sports management.   I train future athletic directors and sports administrators.  I present workshops for coaches and athletic administrators that educate them about risk management related to Title IX compliance, both with regard to athletics and sexual harassment.  I train school and college Title IX compliance officers regarding the methodology of performing Title IX athletics assessments.  With Dr. Connee Zotos, I authored the *Athletic Director's Desk Reference,* one of the most comprehensive policy compilations focused on meeting the needs of high school and college athletic directors. I also wrote *Restructuring A College Athletic Program to Protect Olympic Sports During Financial Uncertainty* and

16

numerous articles on gender equity in sports, sports management, intercollegiate athletics reform, and the benefits of sports participation for women and girls.

My expert qualifications are based upon my education, academic background, previous employment, experience, and other related factors. My background and qualifications, as well as a listing of my publications, to the best of my recollection, are set forth in the attached curriculum vitae as Exhibit A. My www.SportsManagementResources.com web site contains my blogs on athletics issues and other policy-related advice produced by me that are not included in my curriculum vitae.

## V.    OTHER CASES IN WHICH THE EXPERT HAS TESTIFIED

The cases in which I was retained to testify as an expert are included on pp. 6-8 in my curriculum vitae at Exhibit A.

## VI.    COMPENSATION

SMR's consulting fees and terms are attached at Exhibit B. I have agreed to charge at the following specified hourly rates for my preparation and consulting services on this case:

- $250 per hour for report preparation

- $200 per hour for consultation with attorneys related to preparation for expert reports or depositions

- $500 per hour for deposition or court testimony

- $2,500 per day for site visits

- No charge for hours spent traveling

- Actual out-of-pocket expenses.

## VII.   DOCUMENTS, DATA, OR INFORMATION CONSIDERED IN THE FORMATION OF EXPERT OPINIONS

My opinions are based upon my experience and expertise in sports management and gender equity in sport and my review of publicly available information, including UConn athletic department information (including rosters), UConn EADA reports, NCAA athletic participation data (including average squad sizes), high school sports participation data, and NCAA and athletic conference championship information. The documents and sources relied upon in the formulation of my opinions in this report are listed in Exhibit C.

My opinions are also based upon my knowledge of NCAA and other sports governance association rules and practices, my knowledge of financial and other challenges faced by students who transfer from one four-year college to another, and my knowledge of how NCAA Division I higher education institutions engage in recruiting students to participate in and finance their intercollegiate athletics programs.

I reserve the right to review and rely on additional information as it is disclosed or discovered, depositions which have yet to be taken in this case, or other information which comes to my attention following the date of submission of this report.  I will prepare an additional report(s) that reflects such new information if requested.  Finally, I reserve the right to rely on information that I am able to recollect based on questions asked of me following the submission of this document and during my testimony at deposition or trial.

## VIII.   UNDERLYING CONSIDERATIONS

### A.  Rendering opinions, not legal judgments.

I am not an attorney, a judge, or a member of a jury charged with the responsibility of determining whether actions taken by UConn or its administrators constitute illegal discrimination or violations of Title IX.  Rather, my opinions and conclusions reflect and are based on my years of experience as an athletic director, academic, researcher, teacher, and consultant who educates coaches and administrators about best practices in gender equity and sport management.  Many of the vernacular terms we use to teach/advise administrators, Title IX coordinators, and others may be legal terms but should not be interpreted as rendering legal opinions.  I am assessing UConn as I would assess any university who asks me to consult on gender equity or Title IX athletics compliance. Thus, any opinions rendered for this report as to whether UConn data or practices meet Title IX standards of gender equitable participation or treatment, are my expert <u>opinions</u> and are not intended to usurp the authority of a judge or jury to render a legal judgment related to whether a fact situation complies with Title IX.

### B.  Basic premises

Before I present my conclusions and opinions, it is important to understand several important principles that govern Title IX assessments. First, the assessment of athletics gender equity is "institution specific."  "Institution specific" means that comparisons are made with regard to the participation opportunities and benefits afforded to <u>all</u> male and female athletes <u>within</u> each institution rather than compared to what any other institution is doing.  In other words, no comparisons are made to the participation or treatment of males and females at other institutions.   If an institution's athletic program is inequitable, it does not get a free pass from its

gender equity obligations just because another institution in the same athletic conference runs an even more inequitable athletic program.

Second, the assessment of athletics gender equity is "total program oriented," which means that a proper gender equity analysis looks at the treatment of _all_ male athletes versus the treatment of _all_ female athletes, rather than comparing one sport to another (e.g., men's basketball compared to women's basketball).  However, when an institution conducts an athletic program that places sports within different competition levels (e.g., varsity, junior varsity, novice, sub varsity) the proper gender equity analysis looks at  the treatment of _all_ male athletes versus the treatment of _all_ female athletes but within each level of competition.

Third, it is important to understand that a lack of financial resources is not an acceptable defense to an institution's failure to treat male and female athletes equally or to provide equal participation opportunities.  Once an institution determines its available financial resources, it must allocate those resources so that males and females receive an equal opportunity to participate at each level of competition; receive equal access to athletic aid, and overall receive equal athletic benefits.

Fourth, the fact that a sport may generate significant revenues is not an acceptable reason for treating athletes in that sport better than athletes of the opposite sex.  Congress considered exempting revenue producing sports from Title IX analysis in the 1970s but ended up rejecting all such proposals.  College athletic opportunities are educational opportunities that must be made equally available to men and women.  Therefore, once revenues are accepted by the institution or generated by a team or athletic event (tuition, student fees, donor gifts, gate receipts, booster club contributions, media rights fees, sponsorships, etc.), the institution controls

those revenues and is obligated to treat male and female students equally with regard to how they decide to expend those revenues.

Fifth, it is acceptable for an institution to "tier" its athletic program as long as it does so in a gender equitable manner.   This means that an institution may decide to emphasize certain teams over others and thus provide them with more resources, more scholarships, and national competition while it provides other teams with enough resources and scholarships to compete within the institution's region or athletic conference.  For example, tier one teams may receive the most benefits with maximum scholarships, superior facilities, and a national competition schedule; tier two teams may receive good benefits but with fewer scholarships and a more regional competition schedule; and tier three teams may receive fewer benefits, fewer (or no scholarships) and a conference based competition schedule.  However, if an institution chooses to do this, then it must ensure a proportional number of male and female athletes and their teams are in each tier.  If an institution provides proportionally more male athletes than female athletes with tier one benefits (e.g., 25% of male athletes but only 17% of female athletes), then it is treating them inequitably and favoring male athletes over female athletes.

It should also be noted that the affirmative, proactive aspects of Title IX compliance are so important that the federal regulations require that all schools or school districts affirmatively assure they will comply with Title IX and not discriminate as a condition for their receipt of federal funds.  By doing so institutions represent that they have taken affirmative efforts to eliminate past discrimination, that they do not discriminate now, that they will continue not to discriminate, and that they will take whatever remedial action is necessary to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination.

## IX.    TITLE IX CONSIDERATIONS

In this section I lay out the basic gender equity/Title IX considerations and rules that every athletic administrator should know.  These are the standard considerations they must apply every day in their athletic programs and they are the considerations they must apply when they decide to eliminate teams.  They are the standard considerations – essentially the standards of care – I apply when conducting gender equity or Title IX reviews for clients.  I apply these in my opinions, so it is important to lay set them out in the report itself before I do.

Title IX's core language provides:

> *No person in the United States shall, based on sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.*

> *20 U.S.C. §1681(a)*

The Title IX regulations include provisions that directly and indirectly impact intercollegiate athletics. 34 C.F.R. Part 106. Section 106.31 includes a broad mandate that applies to all educational programs and activities, including athletics. Other general sections of the regulations that apply to athletics include financial aid (§106.37), recruiting (§106.23), admissions (§106.21), and facilities (§106.33).

Section 106.41 addresses athletics directly.

> *§ 106.41   Athletics.*
> *(a) General.*
> *No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.*
> *(b) Separate teams.*
> *Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such*

*teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.*

*(c) Equal opportunity.*

*A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:*

*(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;*

*(2) The provision of equipment and supplies;*

*(3) Scheduling of games and practice times;*

*(4) Travel and per diem allowances;*

*(5) Opportunity to receive coaching and academic tutoring;*

*(6) Assignment and compensation of coaches and tutors;*

*(7) Provision of locker rooms, practice and competitive facilities;*

*(8) Provision of medical and training facilities and services;*

*(9) Provision of housing and dining facilities and services;*

*(10) Publicity*

Subpart (a) tracks Title IX but notably adds to the basic language by stating that no one shall be treated differently than any other person on the basis of sex.   If an institution has different policies for men's and women's teams, applies policies disproportionately to athletes from one sex, or makes different decisions or structures its athletic program in different ways for men and women and if that different treatment harms women, then such actions fall within this broad regulation.  Subpart (b) permits and may require separate programs for men and women. Subpart (c) gets even more specific.   Item (c)(1) addresses the effective accommodation of athletic interests and the allocation of athletic participation opportunities. Items (2) through (10) address the allocation of athletic benefits and are commonly referred to as the Title IX "laundry list" of treatment and benefits.  Notably, the effective accommodation provision focuses on the

assessment of athletic interests and abilities, the selection of sports, and levels of competition ---
not just counting athletes.  I will explore this important point later in the report, because it forces
administrators to look at more than numbers on a roster management chart.

In 1979 the U.S. Department of Health Education & Welfare (the precursor to today's
U.S. Department of Education) released what is known as the 1979 Policy Interpretation on Sex
Discrimination in Intercollegiate Athletics (the "1979 Policy Interpretation").   44 Fed.Reg.
71413 et seq.  Exhibit D.  The 1979 Policy Interpretation explains the meaning of athletic equity
in three main areas: (1) the allocation of athletic participation opportunities and "whether the
selection of sports and levels of competition effectively accommodate the interests and abilities
of members of both sexes; (2) the allocation of athletic benefits; and (3) the allocation of athletic
financial assistance.   For purposes of the preliminary injunction, this report focuses on the first
area.

The 1979 Policy Interpretation's section on the effective accommodation of interests and
abilities outlines three policy areas that require review when assessing equity: (A) the
determination of athletic interests and abilities, (B) the selection of sports provided, and (C) the
levels of competition provided to members of each sex.  44 Fed. Reg. at 71417[C][2].  The much
referenced Three Part Test is not the only factor that must be reviewed.  It is merely a component
of Section [C][5] as part of the policy on the levels of competition.  However, because the Three
Part Test is often the first test used by institutions to assess their participation compliance, I will
start there.

**A.  The Three Prong Test**

One common way of assessing the equitable allocation of athletic participation opportunities
is reflected in the "Three Part Test" set forth in the 1979 Policy Interpretation.  It examines:

1. *Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or*

2. *Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of that sex; or*

3. *Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.*

*-- 44 Fed. Reg. at 71418[c][5](a)*

In 1996, in the midst of the early Title IX athletics cases, DOE issued a Dear Colleague Letter that enclosed guidance on the application of the Three Part Test known as the *Clarification of Intercollegiate Athletics Policy Guidance: The Three Part Test* (the "1996 Clarification"). Exhibit E. In 2010 DOE issued a Dear Colleague Letter that provides specific guidance on complying with Prong Three of the Three Part Test. Exhibit F. All athletic administrators and Title IX officers should be well-versed in these guidance documents.

The first prong of the Three-Part Test reflects the goal of actual equity in which each male and female student has the same opportunity to participate in intercollegiate athletics. The second and third prongs reflect alternative means of compliance that are essentially defenses that explain why actual equity (male/female athletic participation proportional to male/female undergraduate enrollment) may not be possible at a given institution.

1. **Prong One**

Prong One reflects the fact that varsity intercollegiate athletics are sex segregated so that male and female students do not compete for the same participation opportunities. Men compete for a spot on the men's basketball team and women compete for a spot on the women's

basketball team.  Thus, an institution achieves actual equity when the percentage of female athletes is substantially proportionate to the percentage of full-time female undergraduate students enrolled at the institution.  If 50% of an institution's full-time undergraduate students are female, then 50% of the institution's varsity athletes should be female.  In other words, if an institution has 1,000 students (500 males and 500 females) but only enough resources to offer 500 athletic participation opportunities, then to achieve actual equity under Prong One, it must provide 250 of those opportunities to males and 250 of those opportunities to females.  Each male and each female will then have an equal 1 in 2 chance of playing sports.  If the school instead created 300 slots for males and only 200 slots for females, then each male student would have a 3 in 5 chance of playing sports while each female would have only a 2 in 5 chance of playing sports.  This would not be equitable.

An institution's permissible deviation from actual proportionality (i.e., substantial proportionality) is fact specific.  The allowable variance is *not* measured by a percentage. It is measured by the participation gap, which is the actual number of additional athletic participation opportunities that the institution should have provided to the under-represented sex given the actual number of athletic opportunities it provided to the other sex in order to achieve a variance of 0.  For many years, some institutions erroneously believed that if they were within 5% of actual equity, then they were close enough.  That was never what the guidance said… and it conflicts with the theory behind actual equity.   The actual participation gap number must be calculated and considered, because even small percentage differences can lead to very different results, depending upon the size of the athletic program.

The 1996 Clarification explains how one institution with 52% female enrollment but only 47% female athletic participation could meet substantial proportionality while another would not

by comparing a small athletic department with only 60 athletes to a large athletic department with 600 athletes.   OCR explained in its 1996 Clarification of the Three-Part Test (at pp. 9-10):

> For instance, Institution A is a university with a total of 600 athletes.  While women make up 52 percent of the university's enrollment, they only represent 47 percent of its athletes.  If the university provided women with 52 percent of athletic opportunities, approximately 62 additional women would be able to participate.  Because this is a significant number of unaccommodated women, it is likely that a viable sport could be added.   If so, Institution A has not met part one.
>
> As another example, at Institution B women also make up 52 percent of the university's enrollment and represent 47 percent of the Institution B's athletes.   Institution B's athletic program consists of only 60 participants.  If the University provided women with 52 percent of athletic opportunities, approximately 6 additional women would be able to participate.   Since 6 participants are unlikely to support a viable team, Institution B would meet part one.

Early versions of the NCAA's Achieving Gender Equity manual[8]  gave an example in which an even smaller, 2% gap was not substantially proportionate enough to meet Prong One. See Exhibit G at p. 6.   The enrollment of the institution in the NCAA manual's example was 52% female, but they received only 50% of the 600 athletic participation opportunities.   Women received 2% fewer opportunities than they should have.   It noted that if men received 300 athletic participation opportunities, then women should have received 325 opportunities to reach 52% of all opportunities.    Because the participation gap - number of additional female participants required (25) to reach equity - was "a sufficient number to form a viable team in every sport sponsored by the NCAA and all other national athletics organizations, the institution in this example would not be offering participation opportunities substantially proportionate to enrollment despite a difference of only two percentage points…. Smaller differences than two percentage points, depending on the participation rates at a specific institution may also be found

---

[8]    National Collegiate Athletics Association. (circa 2000) *Achieving Gender Equity:  A Basic Guide to Title IX and Gender Equity in Athletics for Colleges and Universities.*  Retrieved from:  Internet Archives Wayback Machine at https://web.archive.org/

as not substantially proportionate and, therefore, not in compliance with test one."  Exhibit G at p. 6.

The example shows how a 2% (or even smaller) variance may seem small in the abstract but may, in fact, be large depending upon the size of the athletic program.  It may translate into a small participation gap at an institution with a small athletic program with a small number of participation opportunities, but it may translate into a larger participation gap at an institution with a larger athletic program with many participation opportunities.   In the manual's example, the small variance translated to a participation gap of 25, which was more than enough for a viable team.   Thus, in order to assess whether a specific institution meets Prong One given the size of its athletic program, one must count the number of athletic participation opportunities provided to each sex and then calculate the actual participation gap.

Here is a practical example and step-by-step breakdown of how to calculate the participation gap.  A large institution with 5,500 female students (55%) and 4,500 male students (45%) that decides to offer 1,000 athletic participation opportunities should ideally offer 550 out of those 1,000 athletic participation opportunities (55%) to females and 450 out of those 1,000 opportunities (45%) to males.  If the school offered only 520 of its 1,000 opportunities (52%) to females and 480 to men (48%), the school would not be providing equal athletic opportunities to its female students. To reach proportionality with 550 female opportunities and 350 male opportunities, it could take 30 opportunities away from male athletes and add a new women's team or teams of 30 female athletes.    But what is the participation gap if the men stay at 480? How many opportunities should the institution provide – or should it have provided?  That's the calculation I make below to show the participation gap.

To calculate the participation gap if the number of male opportunities is set (here at 480), we must apply some algebra. Under Prong One, the percentage of female athletes must equal the percentage of female students in the full-time undergraduate enrollment. Algebraically, this is represented in the following equation: $X/(X+Y)$ = percentage of female athletes = percentage of female enrollment. Y is the known number of male athletes. X is the number female athletes that there should be if males have Y opportunities. In this example, there are 480 male athletes and the percentage of female students is 55%. The equation is $X/(X+480) = .55$. Then solve for X. X = 587. This is the number of female athletic participation opportunities that there should be given the 480 male athletes. 480 men + 587 women = 1067. 587 women are 55% of the total 1067 athletes. If women only receive 520 opportunities, then the institution should have provided (or should now add) 67 more opportunities for women (587-520 = 67). This is the participation gap.

Another easy mathematical way to compute the female participation gap in this fact situation is as follows:

- Divide the number of male athletes (overrepresented sex) by their percent of the undergraduate student body (480 divided by .45) – to get the <u>total number of athletes</u> if male athletes were 45% of all athletes--in this example = 1067 total athletes

- Then subtract the actual number of male athletes (480) and the actual number of female athletes (520) to find the number of new female participation opportunities that must be added for females to be 55% of all athletes – in this example, 1,067 minus the 1,000 current male and female athletes = 67

- Now check your math:

- o   Current females are 520 plus new females will be 67 = 587 total female athletes. 587 is 55% of 1067.

- o   Current males are 480.  480 is 45% of 1,067.

Again, the participation gap is 67.

An institution has the option of closing this gap by eliminating men's athletic participation opportunities or by adding women's athletic participation opportunities.   In this example, the institution could add a women's lacrosse team with 32 athletes, a women's field hockey team with 24 athletes, and a women's golf team with 11 athletes.  If it instead added only a women's cross country team (in which only 7 athletes run and only 5 of those 7 athletes score as varsity participants) and then sought to fill it with 67 runners, then it would provide fundamentally different kinds of opportunities that would require a review of those provided to men to determine whether the opportunities provided to men and women were comparable.

If the participation gap is larger than the size of a viable team in a sport that women want to play (or that the institution could recruit women to play), then the participation gap is too large to satisfy Prong One.  The participation gap example in OCR's 1996 Clarification (at pp. 9-10) addresses the concept of a viable team:

> OCR would also consider opportunities to be substantially proportionate when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, **i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team.**  As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution. **(emphasis added)**

> For instance, Institution A is a university with a total of 600 athletes.  While women make up 52 percent of the university's enrollment, they only represent 47 percent of its athletes. If the university provided women with 52 percent of athletic opportunities, approximately 62 additional women would be able to participate.  Because this is a significant number

*of unaccommodated women, it is likely that a viable sport could be added.   If so, Institution A has not met part one.*

*As another example, at Institution B women also make up 52 percent of the university's enrollment and represent 47 percent of the Institution B's athletes.   Institution B's athletic program consists of only 60 participants.   If the University provided women with 52 percent of athletic opportunities, approximately 6 additional women would be able to participate.   Since 6 participants are unlikely to support a viable team, Institution B would meet part one.*

While "OCR may consider the average size of teams offered for the underrepresented sex," neither example above even considered the average team size at the institution.   Both looked solely at whether the participation gap was large enough to add a viable team.   Thus, the 1996 Clarification indicates that the standard is a "viable team" that could be added.

This "viable team" application of the 1996 Clarification makes sense given that Title IX's purpose is to reach equal opportunity, preferably by expanding women's opportunities until they match those that men have always received.    If a school has never met Prong One, but adds enough female opportunities to get down to a participation gap of 26, it still would not reach actual equity of a participation gap of 0.   It would not be equitable to allow it to stop there just because women want a volleyball team with 14 athletes, which is less than the average squad size for all women's teams of 30, when adding the 14 volleyball players would only reduce the participation gap from 26 to 12…. not 0.   The same institution could add 10 golfers and still not reach a participation gap of 0, but at least then it would have only a gap of 2 which would be less than any viable team.

A truly equitable athletic program is one in which sometimes the men have slightly more opportunities proportionate to enrollment and sometimes the women have slightly more opportunities proportional to enrollment.  This back-and-forth accounts for natural fluctuations in enrollment and participation.    When women have never (or only rarely) received an equitable allocation, the goal must be to expand women's opportunities until they actually reach equity as

the statute and regulation require – or in the words of the Three-Part Test itself, until the interests of the under-represented sex are fully and effectively accommodated.

If the participation gap is 15, then to determine the size of a viable team one must examine whether there are sports that require a similar or lower squad size.   One common way to determine if there are such sports is to look at the sports sponsored by the NCAA.  The NCAA publishes average team squad sizes by sport for all NCAA members and for all NCAA Division I members.   See *NCAA Sports Sponsorship and Participation Rates Report 1981-82 – 2019-20* published on the NCAA website.[9]  Note that I have chosen to use 2018-19 tables throughout this report, unless otherwise indicated, in order to avoid 2019-20 averages which may have been affected by the cancellation of spring 2020 sports seasons.

The NCAA Division I average squad size for bowling was 9.6 and for golf was 8.2 in the 2018-2019 report.  An institution with a participation gap of 15 can add either of these women's sports.   If the participation gap is 3, there is no new sport with a roster that small, so the institution's athletic participation would be substantially proportionate.   That conclusion presumes that there are no inflated women's rosters that could or should be right-sized to allow for a new women's team (if the men's rosters are not comparably inflated).

Only actual participants in actual participation opportunities count when measuring athletic participation equity under Title IX.   Ghost opportunities (like those rejected by OCR) and athletes who show up for a short time (and then quit or are cut) do not count.  Participants who are kept on the team roster only until the first competition date usually do not count.   While EADA report instructions allow schools to count athletes who are still on the team on the first

---

[9]   National Collegiate Athletic Association. (2020) *NCAA Sports Sponsorship and Participation Rates Report 1981-82 – 2019-20.*   Retrieve   from:   https://ncaaorg.s3.amazonaws.com/research/sportpart/2019-20RES_SportsSponsorshipParticipationRatesReport.pdf

date of competition (even if cut the next day), Title IX does not.  It requires a more substantive review of the actual opportunity that includes satisfaction of the definition of "participant" included in the 1979 Policy Interpretation (at p. 71415) and the 1996 Clarification (at p. 3), which includes those athletes:

1. *Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved (e.g., coaching, equipment, medical and training room services) on a regular basis during a sport's season; and*

2. *Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and*

3. *Who are listed on the eligibility or squad lists maintained for each sport; or*

4. *Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.*

Participation in a competition is not required in order to count as a participant if an athlete meets all the other criteria and receives the same kind of opportunities provided to men at the same level of competition.  However, to qualify as a participant under this definition, an athlete must participate and receive varsity benefits on a "regular basis" during the sport's season – not just at the beginning of the school year or the beginning of a sport's playing season.  If a softball coach starts the school year with 25 female athletes, conducts try-outs, and plays a couple scrimmages in the fall, but then through cuts or quits ends up with only 18 athletes by the time softball starts its competitive season in the spring, then only 18 athletes (not 25) count as participants under this definition – assuming those 18 athletes meet all the other criteria.  This difference of 7 athletes is an example of why it is important to take a deeper dive into the participation data claimed by institutions.  Not all athletes (even if they exist) are countable participants – just as not all athletes receive the same kind of opportunity.

Similarly, if an institution decides to offer women's rowing and invites 100 women to try out, and cuts or weeds out those women who do not actually have the ability to participate on a varsity team at the institution's level of competition (NCAA Division I at UConn), then only those athletes who remain to participate at the varsity level during the sport season count as participants – not the original 100.

At the NCAA Division I level of competition, nearly every coach (if not every coach) expects varsity athletes to participate in every practice and every team event unless expressly excused.  An athlete is not a regular participant if she does not meet this expectation.   Thus, assessing which athletes count as participants requires a fact intensive review.  The NCAA Hours Limitations records for each team and each athlete, if kept carefully and accurately, can be helpful in making these assessments.

This fact-specific review is necessary to ensure that men do not receive substantive, year-long opportunities while women receive mostly try-out opportunities and do not actually participate long enough to receive the benefits of varsity athletic participation.   It is also necessary to ensure that women receive the same nature of opportunities as men.  It requires an audit of the athletic participation numbers provided by an institution.   As more schools learn how to mask their inequities, my experience tells me that this this deeper review has become more and more important.

## 2.  Prongs Two & Three

Prong Two requires that institutions show that they have a history *and* continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the under-represented sex (females at UConn).  They must meet both parts of the test. The goal is to remediate past discrimination and to prevent ongoing discrimination.

The 1975 Title IX regulations gave institutions a three-year adjustment period to reach athletic equity.  34 C.F.R. §106.41(d).   Even then, OCR made clear in its 1975 *Memorandum on the Elimination of Sex Discrimination in Athletic Programs* that "[t]he adjustment period is not a waiting period.  Institutions must begin now to take whatever steps are necessary to ensure full compliance as quickly as possible."   Exhibit H (p.4); 40 Fed.Reg. 52655.   The compliance deadline passed in July, 1978.   Few colleges met this deadline, but that does not absolve them of ever doing so. Indeed, as female students' interest in athletics grew, institutions should have been adding more opportunities to meet "developing interest."

Those same institutions must also demonstrate "a continuing (i.e., present) practice of program expansion."  It is not enough to show that an institution expanded opportunities shortly after Title IX or that it expanded them until it was "close enough," as the viable team discussion notes.   It also is not enough for an institution to promise to expand its women's program in the future.  1996 Clarification (p. 7).  If an institution does not meet Prong One, then it must have a gender equity plan in place that addresses prongs two and three to get there "as quickly as possible" – the standard set 45 years ago in the 1975 memo (p.4).

Under Prong Three institutions must continue to expand athletic opportunities until they fully and effectively accommodate the interests and abilities of the under-represented sex (usually females) – or meet Prong One.  The 1996 Clarification explains Prong Three (pp. 9-12). OCR issued a Dear Colleague Letter on April 20, 2010, that further explains what factors it will consider when assessing whether an institution actually meets Prong Three.  Exhibit F.  I will apply these principles in my opinions below.

**B. Other Components of Participation Equity**

Although many institutions focus only on the Three-Part Test, it is not the only factor that must be considered when assessing whether an athletic program provides equitable participation. The primary Title IX athletics regulation states:

> *§ 106.41 Athletics.*
> *(c) A recipient which operates or sponsors interscholastic, intercollegiate, club, or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:*
> *(1) **Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes**…*
> *-- 34 C.F.R. 106.41(c) [bold emphasis added]*

In determining "whether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of both sexes," the 1979 Policy Interpretation explains the Title IX effective accommodation regulation, (34 CFR §106.41(c)(1)), the policy behind it, and the factors that must go into assessing whether a school complies with it. (44 Fed. Reg. at 71417-71418).  Its policy section states that OCR will assess compliance with the effective accommodation regulation by examining:

> *a. The determination of athletic interests and abilities of students; and*
> *b. The selection of sports offered; and*
> *c. The levels of competition available, including the opportunity for team competition.*
> *-- 44 Fed. Reg. at 71417*

Note that the regulation and these 1979 Policy Interpretation policy factors do not even mention participation numbers.  The Three-Part Test is merely one of four subsets of the effective accommodation requirement and a small part of the overall policy with which UConn must comply.  Too many schools ignore these factors even though the 1979 Policy Interpretation emphasizes them.  They look only at the 1996 Clarification and fail to realize that the 1996

Clarification was only intended to address the Three Part Test --- no effective accommodation generally.

The 1979 Policy Interpretation explains in subpart (a) how institutions are required to determine athletics interests and ability. In subpart (b) it addresses the issues that schools should consider when selecting the sports they offer. Subpart (c) has two parts: the Three-Part Test (which does address numbers) and the "competition test" which requires institutions to provide proportional athletic opportunities at each level of competition.   In particular, subpart (a) specifies:

> **(a) How schools must assess the interests and abilities of their students.**
> [3] Application of the Policy - Determination of Athletic Interests and Abilities
> Institutions may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing provided:
> a.   The processes take into account the nationally increasing levels of women's interests and abilities;
> b.   The methods of determining interest and ability do not disadvantage the members of the under-represented sex;
> c.   The methods of determining ability take into account team performance records; and
> d.   The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of the under-represented sex.
>
> -- 44 Fed. Reg. at 71417[C][3](a)

The second element of the "effective accommodation" regulation addresses the "selection of sports offered".   The 1979 Policy Interpretation discusses the factors that schools should consider when selecting the sports they offer, including whether the same sports must be offered for men and women, whether the excluded sex must be permitted to try out for a team for the opposite sex, how schools should treat sports categorized as contact or noncontact sports, and whether teams are chosen by athletic skill. See 44 Fed. Reg. at 71417-71418, Part [C][4].

Sports selected for men and women do not have to be identical, but they must respond to the respective interests and abilities of males and females in nondiscriminatory ways.  This may

lead to providing many of the same sports to men and women.  The 1979 Policy Interpretation indicates that if males already have opportunities in a sport and females want their own, the institution may be required to add a separate women's team if (1) women's opportunities were historically limited, (2) there is enough interest and ability among women to sustain a viable team for which competition is available, and (3) women do not possess sufficient skill to be selected for an integrated team (i.e., a coed team).   In other words, if women want a team and are not likely to make the existing men's team, then an institution may have to add the same sport for women.   Women's golf likely falls under this provision at UConn.

Institutions should be careful not to select women's sports in a discriminatory manner. For example, if an institution provides men with sports and opportunities that they want to play (no matter the cost) but provides women with sports and opportunities that are the least expensive (no matter what women most want to play), then the institution's selection of sports is different on the basis of sex.  Similarly, if an institution chooses sports for men that have NCAA championships and high public interest, but then chooses sports for women based upon cost – ignoring the benefits of post-season options or public interest – then that would be another example of a discriminatory selection of sports.

For "(c) Levels of Competition Offered," the third effective accommodation factor, the 1979 Policy Interpretation sets out two separate tests regarding levels of competition: (1) participation, including the Three-Part Test, which has already been examined in this report, and (2) competitive team schedules.  Institutions must satisfy both parts in order to comply with the effective accommodation regulation. In particular,

> [5] Application of the Policy - Levels of Competition.
> In effectively accommodating the interests and abilities of male and female athletes, institutions must provide **both** the opportunity for members of each sex to **participate** in

intercollegiate competition **and** for athletes of each sex **to have competitive team schedules which equally reflect their abilities**.

-- 44 Fed. Reg. at 71418 [bold emphasis added].

If men are provided Division I competition opportunities but women are provided Division III opportunities, then an institution provides different levels of competition based upon sex. The same occurs if an institution provides men with varsity opportunities but women with junior varsity, novice, or club opportunities. In the *Biediger v. Quinnipiac* case, in which I served as an expert, the university was not allowed to replace NCAA Division I women's volleyball with rugby, because rugby did not yet exist at the Division I level or at any varsity level at enough schools. A schedule of competitive club teams and some varsity teams was not comparable to the all Division I competition level of the men's teams.

It is important to recognize that some opportunities may be sub-varsity in fact even if the institution does not declare them as such. For example, in NCAA cross country meets, institutions can enter only seven varsity runners. Only five of these runners can score points for the team. The last two runners can displace runners from other teams, thus reducing the points those runners score for their team, but they cannot score points themselves. Yet, at some meets, the participating institutions agree to allow other athletes to run in the same or a separate race. These athletes cannot score for their team no matter how well they perform. They are essentially participating in a junior varsity or developmental competition. There is nothing wrong with providing such opportunities, but they must be recognized and counted based upon what they are – non-varsity opportunities. Otherwise, an institution could structure its athletics program to provide male athletes with varsity opportunities but female athletes with a mix of varsity and developmental opportunities. We are long past the 1978 adjustment period deadline for Title IX. There are more than enough female athletes with the interest and ability to participate and

compete at the Division I varsity level of competition in many sports.   Division I institutions should not be funneling female students into junior varsity or developmental opportunities instead of Division I varsity opportunities – unless it does the same to its male students and to the same proportional degree.

The final part of the "effective accommodation" section of the 1979 Policy Interpretation recognizes the need to look at the overall policies and nature of the opportunities provided – not just numbers.   In particular, it states that DOE will examine:

> [6] a. Whether the policies of an institution are discriminatory in language or effect; or b. Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afford male and female athletes exist in the institution's program as a whole or c. Whether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of opportunity.   44 Fed. Reg. at 71418.

If an institution has different rules or policies for men's and women's teams or if it applies common rules differently or disproportionately to one sex and if the policies harm that sex, then those policies must be examined as sex discrimination.     For example, this happens when an institution imposes maximum squad sizes on men's teams but minimum squad sizes on women's teams and encourages or requires the women's teams to carry more athletes than needed to fill varsity spots.   Also, if there are disparities in the nature of the athletic participation opportunities provided to male and female athletes and if those disparities disproportionately harm one sex over the other, then the institution fails to provide effective accommodation under the 1979 Policy Interpretation – again independent of the Three-Part Test.

In sum, all parts of the "effective accommodation" regulation and policy must be considered – not just the Three-Part Test and not just counting athletes – when analyzing

whether an institution provides its female students with an equal opportunity to participate in varsity athletics.

**CONCLUSIONS/OPINIONS**

It is my opinion that (1) UConn does not equally or effectively accommodate the interests and abilities of female students in varsity intercollegiate athletics; (2) UConn's proposal to eliminate some of its varsity teams in 2021-2022 harms females more than males; and (3) UConn's elimination of the women's rowing team will cause the team members and the program irreparable harm.

## X. CONCLUSION/OPINION RE: UCONN's CURRENT/HISTORICAL EFFECTIVE ACCOMMODATION OF INTERESTS AND ABILITIES

It is my opinion that UConn does not equally or effectively accommodate the athletic interests and abilities of its female students. My review of UConn's publicly available athletic participation data indicates that UConn does not now and historically has not provided female students with an equal opportunity to participate in varsity intercollegiate athletics. I believe that if I am provided additional information during discovery that enables me to further review which of the athletes listed on the UConn rosters count as participants and the kinds of opportunities that UConn provides, it will show that the disparity in athletic opportunity is even larger than the public data shows. My initial deeper dive into the basic information suggests this. It is also my opinion that UConn has not met its other obligations under the effective accommodation regulation relating to the assessment of athletic interests, the selection of sports, and the levels of competition. UConn discriminated against its female students when it ignored or failed to

consider these factors when deciding which sports teams to add to or eliminate from its varsity athletic program.

### A.   Opinion based upon UConn's self-generated participation data

In this section I review the publicly available athletic participation data that UConn itself generates and publishes, including the athletic participation rosters on UConn's website.   It shows that UConn does not meet any prong of Title IX's Three Part Test.   It does not satisfy Prong One because it has a participation gap that favors men.   It cannot satisfy Prong Two or Prong Three, because it proposes to eliminate a women's team for which there are athletes who have the interest and ability to continue participation.

### 1.   Prong One

I start my athletic participation equity reviews by gathering participation data and by assessing which athletes are countable for purposes of Title IX.   I start by reviewing: (1) official athlete eligibility lists, such as the NCAA Squad List[10] (2) athlete attendance at team practices

---

[10]   NCAA squad lists are official records that show each listed athlete's recruiting, eligibility, participation, and scholarship status.  They also list if/when athletes quit or are cut from teams.  They list all athletes whether or not they meet the Title IX definition of a participant.  The relevant NCAA rule states:

15.5.11  Squad List

15.5.11.1  Eligibility Requirement.   To be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be included on the institution's squad-list form [D].

15.5.11.2  Squad-List Form.  The institution shall compile a list of the squad members in each sport on the first day of competition and shall indicate thereon the status of each member in the categories listed.

15.5.11.2.1  Procedures.  The following procedures shall be used for the squad list:

| | |
|---|---|
| (a) | The form shall be available for examination upon request by an authorized representative of another member institution, the NCAA, and, if the institution is a member of a conference, an authorized representative of the conference; |
| (b) | A supplementary for may be filed to add names of persons not initially on the squad or to indicated change of status; |
| (c) | A student-athlete's name must be on the official institutional form to qualify to represent the institution in intercollegiate athletics; and |
| (d) | The athletic director (or his or her designee, who may not be a coaching staff member) shall sign the form for each sport.  The head coach in each sport shall sign the form for the applicable sport. |

See 2020-2021 NCAA Division I Manual (pp. 230-231) at
http://www.ncaapublications.com/p-4605-2020-2021-ncaa-division-i-manual.aspx
See NCAA Division I Squad Lists and Instructions - Form 20-2. Retrieved from:
https://ncaaorg.s3.amazonaws.com/compliance/d1/2020-21D1Comp_Form20-2-SquadLists.pdf

and meetings, such as that recorded in the NCAA Hour Limitation Records,[11] and (3) competition results.[12]   The NCAA squad lists and hour limitation records are retained by all athletic departments.   When I am retained by schools to advise them about Title IX or gender equity, they provide this information to me.  In this case, they were not provided to me.

When I do not have access to this information, I review publicly available participation information, such as EADA reports and team rosters displayed on the athletic department's official internet web site, archives, and other print or electronic publications (e.g., media guides).[13]  Web site rosters are reliable sources, because they are derived from the squad lists. An athlete cannot tryout or practice until he/she is determined to be NCAA eligible and his/her name is added to the official NCAA Squad List.  Eligible athletes from that list comprise the team roster, which is provided to the staff who maintain the web rosters.   When an athlete leaves the squad due to ineligibility, transfer, or any other reason, the athlete's name usually is removed from the web site.

The institution itself generates the web rosters as their own business records.   The institution, parents, fans, the media, and others depend on them to contain accurate and up-to-date information that is regularly used for newspaper and electronic media coverage of the institution's athletic program. When using these sources, I examine data over a sufficient

---

[11]   The NCAA limits the amount of time that student-athletes must devote to athletics.   To monitor these limitations, it requires members to record the amount of time spent by each student-athlete each day in athletic team-related functions.  This information is helpful to assess whether an athlete meets the Title IX definition of "participant" by regularly participating in team practices and meetings.  The *NCAA 2020-21 Division I Manual* describes the hour limitation record at p. 259.

[12]   Competition results are usually maintained by the sports information director and the sport coaches and are posted on the institution's athletic department website.

[13]   When I refer to "web rosters," I mean the public roster lists generated by the UConn athletic department and displayed on its athletics web site at www.uconnhuskies.com, uconnhuskies.com archives by sport in the form of rosters, media guides, or official statistics or the uconnhuskies.com web site as captured by the Wayback Machine internet archives at https://web.archive.org/.  For track and field only, if rosters were not available at any of these locations, I used the TFRRS UConn roster located at https://www.tfrrs.org/ which, by NCAA rule, must contain only those players who are eligible to compete.

historical time period to be sure that data from more current years are not outliers and to detect consistent counting or participation patterns.   Thus, while I would like to see the official squad lists, I believe the team rosters provide enough information for me to render a reasonable opinion on whether an institution is providing proportional participation opportunities to males and females.

Because some athletic administrators are more familiar with the EADA than Title IX (and erroneously think the EADA participation numbers can be used for Title IX), and because some direct their coaches to carry large women's rosters until after the first date of competition so that their EADA participation statistics look better, I think it is important to explain here why athletic rosters more accurately count athletes than EADA reports.

EADA reports provide a snap shot in time.   One can quickly calculate the EADA participation gap and estimate whether an institution meets the substantial proportionality participation requirement of Prong One. One can review the listed data without having to go through years of team rosters to count up participants.  They are a short-cut that provides basic participation information, but they are not Title IX compliance reports. DOE's own EADA web page states this: "*The data collected in this survey are provided by institutions in accordance with the EADA and may not be the same as data used for determining compliance with other Federal or state laws, including Title IX of the Education Amendments of 1972.*"[14]

EADA reports can show large or obvious disparities, but if the EADA participation gaps appear to be small or inconsistent, it is important to look at the primary sources and rosters to determine which athletic participants are countable under Title IX's definition of participant in

---

[14]   U.S. Department of Education Office of Postsecondary Education (OPE) (November 2020)  *User's Guide for the Equity in Athletics Disclosure Act Web-Based Data Collection*.  Retrieve from: https://surveys.ope.ed.gov/athletics2k20/wwwroot/documents/2020_EADA_Users_Guide.pdf

order to obtain a more accurate number.    Unlike the EADA reports, these sources show actual names and not just raw numbers.    The web sites often include competition information that can confirm an athlete's participation.    Rosters can be confirmed through participation and competition results.  Raw numbers on EADA reports cannot.

Team rosters generally provide more accurate information than EADA reports for Title IX purposes, because the EADA instructions tell institutions to record athletes who do not count for Title IX purposes.  Most notably, EADA instructions direct institutions to count athletes who are on the teams as of the team's first date of competition, whether or not those athletes actually remain on the team or qualify as participants under the Title IX definition explained above. EADA reports thus include athletes who tried out for a team but quit or were cut early in the year.   Some schools' EADA reports count athletes even if they quit or were cut before the first date of competition --- or before the first date of competition of their competition season.   It depends on when the coach or administrator got around to updating the squad list information – information that a compliance administrator then uses to fill out the EADA report.

For example, the EADA would include softball players who tried out in September but were cut from the team after the first game of the nontraditional fall season that same month, even though softball's competition season is in the spring and even though that athlete would not be in the program for 8 of its 9 months (Sept –May).   NCAA rules allow softball teams to start practice in September and to play up to 8 games during the nontraditional fall season. Nontraditional season games do not count towards team win-loss records and do not figure into post-season competition. Fall is the try-out season.  The championship season starts in January and runs through the national championships in May.   Teams can play up to 56 games during this spring season. Coaches often use the nontraditional fall season, including the few games

allowed, to determine which walk-ons (if any) they will keep on the team.   They settle upon a roster which they then bring back in January to actually participate with the team during its competition season.   EADA records would count the athletes who only showed up for the try-out, nontraditional fall season.  Title IX rules would not.   Title IX requires a thorough review of the entire season and academic year in order to assess which athletes meet the definition of a "participant."   Thus, whether an institution complies with the Three-Part Test can only be fully assessed at the end of the academic year when all sports seasons are complete and all participants can be fully reviewed.

Unlike EADA reports, athletic department web rosters are less likely to include athletes who quit or were cut from a program too early for them to count as participants. Coaches and sports information personnel update rosters to reflect the true team members during the competition season. The difference in the number of athletes on a team during tryouts or before cuts compared to the number of athletes who stick around for the sport season can be significant. Even only a few athletes on each team can impact the size of the participation gap by more than the size of a viable team.

The EADA instructions also direct schools not to count athletes who join a team after the first date of competition – even if those athletes participate throughout their sport's traditional season and even if those athletes actually compete.   When I testified in the Quinnipiac case, I recall running across a male athlete whom Quinnipiac had not counted on the EADA, because it said he joined the team after the first fall scrimmage --- even though he participated on the team throughout the spring season and was even named all-conference.   Some institutions intentionally do not add male athletes to squad lists until after the first competitions in the fall off-season so that they do not have to count them.  Those athletes are then added so that they can

compete in the spring sports season.  This tends to happen in sports like baseball and lacrosse in which teams may play a few off-season games or scrimmages in the fall, but who do not start their championship seasons until the spring.   By doing this, their EADA numbers show fewer male participants than would otherwise be countable under Title IX.   Undercounting male participants produces a smaller participation gap.

Below are citations from the EADA User's Guide that direct schools to report athletic participants under metrics that differ from Title IX counting requirements:

1. EADA: "Male practice players…should be counted as participants on the women's team."

   Title IX: Counts only females on women's teams; counts females as females and males as males, no matter which team they participate on.

2. EADA: "Participants are students who…receive athletically related student aid."

   Title IX: Counts athletes who receive athletic aid but do not actually participate only if they are medically unable to participate. Athletes who are cut from a team but keep their aid are not counted.  5th year seniors who do not participate but keep their aid are not counted.

3. EADA: "Do not include:   Fifth-year team members who have received a bachelor's degree."

   Title IX: Counts participants whether or not they are graduate students.

4. EADA: "Do not include:  Individuals who joined the team after the day of the first scheduled contest."

   Title IX: Counts athletes who meet the definition of "participant" in the 1979 Policy Interpretation and 1996 Clarification even if they join the team after the first date of competition.

5. EADA: Counts athletes who are listed on the team roster on the first date of competition, whether or not that person meets the definition of " participant"

47

Title IX:     Does not count athletes who are on the team as of the first date of competition if the athlete does not otherwise meet the definition of "participant."

These EADA instructions can miscount Title IX participants.   Again, just a few disparities can lead to big differences in the participation gap.[15]

One strange counting difference noted above involves male practice players.   Many women's coaches use male practice players to practice against the starters on teams like basketball, volleyball, and soccer.   These male athletes must meet all NCAA eligibility requirements.[16]   They receive the benefits of coaching, practice apparel, athletic training services, etc.   They even receive more practice time than many of the female reserves who sit on the sidelines while the males scrimmage with the starters and top reserves.   The EADA directs institutions to count these male practice players as women rather than as men.   Meanwhile, there are no female practice players on men's teams.   Thus, counting male athletes as female athletes results in an overcount of female athletes on the EADA form and has the effect of producing an undercount of the female participation gap.[17]

If the male practice players receive all the athletic benefits of a participant except competition, then I believe they should count – but as male athletes. They are practicing and receiving benefits ahead of the female reserves who also never compete.    Thus, counting male athletes as female athletes also results in an undercount of male athletes on the EADA form and further undercounts the female participation gap.

---

[15]   I examine the EADA data differences in this report because so many institutions rely on the EADA rather than the Title IX definition of participant when they claim Prong One compliance.   My examination shows why that reliance is so often inaccurate, especially when participation gaps appear small.

[16]   See NCAA Division I Manual Bylaw 12.7.5 at p. 81.

[17]   Although the EADA now instructs institutions to note in the caveat section of the form how many of their recorded female athletes are actually male practice players, not all institutions do so.   For those who do, this information is available on the most recent EADA forms filed with DOE, but not on the historical data.   Thus, historical data is more likely to overcount female athletes and understate the female participation gap.

In some of the older UConn EADA reports I examined, the women's basketball team recorded as many as 30 athletes.  With only 15 scholarships allowed for 15 athletes (women's basketball is a head count rather than equivalency sport) and an NCAA Division I average squad size of only 14.4 athletes (based upon the NCAA's 2018-2019 report), at least half of those 30 female basketball players were likely men, not women.  Thus, the EADA data substantially overcounted females and undercounted males in those years.   More recently, the EADA and roster data for women's basketball shows substantially fewer athletes – as few as 10.  This is an unusually low number. It is barely enough for the basketball players to even scrimmage each other.  If maintained over time it suggests to me that UConn women's basketball uses male practice players but does not record them on the EADA.   Further inquiry may show that other UConn women's teams also use male practice players but do not record them.  If so, this practice would further skew EADA participation data and the participation gaps derived from it.

The EADA instructions to count all students who receive athletic aid and to not count graduate students who participate and even compete also impact the total participation numbers and the ultimate participation gap.  However, the largest impact comes from adjusting roster counts up or down after the first day of competition, which normally produces lower Title IX male and female participation counts than the EADA report, because the EADA allows no subtractions and most adjustments are subtractions -- athletes leaving the program.  This practice leads to even more EADA overcounts of women, as many programs keep women on their rosters just long enough to count on the EADA before they cut them from the team.  They end up counting the try-out athletes and the extra athletes their administrators asked them to find to meet their roster management numbers --- even if those athletes do not stick around long enough to count as regular participants in the competition season.

The EADA also produces skewed data because it allows schools to record their cross country/track athletes as "all track combined."   The EADA report lists only a number.   It does not indicate whether that number reflects different individuals or whether the school is recording the same individual more than once for each season in which he/she participates.   For example, it does not show whether the institution is counting the same long-distance runner once or if the institution is counting him three times for engaging in the same athletic activity (long distance running) in three different seasons (i.e., cross country, indoor track and outdoor track).   Team rosters, on the other hand, generally list the names of participants, so that one can count the actual number of athletes who participate and determine which ones compete in all three seasons for purposes of examining duplicated and unduplicated counts.   UConn's web site includes one roster for cross country and one roster for indoor/outdoor track.   How an institution records its cross country/track athletes on the EADA can lead to large differences in the participation gap, especially when an institution makes sex-based decisions such as requiring its women's teams to carry more athletes than the same men's teams or when it chooses to declare three seasons for the women's team but only one or two seasons for the men's team – as UConn plans to do in cross country.

I have been comparing EADA report participation counts to NCAA squad list counts and web site team rosters counts for the past twenty-five years.   That experience has taught me that overall, EADA reports overcount athletes compared to Title IX participation counts, because they use different metrics and because sometimes institutions count athletes they should not count on the EADA such as when they do not timely record when they quit or are cut from a team.   Sometimes it is because coaches do not get around to timely updating the squad lists. But there also is an incentive to include female athletes even when they should not, because it

makes the institution's gender equity numbers look better on the one gender equity document that the law requires them to make public.  Thus, while EADA reports with large participation gaps likely reflect discrimination, EADA reports with smaller gaps or without gaps do not necessarily show the absence of discrimination.

With this background in mind, I gathered many years of participation data from UConn's EADA reports and athletic department rosters.  I organized the UConn-generated data into charts and then calculated the participation gaps.   Exhibit I shows the EADA data by sport.  Exhibit J shows the athletic web roster data by sport.  COVID-19 caused institutions to shut down their athletic programs in 2019-2020 and not all programs are back to normal in 2020-2021. Therefore, the last publicly available EADA report covered 2018-2019, and rosters after that may be more fluid than their normal size.  Thus, when looking at the impact of program cuts, I examined all three years.  The results of my data collection confirmed why rosters are more reliable.  The EADA reports overcounted athletes every year.  This confirms my opinion that Table 1 on the next page (which reproduces Exhibit K which I prepared to compile and summarize UConn's self-generated roster data which is shown sport-by-sport in Exhibit J) more accurately reflects athletic participation and female athlete participation gaps at UConn than its EADA reports and thus, is a better data source for assessing whether UConn provides athletic participation equity.

TABLE 1.  UConn Prong One Proportionality Analysis and Female Participation Gaps –
2008-09 through 2020-21 – Based on UConnhuskies.com Web Rosters for
the Most Recent 13 years for Which Complete Data was Available

| Year | Male Under Grad* | Percent Male Under Grad | Female Under Grad* | Percent Female Under Grad | Total Under Grads* | Total Male Athletes** | Percent Male Athletes | Total Female Athletes** | Percent Female Athletes | Total Athletes | Female Particip. Gap - # athletes to be added*** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008-09 | 7949 | 49.6% | 8064 | 50.4% | 16013 | 342 | 50.6% | 334 | 49.4% | 676 | 13 |
| 2009-10 | 8132 | 50.1% | 8108 | 49.9% | 16240 | 375 | 51.2% | 357 | 48.8% | 732 | 17 |
| 2010-11 | 8299 | 50.3% | 8197 | 49.7% | 16496 | 396 | 52.8% | 354 | 47.2% | 750 | 37 |
| 2011-12 | 8538 | 50.5% | 8377 | 49.5% | 16915 | 386 | 53.9% | 330 | 46.1% | 716 | 49 |
| 2012-13 | 8407 | 50.7% | 8180 | 49.3% | 16587 | 381 | 52.1% | 350 | 47.9% | 731 | 21 |
| 2013-14 | 8631 | 50.5% | 8452 | 49.5% | 17083 | 372 | 52.8% | 333 | 47.2% | 705 | 31 |
| 2014-15 | 8785 | 50.1% | 8739 | 49.9% | 17524 | 378 | 50.9% | 364 | 49.1% | 742 | 12 |
| 2015-16 | 8977 | 49.9% | 9012 | 50.1% | 17989 | 398 | 49.9% | 399 | 50.1% | 797 | 1 |
| 2016-17 | 9191 | 49.6% | 9347 | 50.4% | 18538 | 369 | 51.1% | 353 | 48.9% | 722 | 22 |
| 2017-18 | 9096 | 49.3% | 9347 | 50.7% | 18443 | 392 | 50.9% | 378 | 49.1% | 770 | 25 |
| 2018-19 | 8998 | 48.9% | 9399 | 51.1% | 18397 | 385 | 50.2% | 382 | 49.8% | 767 | 20 |
| 2019-20**** | 8998 | 48.9% | 9399 | 51.1% | 18397 | 388 | 51.0% | 373 | 49.0% | 761 | 32 |
| 2020-21**** | 8998 | 48.9% | 9399 | 51.1% | 18397 | 381 | 51.1% | 364 | 48.9% | 745 | 34 |

* Enrollment data retrieved from the U.S. Department of Education, EADA Equity in Athletics Data Analysis at https://ope.ed.gov/athletics/#/. Data available 2003-04 through 2020-21 (as of 2-15-21)

**Participation data derived from Web rosters displayed on uconnhuskies.com, uconnhuskies.com/archives by sport from both rosters and media guides, and captures from the uconnhuskies.com web site displayed on the Wayback Machine internet archives at https://web.archive.org/.  2006-07 data was not used due to the unavailability of the men's cross country roster and 2007-08 data was not used due to the unavailability of the men's cross country and men's golf rosters.

***The female participation gap represents the number of female participation opportunities that would need to be added if male participation remained constant AND was equal to the percent males in the undergraduate student body and female participation was equal to the percent of females in the undergraduate student body.

****2018-19 EADA Enrollment utilized for 2018-19, 2019-20 and 2020-21

Table 2 below reproduces the participation gap column from Table 1 (Exhibit K) to emphasize my opinion that UConn does not currently and has not in any of the 13 years for which I had complete web roster data, provided female students with an equal opportunity to participate in varsity intercollegiate athletics.[18]

---

[18]   Normally, I would also calculate the participation gap by counting cross country/track as one sport.  I have long believed that indoor and outdoor track are one sport run in two seasons –no two different sports.  As such, track athletes should be counted only once, not twice.  I also believe that cross country is an extension of the track season for long distance runners and thus is essentially the same sport.  Thus, they also should be counted once, not two or three times based upon the number of seasons they run.  All college varsity athletes practice all year, just like cross country/track athletes.  There is one TFRRS website that follows the entire year.

TABLE 2.  UConn Female Participation Gaps 2008-09 Through 2019-2020 Based
On Web Rosters

| Year | Female Particip. Gap - # athletes to be added |
|------|-----------------------------------------------|
| 2008-09 | 13 |
| 2009-10 | 17 |
| 2010-11 | 37 |
| 2011-12 | 49 |
| 2012-13 | 21 |
| 2013-14 | 31 |
| 2014-15 | 12 |
| 2015-16 | 1 |
| 2016-17 | 22 |
| 2017-18 | 25 |
| 2018-19 | 20 |
| 2019-20 | 32 |
| 2020-21 | 34 |

If UConn had complied with Prong One of the Three-Part Test, one would see random variability in the participation gap so that sometimes it favored men and sometimes it favored women.   In some years there would be single digit negative numbers indicating a variance in favor of females -- an underrepresentation of male athletes.  In other years, there would be single digit positive numbers favoring males - showing an underrepresentation of female athletes. These variations would reflect natural variations in enrollment and team roster sizes.  That is not the case at UConn.  In each of these years, without exception, UConn favored men.

---

https://www.tfrrs.org/teams/CT_college_f_Connecticut.html.  Teams from many sports even compete all year or in different segments of the year (i.e., golf, tennis, rowing, baseball, and softball).  If asked, I am prepared to expand on this view.

If an institution sponsors all three track seasons for both men and women, as UConn has for many years, the different counting of cross country/track athletes does not usually affect the ultimate participation gap – unless the institution intentionally inflates the women's roster and then double or triple counts the extra female athletes.   My later discussion about UConn's proposed elimination of men's cross country will touch on this, because the decision is a sex-based choice that manipulates data and minimizes the harm to men.  However, because UConn's current and historical participation data shows that it discriminates against women even with duplicated track counting, I do not address unduplicated counting in this section.

The participation gaps reflect the number of additional opportunities UConn should have provided to women in each year but did not. The gaps are calculated based upon UConn's self-generated basic athletic participation data – before digging deeper into whether the athletes listed on the rosters count as participants for purposes of Title IX or whether they receive the same kinds of opportunities.   In my experience, deeper reviews reduce participation counts even more – usually by more females than males – leading to an even larger female participation gap.

For example, the 2015-2016 participation gap based upon UConn's data was only 1, but when I looked behind the data I discovered that that year UConn claimed unusually high squad sizes in women's field hockey, lacrosse, swimming, and cross country/track – higher than the NCAA average squad sizes and higher than UConn's average squad sizes in those sports. Swimming alone reported 7 more athletes than normal.   The sudden jump in female cross country athletes from 19 to 29 that year raises even more red flags.  A roster of 29 cross country athletes is nearly 12 more than the NCAA average, 9 to 10 more than UConn's own average, and 14 to 15 more than the average of UConn's men's cross country team.  A deeper dive into the 2015-2016 data will surely uncover a much higher participation gap.

UConn's rosters show participation gaps that exceed the allowable Prong One variance from proportionality, which is the size of a viable team in which the underrepresented sex has interest and ability and for which there is available competition within UConn's normal competitive region.[19] Women's golf is the most obvious viable team that could be added. UConn has sponsored men's golf since 1931. The NCAA, the Big East, and the American Athletic Conference, all sponsor women's golf.   Many CIAC high schools in Connecticut

---

[19]   The only exception is 2015-2016, which had a small gap.  However, UConn listed unusually large numbers of female athletes on many of its teams that year, including 29 cross country runners and 37 swimmers.  Upon further analysis, the actual participation gap will likely increase significantly.  The cross country team alone has 12 more athletes than the men's team and the NCAA average.  This alone is more than enough athletes for a women's golf team.

sponsor girls' golf.  Thousands more high school and college women play golf in this region.

Yet, UConn does not sponsor women's golf.  It could have added a women's golf team of eight

or nine participants (the NCAA Division I average golf team size was 8.2 in 2018-19) at any

time as its participation gap continued to show the under-representation of female athletes.

UConn chose not to do so.  UConn engaged in these many years of sex discrimination even

before its recent decision to eliminate some sports teams.  As set forth in the next section, that

decision itself was discriminatory.

### 2.    Prongs Two & Three

Institutions that eliminate athletic participation opportunities for the under-represented

sex (women at UConn) cannot rely on prongs two or three to meet their equity obligations,

because (1) eliminating the women's team reduces rather than expands opportunities and (2) the

athletes on the eliminated team obviously have the interest and ability to participate in the sport.

Moreover, competition for the sport still exists.  Such institutions must show Prong One

compliance.

UConn acknowledged its obligation to meet the Prong One proportionality standard in

the press:

> "When making the decision to cut one or more sports, it is necessary to take into
> consideration whether participation opportunities for male and female students in
> numbers is substantially proportionate to their respective full-time undergraduate
> enrollments," UConn spokesperson Stephanie Reitz said in a statement via
> email.."[20]

---

[20]    Riley, L. The UConn women's rowing coach thought her program was safe because of Title IX.  Now she's
trying to save the team following budget cuts.  *Hartford Courant* (July 22, 2020).  Retrieved from:
https://www.courant.com/sports/hc-sp-uconn-rowing-cut-title-9-20200722-tqzmmzjvejbgrkxnwuisdevmxe-
story.html

Despite these obvious reasons for UConn's noncompliance with Prongs Two or Three, I examined UConn's athletic history more thoroughly to put its current sex disparities in context with its historical discrimination against women.

Tracking the language of Prong Two, UConn cannot demonstrate a history and continuing practice of program expansion for the underrepresented sex (females).  The 1975 Title IX regulations gave institutions at most three-years to come into compliance with Title IX, from 1975 to 1978. 34 C.F.R. §106.41(d).  By 1978, UConn had established women's basketball, field hockey, gymnastics, softball, swimming and diving, tennis, volleyball, and cross country/ track and field.[21]  Even if the addition of these sports in the 1970s was enough to comply with Prongs Two or Three then, UConn remained obligated to regularly assess the interests and abilities of its female students and to add more women's sports as those interests and abilities developed or were identified.  In 1979, UConn added women's soccer.[22]  In 1986, UConn eliminated women's gymnastics and failed to replace it with any other women's sport with an equal or greater number of participation opportunities, thus reducing rather than expanding opportunities.

Despite the tremendous explosion of women's athletic participation in the 1980s and 1990s, UConn did not add another women's sport until 1997 when it added women's lacrosse and rowing.[23]  This 18-year gap from the addition of soccer in 1979 disqualified UConn from using Prong Two because program expansion was expected to be a "continuing practice." UConn added women's ice hockey in 2000 and has not added another sport in the more than 20

---

[21]    University of Connecticut Athletic Department. University of Connecticut Athletics History:  1890s – 2018. Retrieved from: https://uconnhuskies.com/sports/2018/6/12/trads-history-uconn-athletics-html.aspx

[22]    Id.

[23]    Id.

years since.[24]  Again, UConn had no "continuing practice" of program expansion.  Now UConn seeks to eliminate the women's team with the historically highest number of participants (rowing) at a time when it has a participation gap that discriminates against females.  It does not comply with Prong Two.

UConn cannot rely on Prong Three because it cannot demonstrate that it has fully and effectively accommodated the interests and abilities of the underrepresented sex.  In other words, it cannot show that there was no women's sport that it could have added for which there is competition available within its normal competitive region.  If it eliminates women's rowing next year, it will obviously fail this test, because it will eliminate a sport for which there is interest and ability and for which competition continues to exist.  But UConn historically has not met Prong Three either.

UConn has a big-time NCAA Division I athletic department that competes in the most competitive Football Bowl Subdivision ("FBS").  Its 2021 football schedule includes games against Fresno State and Wyoming.  Its basketball teams are national contenders that compete nationwide. As a member of the American Athletic Conference it competed against schools throughout the south, southwest, and even Wichita, Kansas.  As a member of the Big East Conference, it competes as far west as Nebraska.  Its normal competitive region is national.

UConn could add any sport that the NCAA sponsors for women and easily recruit female athletes and compile a competition schedule.  The NCAA sponsors the following women's sports that UConn does not:  bowling (average Division I squad size in 2018-19 was 9.6); fencing (16.8), golf (8.2), gymnastics (18.1), rifle (7.5), beach volleyball (17.6), and water polo (12.6).[25]

---

[24]  Id.
[25]  Id., NCAA Sports Sponsorship and Participation Rates Report 1981-82 -2019-2020 – see 2018-19 tables.

There are enough institutions that sponsor these sports to support a NCAA championship. These are opponents that UConn could schedule.

The NCAA also recognizes the following emerging sports for women that UConn does not offer:  equestrian (35.3 average squad size), rugby (32.1), triathlon (7.8), and now wrestling and rugby.  High school sports in Connecticut are governed by the Connecticut Interscholastic Athletic Conference ("CIAC").  The CIAC sponsors girls' championships in girls' gymnastics and girls' golf – sports which UConn does not offer.  UConn eliminated women's gymnastics in the 1980s even though Connecticut high schools continued to offer it.  Even today, 54 CIAC members offer girls' gymnastics.[26]  Southern Connecticut State University, the University of Bridgeport, Brown University, Long Island University, New Hampshire, and Rutgers still sponsor it – mere day trips for a UConn team.

UConn has offered men's golf since 1931.  Yet, it has never offered women's golf.  Last year 54 CIAC schools offered girls' golf to more than 700 female athletes.  The National Federation of High School Athletic Associations gathered data from its members showing that nearly 80,000 high school girls participated in golf in 2018-2019.[27] There are more than enough women and girls with the interest and ability to play intercollegiate golf at UConn.

UConn recently joined the Big East Conference.  The Big East sponsors a women's golf championship.  UConn's women recently competed in the American Athletic Conference.  It also offers a women's golf championship.   Nearby Division I schools with women's golf teams include Yale, Harvard, Fairfield, Quinnipiac, Sacred Heart, Boston College, Boston University, Columbia, College of Holy Cross, Farleigh Dickinson, and more. There is and long has been

---

[26]   National Federation of State High School Associations.  2018-19 Participation Data for Connecticut.  Retrieve from: https://members.nfhs.org/participation_statistics.
[27]   Ibid.  2018-19 national participation by sport

more than enough available competition for UConn to sponsor women's golf.  Despite its long history of participation gaps, it simply chose not to do so --- even as it provided that opportunity to men.

### B.  Opinion based upon a closer look at UConn's athletic participation data

My analysis thus far is based upon UConn's self-generated, publicly available athletic participation data, including the team rosters on its athletic department web site.  This information provides a strong basis for my opinion that UConn does not provide its female athletes with an equal opportunity to participate in intercollegiate athletics.  However, it is possible that some of the athletes on those rosters (both men and women) do not count as participants under Title IX, especially if I could not find evidence of their actual participation in any varsity competitions.

I would like to see UConn's NCAA squad lists and NCAA Hour-Limitation Records in order to better assess whether any of the athletes on UConn's rosters do not satisfy the Title IX definition of a countable participant.  Those documents will show how long each athlete was on each team (if records were timely updated) and whether each athlete regularly participated in team practices and meetings throughout the sport season. They will also show which athletes received athletic aid, were medically redshirted, or otherwise were unable to participate and why. I would also like to see the competition records not already included on UConn's athletic website.  This information would enable me to do a deeper dive into the data to determine if all the roster athletes listed by UConn actually count for purposes of Title IX.

Despite lacking access to the above information, I am able to take a deeper dive into the data in other ways.  For example, I often look at whether an institution puts roster ceilings on its men's teams while it puts roster floors on its women's teams.  The application of different

policies to men's and women's teams alone is a form of sex discrimination if it harms one sex over another.  One way to determine if such policies (e.g., roster ceilings and floors) exist is to compare actual roster sizes to NCAA average squad sizes.  If women's rosters routinely exceed NCAA averages while men's rosters do not, then such a policy exists in operation whether or not it exists in writing.

If women's rosters routinely exceed men's rosters in the same sports then such a discriminatory policy exists unless a sport-specific reason for the difference exists.  But usually, men's sports are the ones with sports-specific reasons for larger squad sizes.  For example, male college gymnasts participate in six events while women participate in only five.  Men's lacrosse and ice hockey often have larger squads than women's teams in these sports because the men's rules allow physical checking, which leads to more injuries. Although baseball and softball are different sports, some people see them as comparators, but baseball inherently requires more players because teams need more pitchers.  The overhanded pitching in baseball puts more strain on an athlete than the underhanded pitching of fastpitch softball.  A softball pitcher could throw a doubleheader, while a baseball pitcher should not.   If the women's rosters overall exceed the NCAA averages to a significant extent (such as the size of a viable team in a new sport), then such a policy (roster floors for women) exists unless the men's rosters routinely exceed NCAA average squad sizes to a similar extent.

Sometimes, the policy (i.e., roster floors) is applied to sports offered only to women at the institution, because it is less noticeable when the women's roster size cannot be compared to that of a comparable men's team.   The key is to examine rosters over time to make sure such differences are not anomalies.  If such a policy leads to over-sized women's teams in which the members receive different kinds of opportunities than the male athletes receive, then it is

discrimination that harms women.  The U.S. District Court in Connecticut agreed with my opinion in the Quinnipiac case, holding that it is not permissible to set minimums or "floors" for the underrepresented sex:

> A roster cap implies the need to cut players who would otherwise qualify for a team based upon interest and ability – players who can meaningfully benefit from and contribute to team play.  In contrast, a roster floor implies the need to add players who otherwise would not qualify for a team based upon interest and ability – players who principal role is to provide a gender statistic, rather than a meaningful contribution to the team.  Floors impose an obligation on coaches to pump up roster numbers and to "carry" players otherwise unsuited to further team goals.  Not surprisingly, I have found no caselaw or other authority that sanctions the use of floors – in contrast to the use of caps – as a means of satisfying prong one of Title IX compliance.[28]

Some institutions may have written policies that implement this practice of setting roster floors for women's teams.  Others may have roster management quotas that in fact implement this practice.  Others may pressure coaches to carry more female athletes than their sport needs dictate (or more than those coaches want to manage).  Women's coaches often do not have the power or job security to resist such demands or pressure.  The end result is the same – inflated women's rosters that exceed the needs of the sport and harm the women's program.

Inflated women's rosters are becoming more common as institutions seek to show participation equity on the surface when, in fact, they are cutting (or not adding) women's sports. They then require the remaining women's teams to add more athletes --- even if the nature of the sport does not require more athletes, even if the coach does not want more athletes on the team, even if the institution does not give the coach more scholarships or recruiting resources to find more athletes, even if it does not provide the financial or coaching resources to cover the additional athletes, and even if the existing athletes will be harmed by the presence of additional

---

[28]   Biediger v. Quinnipiac University, 616 F.Supp.2d 277 (D. Conn. 2009)

athletes, some of whom may not have the athletic ability to participate in Division I or to keep up with the core starters and reserves.   As described earlier in this report, being athlete #20 on a cross country team or even athlete #20 on a softball team is not the same as being athlete #1 to 10 on a new water polo team or athlete #1 to #5 on a new golf team.

At some point, the inflation of women's rosters leads to fundamentally different opportunities that cannot be counted in the same way as men's opportunities.   This is not something that those of us who worked on the 1979 Policy Interpretation thought about.   The AIAW still ran women's sports back then and women's athletic interests were still developing. Even the NCAA was not the big money machine it is now.   But colleges athletics are more sophisticated now and some institutions are looking for more ways to look like they comply with the law or provide equity when, in fact, they do not.   Excessive roster inflation and roster management are among these new methods.

Most UConn women's rosters are within a couple athletes of the NCAA averages in their sports.   I counted all these athletes listed on UConn's team rosters when compiling the roster data in Exhibit K even though further review may uncover that some athletes, especially the "extra" female athletes on over-sized teams, do not qualify as participants under Title IX. Notably, UConn recorded 330 female athletes in 2011-2012 and 399 in 2015-2016 – an increase of 69 athletes without adding any new women's sports.   That huge increase strongly suggests roster inflation and a roster floor policy for women.

 I noticed more women's team size increases in recent years.   This year field hockey increased to 27, four more than the national average of 23.0 in the NCAA Division I Sports Sponsorship and Participation Rates Report through 2018-2019.   Women's soccer increased to 31,  2.6 more than the national average.   Women's lacrosse increased to 38 from UConn's own

squad size of 27 in 2017-2018, while the NCAA average is 31.6 (an average that itself has increased substantially in recent years as more institutions inflated women's rosters rather than add new teams). This large, 11-athlete increase on one team is unusual. All these increases raise the question whether UConn raised the roster floors for its women's teams in anticipation of a decision to cut a women's team. These roster sizes may be fine, but as noted above, small inflation on each team can lead to a large difference in the participation gap. Just one extra athlete on each team would be enough to field an entire golf team (as would the 11 lacrosse athletes increase in one year). Thus, it is important to look behind the names and numbers of athletes to better assess whether the athletes qualify as Title IX participants and whether they receive comparable opportunities.

In addition to the large increase in the women's lacrosse roster, I noted concerns regarding women's rowing and women's cross country/track. If the inflated rosters in these sports are reduced, then the participation gap becomes even larger than set forth in Exhibit K, meaning even greater sex discrimination than appears on the surface.

1. **Women's rowing**

The most obvious issue I noticed involves rowing itself. First, the women's roster size is large compared to the varsity needs of the sport (based upon NCAA and athletic conference competition structure). Second, the women's rosters appear to list novice rowers who are not varsity athletes by definition. Even if these rowers exist and participate, they should not be counted as *varsity* athletes. There do not appear to be any comparable sub-varsity male athletes at UConn. Third, the smaller roster sizes of successful women's rowing teams suggests that UConn's squad sizes are inflated and unnecessary. It is possible for UConn to run a competitive women's rowing program with fewer athletes. This fact makes it even more difficult for UConn

to eliminate women's rowing at a time when UConn has a participation gap that favors men and discriminates against women.

       a       Competition structure

The NCAA women's rowing competition structure does not support the large squad sizes that some institutions carry.   Nor does it support the large squad sizes carried by UConn over many of the past 10-15 years.

I was on the NCAA gender equity committee in the early 1990s when the NCAA looked into supporting emerging sports as a way to grow them into NCAA championship sports. Rowing was one of those sports.   When the NCAA created its own rowing championship, its members debated how to structure the sport and its championship.  The Olympic model would have included several different boats, including singles, doubles, fours, and eights.  It would have included skulling (in which each rower uses 2 oars and not just one).  It would have allowed more than one entrant in each event and would have allowed fast boats to qualify for nationals even if no other team boats did so.  This structure would have helped athletes develop for the Olympics and would have supported large squad sizes.  It also would have been expensive, because of the many different kinds of boats and the need to transport more boats to competitions.  The NCAA rejected the Olympic rowing model.

The Intercollegiate Rowing Association model, used by the IRA for the intercollegiate men's rowing championships,[29] would have included various combinations of 8-person, 4-person, and 2-person boats with and without coxswain.  It would have included separate boats for lightweight rowers.   It also would have included freshman-4 and freshman-8 races.[30]  This model also would have supported large squad sizes and would have included freshmen within its

---

[29]   The NCAA does not sponsor a men's intercollegiate rowing championship, so IRA continues as the governing body and championship sponsor for men's intercollegiate rowing.

[30]   See http://irarowing.com/historical-results/ for a list of the IRA men's rowing events.

competition and championship structure.[31]  The NCAA also rejected this model – even though it was the model already in use by intercollegiate men's rowing teams.

Instead, the NCAA created a new team-based model that revolved around only two different kinds of boats – an 8-person boat and a 4-person boat, both with coxswain.  No singles. No doubles.  No skulling.  No lightweight boats. No freshmen or novice in their competition structure.  It was the cheapest model --- and it was for a sport that the NCAA planned to sponsor only for women. They knowingly chose the model that would be cheaper and would support fewer athletes than the model that already existed for men.

In particular, the NCAA structured its women's rowing championship to include only three events:  a 2000m varsity 8-person boat race, a 2000m second 8-person boat race (now sometimes called 8V2 boat), and a 2000m 4-person boat race.[32]  Each school can enter only one boat in each race.   As a comparison, both men's and women's outdoor track meets include 21 events (19 individual events and two 4-person relays).  In track, more than one person from a school can enter an event and even qualify for nationals.  That structure can support large squad sizes.  NCAA rowing was structured to support 20 rowers and three coxswains.  That's a maximum of 23 athletes.   There are no multiple entrants in the varsity races and there are no substitutions once a race starts.[33]   UConn rows in the Colonial Athletic Association.   Its championships use the same competition structure.  If any additional boats race, they cannot score and they cannot qualify for post-season.

---

[31]   In recent years the IRA stopped including freshmen boats and 2-person boats in its championships.
[32]   Before the NCAA started its own women's rowing championship, women's rowing was run by the National Women's Rowing Association.  The national champion was determined by the winning 8-person varsity boat.

[33]   Despite the structural differences, the NCAA average track squad size for men and women ranges from 38 to 40, while the NCAA women's rowing squad size exceeds 60.  This suggests widespread women's roster inflation.

When I say the NCAA created this women's rowing structure, what that really means is that the NCAA members created it.  The member schools that offered or planned to offer women's rowing participated in the discussions and made recommendations to the NCAA membership.  In other words, the schools with women's rowing played a primary role in establishing its NCAA competition structure.  They chose to make that structure different from the structure already provided to men, but knew it would not be obvious to outsiders, because the NCAA would sponsor the women's rowing championships while the IRA would continue to sponsor the men's rowing championships.

Imagine if such very different competition structures existed for men's and women's track.  How long would athletes or the public tolerate a women's track meet with only three events in which a school could only enter one person per event while the men enjoyed a multi-event meet that allowed for the entry of more than one athlete who could qualify for the finals?  The NCAA was pressured to add women's pole vault years ago to ensure that it offered the same events for men and women.   Yet, that's not what happened with women's rowing.  This history is important to know when one examines how NCAA member schools now run their women's rowing programs.   If they really wanted rowing to support large squad sizes, they could and should have adopted a competition structure that would support them.   They did not.

The NCAA championship travel limits in team sports often are good indicators of reasonable squad sizes, because the NCAA will only pay for travel for the number of athletes it believes are reasonably necessary.  For example, the travel squad limit is 15 for basketball, 27 for

baseball, and 22 for field hockey.[34]   For rowing, the travel limit is 25 athletes – the 20 rowers, the 3 coxswain, and 2 alternates in case one of the athletes can't participate.

Coaches in all sports need additional athletes on their team to substitute them in games, to replace injured starters, or to develop them into varsity participants by the time they are upperclassmen.   Coaches ladder their recruiting so that as senior varsity athletes graduate, underclassmen will be ready to move into the varsity seats, as the coach recruits new freshmen and transfer students to replace the old.   But few extra athletes are needed in rowing.   All 20 rowers do the same thing - row - no matter which boat they are in.   If someone is injured or sick before a race, any of the additional athletes can fill in.   Rowing is not like football, where the 11 starters on offense and the 11 starters on defense have very different skill sets and body types. Football also has special teams players with completely different skills (like kickers, punters, long snappers, and return specialists).   Quarterbacks do not play defensive end and kickers do not play linebacker – certainly not in Division I.   But rowers can be moved between seats and between boats.   Once a rower starts a race, there are no substitutions.   In football, substitutions occur often between plays.   Sometimes, many different athletes play the same position in the same game.   In the end, while football often has a three- or four-person depth chart for each position, rowing does not.   As a result, rowing does not need the large squad sizes of football or the 85 scholarships of football even though rowing starts 23 athletes in its varsity races while football ostensibly starts only 11, because football uses far more athletes in just one quarter than rowing does in all its varsity races.   The 20 NCAA maximum number of rowing scholarships reflects these facts.

---

[34]   National Collegiate Athletic Association. *2019-20 Division I Championships Transportation and Per Diem Policies.*   Retrieve   from:   https://ncaaorg.s3.amazonaws.com/championships/resources/travel/2019-20D1Champs_TravelPolicies.pdf

Normally, I would look to the average NCAA squad sizes in the NCAA Sport Sponsorship and Participation Report to determine whether an institution's roster sizes are reasonable (although the average squad sizes in some sports are increasing as more institutions engage in roster inflation, especially in individual sports). But it is well known that institutions often require women's rowing teams to carry far more athletes than a varsity team needs in order to make their women's participation numbers look better.[35] Even the average squad size has more than doubled over the years from an average squad size of 30.2 athletes in 1981-82 to 63.4 rowers in 2019-20 (up from 62.2 in 2018-19).[36]

Institutions often target women's rowing for roster inflation, because few schools offer men's rowing as a comparison. For those who do, the men compete in the IRA which offers more events and thus supports a larger squad size that the women's teams who compete in the NCAA. Thus, even when a school offers both men's and women's rowing, their teams are not comparable because they compete under different competition rules and structures. In my opinion the 2018-19 NCAA average squad size of 62.2[37] for women's rowing reflects widespread roster inflation and does not reflect the reasonable size of a women's rowing team. It also reflects the counting of sub-varsity athletes.

While everyone knows that a Division I basketball team with 30 athletes is untenable, how many people, including athletic administrators, realize that a rowing team with 60 or 70

---

[35] Scott, J. (2019) *Report: Inflated Rowing Rosters Boost Football Schools.* Athletic Business. August, 2019. Retrieve from: https://www.athleticbusiness.com/college/report-inflated-rowing-rosters-boost-football-schools.html; Cordes, H. (2019) *Football Schools Like Alabama, Clemson, Michigan use Massive Women's Rowing Rosters for Gender Equity.* Omaha World-Herald. August 1, 2019. Retrieve from: https://omaha.com/sports/football-schools-like-alabama-clemson-michigan-use-massive-womens-rowing-rosters-for-gender-equity/article_03d2e53d-1a19-5d2e-a752-5472a2532342.html ; Jordan, R. (2016) *Some Say False Gender Balance in University of Iowa Athletics.* The Gazette. March 5, 2016. Retrieve from: https://www.thegazette.com/news/some-say-false-gender-balance-in-university-of-iowa-athletics/ ; McGraw, D. (2019) *No Rowing Experience? No Problem. Here's A College Scholarship.* The American Conservative. March 20, 2019. Retrieve from: https://www.theamericanconservative.com/articles/no-athletic-experience-no-problem-heres-a-college-scholarship/

[36] Id. NCAA Sports Participation and Sponsorship at p. 8 (1981-82), p.84 (2019-20), p. 82 (2018-19)

[37] Ibid at page 82.

68

athletes is also untenable – at least under the current structure?   Few do.  Moreover, few schools sponsor both men's and women's varsity rowing.  If a school had 29 men and 35 women on its soccer teams, the squad size differences would draw scrutiny.   If a school only offers women's rowing, then there is no ready comparison.   These facts make women's rowing teams ripe for roster inflation.  Institutions do it, because it is cheaper to require rowing coaches to carry huge rosters than to require the athletic department to add new women's sports with actual varsity opportunities.   But athlete #60 on the rowing team receives a very different opportunity than athletes #1-#5 on a new golf team or athletes #1-#10 on a new water polo team --- or any of the opportunities on the men's teams.

If the NCAA members had chosen to add more events, like a lightweight 8-boat or a freshman 8-boat (even without adding singles and doubles), it could have supported larger rowing team squad sizes. If they had chosen to allow multiple boats from the same school in each event, each with the opportunity to qualify for the post season (like track), it could have supported larger rowing team squad sizes. But they did not.  They adopted the existing three event structure.  That structure does not support 60 person squads.

UConn's web rosters and EADA counts for women's rowing have ranged from 36 to 82 over the years I studied.  Table 3 that follows compares UConn EADA and Web roster counts.

TABLE 3.    Comparison of UConn EADA and Web Roster Participant
Counts for Women's Rowing - 2008-09 to 2020-21

| Women's Rowing | 08-09 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 | Range | Mean | Med | Avg. D-I roster 18-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rowing-WEB | 36 | 38 | 48 | 44 | 55 | 56 | 50 | 55 | 50 | 57 | 55 | 47 | 41 | 36-57 | 48.6 | 53 | 62.2 |
| Rowing-EADA | 66 | 61 | 57 | 55 | 82 | 62 | 61 | 59 | 71 | 68 | 61 | | | 55-82 | 63.9 | 61 | 62.2 |
| Difference | 30 | 23 | 9 | 11 | 27 | 6 | 11 | 4 | 21 | 11 | 6 | | | | | | |

Table 3 indicates that UConn's EADA numbers over-reported actual female participants, confirming my prior statement supporting reliance on web rosters over EADA counts.  The size of the range, coupled with significant differences between the mean and median roster sizes, indicates significant fluctuations in rowing team size.  When examining team rosters over time, they should be relatively consistent, varying within a narrow range (see Exhibit I upon which I relied for various analyses related to UConn EADA data and Exhibit J for UConn web roster data). In at least four of the 13 years I examined, UConn competed with team sizes in the 36-44 participant range.   Yet, before the Covid-19 pandemic and the UConn elimination announcement, the web rosters were in their 50s while the EADA reported as many as 82 athletes. Why did UConn increase the size of its women's rowing team so much when its conference and championship structure did not change?  I strongly suspect that UConn imposed roster management on the team and asked the coach to carry significantly more athletes in order to make UConn's Title IX numbers look better.   Given the NCAA's championship structure of a maximum 23 competitors without substitutions and the 25-athlete travel limit, 60 or even 50 athletes clearly exceed the inherent needs of the sport.

Requiring teams to carry unnecessarily large rosters harms the athletes who actually compete at the varsity level, the coaches who must coach and monitor more athletes than they'd like, and the program as a whole.   I expect rowing coaches and/or experts to provide more detailed testimony about the inflation of women's rowing squads and the impact that has on the athletes, the coaches, and the program, but some problems and harms are obvious.   NCAA rules limit women's rowing to four paid coaches.  Compare that to eleven for men's football, the only other sport with similar or larger squad sizes.  Those coaches must do more than coach the

athletes. They must monitor their academics and eligibility.  They must serve as mentors. Four coaches for 40 athletes is significantly more manageable than four coaches for 70 athletes.

Coaches must also recruit athletes.  It is much easier to recruit 30 or 40 qualified athletes than 70 --- especially when only 23 of those athletes will get to compete at the varsity level. Athletes with varsity skills do not want to be athlete #70 on a team.  They will go to a school where they can row varsity.   How are the coaches supposed to recruit this many athletes, especially when UConn does not even allocate the NCAA max of 20 scholarships to the team?[38]

Given the relatively small number of females who row in high school, college rowing coaches are left to recruit athletes with little or no rowing experience to fill the "extra" slots. They must then teach those athletes basic skills and even sport rules.  They must teach these novices what the men's baseball players learned as T-ballers or the men's football players learned in Pop Warner leagues.   No coaches in any UConn men's sports are forced to do this. This takes up a great deal of time --- time and coaching that the varsity athletes do not get if the coaches are spread too thin among a large number of athletes.

Rowing coaches must closely monitor their athletes for safety. Rowers practice and compete on deep, moving rivers and lakes.  Coaches must keep track of all of them and must be prepared to rescue athletes if there are any problems.  The recent tragedy at Iowa State,[39] which led to the death of two rowing team members, reminds all that safety is important.  It just isn't possible for four coaches to watch 70 athletes on the water at the same time.

---

[38]   University of Connecticut. NCAA Member Financial Report 2018-19.  14.7 scholarships out of an allowable 20 were awarded to 25 rowers (at page 39).

[39]   Silverman, H. (2021) *Two students died after a collegiate rowing crew capsized during practice*. CNN.com. March 29, 2021.  Retrieve from:  https://www.cnn.com/2021/03/29/us/iowa-state-crew-death/index.html.

b.      Sub-varsity athletes

UConn is a NCAA Division I institution. Division I is the pinnacle of intercollegiate skill and competition.  I expect to see athletes with Division I skills competing as varsity athletes against other varsity athletes. Division I athletic programs typically do not sponsor developmental or sub varsity programs (i.e., junior varsity or "novice" in the case of rowing).[40] If they do, they must offer them to both male and female athletes.  The 1979 Policy Interpretation makes clear that schools must offer proportional opportunities at each level of competition.  They can't offer all varsity opportunities to men but a mix of varsity, sub-varsity, and novice opportunities to women when there are enough women with enough interest and skill in enough sports to offer only varsity opportunities to women.  UConn does not offer any JV or sub varsity teams for men.  Therefore, we should look only at the varsity opportunities it provides to women. Rowing and cross country/track again are sports teams which require scrutiny.

UConn includes novice rowers on its rosters.  Novice rowers are not varsity – by definition.   Novice athletes are athletes who have never participated in a college rowing event and are often athletes who never rowed before.  The NCAA could have chosen to include a freshman or novice boat in its team-based model like the IRA formerly did for men, but it did not.  Having chosen to exclude them, it is not acceptable for member schools to count them as varsity athletes when they cannot compete or score at the varsity level.

Some institutions may argue that they sometimes add novice races to their meets, but those are not varsity races and they are not scored as varsity races.  They usually are not scored at all.   At best, they are like high school junior varsity, which gives athletes who don't make the

---

[40]     Decades ago, some institutions sponsored separate men's freshman teams.  NCAA rules formerly prevented freshmen from competing in varsity contests so that they could focus on their academics.  But those practices are long gone.  If institutions no longer sponsor freshman or novice teams for men, then they should not provide women with such limited opportunities in place of genuine varsity opportunities in new sports.

varsity squad a chance to gain some form of experience.  The Colonial Athletic Association, in which UConn rows, allows such races, but they are not scored.   No such boats can qualify for post-season and the performance of such boats plays no role in qualifying any team for nationals – whether as a conference champion or as an at-large team.

Every other sport at UConn recruits athletes who played the sport on high school or outside club sport teams (e.g., AAU basketball; ASA softball).   These athletes have spent years learning and developing their skills.   But most novice rowers have never even rowed before. They must be taught the sport, its techniques, and safety from scratch.  UConn's rowing coaches must teach these athletes what the baseball players learned in Little League.  They may have the interest but they do not have the ability to participate in rowing at the Division I varsity collegiate level.  Ironically, if athletes had asked UConn to start such a novice program, UConn could and likely would have used Title IX as its excuse not to do so, as Prong Three only requires the addition of a sport if the under-represented sex has the interest and the ability to participate the that institution's level of competition.

UConn expects its women's rowing coaches to carry more athletes than needed for their sport by including these novice rowers and expects them to spend time doing things for them what no men's coaches are expected to do.   This detracts from their time with the varsity athletes.  Any resources spent on these non-varsity athletes detract from resources for the varsity athletes.  Even if UConn finds novice races for these additional athletes to row, those races are not varsity and the athletes should not be counted as varsity athletes under Title IX.

c.      Team sizes of successful programs

Table 4 below examines the roster sizes over the past four years of the top ten women's rowing teams based on the results of the 2018-19 national rowing championship (the 2019-20 championship was cancelled due to the pandemic).

TABLE 4.    Most Recent 4-Year Average Roster Sizes of the Top Ten
Teams in the 2019 NCAA Division I Women's Rowing Championship

| 2019 Division I Top Ten | Conference | 2018-19 | 2017-18 | 2016-17 | 2015-16 | 4 yr. avg. |
|---|---|---|---|---|---|---|
| University of Washington | Pacific-12 Conference | 64 | 67 | 63 | 65 | **64.8** |
| University of Texas - Austin | Big 12 Conference | 61 | 54 | 60 | 56 | **57.8** |
| University of Michigan | Big Ten Conference | 54 | 51 | 44 | 45 | **48.5** |
| Stanford University | Pacific-12 Conference | 46 | 39 | 36 | 41 | **40.5** |
| Ohio State University | Big Ten Conference | 40 | 42 | 35 | 49 | **41.5** |
| University of California – Berkeley | Pacific-12 Conference | 62 | 61 | 57 | 57 | **59.3** |
| Princeton University | Ivy League | 54 | 48 | 48 | 46 | **49.0** |
| Yale University | Ivy League ECAC | 41 | 44 | 39 | 43 | **41.8** |
| Brown University | Ivy League | 46 | 47 | 46 | 44 | **45.8** |
| University of Virginia | Atlantic Coast Conference | 56 | 67 | 55 | 48 | **56.5** |
| | Total/Avg. (N=40) | **524** | **520** | **483** | **494** | **50.5** |

*Based on 2019 NCAA Championship Results - Team finish - retrieved from:
https://www.row2k.com/results/resultspage.cfm?UID=8F2B057FED400A0427984B5E0BD3396B&cat=6

This data shows that it is possible to run a highly successful women's rowing program with far fewer athletes than the NCAA average suggests.   The University of Washington, which lists the highest number of rowers on its rosters, was called out for its inflation of women's rowing in the press.[41]   Based upon all the above information, a squad size of 45 varsity rowers is more reasonable.

2.    Cross country/track[42]

---

[41]   Willmsem, C. (2017) *UW Women's Rowing Team Numbers Inflated, Avoiding Title IX Scrutiny*, Seattle Times. March 5, 2017.   Retrieve from:   https://www.seattletimes.com/seattle-news/times-watchdog/uw-womens-rowing-team-numbers-inflated-avoiding-title-ix-scrutiny/

[42]   UConn's men's and women's track rosters are also unusually large and vary considerably.   In some years, the web roster counts exceed the EADA counts by double digits, which is highly unusual.   The discrepancy is particularly pronounced on the men's side.   This raises concerns for me, because in a number of cases in which I have testified, the higher men's web counts occurred because the men were not recorded as team members until after the first date of competition so that they would not appear on the EADA participation count.   Such superficially reduce the female participation gap.   I would like to examine UConn's squad lists and practice records to determine whether UConn is engaging in this practice.   Because of this wide variability and because

UConn's women's cross country rosters are unusually large.  They exceed UConn's men's cross country rosters and they exceed the NCAA average roster sizes for both men and women.   The NCAA average men's cross country team squad size was 15.5 and the average Division I women's cross country team squad size was 17.2 in the 2018-2019 NCAA Sport Sponsorship and Participate Rate Report.  UConn's women's cross country web rosters ranged from 10 to 29 over the 13 years I examined and the mean of 20.2 and median of 19 exceeded both these averages. In 2018-2019, the last year for which there is both EADA and roster data, UConn listed 29 female cross country runners (see Exhibit I).  That's more than 10 over the NCAA average for women's cross country teams and more than 10 over the average squad sizes of UConn's men's cross country teams.

Table 5 shows the web roster counts for men's and women's cross country for each year since 2008-2009.

TABLE 5.  Comparison of Men's and Women's Web Cross Country Rosters 2008-09 to 2020-21

| Uconn WEB Roster Counts* by Sport (Exhibit J) | 08-09 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 | Range | Mean | Median | D-I Avg. Roster |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Men's Sports** | | | | | | | | | | | | | | | | | |
| Cross Country-WEB | 13 | 12 | 19 | 13 | 12 | 14 | 22 | 17 | 19 | 22 | 20 | 16 | 14 | 12-22 | 16.4 | 14 | 15.5 |
| **Women's Sports** | | | | | | | | | | | | | | | | | |
| Cross Country-WEB | 16 | 20 | 23 | 19 | 19 | 10 | 19 | 29 | 17 | 25 | 29 | 19 | 17 | 10-29 | 20.2 | 19 | 17.2 |

This data shows that UConn's mean average men's cross country squad size is 16.4 while its median average is 14.  Meanwhile, UConn's mean average women's cross country squad size is 20.2, while its median average is 19.    That's an average difference of four to five athletes.  That's roster inflation.   There are no sport specific rules to justify the difference.  If anything, the longer men's race might support more reserves for injuries.  The men's race is 10,000 meters while the women's race is only 6,000 meters.  This persistent women's roster inflation influences

---

UConn 's website includes one track roster, this section focuses on the more readily discernable differences between men's and women's cross country.

the participation gap.  An over-sized women's team makes the overall female participation gap appear smaller.

In 2018-19, the last school year not affected by covid, UConn listed 29 female cross country runners on its web rosters.  The structure of NCAA women's cross country competition does not support the such a large squad.  NCAA women's cross country meets allow seven varsity athletes to compete.  Although only five of those athletes are counted for scoring purposes, in large meets, the additional two non-scoring athletes can help the team win by finishing ahead of the top five athletes on other teams, thus scoring them fewer points. Like rowing races, there are no substitutions in cross country.  Once the race begins, only the seven athletes run and only five of them can score.   Also, like rowing, each athlete performs the same function.  They all run long distance.  Thus, if someone gets sick or injured before a race, then any other athlete on the team can fill in.  It is not like football, where the quarterback cannot reasonably fill in for the defensive end. It is not even like swimming where a freestyler may not be able to fill in for a butterfly stroke specialist.  Cross country does not require athletes of different skills for different positions. Running long distance is running long distance.

Even if institutions agree to allow some of the additional athletes beyond the seven to run in a meet, those additional athletes are not running a varsity race.  Some may be underclassmen who are expected to run varsity in future years, but others are more akin to the novice rowers. They are not running varsity if they are designated as non-scorers and cannot qualify for the NCAA post-season. If the additional athletes do not even participate in these non-varsity opportunities, then it is highly unlikely that they qualify as participants of any kind – unless they participate in other team functions but injury prevents them from running.  If UConn allows

some men to run as non-scorers, then they also may be non-varsity athletes.  But the much larger squad size of the UConn women's cross country team suggests that more of them are not varsity.

I believe the competition of NCAA cross country dictates a more reasonable squad size around 14 --- the average for UConn's men's team.  A squad size of 14 would be large enough even if every single varsity starter got sick and could not run.  The much lower men's averages reflect this.  Further, like rowing, looking at the history of NCAA average squad sizes shows that it is highly likely that many NCAA schools are inflating their cross country squad sizes.  In 1981-82, the average Division I women's cross country team was 12.1 athletes while in 2018-19 average was 17.2 athletes and 2019-20 average was 16.8 athletes.[43]  Thus, it is apparent that UConn engages in roster inflation on its women's cross country team.

### 3.   Impact on Participation Gap

If we look at 2018-2019, the last year before the Covid-19 pandemic, I opine that UConn's women's rowing roster was inflated by at least 10 (and likely more) athletes.  Although the rowing roster that year listed 55 athletes, UConn's rowing coach stated in her declaration that she only needed 40-42 athletes on her team.

I also opine that the women's cross country roster of 29 that year was inflated by at least 9 (if compared to the men's roster of 20 that year), 12 (if compared to the NCAA women's cross country squad size average of 17.2), or 15 (if compared to my opinion of the reasonable squad size of 14, which matches the median average for UConn's men's cross country program).  This translates to inflation in just these two teams of 19 to 25 female athletes.   Thus, the actual participation gap in that year alone was far larger than 20.  It was at least 39 and between 39 and

---

[43]   Id. 1981-82 - 2019-20 NCAA Sports Sponsorship and Participation tables.

45 per my previous discussion.  See Table 6 below which shows how the various inflated rowing and cross country web rosters affect the computation of the female participation gap.

TABLE 6.  The Probable Impact of Inflated 2018-19 Women's Rowing and Cross Country Web Rosters on the Female Participation Gap in that Year

| Year | Male Under Grad* | Percent Male Under Grad | Female Under Grad* | Percent Female Under Grad | Total Under Grads | Total Male Athletes | Percent Male Athletes | Total Female Athletes | Percent Female Athletes | Total Athletes | Female Particip. Gap - # athletes to be added |
|------|------|------|------|------|------|------|------|------|------|------|------|
| Section 3 (c) - Use of Web Data for Female Participation Shortfall (no adjustment) | | | | | | | | | | | |
| 2018-19 | 8998 | 48.9% | 9399 | 51.1% | 18397 | 385 | 50.2% | 382 | 49.8% | 767 | 20 |
| Section 3 (d) (1)- Adjustment for an Overcount of Ten Women Rowers on the Web Roster | | | | | | | | | | | |
| 2018-19 | 8998 | 48.9% | 9399 | 51.1% | 18397 | 385 | 50.9% | 372 | 49.1% | 757 | 30 |
| Section 3 (d) (1) and (2)- Adjustment for Overcount of Ten Women Rowers and Nine Women's Cross Country on the Web Rosters (29 women's Xctry compared to men's roster of 20) | | | | | | | | | | | |
| 2018-19 | 8998 | 48.9% | 9399 | 51.1% | 18397 | 385 | 51.5% | 363 | 48.5% | 748 | 39 |
| Section 3 (d) (1) and (2)- Adjustment for Overcount of Ten Women Rowers and Twelve Women's Cross Country on the Web Rosters (29 women's Xctry compared to NCAA D-I average of 17.2) | | | | | | | | | | | |
| 2018-19 | 8998 | 48.9% | 9399 | 51.1% | 18397 | 385 | 51.7% | 360 | 48.3% | 745 | 42 |
| Section 3 (d) (1) and (2)- Adjustment for Overcount of Ten Women Rowers and Fifteen Women's Cross Country on the Web Rosters (29 women's Xctry compared Lopiano opinion of reasonable squad size of 14) | | | | | | | | | | | |
| 2018-19 | 8998 | 48.9% | 9399 | 51.1% | 18397 | 385 | 51.9% | 357 | 48.1% | 742 | 45 |

## C.    **Effective Accommodation – beyond the data**

Effective accommodation and participation equity involve more than moving numbers around a chart.   As required by the 1979 Policy Interpretation, I looked at (1) whether UConn had assessed the athletic interests and abilities of its students in a nondiscriminatory manner, (2) whether UConn selected the sports it offered in a nondiscriminatory manner, and (3) whether UConn offers male and female athletes opportunities at the same level of competition.   I opine that UConn discriminated against its female students when it ignored or failed to consider these factors when deciding which sports teams to add to or eliminate from its varsity athletic program.

I could not find information about whether UConn has assessed the athletic interests of its students in any manner – let alone a nondiscriminatory manner – even though UConn's basic roster data over several years shows a participation gap that discriminates against females.  If it had done such an interest assessment, I am confident that it would have discovered long ago that there were sports that it did not offer to women but that its female students had – and continue to have - an interest in playing.  If UConn regularly had done such assessments, and if it had promptly responded to the interests shown in them, it would have added more women's sports sooner – and it would have added more women's sports in the years since it last added one in 2000.  It would not still have a participation gap, let alone a participation gap larger than the size of a viable team.

I am confident that if UConn decided to add a women's sport, it could easily recruit female high school students to enroll at UConn to participate on the team --- just as UConn does with its already existing sports.  My analysis under Prong Three identified some of these sports, including women's golf, a popular sport among Connecticut high school girls and in UConn's own athletic conference.

Based upon UConn's history and participation data, I surmise that UConn added new women's sports when it chose to do so (or was forced to do so) rather than when female students demonstrated interest in them.  I also surmise that the new sports UConn offered were chosen by UConn rather than its female students.  In other words, UConn did not assess or respond to the interests of its female students in a nondiscriminatory manner.  Had it done so, surely UConn would have added more sports sooner – and it would have added enough different sports with reasonable squad sizes so that most or all would have had an opportunity to compete.  Certainly, it would have added a women's golf team to match the men's golf team it has supported for 90

years.  Instead of adding 69 women to already existing teams between 2011-12 and 2015-16 it would have added enough new women's sports to support 69 new varsity athletes.   Division I athletes want a chance to play.  They don't want to sit on the bench for long.  I am confident there were more than enough females with the interest and ability to create such a broad women's program.

When UConn decided to add women's rowing and lacrosse in the 1990s, rowing was not yet an NCAA championship sport[44] and lacrosse was a "national collegiate championship" sport.[45]  All UConn's men's sports now and at the time were sponsored by the NCAA and had NCAA Division I national championships.[46]   In 1996-1997, UConn's first year of rowing competition,  only 54 NCAA Division I institutions sponsored women's rowing and only 56 offered women's lacrosse   compared to 167 NCAA Division I institutions that sponsored women's golf.  At the high school level at the time, there were only 42 schools in the nation offering women's crew and only 451 offering women's lacrosse, compared to 5,820 offering women's golf and 1,572 offering women's gymnastics (which UConn cut in the 1980s).[47]  Connecticut high school girls played golf and gymnastics at the time (and now) but not rowing or lacrosse. Some even played ice hockey, but UConn did not add that sport for several more years.  See 1996-97 NFHS participation data at www.nfhs.org. Why would UConn, a public institution, add sports that high school girls in its own state did not play and not add sports that they did

---

[44]   This means that that NCAA recognizes the national championship conducted by the national sport governing body rather than the NCAA.  1997 was the first year that the NCAA recognized a women's national rowing championship.  See https://www.ncaa.com/history/rowing/d1

[45]   A "national collegiate championship" is one conducted by the NCAA but open to all members institutions rather than restricted to Division I institutions.  Thus, UConn selected a sport in which, at the time, the level of competition offered to its women's lacrosse team was against lower competitive division institutions.  Lacrosse did not become a Division I NCAA championship until 2001.  See https://www.ncaa.com/history/lacrosse-women/d1

[46]   NCAA Division I Football Bowl Subdivision schools like UConn choose to compete for post-season bowl games rather than the NCAA football championships that it runs for the Division I Football Championship Subdivision schools.

[47]   National Federation of State High School Associations.  Participation Statistics.  Retrieved from: https://members.nfhs.org/participation_statistics

play?   Was it because rowing and lacrosse were cheaper per capita than golf, gymnastics, or ice hockey – even as UConn already offered two of those sports for its male students?

Women's rowing is now a NCAA Division I championship sport and UConn's coaches have built a program, so why does this history matter now?   It puts UConn's decisions, including its decisions to eliminate the team, in context.   It shows that UConn did not meet its obligations to regularly assess the interests and abilities of its female students and thus did not expand opportunities to meet those interests. It shows that in selecting which sports to add, UConn was willing to add one it chose over sports more women and girls played (e.g., golf ).  It also shows that UConn was willing to add a sport for which there was no Division I championship for women even though all its men's teams participated in NCAA Division I competition.  It then chose to inflate the rosters of the women's rowing team, which reduced the per capita cost, instead of maintaining a reasonable varsity squad size and adding more varsity sports (like golf) rather than novice rowers.

When UConn selected women's rowing as a new sport, it knew that the NCAA's chosen model would only support 25 athletes in each competition.  Yet, it needed to appear to offer more opportunities than that, so it inflated rosters with novice rowers – athletes who had never participated in the sport before.   Novice rowers are not varsity rowers.    By definition, they are sub-varsity.   Thus, when they are able to row, they do so at the novice level of competition – a lower level of competition than UConn's men.   The 1979 Policy Interpretation requires proportional participation at each level of competition.   Yet, only women at UConn participate as novices.

Despite requiring large roster sizes, UConn did not give the women's program the full NCAA allotment of rowing scholarships (20) to enable the coaches to recruit students with

rowing experience.   Nor did it allocate the recruiting resources necessary to recruit so many

athletes – at least not enough athletes who had experience participating in the sport. See Table 7

below which depicts UConn 2018-19 recruiting expenditures by sport.

TABLE 7.  2018-19 NCAA Annual Member Financial Report:
Recruiting Expenditures by Sport

**Reporting Institution:** University of Connecticut                    **Reporting Year (FY):** 2019

27 Recruiting $1,820,461 Input transportation, lodging and meals for prospective student-athletes and
institutional personnel on official and unofficial visits, telephone call charges,
postage and such. Include value of use of institution's own vehicles or airplanes as
well as in-kind value of loaned or contributed transportation.

| Expenses by Object of Expenditure | Men's Teams Only Recruiting | Women's Teams Only Recruiting | Not Allocated by Gender Recruiting |
|---|---|---|---|
| Baseball | 23,041 | | |
| Basketball | 507,928 | 272,697 | |
| Field Hockey | | 16,531 | |
| Football | 499,866 | | |
| Golf | 10,528 | | |
| Ice Hockey | 85,106 | 72,150 | |
| Lacrosse | | 22,590 | |
| Rowing | | 7,301 | |
| Soccer | 119,217 | 35,324 | |
| Softball | | 29,292 | |
| Swimming and Diving | 12,854 | 12,854 | |
| Tennis | 5,698 | 16,898 | |
| Track and Field, X-Country | 18,356 | 15,676 | |
| Volleyball | | 36,554 | |
| Others | | | |
| Subtotal All Teams | 1,282,594 | 537,867 | 0 |
| Expenses Not Related to Specific Teams | | | |
| Total Expenses | 1,282,594 | 537,867 | 0 |

Good  rowing  programs  often  go  overseas  to  find  athletes  with  the  skill  needed  to

compete at the Division I level.    Yet, UConn currently has no international students on its

women's rowing roster and in the past has had very few.[48]   Instead, UConn expected the rowing coaches to fill the inflated roster with novices who had never rowed before, try to turn them into college rowers, and keep them on the squad list long enough to count them on their annual EADA report.[49]   UConn did not select any of its men's teams in this manner.   Nor did it treat any of its men's teams this way.[50]

Why did UConn subject only women's rowing to these obstacles?  In my experience, it usually comes down to money and appearances.  Institutions want to appear to provide equity but at the lowest possible cost.  This means manipulating the numbers if necessary.  Rather than add new sports, UConn burdened its women's rowing team with inflated rosters to appear to offer more varsity athletic opportunities than it did while spending as little money as possible.  UConn added women's rowing when women did not ask for it but now it wants to eliminate it when women actually do want to participate.  When UConn announced its plans to eliminate women's rowing along with men's swimming, tennis, and cross country, it ignored this history.  These are not the decisions of an institution that assesses and responds to the interests and abilities of its under-represented female students.

---

[48]   In contrast, UConn's men's ice hockey rosters regularly list several international students.  The 2020-2021 men's roster lists fourteen (14).    This fact supports my experience-based view that UConn chose to offer women's rowing in a manner that made it look – on the surface - like it offered many women's athletic participation opportunities but then did not provide it with the resources to support the large squad sizes with experienced athletes.  It is more difficult to do that when there are comparable men's and women's teams (as the presence of some international female ice hockey players shows).

[49]   During discovery, I also intend to examine whether male and female participants are treated equally with regard to the opportunity to be selected for teams – whether there is policy and practice to require all teams to conduct tryouts.  At many institutions, sports such as rowing, football, swimming and diving and track and field do not conduct tryouts and accept all-comers or do not apply roster limits to teams, practices which affect player/coach instructional ratios, opportunities to receive athletics financial assistance, and whether operating budgets can provide equal treatment to athletes.

[50]   I expect that discovery will show that UConn's female rowers received fewer athletic benefits than its men's teams.   I also expect that discovery will show that UConn runs a tiered athletic program in which different tiers of teams receive different levels of resources.  Tiering is acceptable if the same percentage of male and female athletes receive the same levels of benefits.  However, based upon my review of UConn's EADA reports, I suspect that discovery will show that UConn disproportionately supports women's teams in the lowest tier. I expect to do such an analysis and to submit a supplemental report if I receive additional information and if I am asked to assess whether UConn provides its male and female athletes will equal access to athletic benefits.

UConn should have been aware that its selection of sports would lead to an imbalance favoring men and a female participation gap.  I looked at the sports teams UConn selected and the 2018-19 NCAA Sports Sponsorship and Participation Rates Report.  If UConn's roster sizes followed the  NCAA Division I average squad sizes for each men's and women's team for each sport UConn sponsors, it would provide 373.2   opportunities for men but only 358.1 opportunities for women based upon 2018-2019 NCAA average squad size data.[51]  Exhibit J at p. 81.  With 51.1% female enrollment (as reported on UConn's last EADA) and with 373.2 male athletes, women should receive 390 opportunities for a participation gap of 31.9 (390 - 358.1 = 31.9).  This 31.9 female gap is built into the selected sports teams.  This number is larger than the size of a viable team like golf team --- and that's using the inflated NCAA women's rowing average of 62.2 rather than the more reasonable varsity size of 40-42.  At 42 rowers, the gap would increase by 20.2 to 49.1 athletes (31.9 + 20.2 = 51.1).  With the sports teams UConn selected, it could not appear to provide athletic participation equity without engaging in extreme roster management.

By inflating some of its women's rosters, UConn provided the "extra" athletes with very different opportunities than those provided to male athletes.  It provided the many extra female rowers with novice races that are by definition non-varsity.  It provided the extra cross country runners with sub-varsity racing opportunities in which they could not score for the team no matter how well they performed (if they raced at all).  It provided still other "extra" athletes with no competition opportunities and/or with such opportunities fundamentally different from those

---

[51]   This number uses the FBS average squad size for football.  Counting track as one program would be 319.5 men and 301.2 women for a participation gap of 33.  However, as previously discussed, UConn has a participation gap no matter how one calculates it, so there is no need in this report to explain why I think athletes in the track program should be counted only once (the unduplicated count).

of male athletes and female athletes.  UConn chose to do this rather than to add new women's sports with genuine varsity opportunities to compete.

After decades of this discrimination, it is disconcerting that UConn is willing to now eliminate the women's rowing team even though it is now a full Division I sport, even though UConn has a long history of offering too few opportunities for women, and even though UConn will continue to have a participation gap that discriminates against women if it is allowed to eliminate the women's rowing team.


## XI.     CONCLUSION/OPINION: The effect of UConn's proposed sport cuts

The 1979 Policy Interpretation discusses the importance of the "selection of sports" within the context of the effective accommodation regulation.  44 Fed. Reg. at 71417-71418. Just as the "selection of sports" matters when an institution decides which sports teams to add, it also matters when it decides which sports teams to eliminate.  The selection must not be done in a discriminatory manner.

I considered the consequences of UConn's proposal.  I reviewed roster participation data as a means of estimating what next year's participation could be without those teams.   Neither UConn nor I can predict next year's squad sizes.   We must make our most educated projections based upon the historical and existing squad sizes and the athletes who are there.  My review of UConn's own data shows that after eliminating the proposed teams, UConn will still have a female participation gap.  Thus, UConn's plan will not solve its historical athletic participation problems.  Instead, it will make it worse.

It is my opinion that UConn's sex-based decision to eliminate men's cross country, men's swimming, men's tennis, and women's rowing will harm females more than males.  It will cut more women than men from the athletic program and will cut more women's athletic scholarships than men's athletic scholarships.   It also will not solve the problem of UConn's longtime female participation gap.   It appears to be designed to minimize the harm to males.  Accordingly, it is my opinion that UConn should not be allowed to eliminate any women's teams at this time.

### A.  Women's Athletic Participation Opportunities Should Not Be Eliminated When the Participation Gap Favors Men

As a starting point, no institution that currently has and historically has had a participation gap that favors men and discriminates against women should cut any women's teams until it eliminates that gap.   It must then show that it has a participation gap that favors women and that the gap is at least the size of the women's team it wants to cut.  UConn has a female participation gap.   It had a participation gap that favored men in each of the past 13 years for which I had complete data (see Table 1).  It should not be cutting any women's teams at this time.  An equitable athletic program will sometimes slightly favor men and sometimes slightly favor women.  Think of it like a teeter totter that goes back and forth as enrollment and team sizes fluctuate over time.

UConn's current and historical program favors men. Hundreds of more women should have been playing varsity sports at UConn the past 13 years --- even if all athletes on inflated rosters are counted.  But instead of eliminating only men's opportunities until they proportionally match those of the historically under-represented women, UConn wants to eliminate a women's team – rowing.   UConn does not propose to eliminate men's opportunities until women are

favored for the first time (let alone for as long as UConn favored men). Nor does UConn propose to eliminate men's opportunities until women are favored enough to cover the rowing team it wanted to eliminate.[52] UConn's own participation data shows UConn is not there. UConn wants to eliminate them now – while the gap still exists. And it wants to eliminate the women even though UConn will still have a participation gap after eliminating the men's teams.

At the time UConn announced its decision to eliminate teams, UConn's 2019-2020 female participation gap was 32 (accepting UConn's data as true, even with roster inflations and novice rowers). See Exhibit K. Before cutting any women's teams, UConn must first eliminate enough men to erase that 32 athlete female participation gap. It must then eliminate enough men so that it has a male participation gap of around 41 – the size of this year's women's rowing team. That's at least 73 male athletes (32 + 41). UConn's proposal does not do that. It wants to eliminate the women's team first. After years of a participation gap favoring men, rushing to cut a women's team when that gap still exists, shows a continuing willingness to favor men over women.

**B.      Program Cuts Should Not Harm Females More than Males.**

I reviewed the 2018-2019, 2019-20, and 2020-2021 roster participation numbers. I examined the number of male and female opportunities that would be lost under the proposed program cuts of women's rowing and men's tennis, swimming, and cross country runners from those totals (based upon UConn's own web rosters - see Exhibit J) as a means of estimating what the participation numbers might be next year after the sport eliminations. However, in this case,

---

[52]   When/if UConn eliminates enough men's opportunities to reach a female participation gap of negative 55 (the size of the women's rowing team the last full year before the Covid-19 pandemic), it could then eliminate the 55 female rowers and achieve the participation gap goal of zero. Of course, eliminating women's opportunities the first-year women were favored would hardly be equitable given the years of discrimination against women. It would show that UConn is willing to tolerate years of discrimination against women but not one year of any imbalance against men.

next year's men's cross country runners are not actually being eliminated from UConn's athletic program.   They will still be able to run and will continue to receive all of the athletic benefits for the entire year, because they will continue to participate in indoor and outdoor track as long distance runners.   While training in the fall, they could run in local cross country meets as unattached runners or do so as a regular practice scrimmage activity without losing this as either competition opportunity or a training program.   Thus, I opine that men's participation should not be lowered to count these cross country runners.   Table 8 below represents a more accurate picture of the proposed program cuts without including men's cross country.

TABLE 8.  Proposed 2021-22 Elimination of Actual Male and Female
Participation Opportunities

| Proposed Program Cuts | Based on Actual Web Rosters 2018-19 | | Based on Actual Web Rosters 2019-20 | | Based on Actual Web Rosters 2020-21 | |
|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female |
| Men's Tennis | 7 | | 8 | | 8 | |
| Men's Swimming | 29 | | 28 | | 13 | |
| Women's Rowing | | 55 | | 47 | | 41 |
| TOTAL | 36 | 55 | 36 | 47 | 21 | 41 |

The table shows how UConn's proposal will eliminate more females than males from its athletic program – at a time when UConn already has a female participation gap that favors men.

UConn's sex-based selection of sports teams to eliminate also is problematic.   UConn decided to eliminate men's cross country instead of men's golf.   It did so even though eliminating men's golf would save UConn more money, the purported reason for the cuts. UConn's 2018-2019 EADA data shows that it spent $21,588 per capita in operating expenses on men's golf, but only $4,016 per capita for men's all track.   Eliminating golf rather than cross country would clearly save more operating expenses.   It would also save more money in other

areas, because eliminating men's cross country does not really eliminate those athletes or the costs associated with them.  Eliminating men's cross country will not cut coaching costs, because the same long-distance coaches will remain part of UConn's all track program. Eliminating cross country will not cut scholarship costs, because NCAA rules allow 12.6 scholarships for all men's track (including cross country) and the cross country runners will retain their scholarships.   If golf is more expensive per male athlete and if eliminating cross country will not eliminate these costs, then why cut men's cross country instead of golf?

UConn's decision to eliminate men's cross country instead of golf protects men.  It minimizes the harm they will suffer from the cuts.   The male cross country runners will not be eliminated from the all track program.   They will continue to receive all of the benefits of varsity participation that they have always received – even in the fall season.  They will be able to practice the exact same number of days and will be able to do so from early fall through the end of the spring track championships. See NCAA Manual Figure 17-2.  These men will continue to receive their athletic scholarships as part of the track program and they will continue to be able to compete in the winter and spring.  They will remain fully part of the "all track" program.  If men's golf were eliminated, they (like the female rowers) would lose all of these things.  By choosing to "cut" men's cross country instead of golf or any other men's sport, UConn really is proposing to cut only 21 men based upon 2020-21 rosters (13 swimmers and 8 tennis players).[53]   That compares to 41 female rowers (based upon 2020-2021 rosters).  That's cutting nearly twice as many women as men (see Table 7)    That harms women more than men. Overall, UConn's decision to eliminate men's cross country instead of other men's opportunities

---

[53]   The small number of male swimmers likely reflects attrition after UConn announced it will eliminate the men's swim team next year.

(like golf) shows that it is choosing to preserve men's opportunities, even as it purports to cut them.

UConn's decision to cut men's tennis instead of men's golf also does not make sense if, as UConn claimed, its purpose for eliminating teams is to reduce costs. Eliminating tennis will not eliminate the head coach (because he also coaches the women). It will not eliminate the facilities (because it already exists and must be maintained for the women). UConn does not provide athletic scholarships to its male tennis players. It does provide them in men's golf. In 2019-2020, UConn awarded 3.98 golf scholarships and 0 tennis scholarships. See UConn's NCAA 2019-2020 financial report. The year before, UConn awarded 4.78 men's golf scholarships (more than the 4.5 allowed by NCAA rules) and 0 men's tennis scholarships. Even if the extra golf aid was permissible, the fact that UConn selected men's tennis instead of men's golf to eliminate shows that UConn is choosing to preserve male scholarship opportunities. Eliminating men's cross country and tennis reduces NO male aid. Only the eliminated swimmers will lose their aid —5.86 scholarships based upon 2019-2020 data. Meanwhile, UConn's proposed elimination of women's rowing will eliminate 14.83 women's athletic scholarships (based on UConn's NCAA 2019-20 financial report). Women will lose 14.83; men will lose only 5.86. That's a huge gap that harms women more than men. See UConn's NCAA financial reports for 2018-2019 and 2019-2020. UConn is choosing to harm fewer men than women and to harm them less.

UConn's decision to eliminate men's cross country instead of men's golf highlights an increasingly common structural change in college sports: the manipulation of men's and women's track. Historically, most institutions with track sponsored three "all track" seasons for both men and women. With normal squad sizes, whether institutions chose to single, double, or

triple count athletes based upon the number of seasons, had little or no impact on the participation gap.   But institutions soon realized (or were taught) that if they decided to multi-count track athletes by season and if they inflated women's rosters, then they could add 10 female long distance runners and count them each 3 times to make it look like they added 30 new opportunities – all without adding any new women's sports.   If no one looked at the fact that the extra female athletes received different opportunities than the men on reasonably sized teams (or even the other women on the same team), then such a tactic could hide sex discrimination.   It could hide the fact that the institution was choosing to restructure its program in a way to make its superficial numbers look good enough to avoid adding new women's teams (despite participation gaps) for new female athletes.

At some institutions, even this tactic did not eliminate the participation gap, so rather than add more women's sports, they decided to "eliminate" one of their men's track seasons.   In doing so, they did not eliminate any male athletes.  The same number of coaches coached.   The same number of track scholarships were awarded.  The same number of athletes received athletic benefits the entire year, and the same number of male athletes competed (or could compete). But the institutions would then count the male athletes only once or twice, while they counted the female athletes three times for participating in the same program for the same coaches with the same athletic aid and the same benefits for the entire year.   This leverage again would hide sex discrimination from those who did not look behind the numbers to find it.[54]   The manipulation is easy to hide, because the EADA reports all track combined as one sport – not by

---

[54]   Institutions' willingness to manipulate track in this way confirms my belief that "all track" athletes should be counted only once, no matter how many seasons they compete, because in they ultimately participate the entire school year no matter how many seasons they compete.   While explaining my position is not necessary for purposes of this report, if it becomes necessary to do so based upon any defenses raised by UConn, I will supplement this report accordingly.

season.[55]  This structural manipulation of track is sex-based.  Its purpose is to preserve men's opportunities and/or to avoid adding new women's varsity opportunities in new women's sports. It saves money on the back of women.

Some might argue that eliminating one of the men's track seasons would deny men the opportunity to compete in that season.   Such an argument seems ironic given that those same people usually insist on counting the women on inflated cross country rosters who never compete --- and never are expected to do so.  In other words, they want to count women but not men who are in the same situation – practicing but not competing in the fall. UConn's male cross country athletes will still practice the same number of days, still receive coaching, and still receive all athletic benefits for the entire year – even if UConn eliminates fall cross country competitions. Thus, when calculating the number of eliminated opportunities, male cross country athletes should not be included.

Track manipulations are sex-based decisions that institutions make to change the structure of their athletic programs in a way that minimizes the harm to men while track roster inflation continues to harm women.   Whenever an institution decides to eliminate a men's cross country/track season instead of a completely independent men's sport (like golf), its decision is sex based and the decision minimizes harm to men.  Institutions are moving numbers around a chart and hoping that no one looks behind them to see whether the institutions are providing men and women the same kinds of opportunities or whether the institutions are manipulating the structure of their programs to make their charts look more equitable.   These decisions are sex-

---

[55]    This fact further supports my position that "all track" is one sport over three seasons and not three different sports.   If track really were 3 different sports, its participation would be reported separately, its scholarships would be awarded separately, its coaches would be limited separately rather than combined,  its schedule would be limited separately rather than combined, and it would have separate national governing bodies (not one).

based decisions that harm women – whether or not the numbers chart appears to show Prong One compliance.

UConn's willingness to engage in this kind of track manipulation by purporting to eliminate the men's fall cross country season instead of eliminating actual male golf athletes (even as it has denied women golf opportunities), makes it even more important to fully review UConn's athletic participation opportunities before allowing it to eliminate any women's sports. Its promise of future compliance cannot be accepted at face value given its long history of sex discrimination.

UConn's sex-based decision to eliminate women's rowing and men's swimming, tennis, and cross country makes sense only if UConn's goal is to minimize the harm endured by men. It certainly does not save UConn the most money.  If UConn's true goal is to save money, it would choose to eliminate different men's sports teams.  Moreover, my experience suggests that UConn could save money without eliminating some or all of the sports teams in its proposal.   In my textbook, *Athletic Director's Desk Reference*, chapter four explains how to restructure an athletic program to significantly reduce expenses and keep all sports programs.  It explains how many Division I institutions financially tier their sports.   This is allowed under Title IX and principles of gender equity if they support the same proportion of male and female athletes in each tier. Having moved to the Big East Conference, which does not even sponsor football, another way UConn could save all its sports is to move its football program from the Division I Football Bowl Subdivision to the Division I Football Championship Subdivision.  FCS programs are Division I, but they do not require as much funding and they allow a maximum of 63 football scholarships rather than 85.

**C. UConn's proposed plan to cut sports teams does not eliminate the female participation gap.**

I reviewed the 2018-2019, 2019-20, and 2020-2021 roster participation numbers.  I subtracted the number of female rowers and the number of male tennis, swimming, and cross country runners from those totals (based upon UConn's own rosters) as a means of estimating what the participation numbers might be after the sport eliminations.  See Exhibit L.  I used the total roster numbers after the cuts as contained in Exhibit M to create Table 8 on the next page which shows female participation gaps based on 2018-29, 2019-20 and 2020-21 total rosters after the proposed cuts and also shows how those gaps increase when male cross country runners are not eliminated (because they still will be able to run long distance in the track program for the entire year).

Table 8 shows that UConn's actions will lead to larger participation gaps.  UConn's 2018-2019 female participation gap was 20.  If the men's tennis and swimming and women's rowers are cut, the gap becomes 38 --- 18 more.   UConn's 2019-2020 female participation gap was 32.   If the same teams are cut, the gap becomes 42.   UConn's 2019-2020 female participation gap was 34.  Notice the steady increase over the past three years.   If the same teams are cut, the gap becomes 53.   These are large female participation gaps that are larger than the size of a viable team --- including the size of the women's rowing team.   And these gaps accept UConn's data as true – without auditing for accuracy or reducing inflated women's rosters.

Even if men's total athletic participation is also reduced by the number of men's cross country runners, UConn will still have a participation gap that favors men.  Based upon 2018-2019 participation data, UConn's proposal will cut 56 men and 55 women for an after cuts female participation gap of 17 (again, counting all athletes claimed by UConn whether or not on

teams with inflated squad sizes or on teams with sub-varsity athletes). Based upon 2019-2020 data, UConn's proposal will cut 52 men and 47 women for a female participation gap of 25. For 2020-2021, Conn's proposal will cut 35 men and 41 women for a participation gap would be 38. See Table 9. But here, based upon UConn's own data, the resulting female participation gap of 38 would be the largest gap in about 10 years – and that's with including men's cross country in the men's reductions.

TABLE 9. Computation of Female Participation Gaps After Proposed 2021-22 Cuts of Men's Tennis, Men's Swimming, Men's Cross Country and Women's Rowing Programs and Without the Elimination of Men's Cross Country

| 2021-22 Proposed Sport Programs (no men's cross country, swimming, and tennis; no women's rowing) | Based on Actual Web Rosters 2018-19 | Based on Actual Web Rosters 2019-20 | Based on Actual Web Rosters 2020-21 |
|---|---|---|---|
| Total # F-T Male Undergraduates | 8998 | 8998 | 8998 |
| % Students | 48.9% | 48.9% | 48.9% |
| Total # F-T Female Undergraduates | 9399 | 9399 | 9399 |
| % Students | 51.1% | 51.1% | 51.1% |
| Men's Sports | | | |
| TOTAL | 329 | 336 | 346 |
| Women's Sports | | | |
| TOTAL | 327 | 326 | 323 |
| OVERALL FEMALE PARTICIPATION GAP* | 17 | 25 | 38 |
| IF MEN'S CROSS COUNTRY NOT COUNTED AMONG THOSE OPPORTUNITIES BEING ELIMINATED | | | |
| Men's Sports | | | |
| Cross Country | 20 | 16 | 14 |
| TOTAL | 349 | 352 | 360 |
| Women's Sports | | | |
| TOTAL | 327 | 326 | 323 |
| OVERALL FEMALE PARTICIPATION GAP* | 38 | 42 | 53 |

*The female participation gap represents the number of female participation opportunities that would need to be added if male participation remained constant AND was equal to the percent males in the undergraduate student body AND female participation was equal to the percent of females in the undergraduate student body.

The mathematical impact of choosing to "cut" men's cross country instead of men's golf or some other sport on the female participation gap is evident.  It protects men's opportunities and men's scholarships while it appears to make the participation gap less, even though it still favors men and still exceeds the size of a viable women's team --- and that's without auditing UConn's claimed participation for inflated women's rosters or assessing whether all the claimed athletes actually qualify as Title IX participants.  With participation gaps like these that continue UConn's historical discrimination against women, UConn should not be cutting any women's teams.

### D.   Participation Cuts are Speculative

UConn's roster participation data shows that its proposal will not lead to a gender equitable athletic program.  If UConn thinks its cuts are acceptable, then it must either be relying on inaccurate data (like EADA participation as of the first date of competition) or it must believe it can engage in enough roster manipulation next year and in the future to make its participation gap look small – on the surface.  Reliance on EADA participation is wrong.  Reliance on future roster management would be merely speculative, especially given UConn's historical failure to do so in a gender equitable manner.

UConn's history of female participation gaps shows that UConn has long failed to provide female students with a substantially proportionate number of varsity athletic participation opportunities.  Those gaps are even larger once the sub-varsity athletes are removed from the varsity totals.   Those gaps may grow even larger if a more detailed review shows that some of the "extra" female athletes do not meet the Title IX definition of participant or receive opportunities that are fundamentally different from those provided to men.   UConn has not been able to manage its rosters to close its female participation gap – and certainly has not managed

them in a nondiscriminatory way (without women's roster inflation or reliance on sub-varsity opportunities).  Until UConn can show that it can do so in real life over several years, then its belief is mere speculation.  It is a mere promise to comply with Title IX in the future.  That's not compliance and that's not equity.

Many institutions hope that their public claims of equity will be enough to squelch complaints by female athletes.  After all, no one audits institutions' Title IX compliance – unless and until they end up in litigation.  Many other institutions that cut women's teams recently are learning this.  Brown, Dartmouth, William & Mary, Iowa, and other institutions have had to retain or add back the women's teams they threatened to cut once lawyers got involved in just the past year.  UConn is undoubtedly hoping the athletes – and now the court – will allow its "paper" plan to eliminate sports teams to proceed without first making sure that UConn actually demonstrates for a specified period of time that it is capable of conducting an athletic program that provides female athletes an equal opportunity to participate in the same types of opportunities at the same levels of competition as the men.

Even if UConn someday claims it has reached a participation gap greater than the size of the women's rowing team it wants to eliminate, its claims should be fully audited.    Its participation data should be reviewed at that time to ensure that women's rosters are not inflated more than men's, that women compete at the same level of competition as men, and that women's opportunities are comparable to those provided to men.  Only after UConn can sustain roster numbers without manipulating them for a period of years should it be allowed to eliminate any women's team.   After years and possibly decades of providing women with too few opportunities, UConn's promise of doing better in the future is not enough, especially when its own proposal would cut more women than men at a time when it already offers too few

opportunities for women.    Certainly, no women's team should be eliminated pending the outcome of this litigation.

### E. UConn is able to comply with Title IX proportionality provisions without dropping any men's or women's team

UConn is able to comply with the proportionality provision of Title IX without dropping any men's or women's teams.  No Title IX regulation compels UConn to restructure its program in a manner which requires the dropping of any men's or women's sport program.   It is inaccurate in most instances for an athletics administrator to maintain that financial exigencies *require* the athletic program to eliminate sports teams.    It appears that UConn is alleging that this is the case:

> UConn athletics announced today that it will reduce the number of sports it sponsors by four, effective at the conclusion of the 2020-21 season.  This action was taken as part of the university's overall budget reduction effort and allows athletics to meet a university directive calling for a 25 percent reduction (approximately $10 million) in institutional support by 2023.

> Affected programs are men's cross country, women's rowing, men's swimming & diving and men's tennis.  The move affects 124 student-athletes.

> "While this is a painful decision, it is in the best interest of the long-term viability of UConn and UConn athletics," said UConn President Thomas Katsouleas. "The Division of Athletics recently completed a thorough and comprehensive review of its operation and programs, an inquiry initiated long before the COVID-19 crisis began. For several years, the level of institutional financial support committed to athletics has been growing. Today, we shared some difficult decisions that nonetheless should chart a course towards better financial sustainability at a level of support and sport sponsorship more in line with our peers."[56]

Given the teams that UConn proposes to eliminate, I question these financial assertions.

---

[56]   University of Connecticut Athletic Department.   June 24, 2020.   UConn Announces Changes to Division of Athletics.     Retrieved from  https://uconnhuskies.com/news/2020/6/24/general-uconn-announces-changes-to-division-of-athletics.aspx

In sum, UConn will still have a participation gap that favors men and discriminates against women if it is allowed to eliminate the women's rowing team.  Given its long history of such participation gaps, this is unacceptable.   UConn's proposal will end up cutting more women than men from the athletic program and will cut more women's athletic scholarships than men's athletic scholarships.   Its decision to cut men's cross country instead of more expensive sports like golf shows UConn's intent to minimize the harm to men.   It also raises questions about the financial basis for UConn's decision.   Overall, UConn's proposal harms women more than men and should be enjoined pending litigation on the merits.  UConn should have to demonstrate that it can actually provide female students with participation equity --- not just promise it.

## -XII.   CONCLUSIONS/OPINIONS RE:  IRREPARABLE HARM

I opine that UConn's decision to eliminate the women's rowing team in 2021-2022 will cause – and already has caused - the student athletes, their coaches, and the program itself substantial harm.  That harm will become irreparable if a preliminary injunction is not issued. The harm of sex discrimination will also be felt by other UConn female athletes even if their teams are not cut (and even if their teams are not the ones forced to add more athletes to make up for the lost rowers).   This opinion is based upon my decades of experience in intercollegiate athletics, including 18 years as the women's athletics director at the University of Texas, over 25 years as a consultant to college athletic departments, and over 25 years of working with similarly situated clients in Title IX cases.

## A.     Harm to the women rowers

The most obvious harm that UConn's actions will inflict is on the female rowers themselves.   If the team is eliminated, the athletes will be faced with the difficult choice of losing the opportunity to row and transferring to another school.  It is difficult to explain the educational, physical, psycho-social, and lifelong impact that participation in college athletics has --- especially at the Division I level of competition.   The athletes themselves will surely explain it in their testimony.  But all of us who have been involved in collegiate athletics know just how profound the experience can be.  It shapes who we are, who our friends and mentors are, and our future careers.   College athletes tell their friends and grandkids stories about glory days and victories, as well as lessons learned from adversity, throughout their lives.   Teams become like families and their members become lifelong friends.  If UConn eliminates women's rowing, it will deny its participants these irreplaceable experiences.

College athletes have only 4 years of eligibility that must be used within a 5-year window.   Once the window closes, athletes can never recover what they've lost.   For those athletes who do not or cannot participate at a professional or Olympic level, college is their last chance to participate – often after a lifetime of preparation.  If they lose it, they can never recover it.   If UConn eliminates women's rowing, but is ordered to reinstate it after trial, most of the athletes on the team now will no longer be around to benefit.  They either will have graduated or will have transferred.   Even if some freshmen rowers get to row again as seniors (or have to stick around as 5th year seniors by the time the team is re-instated), they will not be able to recover the years they lost --- and they will not be able to add them after they graduate or after their eligibility expires.   Their opportunity will be lost permanently.

In the meantime, for those who may be back, they will lose much more than participation during the years lost pending trial.  They will lose coaching, development, and skill. They will also lose access to the strength and conditioning and medical services that varsity athletes receive.  If they start up again as seniors, they will not have the same skills they would have if they had continued varsity rowing for three years.  They – and their team – will not be as competitive.   They will lose academic tutoring and the structure that athletics participation brings to their lives.   College athletics is an educational program that is about more than participation.

A Division I athlete's decision to attend a university because of the coach and participation in athletics is as important, and in some cases, even more important, than the academic opportunities offered.  Daily physical conditioning, being pushed by the coach to achieve growth in the acquisition of skills, a commitment to devote 30 to 50 hours per week within a narrow window of time during which an athlete is physically capable of achieving high levels of performance, is a way of life for the athlete.  Division I rowing is not a recreational sport activity common to most club sports or programs and the experience offered by lower NCAA competitive divisions is not comparable.  Division I college sport has become the primary training ground for aspiring USA national team members and Olympians.  When coaches are no longer available because they have departed, when access to athletics facilities and services is limited because the athlete is no longer a member of the varsity athletic teams, this is a huge culture change that affects the mental health and well-being of athletes that should not be underestimated.

Coaches are the people who help balance the athlete's life, especially when that need is created by the pressures of classes, training, competition, dealing with injuries, etc.  They guide

the development of team chemistry and instill the player's trust in teammates – relationships that last for a lifetime.  Breaking up the team construct of highly valued intrapersonal relationships is a significant harm – losing your best friend times ten.

Rowers who transfer to other schools will also suffer harm – even if they are able to continue rowing at another school.  Transferring is stressful.   The athletes will leave behind their friends and teammates.  They will have to figure out how to fit into the structure of a new program.  They will have to start all over to earn a place in the starting boats.  For some, even the cost of moving to a new school can be insurmountable.

Those forced to transfer will likely lose some of their academic credits upon transfer – or will have to take additional courses to meet the requirements of their new school.  Some may even have to stay an extra year – and delay their paid careers a year – in order to meet graduation and residency requirements.  Others will have to take heavier course loads in order to graduate on time.  Some may have to change academic majors, because their new school does not offer what they studied at UConn.  Others may face obstacles being accepted into more highly desired academic majors due to prerequisite academic courses that may only be available at the new institution. It will be difficult for anyone to transfer successfully to another Division I institution with an exceptional rowing program unless the athlete is an exceptional student or proficient enough to qualify for an athletic scholarship or be the beneficiary of special admissions privileges associated with that status.  Thus, the transfer student-athlete may be forced to attend an academically less-selective institution and/or one with a comparable quality rowing program.

Athletes who are forced to transfer will likely face financial harm.   Because rowing is an NCAA equivalency sport, athletes are more likely to receive partial athletic scholarships rather than full scholarships unless the athlete is nationally ranked and highly desired.   Recruited

student athletes usually receive preferred packaging of need-based and merit financial aid, meaning that a larger portion of their financial aid package will be non-repayable grants rather than loans. Thus, it is more likely that the rowing transfer athlete will attend a lesser resourced Division I institution with a comparable athletic program that may or may not have athletic aid available and may or may not have the financial resources available to offer an attractive financial aid package that includes a significant percentage of non-repayable aid.

There are two other factors that will minimize the availability of athletic aid for transfer students: (a) the Covid-19 economic crisis has caused reductions in athletics budgets nationwide and (b) the unplanned extension of the eligibility of college athlete seniors who would have completed their athletic eligibility in the spring of 2020, but, because of Covid-19, did not use their last year of eligibility and plan to return to their original institutions for a "do over." This may well occur with 2021 spring sports athletes in the midst of the 2nd wave of the pandemic. The NCAA is permitting member institutions to exceed normal NCAA scholarship limits in 2020-21 in order to accommodate these athletes but it is unclear what will happen with similarly situated 2020-21 athletes needing to extend their eligibility into 2021-22. In any event, unanticipated athletic scholarship costs ranging from $250,000 to $600,000 per institution (depending on number of athletes and differences in cost of tuition) to support athletes whose eligibility has been extended makes it more unlikely that athletic aid and non-athletics non-repayable financial aid will be widely available to new transfer student athletes. Thus, the combination of lack of availability of athletics aid and more loans than non-repayable grants in the packaging of other non-athletics aid increases the likelihood of significant additional financial costs to complete the transfer student-athlete's education.

On an even more basic level, some rowers will not have the financial resources to move to another school.  They will not have the resource to find new housing or to set up a new household.

I also opine that the rowers will experience moral injury because of the fact that their institution has treated them as "second class citizens" and, with no notice or input, announced the elimination of the sport that served as an important (if not most important) reason for their decision to attend UConn**.**  UConn's lack of notice to athletes regarding the intent to eliminate programs represents a "moral injury" in that athletes *trusted* that the higher education institution they chose to attend would fulfill its recruiting commitment -- four years of an outstanding education and athletic program benefits. They expected the institution to provide the same certainty with this athletic promise as the availability of academic classes and outstanding faculty.  When the proverbial "rug is pulled out from under" student athletes with no notice and no justification, the student athletes are harmed.

The female student athletes were also injured by the inequitable ways in which their varsity athletic team was not equally supported prior to the termination decision, then injured again with a termination decision.  They have received a clear message that UConn does not value their participation or equal treatment obligations under Title IX.

### B.      Harm to the women's rowing coaches

UConn's rowing coaches and staff will incur harm if they lose their jobs when the program is eliminated, which also will harm the athletes who have developed relationships with their coaches.  They will lose pay, benefits, and the program they built over many years.  They will lose their athletes and their colleagues.  They will have to look for new jobs and will have to

uproot their lives if they find other jobs.  They can't just move down the road to another rowing job.

Once the coaches are forced to leave UConn, the athletes who remain will lose the people who coach and develop them.   They will lose the people who keep them organized and who provide them with mentorship.   Even if UConn eventually hires new coaches if the program is reinstated, the athletes will lose people important to their personal and athletic development – the people behind their decision to enroll at UConn in the first place.   They will have to adjust to a new coach and a new system.  In addition, as set forth below, once the coaches are gone, it will be significantly more difficult to reinstate the program later.   It will take years to rebuild the program and to rebuild enough trust in the rowing world to convince rowing recruits they should attend UConn.

### C.      Harm to the rowing program and thus to the athletes

I opine that UConn's announcement that it plans to eliminate the women's rowing team for the 2021-2022 school year has already started to harm the program and will make that harm insurmountable if a preliminary injunction is not issued and the decision is allowed to be implemented before the trial of this case.  It would be tragic for the athletes, coaches, and the program itself to endure this irreparable harm now if this litigation shows that UConn's decision was discriminatory, as I expect it will.

Some rowing athletes have already committed to other programs.  Others are looking at their transfer options.  The more athletes who do this, the more difficult it will be to keep enough athletes with varsity skills together to reform a team if/when the athletes prevail.  Top athletes, in particular, are the most likely to look for opportunities at other schools.  Meanwhile, if the team

is cut, no new athletes will be recruited to be ready to compete if/when the team is reconstituted after litigation.   As a result, the program will not just cease to exist during the litigation, it will take years to start it back up again.   A preliminary injunction could stop that bleeding of talent, especially of upperclassmen who could finish their careers at UConn.

Without a preliminary injunction, the rowing coaches will seek employment at institutions other than UConn as soon as possible. If they leave, prospective head coach applicants will not consider coaching UConn without an assurance that the team will be permanently restored to its previous varsity sport status in the athletic program.   Thus, absent a stay of the proposed program cut, recruiting a permanent replacement would have to wait until any court case and appeal was completed and resulted in a judgment in favor of the plaintiffs' eliminated team, easily a multi-year process.   Even then, prospective coaches would have to be assured of the long-term stability of the program in some way.   Thus, it is unlikely that a favorable court judgment could occur prior to 2022-23, which means a new coach would likely not be hired until the end of the 2022-23 academic year, because coaches are generally hired in the offseason.   This would be well after a 2023-24 freshman recruiting class committed to their institutions – which would not include UConn as a choice.

Realistically, recruiting varsity quality athletes to reconstitute the team would have to wait for the hiring of a new coach.   Assuming a coach could be hired for the 2023-24 season, the first recruiting class of athletes would not arrive on campus until the 2024-25 season, and it is doubtful that sufficient numbers or a balanced roster of freshmen, sophomores, juniors and seniors could be assembled for that season – especially given how difficult it is to recruit athletes with rowing experience and varsity level skill.   There just aren't that many high school rowers.

If the program is cut pending litigation, 2021-22 and 2022-23 team schedules would not exist and rescheduling could occur for the 2023-24 seasons only if all judicial processes were completed, a judgment rendered in favor of the plaintiffs and there were a sufficient number of current athletes who had not yet graduated or transferred who, combined with transfers and less than high quality athletes, could be assembled to participate in a 2023-24 season.  By then, regatta competitions could be full, as college sports schedules are often established years in advance.   UConn would have to scramble to put a hodge-podge schedule together until it could resume a normal scheduling rhythm.

It would take two to four years beginning in 2024-25 for UConn to rebuild its reputation and gain the confidence of the most highly sought-after prospective student-athletes, who will look at UConn's decision to drop rowing as a lack of commitment.  Only a very high quality coach hire would minimize this liability.  It will be difficult for UConn to field a full team of reasonably skilled athletes before 2024-25 at the earliest.   If a preliminary injunction is not granted, UConn's rowing program will take years to recover even if the current athletes win this case – proving that the rowing program never should be cut in the first place.

## CONCLUSION

UConn does not effectively accommodate the interests and abilities of its female students. It does not now and historically has not provided its female students with an equal opportunity to participate in varsity intercollegiate athletics.   Its own participation data shows longtime participation gaps that discriminate against women.   UConn's proposal to eliminate some of its varsity sports in 2021-2022 harms females more than males.  It will eliminate more real women's opportunities than male opportunities and more women's athletic scholarships than men's

athletic scholarships.   After doing so, it will still have a participation gap that discriminates against women.   Until UConn eliminates this participation gap favoring men and until UConn demonstrates in fact (not by promise) over a period of years that it has developed a participation gap in favor of women that is at least the size of the women's rowing team so that there will be no participation gap thereafter, UConn should not be allowed to eliminate the women's rowing team.   After many years of knowingly discriminating against women, UConn certainly should not be allowed to eliminate women's rowing pending the outcome of this litigation.   Prematurely allowing an institution that has already proven its unwillingness or inability to provide equal athletic opportunities for its female students to eliminate the women's rowing team (or any team) will cause the team and the program irreparable harm.

Respectfully submitted,

Donna A. Lopiano, Ph.D.

Date:  April 26, 2021

# **DONNA A. LOPIANO**, B.S., M.A., Ph.D

452 Fisher Court
Shelton, CT 06484     516-380-1213 (c)   203-538-5280 (w)
SportsManagementResources@gmail.com

*Revised as of 1-17-2021*

## EDUCATION

Doctor of Philosophy
in Physical Education

University of Southern California
January 11, 1974

Master of Arts in
Physical Education

University of Southern California
August 20, 1969

Bachelor of Science in Health
and Physical Education

Southern Connecticut State College
June 8, 1968

Institute for Non-Profit Consulting
Certificate of Completion

CompassPoint Nonprofit Services
December 7, 2007

## PREVIOUS EMPLOYMENT

2012-present    Adjunct Professor, Sports Management, Southern Connecticut State University

2008-present    President and Founder, Sports Management Resources
- a consulting firm specializing in educational sport
- helping sports organizations solve integrity, growth and development challenges
- www.SportsManagementResources.com

1992-2007    Chief Executive Officer, Women's Sports Foundation
Built an internationally respected education, research and public policy organization:
- Secured funds that enabled the Women's Sports Foundation to award more than $50 million in cash grants and educational materials
- Expanded the Women's Sports Foundation endowment from $1 million to $4 million; grew annual revenues from $1 million to $10 million and built staff from eight to sixty-five
- Driving force behind the development of the award-winning GoGirlGo! educational curriculum that since 2001 has reached more than 625,000 girls; significantly changing their attitudes about healthy lifestyle choices
- Served as a leading expert and national spokesperson on gender equity issues, including Title IX and the Amateur Sports Act, providing expert testimony for numerous court cases on coaches' compensation, athletes' rights, and equitable treatment
- Repeatedly led national efforts to strengthen Title IX legislation and its enforcement, successfully educating elected officials and policy makers on the importance of upholding the law
- Recognized as one of the "100 Most Influential Sports Educators in America" by the Institute for International Sport, "100 Most Influential People in Sports" by *The Sporting News* and "The 50 Most Influential People in College Sports" by *College Sports*

1975-1992    Director of Intercollegiate Athletics for Women and lecturer, Kinesiology and Health Education Department, The University of Texas at Austin
Constructed what many believed to be the premiere women's athletics program during this period; twice earning designation of top program in the nation:
- All eight sports consistently national ranked in the top ten in Division I

## PREVIOUS EMPLOYMENT (continued)

- o Grew budget from $57,000 in 1975 to over $4 million with 34 endowed academic scholarships for student-athletes in 1992
- o Eighteen national championships in six different sports, 51 individual sport national champion athletes, 57 Southwest Conference championships and 395 All-American athletes, dozens among them Olympians and world champions
- o Ninety percent of women athletes who exhausted their athletic eligibility at the University of Texas received a baccalaureate degree
- o Served as Lecturer, Kinesiology and Health Education Department, teaching sports ethics and athletic management

1971-75    Assistant Professor of Physical Education,  Assistant Director of Athletics and Head Coach of men's and women's varsity teams at Brooklyn College of The City University of New York
- o Led development of new undergraduate curriculum for physical education majors
- o Taught undergraduate courses: Philosophical Perspectives of Physical Education, Women in Sport,  Behavioral Perspectives of Physical Education, Coaching Techniques, and Psycho-Social Aspects of Women in Sport as well as skills and methods courses in volleyball, basketball, softball and officiating
- o Taught graduate courses in Sociology of Sport, Administration of Athletics, Women in Sport
- o Initiated women's intercollegiate volleyball and grew it into a nationally ranked program
- o Head Coach of women's basketball, women's softball, women's volleyball and men's volleyball

1969-70    Graduate Teaching Assistant, Women's Intramural Director, Women's Intercollegiate Volleyball Coach at The University of Southern California
While a graduate assistant and doctoral student:
- o Served as head administrator of the University's women's intramural program
- o Served as head varsity volleyball coach
- o Taught a variety of sports classes for undergraduate students

Visiting Professor/Adjunct Professor/Executive in Residence - Courses Taught at Other Universities

| | |
|---|---|
| Spring 2015-20 | Global Issues in Sport and Entertainment Management, Southern Connecticut State University |
| Fall 2014-20 | Governance and Administration of Sport Organizations, Southern Connecticut State University |
| Fall 2012-20 | Current Issues in Sport Management, Southern Connecticut State University |
| Spring 2014-17 | Sport Ethics, Southern Connecticut State University |
| 2013-2014 | Executive-in-Residence, University of New Haven College of Business |
| Fall, 2011 | Amateur Sports Governance, New York University |
| Spring, 2011 | Amateur Sports Governance, New York University |
| Fall, 2011 | Seminar in Sports Business, Columbia University |
| Spring, 2009 | Community, Educational and Open Amateur Sports Organization and Governance, University of Massachusetts at Amherst |
| Summer, 1981 | Sports Programs for Girls and Women, University of Illinois @ Chicago Circle |
| Summer, 1980 | Coaching Softball, University of Iowa |
| Summer, 1979 | Athletic Administration, University of Iowa |
| Summer, 1976 | Administration of Girls' and Women's Athletics, University of Denver |
| Summer, 1975 | Psycho-Social Aspects of Women in Sport, University of Washington |

## TEACHING, COACHING AND ADMINISTRATIVE RESPONSIBILITIES

***Administrative Experience:***
Assistant Director of Athletics, Brooklyn College of The City University of New York
Director of Intercollegiate Athletics for Women, The University of Texas at Austin
Chief Executive Officer, Women's Sports Foundation
President, Sports Management Resources

**TEACHING, COACHING AND ADMINISTRATIVE RESPONSIBILITIES**

*Courses Taught:*

### Undergraduate

| | |
|---|---|
| Contemporary Issues in Sport Management | Philosophical Perspectives of Physical Education |
| Behavioral Perspective of Physical Education | Coaching for Women |
| Psycho-Social Aspects of Women in Sport | Intermediate and Advanced Volleyball |
| Intermediate and Advanced Basketball | Beginning and Intermediate Softball |
| Methods in Team Sports | Officiating Team Sports |
| Women in Sport | Coaching Techniques in Volleyball |
| Ethics in Sport | Contemporary Issues in Sport and Entertainment Management |

### Graduate

| | |
|---|---|
| Sociology of Sport | Administration of Athletics |
| Women in Sport | Sport Ethics |
| Community, Educational and Open Amateur Sport | Amateur Sports Governance |
| Seminar in Sports Business | Governance and Administration of Sport |
| Governance and Administration of Sport Organizations | Global Issues in Sport Management |
| | Current Issues in Sport Management |

*Coaching Experience:*
Head Coach of Women's Intercollegiate Volleyball, Basketball and Softball
Head Coach of Men's Intercollegiate Volleyball
Head Coach, Italian National Softball Team
Pitching Coach, Professional Women's Softball

**PROFESSIONAL ORGANIZATIONAL AFFILIATIONS**

American Alliance for Health, Physical Education, Recreation and Dance
National Association of Collegiate Women Athletics Administrators
Women's Sports International
The Drake Group

**HONORARY DEGREES**

Honorary Doctorate, Monmouth University, West Branch, New Jersey, May 20, 1998
Honorary Doctorate, Ripon College, Ripon, Wisconsin, May 16, 1998
Honorary Doctorate, St. Joseph's College, Hartford, Ct., September 14, 1994
Honorary Doctorate, United States Sports Academy, July 8, 1994
Honorary Doctorate as Outstanding Alumnus, Southern Connecticut State University, May 28, 1993
Ethics Fellow, Institute for International Sport, 1990

**HALL OF FAME AWARDS**

Texas Sports Hall of Fame, 2011
Fairfield County (CT) Sports Hall of Fame, 2007
Public Schools Athletic League Hall of Fame Award, Brooklyn, NY, November 22, 2003
Verizon Academic All-American Hall of Fame, Cleveland, OH, June 28, 2003
Connecticut Women's Basketball Hall of Fame 16th Anniversary Induction, New Haven, CT, April 10, 2003
Connecticut High School Coaches Association Hall of Fame, Southington, CT, November 14, 2002
National Italian American Sports Hall of Fame, Inc., Chicago, IL, 2001
International Scholar-Athlete Hall of Fame, Institute for International Sport, Kingston, Rhode Island, June 27, 1999
Connecticut Women's Hall of Fame, 1995
Texas Women's Hall of Fame, 1987, by the Governor's Commission for Women
Communiplex National Women's Sports Hall of Fame, 1987, Cincinnati, Ohio
Southern Connecticut State University Alumni Sports Hall of Fame, 1986, SCSU Alumni Association
National Sport Hall of Fame, 1985, by the National Association for Sport and Physical Education
National Softball Hall of Fame, 1983, American Softball Association

## OTHER AWARDS AND HONORS

Lalia Rach Profile in Excellence Award, NYU Preston Robert Tisch Center for Hospitality, Tourism, and Sports Management Sports Business and Graduate Sports Business Societies, April, 2014

NCAA Gerald R. Ford Award, 2013, honors an individual who has provided significant leadership as an advocate for intercollegiate athletics over the course of his or her career

100 Most Influential Sports Educators in America, 2013

American Civil Liberties Union, Nine of the Most Influential Actors in Title IX's History, April, 2012

Elm City Legend, Connecticut March of Dimes, New Haven, CT, November, 2011

"The Champions:  Pioneers and Innovators in Sports Business" Award, Sports Business Journal/Sports Business Daily, March, 2010

Cal Ramsey Distinguished Lecturer in Sports Management, New York University, 2009

Sports Lawyers Association, 2008 Award of Excellence

Women in Sports Business Symposium 2008 Woman of the Year Award, University of Oregon Warsaw Center for Sports Marketing

Institute for International Sport, 100 Most Influential Sports Educators in America, 2007

Adelphi University Sports Leadership Institute, Community Leadership Award, 2007

New York Institute of Technology William T. "Buck" Lai Wonderful Life Achievement Award, June 21, 2007

Ithaca College Department of Sport Management and Media, Distinguished Sports Industry Leader Award, 2007

*The Sporting News*, "The 100 Most Influential People in Sport," 1997 (#67), 1996 (#46), 1995 (#41), 1994 (#43), 1993 (#62), 1992 (#72)

*College Sports*, "The 50 Most Influential People in College Sports," 1996-97 (#22) 1995-96 (#10),  1994-95 (#31)

International Olympic Committee Women and Sport Trophy, 2005

Miami-Dade Community College Honor Award, Champion of Equal Opportunity for Women in Sports and Education, 2005

Columbia-Barnard Athletic Consortium Award for Exemplary Contributions to the Advancement of Athletic Opportunities for Girls and Women, Feb. 6, 2004

Patsy Mink Memorial Title IX at 30 Award, National Association for Girls and Women in Sports, 2003

Women in Leadership Award, The Center for Women of NY, Elmhurst, NY, June 19, 2003

Jacobs Institute for Women's Health, Excellence in Women's Health Award, Washington, D.C., May 16, 2002

National Association of Collegiate Directors of Athletics (NACDA) 30th Anniversary of Title IX Award, 2002

United States Sports Academy Distinguished Service Award, 2001

International Olympic Committee, Women and Sport Achievement Award, 2000

San Antonio Sports Foundation Appreciation Award, 2000

The Feminist Majority Foundation Contribution Award "for unique contribution to the historic struggle for women's equality and human rights", 2000

Town of North Hempstead Recognition Award for Support of the Education and Assistance Corporation, 1999

Nassau County, State of New York, Special Commendation for Outstanding Service to Local Citizenry, 1999

National Association of Collegiate Women Athletic Administrators Honor Award for Outstanding Support of Women Athletes and their Sports, 1998

National Association of Sports Commissions Recognition Award, 1998

Sporting Goods Business Woman of the Year (Non-Profit Organization), 1998

Stamford Old Timers Athletic Association National Honoree, 1998

Women's Sports and Fitness Magazine, The 20 Most Influential Women in Sports, 1997

NCSC Lifetime Achievement Award, 1997

Girl Scouts of Nassau County Juliette Low Award of Distinction, 1996

New York State Public High School Association, Inspiration Award, Young Women in Sport Forum, April, 1995

Tennessee Lawyers Association for Women Recognition Award, 1995

NAFFY Award (National Association for Female Executives), 1995

King County and NYSAC Award for Contributions in Sports,, 1994

National Collegiate Athletic Association Silver Anniversary Award, 1993

Dallas All Sports Association Distinquished Service Award, 1992

## OTHER AWARDS AND HONORS (cont.)

National Association for Girls and Women in Sports Guiding Woman in Sport Award, 1992
National Association of Collegiate Women Athletic Administrators, District 7 NACWAA
    Administrator of the Year, 1992 and 1991
National Association for Girls and Women in Sport Guiding Woman in Sport Award, 1992
Recipient of the 1987 Flo Hyman Memorial Gazelle Award "to honor a person who exemplifiesfeminist
    values in athletics and scholarship."  Presented by the Project on Equal Education Rights of the NOW
    Legal Defense and Education Fund, 1987.
Margaret C. Berry Award for Outstanding Contribution to Student Life, 1985, by the Eyes of Texas

## LEADERSHIP EXPERIENCE

*Current:*

Member, President, Board of Directors, The Drake Group (2015 to present)
Member, Advisory Board, Fishlinger Center for Public Policy Research, College of Mount St. Vincent
    (2015 to present)
Member, Advisory Board, The Drake Group, (2010 to present)
Member, Advisory Board, Champion Women (2015-present)
Chair, Drake Working Group on Collegiate Athletics Reform (2013 –present)
Member, Advisory Board, Sports Law Institute, Vermont Law School (2013 to present)
Member, Advisory Board, Friends of the Tisch Center – Sports (2011 to present)
Member, Advisory Board, Center for Research on Sport & Physical Activity, D'Youville College (2010
    to present)
Member, Foundation for Global Sports Development (formerly Justice for Athletes), Advisory Board
    (2005 to present)
Member, Advisory Board PowerPlay NYC, (2001 to present)
Member, Advisory Board of the MBA in Sport Management, Florida Atlantic University (2000 to present)
Member, Committee of Advisors, Positive Coaching Alliance (1999 to present)
Member, Editorial Advisory Board of *Athletic Business* (1997 to present)

*Past:*

Member, National Honors Committee of The National Women's Hall of Fame (1994 to 2015)
Chair, International Baseball Federation (IBAF) Women's Baseball Committee (2009)
Member, Advisory Board, 2003 World Congress of Sports
Member, The ESPY Academy, (2002 to 2004)
Member, United States Olympic Committee Board of Directors, Public Sector member (2000 to 2004)
National Gambling Task Force, National Association of Student Personnel Administrators (1999)
Member, Major League Golf Advisory Board (1999)
Member, 1999 FIFA Women's World Cup Advisory Board (1997)
Member, Advisory Board of SportsBridge (1997)
Member, Nassau County (NY) Sports Commission (1995 to 2007)
Member, Sara Lee Frontrunners Award Selection Committee, (1995-2000)
Member, National Advisory Board to the National Consortium for Academics and Sports (1993 to
    2004)
Editorial Board, *Training Table* magazine, United States Sports Academy (1993)
Advisory Board, *Fitness* magazine (1993-2000)
ESPN American Sports Awards, Select Nominating Committee (1992-2000)
SMART Eureka Advisory Board (1992-1998)
NCAA Gender Equity Task Force (1992 to 1993)
NACDA Foundation Blue Ribbon Review Committee, (1992)
Ethics Fellow, Institute for International Sport (1990 to 1998)
Member, Southern Association of Colleges and Schools Commission on Colleges Committee on
    Intercollegiate Athletics (1990-91)
Babe Zaharias Award Selection Committee (1990)
Chair, Education Division of Capital Area United Way (1990)
Member, National Advisory Board of the Center for the Study of Sport in Society (1989 to 2008)
Member, Advisory Board, Center for Athletes' Rights and Education (1989 to 2003)
Chair, NCAA Legislative Review Committee (1989-1992)
Member, NCAA Cost Reduction Committee (1989-90)

## LEADERSHIP EXPERIENCE (cont.)

*Past (cont.)*

Chair, National Association of Collegiate Women Athletic Administrators Television Committee (1988 to 1992)

Member, Executive Committee, Project Fair Play of Texas (1988-92)

Member, Future Directions Committee, University of Texas Ex-Students' Association (1988-90)

Member, Sports Foundation Feasibility Committee of the Austin Chamber of Commerce (1988-89)

Member, Community Advisory Board for Austin's Ronald McDonald House (1987-1992)

Trustee, Women's Sports Foundation (1987-1991)

Member, Council of Collegiate Women Athletic Administrators Legislation Committee (1986 to 1992)

Member, Board of Directors of the Women's Advocacy Project (1986-1992)

Member, NCAA Manual Revision and Deregulation Committee (1986-89)

Member, Executive Committee of the Texas University Interscholastic League (1986-88)

Member, City of Austin Parks and Recreation Board (1986)

Member, Board of Governors of the Texas Foundation for Intercollegiate Athletics for Women (1984-92)

Member, United States Olympic Development Committee (1984-88)

President, Association for Intercollegiate Athletics for Women (AIAW) (1981)

President-Elect, Association for Intercollegiate Athletics for Women (1980)

Past-President, Association for Intercollegiate Athletics for Women (1982)

President, Southwest Association for Intercollegiate Athletics for Women (1980)

President-Elect, Southwest Association for Intercollegiate Athletics for Women (1979)

Consultant to Office of Civil Rights, U.S. Department of Education on Title IX Investigations of Athletic Programs (1979)

Investigator, American Council on Education Study of the Financial Problems of Intercollegiate Athletics (1978-79)

Member, AIAW Ethics and Eligibility and Eligibility Committee (1978)

Chair, AIAW Television Committee (1976-77)

Chair, AIAW President's Summit Conference on Intercollegiate Athletics (1976)

Member, NAGWS Development Committee (1975-76)

Member, AIAW Restructure Committee (1975)

Chair, AAHPERD/DGWS Softball Guide Committee (1974-76)

Member, Eastern Association of Intercollegiate Athletics for Women Volleyball Committee (1974-76)

Member, AAHPERD Secondary Physical Education Commission Ad Hoc Committee for the Development of a Secondary Physical Education Program Assessment Instrument (1974-75)

Chair, United States Collegiate Sports Council Volleyball Committee (1973-75)

Director, National Softball Program, Italian Olympic Committee (1973-75)

Chair, AAHPERD/DGWS Softball Examinations and Rating Committee (1973-75)

Chair, New York State Association for Intercollegiate Athletics for Women's Volleyball Sport Committee (1972-74)

## EXPERT WITNESS/CONSULTANT – LAWSUITS

Association of Intercollegiate Athletics for Women  v. the National Collegiate Athletic Association (Washington, DC - antitrust)

Pam Bowers v. Baylor University (Texas – employment discrimination/Title IX)

Pam Pederson, Lisa Oller and Semantha Clark v. Louisiana State University (Louisiana – Title IX)

Ann A. Pitts v. State of Oklahoma (Oklahoma State University – employment discrimination)

Marianne Stanley v. University of Southern California (California – employment discrimination)

Jennifer Roberts et al v. Colorado State University (Colorado – Title IX)

Rachel Sanders et al v. University of Texas at Austin (Texas – Title IX)

Cohen et al v. Brown University (Rhode Island – Title IX)

Roth v. School Board (sexual harassment/Title IX)

Sonya Tyler v. Howard University (Washington, D.C.- employment/Title IX)

Weaver v. Ohio State University (Ohio – employment discrimination/Title IX)

Haffer et all v. Temple University (Pennsylvania – Title IX)

Blair et al v. Washington State University (Washington – Title IX)

Hession et al v. Rollins College (Florida – sexual harassment of students/Title IX)

Joanne A. Fortunato v. Keene State College, et al  (New Hampshire – employment discrimination)

Tannisha Stevens v. Univ. of Michigan (Michigan - injury)

**EXPERT WITNESS/CONSULTANT – LAWSUITS (cont.)**

Molly Perdue v. City University of New York et. al.  (New York – employment discrimination/Title IX)
Vicki Dugan v. Oregon State University (Oregon – employment discrimination/Title IX)
Norman Law, et al. v. National Collegiate Athletic Association (Kansas – employment discrimination)
Jan Lowrey v. Texas A&M University System, et al. (Tarleton U./Texas – employment discrimination/Title IX)
Grandson v. University of Minnesota-Duluth, et al (Minnesota-Title IX athletics)
Thompson, Lindahl, Jeffries v. University of Minnesota-Duluth, et al. (Minnesota – Title IX athletics)
Julian v. Southwest Baptist University (Missouri – Title IX retaliation against coach)
Kevin Alston and Sandra Alston, et. al., v. Virginia High School League, Inc., et al. (Virginia – girls playing in non traditional seasons)
Daniel Daniels, as next friend of Jessica Daniels and Jennifer Daniels, as representatives of a class of similarly situated persons v. School Board of Brevard County California (Florida – Title IX facilities, benefits)
Kaitlin Baca, et al v. City of Los Angeles, et al (U.S. District Court-Central District of California – city recreational facilities)
Communities for Equity vs. Michigan High School Athletic Association (US District Court-Western District Court of Michigan-non-traditional seasons)
Mason et al v. Minnesota State High School League (U.S. District Court-Minnesota-Title IX facilities)
Ries v. Montana High School Association (Montana Human Rights Act/State Equal Protection – non-traditional seasons)
Ashley Bellum, et all v. City of Grants Pass  (Oregon gender inequality in assignment of softball facilities by parks and recreation)
Humphreys, Karen Moe v. Regents of the University of California, University of California, Berkeley (employment sex discrimination)
Burch v. Regents of the University of California, et. al (Title IX retaliation against coach)
Mansourian et al. v. Regents of the University of California, et al. (Title IX retaliation against coach)
Ollier et al v. Sweetwater Union High School District, et al (Title IX)
Young v. Indiana High School Athletic Association and Monroe County Community School Corporation (Title IX denial of baseball participation opportunity)
Biediger et al. v. Quinnipiac University (Title IX athletics participation)
Surina Dixon v. Texas Southern University (Title IX retaliation against coach)
Kathleen Bull v. Ball State University (Title IX retaliation against coach)
Bigge v. Citrus County School Board (Title IX relaliation against parents)

POST 2012

Brenny v. Board of Regents of the University of Minnesota and John Harris (employment-gender and sexual orientation discrimination)
Burns v. Board of Trustees California State University, San Diego State University (employment-Title IX retaliation)
Miller, Banford and Miles v. Board of Regents v. University of Minnesota, University of Minnesota-Duluth (employment-gender and sexual orientation discrimination, Title IX retaliation)
Jane Doe No. 1 (a pseudonym) v. Bikram Choudhury, Bikram Yoga College of India (gender discrimination, sexual assault)
Jane Doe No. 3 (a pseudonym) v. Bikram Choudhury, Bikram Yoga College of India (gender discrimination, sexual assault)
Alexie Portz, et al on behalf of all those similarly situated vs.St. Cloud State University and Minnesota State Colleges and Universities (Title IX athletics participation)
Jane Meyer vs. The University of Iowa, Board of Regents, State of Iowa, and the State of Iowa (employment-gender and sexual orientation discrimination, Title IX retaliation)
Tracey Griesbaum vs. The University of Iowa, Board of Regents and the State of Iowa (employment-gender and sexual orientation discrimination, Title IX retaliation)
Lauren Working, et al v. Lake Oswego School District (Oregon) (Title IX athletics)
B.W. v. Black Hills Football Club (Title IX sexual harassment)
Struthers and Brandt v. Red Bluff Joint Union High School District (California) (Title IX athletics)
Videckis and White v. Pepperdine University (Title IX sexual harassment/sexual orientation)
Robb et al. v. Lock Haven University of Pennsylvania (Title IX athletics)
Christine A. Cochran v. Bethune-Cookman University (employment-gender, Title IX retaliation)

**EXPERT WITNESS/CONSULTANT – LAWSUITS (cont.)**

Sheila Hudson v. California State University (employment-gender, Title IX retaliation)
C.B.. v. Black Hills Football Club (Title IX sexual harassment)
K.H. v. Black Hills Football Club (Title IX sexual harassment)
Noriana Radwan v. University of Connecticut (Title IX – athlete treatment)
Jamie Howard v. William Jessup University (Title VI and IX employment)
A.B., by her parents and next friends, C.B. and D.B., and T.T., by her parents and next friends, K.T. and
    S.T. v. Hawaii State Department of Education and Oahu Interscholastic Association
Bonnie J. Kenny, Cindy Gregory v. University of Delaware, et al.
A.C. v. United States Bowling Congress, Greater Seattle USBC, Northwest Challenge League f/k/a Puget
    Sound Travel League, Washington State Young American Bowling Alliance, Lee Treddenbarger
J.L. v. United States Bowling Congress, Greater Seattle USBC, Northwest Challenge League f/k/a Puget
    Sound Travel League, Washington State Young American Bowling Alliance, Lee Treddenbarger
T.M. v. United States Bowling Congress, Greater Seattle USBC, Northwest Challenge League f/k/a Puget
    Sound Travel League, Washington State Young American Bowling Alliance, Lee Treddenbarger
S.G., by and through her general guardian, BRENT GORDON; et al v. Jordan School District, et al U.S.
    District Court - Utah
Amy Cohen, et al v. Brown University, Christina Paxson (2020)
Sage Ohlensehlen, et al v. The University of Iowa, Bruce Harreld, Gary Barta (2020)
Sophia Balow, et al v. Michigan State University , et al (2021)


**PUBLICATIONS**

**Books, Books Chapters, Handbooks and Research Reports**

Lopiano, D. and C. Zotos (2013) *Restructuring A College Athletic Program to Protect Olympic Sports During Financial Uncertainty*. Champaign, IL: Human Kinetics.

Gurney, G., Lopiano, D. and Zimbalist, A. (2017)  *Unwinding Madness:  What Went Wrong with College Sports and How to Fix It.*  The Brookings Institution:  Washington, DC.

Lopiano, D. (2015)  The roots of corruption in US collegiate sport.  Global Corruption Report:  Sport. Transparency International.  Routledge: London/New York

Lopiano, D. and C. Zotos  (2015) "Athlete welfare and protection policy development in the USA" in *Safeguarding, Child Protection and Abuse in Sport:  International perspectives in research, policy and practice* edited by Melanie Lang and Mike Hartill, London and New York:  Routledge, pp. 97-106.

Lopiano, D. and C. Zotos (2013) *Athletic Director's Desk Reference*. Champaign, IL: Human Kinetics.

Lopiano, D., Fortunato, J, Hogshead-Makar, N. and Starr, K. (2012)  Safe4Athletes Handbook: Local Sport Club Policies and Procedures to Provide Athletes with a Safe and Positive Environment Free of Sexual Abuse, Bullying and Harassment. Safe4Athletes.org  See:  http://safe4athletes.org/4-clubs/model-policy

Lopiano, D., M. Snyder and L. Zurn. (2007). The Women's Sports Foundation Report: The Status of Female Youth Health and Physical Activity in the Boston Metropolitan Area. East Meadow, NY: Women's Sports Foundation.

Lopiano, D. (2006) "Gender and Sport" in *New Game Plan for College Sport* edited by Richard E. Lapchick, American Council on Education and Praeger Publishing, pp. 127-155.

Lopiano, D., and Lakowski, T. (2006). *Increasing Youth Sports & Physical Activity Participation: A Women's Sports Foundation Public Policy Guide*. East Meadow, NY: Women's Sports Foundation.

Lopiano, D.  (2002)  Advocating for Gender Equality in Sport:  The Experience of the Women's Sports Foundation in the United States.  A Guide and Education Kit.  Women's Sports Foundation, East Meadow, NY.

Lopiano, D. and C. Zotos. (2001)  Women's Sports Foundation Education Guide:  Special Issues for Coaches of Women's Sports.  East Meadow, NY:  Women's Sports Foundation.

## PUBLICATIONS

### Books, Books Chapters, Handbooks and Research Reports

"Women's Sports:  Coming of Age in the Third Millennium", in *The Olympics at the Millennium:  power, politics, and the games*, edited by Kay Schaffer and Sidonie Smith, Rutgers University Press, pp. 117-127, 2000.

"Gender Equity in Sports" in *Medical and Orthopedic Issues of Active and Athletic Women*, edited by Rosemary Agostini, M.D., Hanlye & Belfus, Inc., Philadelphia, PA, pp. 13-22, 1994.

"Modern Athletics:  The Pressure to Perform," with Connee Zotos in *Eating, Body Weight, and Performance in Athletes:  Disorders of Modern Society,* 1991.

"Equity Issues and Policy Problems in Women's Intercollegiate Athletics" with Connee Zotos in *The Rules of the Game:  Ethics in College Sport*, edited by Richard Lapchick and John Slaughter, McMillan, 1989.

"A Political Analysis of the Possibility of Impact Alternatives for the Accomplishment of Feminist Objectives Within American Intercollegiate Sport," *Fractured Focus:  Sport as a Reflection of Society*, Richard E. Lapchick, editor.  Lexington, MA:  Lexington Books, 1986.

*The Baseball-Softball Playbook* with Ron Polk, Ron Polk, Mississippi State University, 1980.

*The Money Game*:  *Financing Collegiate Athletics* with Robert H. Atwell and Bruce Grimes, American Council on Education, Washington, D.C., 1980.

*Coaching Clinic* with David Pierce, Canadian Amateur Softball Association, Ottawa, Ontario, 1974.

### Journal Articles

"Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule" with Doriane Lambelet Coleman and Michael J. Joyner.  Duke Journal of Gender Law & Policy, March, 2020

"Fixing enforcement and due process will not fix what Is wrong with the NCAA."  *Roger Williams University Law Review,* 20:2, Spring, 2015, pp. 250-291.

"It's Time for the NCAA and Other Educational Sport Governance Organizations to Get Serious about Gender Equity".  *Journal of Physical Education, Recreation and Dance, Vol. 85, No. 2, February, 2014.*

"Time for a Sport Sex-Discrimination Uprising of a Different Sort".  *Journal of Physical Education, Recreation and Dance, Vol. 84, No. 1, January, 2013.*

"Women's Impact on Sport", in *Perspectives, 2001, The Multidisciplinary Series of Physical Education and Sport Science, Volume 3, The Business of Sport,* edited by Darlene Kluka and Guido Schilling, Oxford: Meyer & Meyer Sport (UK) Ltd., 2001, pp. 131-142.

"Equity in Women's Sports:  A Health and Fairness Perspective", *Clinics in Sports Medicine:  The Athletic Woman*, Vol. 13, No. 2, April, 1994, pp. 281-296.

"Colleges Can Achieve Equity in College Sports," *Texas Entertainment and Sports Law Journal*, Volume 3, No. 1, Spring, 1993, pp. 6-8.

"Recruiting, Retention and Advancement of Women in Athletics, Coaching and Administration" in *Perspectives:  Journal of the Western Society for Physical Education of College Women*, Volume 12, 1992, pp. 5-11.

"Perceived Problems and Sources of Dissatisfaction for Coaches of Women Sports, with Dorothy J. Lovett and Carla Lowry  in*" The Applied Research in Coaching and Athletics Annual 1991*, March 1991, pp. 207-241.

"The Good News/Bad News About Women's Athletics," *Southern Feminist*, Vol. 4, No. 2, Spring, 1987.

### Congressional Testimony

"Statement of Donna A. Lopiano Before Subcommittee on Commerce, Consumer Protection, and Competitiveness, U.S. House of Representatives, February 17, 1993".

**Congressional Testimony**

"Statement of Donna A. Lopiano Before Subcommittee on Post Secondary Education of the Committee on Education and Labor, U.S. House of Representatives, *Hearings on the Roles of Athletics in College Life*, May 18, 1989.

"Statement of Donna A. Lopiano, Women's Athletic Director of the University of Texas at Austin," *Prohibition of Sex Discrimination:  Hearings on S.2106* Before the Subcommittee on Education of the Senate Committee on Labor and Public Welfare, 94th Congress, First Session (1975), (Washington, D.C.- U.S. Government Printing Office), pp. 105-113, 115-136.

## PUBLICATIONS

**Editorials, Opinion, Business Magazine and .com Articles**

Donna Lopiano and Andrew Zimbalist. (December 20, 2020) The NCAA Sports Model is Broken and It's Time for Congress to Step In. *Forbes.com*.  Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2019/12/20/the-ncaa-sports-model-is-broken-and-its-time-for-congress-to-step-in/?sh=734fbf23d09c

Donna Lopiano. (October 4, 2020) Why Cutting College Sports Programs is a Bad Idea – Especially Now. *Forbes.com*.  Retrieve at: https://www.forbes.com/sites/donnalopiano/2020/10/04/why-cutting-college-sports-programs-is-a-bad-idea--especially-now/#4a237ea053fd

Donna Lopiano and Andrew Zimbalist. (September 15, 2020) Message to Congress on NCAA Reform: NIL Income Yes, Cash Income No.. *Forbes.com*.  Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2020/09/15/message-to-congress-on-ncaa-reform-nil-income-yes-cash-income-no/#5692ad6617fc

Donna Lopiano. (August 5, 2020) College Athletics Minority Hiring Initiatives Long Past Due. *Forbes.com*.  Retrieve at:  https://www.forbes.com/sites/donnalopiano/2020/08/05/college-athletics-minority-hiring-initiatives-long-past-due/#43cb77e45774

Donna Lopiano. (August 1, 2020) State High School Organizations Should Have Proper Resources Before Supporting Esports? *Forbes.com*.  Retrieve at: https://www.forbes.com/sites/donnalopiano/2020/08/01/state-high-school-organizations-should-have-proper-resources-before-supporting-esports/#7a2871c6259c

Donna Lopiano and Andrew Zimbalist. (June 28, 2020) Theatre of the Absurd and Immoral:  College Football 2020. *Forbes.com*.  Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2020/06/28/theater-of-the-absurd-and-the-immoral-college-football-2020/#251d353622e5

Donna Lopiano and Andrew Zimbalist. (June 13, 2020) Has Higher Education Lost Its Mind? *Forbes.com*.  Retrieve at:  https://www.forbes.com/sites/andrewzimbalist/2020/06/13/has-higher-education-lost-its-mind/#52e78c7a39c0

Gerald Gurney, Donna Lopiano, Andrew Zimbalist.  *(April 25, 2020) Sports Hiatus Gives NCAA An Opportunity to Rethink the Structure of College Sports*.  Forbes.com.  Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2020/04/25/sports-being-on-hiatus-gives-ncaa-an-opportunity-to-rethink-the-structure-of-college-sports/#6a38d2a93b54

Donna Lopiano and Andrew Zimbalist.  (December 20, 2019)  *The Collegiate Sports Model Is Broken:  It's Time for Congress to Step In*.  Forbes.com  Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2019/12/20/the-ncaa-sports-model-is-broken-and-its-time-for-congress-to-step-in/#487a474c3d09

**PUBLICATIONS (cont.)**

**Editorials, Opinion, Business Magazine and .com Articles**

Brian Porto, Gerald Gurney, Donna Lopiano, Mary Willingham, B. David Ridpath, Allen Sack, and Andrew Zimbalist.  (2019) *The Drake Group Position Statement:  Congress Granting a Limited Antitrust Exemption to the NCAA and Its Member Institutions*.  Retrieve at: https://www.thedrakegroup.org/2013/06/04/congress-granting-a-conditional-limited-antitrust-exemption-to-the-ncaa-and-its-member-institutions/ This paper was originally issued on June 1, 2015 and revised on October 4 and 28, 2019)

Donna Lopiano, Brian Porto, Gerald Gurney, B. David Ridpath, Allen Sack, Mary Willingham, and Andrew Zimbalist, (2017) *The Drake Group Position Statement: Compensation of College Athletes Including Revenues Earned from Commercial Use of Their Names, Images and Likenesses and Outside Employment*.  (March 24, 2015, Revised February 12, 2016, December 2, 2017, December 27, 2017, September 27, 2019 and October 14, 2019).  Retrieve at: https://www.thedrakegroup.org/2019/10/14/compensation-of-college-athletes-including-revenues-earned-from-commercial-use-of-their-names-images-and-likenesses-and-outside-employment/

Donna Lopiano, Janet Blade, Gerald Gurney, Sheila Hudson, Brian Porto, Allen Sack, David Ridpath and Andrew Zimbalist  (2019) The Drake Group Position Statement:   *College Athlete Health and Protection from Physical and Psychological Harm.*  (October 1, 2019).  Retrieve at: http://thedrakegroup.org

Ridpath, D., G. Gurney and D. Lopiano. *Presidents Choose to Enable Academic Fraud in Athletics. Journal of NCAA Compliance.*  July-August, 2019.  Hackney Publications.

The Drake Group Position Statement: *Athletic Governance Organization and Institutional Responsibilities Related to Professional Coaching Conduct.*   December, 2016  with Gurney, G., Polite, F., Porto, B., Ridpath, D.B., Sack, A., and Zimbalist, A. (2016) Retrieve at:  http://thedrakegroup.org/

 "The Drake Group Position Statement: Institutional Integrity Issues Related to Athlete Sexual Misconduct and Other Forms of Violence." May, 2020 revised; August, 2016 with Gurney, G., Porto, B., Ridpath, D.B., Sack, A., Sommer, J., Willingham, M., and Zimbalist, A. *TheDrakeGroup.org.*  Retrieve at: https://www.thedrakegroup.org/2016/09/11/institutional-integrity-issues-related-to-college-athlete-sexual-assault-and-other-forms-of-serious-violence/

"The Drake Group Position Statement: *A Critical Analysis of Proposed Models of College Athlete Compensation.*" February, 2019 with Gerald Gurney, Fritz Polite, David B. Ridpath, Allen Sack, Sandy Thatcher, Andrew Zimbalist.  *TheDrakeGroup.org.* Retrieve at: http://thedrakegroup.org/

"The Drake Group Position Statement:   *College Athlete Codes of Conduct and Issues Related to Freedom of Speech and Expression,*" November 2018 with Sanford G. Thatcher, Brian Porto, Gerald Gurney, Fritz Polite, B. David Ridpath, Allen Sack, and Andrew Zimbalist.  *TheDrakeGroup.org.  Retrieve at*:  http://thedrakegroup.org.

"The Drake Group Position Statement: *Excessive Athletics Time Demands Undermine College Athletes' Health and Education and Required Immediate Reform.*"  July, 2016 with Gurney, G., Sack, A., Meyer, J., Porto, B., Ridpath, D.B., Willingham, M., and Zimbalist, A. *TheDrakeGroup.org*  Retrieve at: https://thedrakegroup.org/2016/08/04/drake-group-urges-significant-changes-to-reduce-athlete-time-demands/

"The Drake Group Position Statement:  *Why the NCAA Academic Progress Rate (APR) and Graduation Success Rate (GSR) Should Be Abandoned and Replaced with More Effective Academic Metrics.*" October, 2015 with Gurney, G., Snyder, E.,Willingham, M., Meyer, J., Porto, B., Ridpath, D.B., Sack, A., and Zimbalist, A. *TheDrakeGroup.org*, Retrieve at:  https://thedrakegroup.org/2015/06/07/drake-group-questions-ncaa-academic-metrics/

## PUBLICATIONS (cont.)

**Editorials, Opinion, Business Magazine and .com Articles**

"The Drake Group Position Statement:  *Rights of College Athletes*."  June 4, 2015 with Gurney, G., Willingham, M., Meyer, J., Porto, B., Ridpath, D.B., Sack, A., and Zimbalist, A.  *TheDrakeGroup.org.*, Retrieve at:  https://thedrakegroup.org/2015/06/05/rights-of-college-athletes/

"The Drake Group Position Statement:  *Congress Granting a Limited Antitrust Exempiton to the NCAA and Its Member Institutions*." June 1, 2015 with Porto, B., Meyer, J., Gurney, G., Willingham, M., Ridpath, D.B., Sack, A., and Zimbalist, A. *TheDrakeGroup.org*  Retrieve at: https://thedrakegroup.org/2013/06/04/congress-granting-a-conditional-limited-antitrust-exemption-to-the-ncaa-and-its-member-institutions/

"The Drake Group Position Statement:  Freshmen Ineligibility in Intercollegiate Athletics." April 20, 2015 with Gurney, G., Willingham, M., Porto, B., Ridpath, D.B., Sack, A., and Zimbalist, A. *TheDrakeGroup.org*. Retrieve at:  https://thedrakegroup.org/2015/04/20/freshmen-ineligibility-proposals/

"The Drake Group Calls Upon the NCAA, Its Member Institutions and Higher Education Regional Accreditation Agencies to Fulfill Athlete Academic Protection Responsibilities."  April 16, 2015 with Gurney, G , Porto, B., Ridpath, D.B., Sack, A., Willingham, M., Zimbalist, A.  *TheDrakeGroup.org* Retrieve at:  https://thedrakegroup.org/2015/06/02/academic-protection-responsibilities/

"The Drake Group Position Statement: Fixing the Dysfunctional NCAA Enforcement System."  April 7, 2015 with Porto, B., Gurney, G., Ridpath, D.B., Sack, A., Willingham, M., Zimbalist, A. *TheDrakeGroup.org*.  Retrieve at:  https://thedrakegroup.org/2015/06/03/drake-group-addresses-dysfunctional-ncaa-enforcement-system/

"The Drake Group Position Statement: Establishment of a Presidential Commission on Intercollegiate Athletics Reform."  March 31, 2015; revised February 12, 2016 with Gurney, G., Porto, B., Ridpath, D.B., Sack, A., Willingham, M., and Zimbalist, A.  *TheDrakeGroup.org*  Retrieve at: https://thedrakegroup.org/2015/06/09/bill-to-establish-a-presidential-commission/

 "The Drake Group Position Statement: Compensation of College Athletes Including Revenues from Commercial Use of Their Names, Likenesses, and Images"  March 24, 2015; Revised February 12, 2016 with Porto, B., Gurney, G., Ridpath, D.B., Sack, A., Willingham, M., Zimbalist, A. *TheDrakeGroup.org* Retrieve at:  https://thedrakegroup.org/2015/06/08/position-statement-032615/

"The Drake Group Position Statement:  Student Fee Allocations to Fund Intercollegiate Athletics." March 2, 2015 with Ridpath, D.B., Porto, B., Gurney, G., Sack, A., Willingham, M., and Zimbalist, A. *TheDrakeGroup.org*  Retrieve at:  https://thedrakegroup.org/2015/06/06/studentfeeinstitutionalsubsidy/

"The Drake Group Position Statement:  Guidelines for Academic Integrity in Athletics."  October 28, 2014 with Gurney, G., Sack, A., Willingham, M., Porto, B., Ridpath, D.B., and Zimbalist, A. *TheDrakeGroup.org*. Retrieve at:  https://thedrakegroup.org/2012/03/06/the-drake-group-issues-guidelines-for-academic-integrity-in-athletics/

"Don't Reform the NCAA - Replace It".  *Inside Higher Education.com, September 11, 2014 with Gerald Gurney available at:  https://www.insidehighered.com/views/2014/09/11/ncaa-cant-be-reformed-congress-should-replace-it-essay*

"Big Five Power Grab".  *Chronicle of Higher Education.com, June 19, 2014* with B. Porto, D. Ridpath, A. Sack, M. Willingham, A. Zimbalist available at:
 http://chronicle.com/article/The-Big-Five-Power-Grab-/147265/?cid=pm&utm_source=pm&utm_medium=en

**PUBLICATIONS (cont.)**

**Editorials, Opinion, Business Magazine and .com Articles**

"Time for a Sport Sex-Discrimination Uprising of a Different Sort".  *Journal of Physical Education, Recreation and Dance.*  Vol. 84, Issue 1, 2013 available at http://www.tandfonline.com/eprint/yeQmfD7xdPWszEHpJAag/full

 "With the Olympic Games Around the Corner, Coaches Need a Wake-Up Call".  *Sports Litigation Alert.*  Volume 9, Issue 13 July 27, 2012.  hhackney@hackneypublications.com

"Consider a Policy for Medical Screening, Records, Emergencies".  *Legal Issues in Collegiate Athletics.*  April, 2012, 13:6, pp. 7-8.

"Recommended Actions in Response to April 4, 2011 OCR Sexual Harassment and Sexual Violence Guidance", *At Issue: A Risk Management Newsletter for Elementary and Secondary Schools,* Fall, 2011, Uniondale, NY: Wright Risk Management America.

"The Cost of Gender Equity", in *School Business Affairs*, November 2008, Volume 74, No. 10, pp. 30-32.

"Their Lives May Depend on It", in *The Chautauqua Daily*, June 24, 2008, Chautauqua, NY, p. 3.

 "Fair Play", in *Southern Alumni Magazine, 2003, A Publication for Alumni and Friends of Southern Connecticut State University*,  New Haven, CT, pp. 21-22, 31.

"College Football Woes Not the Fault of Title IX", in *Sports Business Journal*, October 21, 2002, p. 28.

"Title IX Turns 30" in *ABC News.co*m, July 1, 2002.

"Sex May Sell, But Sexism Sells Women Short", in *Sports Business Journal*, February 4, 2002..

 "Look Around…What Can You Do To Remind Others of Women/Sports Day?", in *Sports Business Journal*, January 15, 2001, p. 46.

"The Soul of Women's Sports Comes Cloaked in Diverse Bodies", in *Sports Business Journal*, February 19, 2001, p. 46.

 "…No Answer Except, 'You Weren't Picked Because You Are A Girl'", in *Sports Business Journal*, March 26, 2001, p. 50.

"It's Time for Straight Talk About Title IX", in *Sports Business Journal*, April 30, 2001, p. 33

"Division I Cranks Up A Sports 'Arms Race'", in *Sports Business Journal*, June 11, 2001, p. 33.
.
"Bowling Proprietors Roll a Gutter Ball", in *Sports Business Journal*, August 20, 2001, p. 35.

 "Sept. 11 Attacks Give New Purpose to Sport", in *Sports Business Journal*, October 1, 2001, p. 35.

 "Soccer Team's Treatment A Kick in the Teeth", in *Sports Business Journal*, February 7, 2000, p. 46.

"Marketplace Values, Not Title IX, Threaten Nonrevenue Sports", in *Sports Business Journal*, March 6, 2000, p. 54.

"Answers Must Come Quickly for New World of U.S. Amateur Athletics", in *Sports Business Journal*, April 3, 2000, p. 54.

 "Looking for an Olympic Hero?  Vive DeFrantz", in *Sports Business Journal*, May 29, 2000, p. 54.

"Get Involved, Help Bring Sports to Our Children", in *Sports Business Journal*, June 26, 2000, p. 70.

**PUBLICATIONS (cont.)**
**Editorials, Opinion, Business Magazine and .com Articles**

"Diversity Stars in Many Recent Sports Headlines", in *Sports Business Journal*, July 24, 2000, p. 46.

"Bare Breasts Are A Distraction from Issue At Hand", in *Sports Business Journal*, August 28, 2000, p. 50.

"Posing Nude:  What's OK, What Isn't?", in *Sports Business Journal*, September 18, 2000, p. 62.

"The Final Word:  Heather Mercer's Fight Stretches Far Beyond the Football Field", in *Sports Business Journal*, November 13, 2000, p. 78.

"Girls Deserve the Gift of Physical Activity Just As Much As Boys", in *Sports Business Journal*, December 11, 2000, p. 62.

"Coaching Debate Should Extend Beyond WNBA Into Men's Game", in *Sports Business Journal*, January 25, 1999.

"Women's Sports Marketing:  Dabblers Need Not Apply", in *Sports Business Journal*, March 8, 1999.

"Mismanaged Men's Sporting Goods Market Hurts Women", in *Sports Business Journal*, April 5, 1999.

"Sex There's No Economic Justification for Disobeying Title IX", in *Sports Business Journal*, May 31, 1999.

"Sports Must Work to Make Our Society Better, Not More Violent", in *Sports Business Journal*, May 3, 1999.

"Medical, Media Reaction to Injuries Deserves Scrutiny", in *Sports Business Journal*, June 28, 1999.

"Next Goal for Women:  Commitment From the Keepers of Capital", in *Sports Business Journal*, July 26, 1999.

"Amateur, Pro Female Athletes Deserve Title IX-Style Gains", in *Sports Business Journal*, August 23, 1999.

"Auto Racing Gives Little Opportunity to Women and Minorities", in *Sports Business Journal*, September 20, 1999.

"Sex In Union Vote, Are WNBA Players in Control of Their Own Business?", in *Sports Business Journal*, November 23, 1998.

"WNBA's Remarkable 1999 Blows the Vultures Out of the Sky", in *Sports Business Journal*, December 13, 1999, p. 62.

"Donna Lopiano Rebuttal:  The Strong Fem Side of  Women's Sports" in *Brandweek*, February 2, 1998.

"Colleges Can Achieve Gender Equity in Sport" in *Chronicle of Higher Education*, December 2, 1992, volume 39, No. 15.

"Savings Should Be Reinvested to Boost Women's Programs," editorial in *USA Today,* January 15, 1991, Section C, p. 4.

"A Good Case for the Books," *The Austin American Statesman*, March 31, 1991.

"Women's Opportunities in Sports Still Far Behind," *Houston Chronicle*, February 25, 1990, p. 23B.

**PUBLICATIONS (cont.)**

**Editorials, Opinion, Business Magazine and .com Articles**

"Final Four Site:  Women and Men Together?" *The National Sports Daily*, March 27, 1990, p. 18.

"Fair Play for All (Even Women)," editorial in *The New York Times*, April 15, 1990, p. 10s.

"The Character of American Higher Education and Intercollegiate Sport," book review in *Academe*, Nov.-Dec., 1990, p. 57.

"Where We Are in the Development of Women's Athletics," Public Affairs Symposium, Dickinson College, Sport:  Its Place in Society, February, 1987.

"Colleges Should Serve All, Not Just Some," editorial in *The New York Times*, Sunday, June 26, 1987, Section S, pg. 7.

"The Certified Coach:  A Central Figure," *Journal of Physical Education, Recreation & Dance*, March, 1986.

"How to Pursue a Sport Management Career," *Journal of Physical Education, Recreation and Dance*, Vol. 55, No. 7, September, 1984.

"Promotion and Fundraising for Men's and Women's Non-Revenue Sports (Part I)," *Athletic Business*, Vol. 7, No. 10, October, 1983.

"Promotion and Fundraising for Men's and Women's Non-Revenue Sports (Part II)," *Athletic Business*, Vol. 7, No., 11, November, 1983.

"Will the Women in the Pros Survive?," *The Dallas Times Herald*, June 27, 1982.

"AIAW Landmarks," *Coaching:  Women's Athletics*, VII, No. 2, March/April, 1981.

"The NCAA, NAIA and Women's Sports:  The Price of Control," *Athletic Purchasing and Facilities*, IV, No. 12, December, 1980.

"Selling Women's Athletics:  Realities and Potentials," *Athletic Purchasing and Facilities*, IV, No. 10, October, 1980.

"What Women Coaches and Administrators Can Do to Cope With the Current Situation in High School Athletics," *The Athletic Educator's Report*, Issue No. 846, September, 1980.

"A Look at the Forest:  What's Happening to Women in High School Athletics," *The Athletic Educator's Report*, Issue No. 846, September, 1980.

"A Fact-Finding Model for Conducting a Title IX Self-Evaluation Study in Athletic Programs," *Journal of Physical Education, Recreation and Dance*, Vol. 47, No. 5, May, 1976.

"Developing the Exceptional Slingshot Pitcher," *1974-76 DGWS Softball Guide*, AAHPER:  Washington, D.C., January, 1974.

"The Glove as a Foreign Object," *1974-76 DGWS Softball Guide*, AAHPER:  Washington, D.C., January, 1974.

"Eerst Moet Je Snelheid Hebben, Dan Komt Controle Aan DeBeurt" (translated by Janke Nydam), *Inside*, Amsterdam, The Netherlands, III, No. 1, January, 1973.

"Chauvinists Beware:  Odds are Against Sexist Gamblers," *Kingsman*, Brooklyn College, 1973.

**PUBLICATIONS (cont.)**
**Editorials, Opinion, Business Magazine and .com Articles**

"De Meeste Mensen Die Softball Doceren Weten Er Weinig Van" with Joan Joyce (translated by Janke Nydam), *Inside*, Amsterdam, the Netherlands, II, No. 12, December, 1972.

"Concepts and Issues in Administrative Behavior:  A Book Review," *A Compendium of Analytical Book Reviews in Organizational Behavior* (Percy G. Rogers, editor), University of Southern California Press, Los Angeles, CA, 1972.

"Enforcement Machinery Needed Now for Girls' Athletic Competition," J*ournal of Physical Education, Recreation and Dance*, XLII, No. 1, January, 1971.

 "The Brakette Formula:  Anatomy of a Winner," *Balls and Strikes*, American Softball Association, Fall, 1971.

**Copyrighted Videotapes**
Fast Pitch Softball:  Developing the Pitcher (Part I), Truckee River Studios, Inc. (Verdi, Nevada), 1983.
Fast Pitch Softball:  Developing the Pitcher (Part II), Truckee River Studios, Inc. (Verdi, Nevada), 1984.
Fast Pitch Softball:  Defensive Strategies (Part I), Truckee River Studios, Inc. (Verdi, Nevada), 1984.
Fast Pitch Softball:  Defensive Strategies (Part II), Truckee River Studios, Inc. (Verdi, Nevada), 1985.

## ATHLETIC PARTICIPATION

Participated in 26 National Championship tournaments in four different sports
Softball:
- National Hall of Fame, American Softball Association
- Participated in Ten National ASA Softball Championship tournaments (as member of six national championship and four national championship runner-up teams)
- Nine-Time Softball All-American at four different positions (pitcher, shortstop, first base and second base)
- 3-time National Tournament Most Valuable Player and 1-time Batting Champ (.429)
- U.S. National Team Player at 1967 Pan American Games and 1966 first World Softball Championships
- Amateur softball career marks as a pitcher:
  183-18 won/lost record                         15-2 in National Championship play
  .910 winning percentage                       1,633 strikeouts in 817 innings
  ERA .25 (51 earned runs in 10 years)
- Played professional softball for three years-in two national championship finals (both times runner-up)
Volleyball:
- Participant in Five National USVBA Volleyball Championship Tournaments
Basketball:
- Participant in Five National AAU Basketball Championship Tournaments
Field Hockey:
- Participant in Three National Field Hockey Championship Tournaments



## Donna A. Lopiano, Ph.D.
## Fees for Expert Consultation and Services Related to Pending or Probable Litigation

| Expense Type | Fee Basis |
|---|---|
| **Consultation with attorneys** related to preparation for depositions, trial testimony, expert reports, compliance plans or legal theories | **$200/hour** |
| **Preparation of written reports** including review of case materials, research/data collection related to preparation of such reports | **$250/hour** |
| **Deposition or court testimony** | **$500/hour** |
| **Hours traveling**<br>Exception:  consultant travels for court testimony and such appearance does not occur for any reason - $2,000/day flat rate.<br>Exception:  assumes a video capability for deposition; consultant shall not be required to travel a distance greater than 50 miles from Shelton CT | **No charge** |
| **Site Visits** for assessment, presentations, or other purposes requested by client | **$2,500/day flat rate** |
| **"Out-of-pocket" expenses for site visits** including: | **Actual** |

- postage, mailing or overnight shipping costs or reproduction of materials detailed above upon which analysis will be based
- actual cost of coach class travel (except for for airline trips in excess of 1,000 miles, "extra space" seating if available in coach class and for international travel, business class airfare)
- actual cost of transfers to and from Shelton, Connecticut and LaGuardia or JFK airports for departure and return travel and, at the destination, transfers from and to the airport and hotels and/or the site to be visited
- actual cost of accommodations, including internet service
- provision of meals or reimbursement for actual cost not to exceed $75.00 per diem

## Invoicing and Payment Terms

**"Out-of-pocket" expenses** - Receipts shall be submitted for all out-of-pocket expenses with payment due within 30 days of receipt of invoice.

**Fees –** Written invoice with work record of billable hours shall be submitted for all fees upon completion of reports, site visits, and deposition and/or trial testimony with payment due within 30 days of receipt of invoice.

## Interim Reports

Interim report(s) of hours spent or fees/expenses-to-date shall be submitted upon the request of client at any time.

**Sports Management Resources, LLC**
**452 Fisher Court     Shelton, CT 06484**
**Phone/Fax:  203-538-5280   E-mail:  Info@SportsManagementResources.com**
**www.SportsManagementResources.com**

**EXHIBIT C**

**DOCUMENTS, DATA OR INFORMATION CONSIDERED IN THE FORMATION OF**

**EXPERT OPINIONS**

The following documents and sources were relied upon in the formulation of opinions contained in this initial report.

Atlantic 10 Conference. 2016-17 Women's Rowing Championship Manual

American Athletic Conference.  2015-16 Policy Manual.

Big Ten Conference.  Championships Manual – Rowing – dated February, 2019

Big 12 Conference.  2019-20 Conference Handbook.

Colonial Athletic Association.  2018-10 Women's Rowing Sport Policy Manual.

Cordes, H. (2019)  *Football Schools Like Alabama, Clemson, Michigan use Massive Women's Rowing Rosters for Gender Equity.*  Omaha World-Herald.  August 1, 2019.  Retrieve from: https://omaha.com/sports/football-schools-like-alabama-clemson-michigan-use-massive-womens-rowing-rosters-for-gender-equity/article_03d2e53d-1a19-5d2e-a752-5472a2532342.html

Jordan, R. (2016) *Some Say False Gender Balance in University of Iowa Athletics.*  The Gazette.  March 5, 2016.  Retrieve from:  https://www.thegazette.com/news/some-say-false-gender-balance-in-university-of-iowa-athletics/

Judge, J. and O'Brien, T. (2010)  Gender Equity in Intercollegiate Athletics:  A Practical Guide for Colleges and Universities.  National Collegiate Athletic Association.

Lopiano, D. and Zotos, C.  (2013) Athletic Director's Desk Reference.  Human Kinetics: Champaign, IL.

Lopiano, D. and Zotos, C.  (2021) Restructuring A College Athletic Program to Protect Olympic Sports During Financial Uncertainty. Human Kinetics: Champaign, IL.

McGraw, D. (2019) *No Rowing Experience?  No Problem.  Here's A College Scholarship.* The American Conservative. March 20, 2019. Retrieve from: https://www.theamericanconservative.com/articles/no-athletic-experience-no-problem-heres-a-college-scholarship/

Metro Atlantic Athletic Conference.  MAAC Sports Handbook.

National Collegiate Athletic Association. *2019-20 Division I Championships Transportation and Per Diem Policies.*  Retrieve from:  https://ncaaorg.s3.amazonaws.com/championships/resources/travel/2019-20D1Champs_TravelPolicies.pdf

National Collegiate Athletics Association. (circa 2000) *Achieving Gender Equity:  A Basic Guide to Title IX and Gender Equity in Athletics for Colleges and Universities.*  Retrieved from:  Internet Archives Wayback Machine at https://web.archive.org/ as it appeared online on June 12, 2002 at ncaa.org  as downloadable publication.  In years previous to 2002, it was only available in print for purchase.

National Collegiate Athletics Association. (2020) Student-Athlete Participation 1981-82 – 2019-20 NCAA Sports Sponsorship and Participation Rates Report.  Retrieved from:  https://ncaaorg.s3.amazonaws.com/research/sportpart/2019-20RES_SportsSponsorshipParticipationRatesReport.pdf

National Collegiate Athletic Association.  NCAA Division I Squad Lists and Instructions - Form 20-2. Retrieve from:  https://ncaaorg.s3.amazonaws.com/compliance/d1/2020-21D1Comp_Form20-2-SquadLists.pdf

National Collegiate Athletic Association.   2020-21 NCAA Division I Manual.  Retrieve from:  http://www.ncaapublications.com/p-4605-2020-2021-ncaa-division-i-manual.aspx

National Federation of State High School Associations.  Participation Statistics.  Retrieved from:  https://members.nfhs.org/participation_statistics

Patriot League.  Patriot League Handbook Regular Season Sport Specific Regulations-Women's Rowing.

Scott, J. (2019) *Report:  Inflated Rowing Rosters Boost Football Schools.*  Athletic Business. August, 2019.  Retrieve from:  https://www.athleticbusiness.com/college/report-inflated-rowing-rosters-boost-football-schools.html

Silverman, H. (2021) *Two students died after a collegiate rowing crew capsized during practice*. CNN.com.  March 29, 2021.  Retrieve from:  https://www.cnn.com/2021/03/29/us/iowa-state-crew-death/index.html

United States Department of Education Office for Civil Rights. Assurance of Compliance – Civil Rights Certificate.  Retrieved from:  https://www2.ed.gov/about/offices/list/ocr/letters/boy-scouts-assurance-form.pdf

United States Department of Education Office for Civil Rights Recent Resolution Search.  https://ocrcas.ed.gov/ocr-search

United States Department of Education Equity in Athletics Disclosure Act Database. Retrieved at: http://ope.ed.gov/athletics/#/

United States Department of Education Office of Postsecondary Education (OPE). (2020) User's Guide for the Equity in Athletics Act Web-Based Data Collection.

United States Government Title IX Resources:
- 20 U.S.C. '1681 et seq. ("Title IX")
- 24 CFR Part 106 (the "Title IX regulations")
- OCR's 1979 Policy Interpretation on Title IX and Intercollegiate Athletics
- OCR's 1996 Policy Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test
- OCR's 2003 Further Policy Clarification on the Three-Part Test
- OCR's 2010 Dear Colleague Letter re: Prong Three of the Three-Part Test
- OCR's 1990 Title IX Athletics Investigator's Manual

U.S. Track & Field and Cross Country Coaches Association.  TFRRS database.  Retrieve from: https://www.tfrrs.org/

University of Connecticut Athletic Department.  Web rosters for all sports teams displayed on uconnhuskies.com, uconnhuskies.com/archives reported as rosters, media guides, and statistical reports, and captures from the uconnhuskies.com web site displayed on the Wayback Machine internet archives at https://web.archive.org/

University of Connecticut Athletic Department.  June 24, 2020.  UConn Announces Changes to Division of Athletics.  Retrieved from https://uconnhuskies.com/news/2020/6/24/general-uconn-announces-changes-to-division-of-athletics.aspx

University of Connecticut. NCAA Member Financial Report 2018-19 and 2019-20.

Willmsem, C. (2017) *UW Women's Rowing Team Numbers Inflated, Avoiding Title IX Scrutiny*, Seattle Times.  March 5, 2017.  Retrieve from:  https://www.seattletimes.com/seattle-news/times-watchdog/uw-womens-rowing-team-numbers-inflated-avoiding-title-ix-scrutiny/

# EXHIBIT D



**Tuesday**
**December 11, 1979**



# DEPARTMENT OF EDUCATION

## Office for Civil Rights

## Office of the Secretary

■

Intercollegiate Athletics: Sex Discrimination
HEW/Secretary/Civil Rights Office issues policy
interpretation of Title IX Education Amendments of
1972; effective 12–11–79

Case 3:21-cv-00583-SRU   Document 44   Filed 05/20/21   Page 132 of 200

Federal Register / Vol. 44. No. 239 / Tuesday. December 11. 1979 / Rules and Regulations   71413

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

Office for Civil Rights

Office of the Secretary

45 CFR Part 86

Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics

**AGENCY:** Office for Civil Rights. Office of the Secretary. HEW.

**ACTION:** Policy interpretation.

**SUMMARY:** The following Policy Interpretation represents the Department of Health. Education, and Welfare's interpretation of the intercollegiate athletic provisions of Title IX of the Education Amendments of 1972 and its implementing regulation. Title IX prohibits educational programs and institutions funded or otherwise supported by the Department from discriminating on the basis of sex. The Department published a proposed Policy Interpretation for public comment on December 11, 1978. Over 700 comments reflecting a broad range of opinion were received. In addition. HEW staff visited eight universities during June and July, 1979, to see how the proposed policy and other suggested alternatives would apply in actual practice at individual campuses. The final Policy Interpretation reflects the many comments HEW received and the results of the individual campus visits.

**EFFECTIVE DATE:** December 11, 1979

**FOR FURTHER INFORMATION CONTACT:** Colleen O'Connor, 330 Independence Avenue, Washington, D.C. (202) 245-6671

**SUPPLEMENTARY INFORMATION:**

I. Legal Background

*A. The Statute*

Section 901(a) of Title IX of the Education Amendments of 1972 provides:

No person in the United States shall. on the basis of sex. be excluded from participation. in, be denied the benefits of. or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

Section 844 of the Education Amendments of 1974 further provides:

The Secretary of (of HEW) shall prepare and publish * * * proposed regulations implementing the provisions of Title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.

Congress passed Section 844 after the Conference Committee deleted a Senate floor amendment that would have exempted revenue-producing athletics from the jurisdiction of Title IX.

*B. The Regulation*

The regulation implementing Title IX is set forth. in pertinent part. in the Policy Interpretation below. It was signed by President Ford on May 27, 1975. and submitted to the Congress for review pursuant to Section 431(d)(1) of the General Education Provisions Act (GEPA).

During this review. the House Subcommittee on Postsecondary Education held hearings on a resolution disapproving the regulation. The Congress did not disapprove the regulation within the 45 days allowed under GEPA. and it therefore became effective on July 21. 1975.

Subsequent hearings were held in the Senate Subcommittee on Education on a bill to exclude revenues produced by sports to the extent they are used to pay the costs of those sports. The Committee. however. took no action on this bill.

The regulation established a three year transition period to give institutions time to comply with its equal athletic opportunity requirements. That transition period expired on July 21. 1978.

II. Purpose of Policy Interpretation

By the end of July 1978. the Department had received nearly 100 complaints alleging discrimination in athletics against more than 50 institutions of higher education. In attempting to investigate these complaints. and to answer questions from the university community. the Department determined that it should provide further guidance on what constitutes compliance with the law. Accordingly, this Policy Interpretation explains the regulation so as to provide a framework within which the complaints can be resolved. and to provide institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs.

III. Scope of Application

This Policy Interpretation is designed specifically for intercollegiate athletics. However. its general principles will often apply to club, intramural. and interscholastic athletic programs. which are also covered by regulation.[1]

---

[1] The regulation specifically refers to club sports separately from intercollegiate athletics. Accordingly. under this Policy Interpretation. club
Footnotes continued on next page

Accordingly, the Policy Interpretation may be used for guidance by the administrators of such programs when opropriate.

This policy interpretation applies to any public or private institution, person or other entity that operates an educational program or activity which receives or benefits from financial assistance authorized or extended under a law administered by the Department. This includes educational institutions whose students participate in HEW funded or guaranteed student loan or assistance programs. For further information see definition of "recipient" in Section 86.2 of the Title IX regulation.

## IV. Summary of Final Policy Interpretation

The final Policy Interpretation clarifies the meaning of "equal opportunity" in intercollegiate athletics. It explains the factors and standards set out in the law and regulation which the Department will consider in determining whether an institution's intercollegiate athletics program complies with the law and regulations. It also provides guidance to assist institutions in determining whether any disparities which may exist between men's and women's programs are justifiable and nondiscriminatory. The Policy Interpretation is divided into three ~ctions:

*Compliance in Financial Assistance scholarships) Based on Athletic Ability:* Pursuant to the regulation, the governing principle in this area is that all such assistance should be available on a substantially proportional basis to the number of male and female participants in the institution's athletic program.

• *Compliance in Other Program Areas (Equipment and supplies; games and practice times; travel and per diem; coaching and academic tutoring; assignment and compensation of coaches and tutors; locker rooms, and practice and competitive facilities; medical and training facilities; housing and dining facilities; publicity; recruitment; and support services):* Pursuant to the regulation, the governing principle is that male and female athletes should receive equivalent treatment, benefits, and opportunities.

• *Compliance in Meeting the Interests and Abilities of Male and Female Students:* Pursuant to the regulation, the governing principle in this area is that the athletic interests

and abilities of male and female students must be equally effectively accommodated.

## V. Major Changes to Proposed Policy Interpretation

The final Policy Interpretation has been revised from the one published in proposed form on December 11, 1978. The proposed Policy Interpretation was based on a two-part approach. Part I addressed equal opportunity for participants in athletic programs. It required the elimination of discrimination in financial support and other benefits and opportunities in an institution's existing athletic program. Institutions could establish a presumption of compliance if they could demonstrate that:

• "Average per capita" expenditures for male and female athletes were substantially equal in the area of "readily financially measurable" benefits and opportunities or, if not, that any disparities were the result of nondiscriminatory factors, and

• Benefits and opportunities for male and female athletes, in areas which are not financially measurable, "were comparable."

Part II of the proposed Policy Interpretation addressed an institution's obligation to accommodate effectively the athletic interests and abilities of women as well as men on a continuing basis. It required an institution either:

• To follow a policy of development of its women's athletic program to provide the participation and competition opportunities needed to accommodate the growing interests and abilities of women, or

• To demonstrate that it was effectively (and equally) accommodating the athletic interests and abilities of students, particularly as the interests and abilities of women students developed.

While the basic considerations of equal opportunity remain, the final Policy Interpretation sets forth the factors that will be examined to determine an institution's actual, as opposed to presumed, compliance with Title IX in the area of intercollegiate athletics.

The final Policy Interpretation does not contain a separate section on institutions' future responsibilities. However, institutions remain obligated by the Title IX regulation to accommodate effectively the interests and abilities of male and female students with regard to the selection of sports and levels of competition available. In most cases, this will entail development of athletic programs that substantially expand opportunities for

women to participate and compete at all levels.

The major reasons for the change in approach are as follows:

(1) Institutions and representatives of athletic program participants expressed a need for more definitive guidance on what constituted compliance than the discussion of a presumption of compliance provided. Consequently the final Policy Interpretation explains the meaning of "equal athletic opportunity" in such a way as to facilities an assessment of compliance.

(2) Many comments reflected a serious misunderstanding of the presumption of compliance. Most institutions based objections to the proposed Policy Interpretation in part on the assumption that failure to provide compelling justifications for disparities in per capita expenditures would have automatically resulted in a finding of noncompliance. In fact, such a failure would only have deprived an institution of the benefit of the presumption that it was in compliance with the law. The Department would still have had the burden of demonstrating that the institution was actually engaged in unlawful discrimination. Since the purpose of issuing a policy interpretation was to clarify the regulation, the Department has determined that the approach of stating actual compliance factors would be more useful to all concerned.

(3) The Department has concluded that purely financial measures such as the per capita test do not in themselves offer conclusive documentation of discrimination, except where the benefit or opportunity under review, like a scholarship, is itself financial in nature. Consequently, in the final Policy Interpretation, the Department has detailed the factors to be considered in assessing actual compliance. While per capita breakdowns and other devices to examine expenditures patterns will be used as tools of analysis in the Department's investigative process, it is achievement of "equal opportunity" for which recipients are responsible and to which the final Policy Interpretation is addressed.

A description of the comments received, and other information obtained through the comment/consultation process, with a description of Departmental action in response to the major points raised, is set forth at Appendix "B" to this document.

## VI. Historic Patterns of Intercollegiate Athletics Program Development and Operations

In its proposed Policy Interpretation of December 11, 1978, the Department

Footnotes continued from last page
teams will not be considered to be intercollegiate
ems except in those instances where they
ilarly participate in varsity competition.

published a summary of historic patterns affecting the relative status of men's and women's athletic programs. The Department has modified that summary to reflect additional information obtained during the comment and consultation process. The summary is set forth at Appendix A to this document.

## VII. The Policy Interpretation

This Policy Interpretation clarifies the obligations which recipients of Federal aid have under Title IX to provide equal opportunities in athletic programs. In particular, this Policy Interpretation provides a means to assess an institution's compliance with the equal opportunity requirements of the regulation which are set forth at 45 CFR 86.37(c) and 86.41(c).

### A. Athletic Financial Assistance (Scholarships)

1. *The Regulation*—Section 86.37(c) of the regulation provides:

[Institutions] must provide reasonable opportunities for such award [of financial assistance] for members of each sex in proportion to the number of students of each sex participating in * * * inter-collegiate athletics.[3]

2. *The Policy*—The Department will examine compliance with this provision of the regulation primarily by means of a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs. The Department will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results. Institutions may be found in compliance if this comparison results in substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors. Two such factors are:

a. At public institutions, the higher costs of tuition for students from out-of-state may in some years be unevenly distributed between men's and women's programs. These differences will be considered nondiscriminatory if they are not the result of policies or practices which disproportionately limit the availability of out-of-state scholarships to either men or women.

b. An institution may make reasonable professional decisions concerning the awards most appropriate for program development. For example, team development initially may require

---

[3] See also § 86.37(a) of the regulation.

spreading scholarships over as much as a full generation (four years) of student athletes. This may result in the award of fewer scholarships in the first few years than would be necessary to create proportionality between male and female athletes.

3. *Application of the Policy*—a. This section does not require a proportionate number of scholarships for men and women or individual scholarships of equal dollar value. It does mean that the total amount of scholarship aid made available to men and women must be substantially proportionate to their participation rates.

b. When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to male and female athletes. A disproportionate amount of work-related aid or loans in the assistance made available to the members of one sex, for example, could constitute a violation of Title IX.

4. *Definition*—For purposes of examining compliance with this Section, the participants will be defined as those athletes:

a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

c. Who are listed on the eligibility or squad lists maintained for each sport, or

d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

### B. Equivalence in Other Athletic Benefits and Opportunities

1. *The Regulation*—The Regulation requires that recipients that operate or sponsor interscholastic, intercollegiate, club, or intramural athletics, "provide equal athletic opportunities for members of both sexes." In determining whether an institution is providing equal opportunity in intercollegiate athletics, the regulation requires the Department to consider, among others, the following factors:

(1)[3]

(2) Provision and maintenance of equipment and supplies;

---

[3] 86.41(c) (1) on the accommodation of student interests and abilities, is covered in detail in the following Section C of this policy interpretation.

(3) Scheduling of games and practice times;

(4) Travel and per diem expenses;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training services and facilities;

(9) Provision of housing and dining services and facilities; and

(10) Publicity

Section 86.41(c) also permits the Director of the Office for Civil Rights to consider other factors in the determination of equal opportunity. Accordingly, this Section also addresses recruitment of student athletes and provision of support services.

This list is not exhaustive. Under the regulation, it may be expanded as necessary at the discretion of the Director of the Office for Civil Rights.[4]

2. *The Policy*—The Department will assess compliance with both the recruitment and the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the overall effect of any differences is negligible.

If comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability, a finding of compliance may still be justified if the differences are the result of nondiscriminatory factors. Some of the factors that may justify these differences are as follows:

a. Some aspects of athletic programs may not be equivalent for men and women because of unique aspects of particular sports or athletic activities. This type of distinction was called for by the "Javits' Amendment"[5] to Title IX, which instructed HEW to make "reasonable (regulatory) provisions considering the nature of particular sports" in intercollegiate athletics.

Generally, these differences will be the result of factors that are inherent to the basic operation of specific sports. Such factors may include rules of play, nature/replacement of equipment, rates of injury resulting from participation,

---

[4] See also § 86.41(a) and (b) of the regulation.
[5] Section 844 of the Education Amendments of 1974, Pub. L. 93–380, Title VIII, (August 21, 1974) 88 Stat. 612.

nature of facilities required for competition, and the maintenance/upkeep requirements of those facilities. For the most part, differences involving such factors will occur in programs offering football, and consequently these differences will favor men. If sport-specific needs are met equivalently in both men's and women's programs, however, differences in particular program components will be found to be justifiable.

b. Some aspects of athletic programs may not be equivalent for men and women because of legitimately sex-neutral factors related to special circumstances of a temporary nature. For example, large disparities in recruitment activity for any particular year may be the result of annual fluctuations in team needs for first-year athletes. Such differences are justifiable to the extent that they do not reduce overall equality of opportunity.

c. The activities directly associated with the operation of a competitive event in a single-sex sport may, under some circumstances, create unique demands or imbalances in particular program components. Provided any special demands associated with the activities of sports involving participants of the other sex are met to an equivalent degree, the resulting differences may be found nondiscriminatory. At many schools, for example, certain sports—notably football and men's basketball—traditionally draw large crowds. Since the costs of managing an athletic event increase with crowd size, the overall support made available for event management to men's and women's programs may differ in degree and kind. These differences would not violate Title IX if the recipient does not limit the potential for women's athletic events to rise in spectator appeal and if the levels of event management support available to both programs are based on sex-neutral criteria (e.g., facilities used, projected attendance, and staffing needs).

d. Some aspects of athletic programs may not be equivalent for men and women because institutions are undertaking voluntary affirmative actions to overcome effects of historical conditions that have limited participation in athletics by the members of one sex. This is authorized at § 86.3(b) of the regulation.

3. Application of the Policy—General Athletic Program Components—a. Equipment and Supplies (§ 86.41(c)(2)). Equipment and supplies include but are not limited to uniforms, other apparel, sport-specific equipment and supplies, general equipment and supplies,

instructional devices, and conditioning and weight training equipment.

Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) The quality of equipment and supplies;
(2) The amount of equipment and supplies;
(3) The suitability of equipment and supplies;
(4) The maintenance and replacement of the equipment and supplies; and
(5) The availability of equipment and supplies.

b. Scheduling of Games and Practice Times (§ 86.41(c)(3)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) The number of competitive events per sport;
(2) The number and length of practice opportunities;
(3) The time of day competitive events are scheduled;
(4) The time of day practice opportunities are scheduled; and
(5) The opportunities to engage in available pre-season and post-season competition.

c. Travel and Per Diem Allowances (§ 86.41(c)(4)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Modes of transportation;
(2) Housing furnished during travel;
(3) Length of stay before and after competitive events;
(4) Per diem allowances; and
(5) Dining arrangements.

d. Opportunity to Receive Coaching and Academic Tutoring (§ 86.41(c)(5)). (1) Coaching—Compliance will be assessed by examining, among other factors:

(a) Relative availability of full-time coaches;
(b) Relative availability of part-time and assistant coaches; and
(c) Relative availability of graduate assistants.

(2) Academic tutoring—Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(a) The availability of tutoring; and
(b) Procedures and criteria for obtaining tutorial assistance.

e. Assignment and Compensation of Coaches and Tutors (§ 86.41(c)(6)).[6] In

[6] The Department's jurisdiction over the employment practices of recipients under Subpart E, §§ 86.51–86.61 of the Title IX regulation has been successfully challenged in several court cases. Accordingly, the Department has suspended enforcement of Subpart E. Section 86.41(c)(6) of the regulation, however, authorizes the Department to

general, a violation of Section 86.41(c)(6) will be found only where compensation or assignment policies or practices deny male and female athletes coaching of equivalent quality, nature, or availability.

Nondiscriminatory factors can affect the compensation of coaches. In determining whether differences are caused by permissible factors, the range and nature of duties, the experience of individual coaches, the number of participants for particular sports, the number of assistant coaches supervised, and the level of competition will be considered.

Where these or similar factors represent valid differences in skill, effort, responsibility or working conditions they may, in specific circumstances, justify differences in compensation. Similarly, there may be unique situations in which a particular person may possess such an outstanding record of achievement as to justify an abnormally high salary.

(1) Assignment of Coaches—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's coaches of:

(a) Training, experience, and other professional qualifications;
(b) Professional standing.

(2) Assignment of Tutors—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's tutors of:

(a) Tutor qualifications;
(b) Training, experience, and other qualifications.

(3) Compensation of Coaches—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's coaches of:

(a) Rate of compensation (per sport, per season);
(b) Duration of contracts;
(c) Conditions relating to contract renewal;
(d) Experience;
(e) Nature of coaching duties performed;
(f) Working conditions; and
(g) Other terms and conditions of employment.

(4) Compensation of Tutors—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's tutors of:

consider the compensation of coaches of men and women in the determination of the equality of athletic opportunity provided to male and female athletes. It is on this section of the regulation that this Policy Interpretation is based.

(a) Hourly rate of payment by nature of subjects tutored;
(b) Pupil loads per tutoring season;
(c) Tutor qualifications;
(d) Experience;
(e) Other terms and conditions of employment.

f. *Provision of Locker Rooms, Practice and Competitive Facilities* (§ 86.41(c)(7)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Quality and availability of the facilities provided for practice and competitive events;
(2) Exclusivity of use of facilities provided for practice and competitive events;
(3) Availability of locker rooms;
(4) Quality of locker rooms;
(5) Maintenance of practice and competitive facilities; and
(6) Preparation of facilities for practice and competitive events.

g. *Provision of Medical and Training Facilities and Services* (§ 86.41(c)(8)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Availability of medical personnel and assistance;
(2) Health, accident and injury insurance coverage;
(3) Availability and quality of weight and training facilities;
(4) Availability and quality of conditioning facilities; and
(5) Availability and qualifications of athletic trainers.

h. *Provision of Housing and Dining Facilities and Services* (§ 86.41(c)(9)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Housing provided;
(2) Special services as part of housing arrangements (e.g., laundry facilities, parking space, maid service).

i. *Publicity* (§ 86.41(c)(10)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Availability and quality of sports information personnel;
(2) Access to other publicity resources for men's and women's programs; and
(3) Quantity and quality of publications and other promotional devices featuring men's and women's programs.

4. *Application of the Policy—Other Factors* (§ 86.41(c)). a. *Recruitment of Student Athletes.*[1] The athletic

recruitment practices of institutions often affect the overall provision of opportunity to male and female athletes. Accordingly, where equal athletic opportunities are not present for male and female students, compliance will be assessed by examining the recruitment practices of the athletic programs for both sexes to determine whether the provision of equal opportunity will require modification of those practices.

Such examinations will review the following factors:

(1) Whether coaches or other professional athletic personnel in the programs serving male and female athletes are provided with substantially equal opportunities to recruit;
(2) Whether the financial and other resources made available for recruitment in male and female athletic programs are equivalently adequate to meet the needs of each program; and
(3) Whether the differences in benefits, opportunities, and treatment afforded prospective student athletes of each sex have a disproportionately limiting effect upon the recruitment of students of either sex.

b. *Provision of Support Services.* The administrative and clerical support provided to an athletic program can affect the overall provision of opportunity to male and female athletes, particularly to the extent that the provided services enable coaches to perform better their coaching functions.

In the provision of support services, compliance will be assessed by examining, among other factors, the equivalence of:

(1) The amount of administrative assistance provided to men's and women's programs;
(2) The amount of secretarial and clerical assistance provided to men's and women's programs.

5. *Overall Determination of Compliance.* The Department will base its compliance determination under § 86.41(c) of the regulation upon an examination of the following:

a. Whether the policies of an institution are discriminatory in language or effect; or
b. Whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female

athletes in the institution's program as a whole; or
c. Whether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity.

C. *Effective Accommodation of Student Interests and Abilities.*

1. *The Regulation.* The regulation requires institutions to accommodate effectively the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports and levels of competition available to members of both sexes.

Specifically, the regulation, at § 86.41(c)(1), requires the Director to consider, when determining whether equal opportunities are available—

Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes.

Section 86.41(c) also permits the Director of the Office for Civil Rights to consider other factors in the determination of equal opportunity. Accordingly, this section also addresses competitive opportunities in terms of the competitive team schedules available to athletes of both sexes.

2. *The Policy.* The Department will assess compliance with the interests and abilities section of the regulation by examining the following factors:

a. The determination of athletic interests and abilities of students;
b. The selection of sports offered; and
c. The levels of competition available including the opportunity for team competition.

3. *Application of the Policy— Determination of Athletic Interests and Abilities.*

Institutions may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing provided:

a. The processes take into account the nationally increasing levels of women's interests and abilities;
b. The methods of determining interest and ability do not disadvantage the members of an underrepresented sex;
c. The methods of determining ability take into account team performance records; and
d. The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex.

4. *Application of the Policy— Selection of Sports.*

In the selection of sports, the regulation does not require institutions

[1] Public undergraduate institutions are also subject to the general anti-discrimination provisions at § 86.23 of the regulation, which reads in part:

"A recipient * * * shall not discriminate on the basis of sex in the recruitment and admission of

students. A recipient may be required to undertake additional recruitment efforts for one sex as remedial action * * * and may choose to undertake such efforts as affirmative action * * *"

Accordingly, institutions subject to § 86.23 are required in all cases to maintain equivalently effective recruitment programs for both sexes and, under § 86.41(c), to provide equivalent benefits, opportunities, and treatment to student athletes of both sexes.

to integrate their teams nor to provide exactly the same choice of sports to men and women. However, where an institution sponsors a team in a particular sport for members of one sex, it may be required either to permit the excluded sex to try out for the team or to sponsor a separate team for the previously excluded sex.

a. Contact Sports—Effective accommodation means that if an institution sponsors a team for members of one sex in a contact sport, it must do so for members of the other sex under the following circumstances:

(1) The opportunities for members of the excluded sex have historically been limited; and

(2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team.

b. Non-Contact Sports—Effective accommodation means that if an institution sponsors a team for members of one sex in a non-contact sport, it must do so for members of the other sex under the following circumstances:

(1) The opportunities for members of the excluded sex have historically been limited;

(2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team; and

(3) Members of the excluded sex do not possess sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected.

5. *Application of the Policy—Levels of Competition.*

In effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities.

a. Compliance will be assessed in any one of the following ways:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest

and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

b. Compliance with this provision of the regulation will also be assessed by examining the following:

(1) Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; or

(2) Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

c. Institutions are not required to upgrade teams to intercollegiate status or otherwise develop intercollegiate sports absent a reasonable expectation that intercollegiate competition in that sport will be available within the institution's normal competitive regions. Institutions may be required by the Title IX regulation to actively encourage the development of such competition, however, when overall athletic opportunities within that region have been historically limited for the members of one sex.

6. *Overall Determination of Compliance.*

The Department will base its compliance determination under § 86.41(c) of the regulation upon a determination of the following:

a. Whether the policies of an institution are discriminatory in language or effect; or

b. Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole; or

c. Whether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.

**VIII. The Enforcement Process**

The process of Title IX enforcement is set forth in § 86.71 of the Title IX regulation, which incorporates by reference the enforcement procedures applicable to Title VI of the Civil Rights

Act of 1964.[8] The enforcement process prescribed by the regulation is supplemented by an order of the Federal District Court, District of Columbia, which establishes time frames for each of the enforcement steps.[9]

According to the regulation, there are two ways in which enforcement is initiated:

• *Compliance Reviews*—Periodically the Department must select a number of recipients (in this case, colleges and universities which operate intercollegiate athletic programs) and conduct investigations to determine whether recipients are complying with Title IX. (45 CFR 80.7(a))

• *Complaints*—The Department must investigate all valid (written and timely) complaints alleging discrimination on the basis of sex in a recipient's programs. (45 CFR 80.7(b))

The Department must inform the recipient (and the complainant if applicable) of the results of its investigation. If the investigation indicates that a recipient is in compliance, the Department states this, and the case is closed. If the investigation indicates noncompliance, the Department outlines the violations found.

The Department has 90 days to conduct an investigation and inform the recipient of its findings, and an additional 90 days to resolve violations by obtaining a voluntary compliance agreement from the recipient. This is done through negotiations between the Department and the recipient, the goal of which is agreement on steps the recipient will take to achieve compliance. Sometimes the violation is relatively minor and can be corrected immediately. At other times, however, the negotiations result in a plan that will correct the violations within a specified period of time. To be acceptable, a plan must describe the manner in which institutional resources will be used to correct the violation. It also must state acceptable time tables for reaching interim goals and full compliance. When agreement is reached, the Department notifies the institution that its plan is acceptable. The Department then is obligated to review periodically the implementation of the plan.

An institution that is in violation of Title IX may already be implementing a corrective plan. In this case, prior to informing the recipient about the results of its investigation, the Department will determine whether the plan is adequate.

---

[8] These procedures may be found at 45 CFR 80.6–80.11 and 45 CFR Part 81.

[9] *WEAL v. Harris*, Civil Action No. 74–1720 (D.D.C. December 29, 1977).

If the plan is not adequate to correct the violations (or to correct them within a reasonable period of time) the recipient will be found in noncompliance and voluntary negotiations will begin. However, if the institutional plan is acceptable, the Department will inform the institution that although the institution has violations, it is found to be in compliance because it is implementing a corrective plan. The Department, in this instance also, would monitor the progress of the institutional plan. If the institution subsequently does not completely implement its plan, it will be found in noncompliance.

When a recipient is found in noncompliance and voluntary compliance attempts are unsuccessful, the formal process leading to termination of Federal assistance will be begun. These procedures, which include the opportunity for a hearing before an administrative law judge, are set forth at 45 CFR 80.8–80.11 and 45 CFR Part 81.

## IX. Authority

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374, 20 U.S.C. 1681, 1682; sec. 844, Education Amendments of 1974, Pub. L. 93–380, 88 Stat. 612; and 45 CFR Part 86)

Dated: December 3, 1979.

**Roma Stewart.**

*Director, Office for Civil Rights, Department of Health, Education, and Welfare.*

Dated: December 4, 1979.

**Patricia Roberts Harris.**

*Secretary, Department of Health, Education, and Welfare.*

Appendix A—Historic Patterns of Intercollegiate Athletics Program Development

1. Participation in intercollegiate sports has historically been emphasized for men but not women. Partially as a consequence of this, participation rates of women are far below those of men. During the 1977–78 academic year women students accounted for 48 percent of the national undergraduate enrollment (5,496,000 of 11,267,000 students).[1] Yet, only 30 percent of the intercollegiate athletes are women.[2]

The historic emphasis on men's intercollegiate athletic programs has also contributed to existing differences in the number of sports and scope of competition offered men and women. One source indicates that, on the average, colleges and universities are

providing twice the number of sports for men as they are for women.[3]

2. Participation by women in sports is growing rapidly. During the period from 1971–1976, for example, the number of female participants in organized high school sports increased from 294,000 to 2,083,000—an increase of over 600 percent.[4] In contrast, between Fall 1971 and Fall 1977, the enrollment of females in high school decreased from approximately 7,600,000 to approximately 7,150,000 a decrease of over 5 percent.[5]

The growth in athletic participation by high school women has been reflected on the campuses of the nation's colleges and universities. During the period from 1971 to 1976 the enrollment of women in the nation's institutions of higher education rose 32 percent, from 3,400,000 to 5,201,000.[6] During this same period, the number of women participating in intramural sports increased 108 percent from 276,167 to 576,167. In club sports, the number of women participants increased from 16,386 to 25,541 or 55 percent. In intercollegiate sports, women's participation increased 102 percent from 31,852 to 64,375.[7] These developments reflect the growing interest of women in competitive athletics, as well as the efforts of colleges and universities to accommodate those interests.

3. The overall growth of women's intercollegiate programs has not been at the expense of men's programs. During the past decade of rapid growth in women's programs, the number of intercollegiate sports available for men has remained stable, and the number of male athletes has increased slightly. Funding for men's programs has increased from $1.2 to $2.2 million between 1970–1977 alone.[8]

4. On most campuses, the primary problem confronting women athletes is

the absence of a fair and adequate level of resources, services, and benefits. For example, disproportionately more financial aid has been made available for male athletes than for female athletes. Presently, in institutions that are members of both the National Collegiate Athletic Association (NCAA) and the Association for Intercollegiate Athletics for Women (AIAW), the average annual scholarship budget is $39,000. Male athletes receive $32,000 or 78 percent of this amount, and female athletes receive $7,000 or 22 percent, although women are 30 percent of all the athletes eligible for scholarships.[9]

Likewise, substantial amounts have been provided for the recruitment of male athletes, but little funding has been made available for recruitment of female athletes.

Congressional testimony on Title IX and subsequent surveys indicates that discrepancies also exist in the opportunity to receive coaching and in other benefits and opportunities, such as the quality and amount of equipment, access to facilities and practice times, publicity, medical and training facilities, and housing and dining facilities.[10]

5. At several institutions, intercollegiate football is unique among sports. The size of the teams, the expense of the operation, and the revenue produced distinguish football from other sports, both men's and women's. Title IX requires that "an institution of higher education must comply with the prohibition against sex discrimination imposed by that title and its implementing regulations in the administration of any revenue producing intercollegiate athletic activity."[11] However, the unique size and cost of football programs have been taken into account in developing this Policy Interpretation.

Appendix B—Comments and Responses

The Office for Civil Rights (OCR) received over 700 comments and recommendations in response to the December 11, 1978 publication of the proposed Policy Interpretation. After the formal comment period, representatives of the Department met for additional discussions with many individuals and

---

[1] *The Condition of Education 1978,* National Center for Education Statistics, p. 112.

[2] Figure obtained from Association for Intercollegiate Athletics for Women (AIAW) member survey, *AIAW Structure Implementation Survey Data Summary,* October 1978, p. 11.

[3] U.S. Commission on Civil Rights, Comments to DHEW on proposed Policy Interpretation: Analysis of data supplied by the National Association of Directors of Collegiate Athletics.

[4] Figures obtained from National Federation of High School Associations (NFHSA) data.

[5] *Digest of Education Statistics 1977–78,* National Center for Education Statistics (1978), Table 40, at 44. Data, by sex, are unavailable for the period from 1971 to 1977; consequently, these figures represent 90 percent of total enrollment for that period. This is the best comparison that could be made based on available data.

[6] Ibid, p. 112.

[7] These figures, which are not precisely comparable to those cited at footnote 2, were obtained from *Sports and Recreational Programs of the Nation's Universities and Colleges,* NCAA Report No. 5, March 1978. It includes figures only from the 722 NCAA member institutions because comparable data was not available from other associations.

[8] Compiled from NCAA *Revenues and Expenses for Intercollegiate Athletic Programs,* 1978.

[9] Figures obtained from *AIAW Structure Implementation Survey Data Summary,* October 1978, p. 11.

[10] 121 Cong. REc. 29791–95 (1975) (remarks of Senator Williams); Comments by Senator Bayh, Hearings on S. 2106 Before the Subcommittee on Education of the Senate Committee on Labor and Public Welfare, 94th Congress, 1st Session 46 (1975). "Survey of Women's Athletic Directors," AIAW Workshop (January 1978).

[11] See April 18, 1979, Opinion of General Counsel, Department of Health, Education, and Welfare, page 1.

groups including college and university officials, athletic associations, athletic directors, women's rights organizations and other interested parties. HEW representatives also visited eight universities in order to assess the potential of the proposed Policy Interpretation and of suggested alternative approaches for effective enforcement of Title IX.

The Department carefully considered all information before preparing the final policy. Some changes in the structure and substance of the Policy Interpretation have been made as a result of concerns that were identified in the comment and consultation process.

Persons who responded to the request for public comment were asked to comment generally and also to respond specifically to eight questions that focused on different aspects of the proposed Policy Interpretation.

*Question No. 1:* Is the description of the current status and development of intercollegiate athletics for men and women accurate? What other factors should be considered?

*Comment A:* Some commentors noted that the description implied the presence of intent on the part of all universities to discriminate against women. Many of these same commentors noted an absence of concern in the proposed Policy Interpretation for those universities that have in good faith attempted to meet what they felt to be a vague compliance standard in the regulation.

*Response:* The description of the current status and development of intercollegiate athletics for men and women was designed to be a factual, historical overview. There was no intent to imply the universal presence of discrimination. The Department recognizes that there are many colleges and universities that have been and are making good faith efforts, in the midst of increasing financial pressures, to provide equal athletic opportunities to their male and female athletes.

*Comment B:* Commentors stated that the statistics used were outdated in some areas, incomplete in some areas, and inaccurate in some areas.

*Response:* Comment accepted. The statistics have been updated and corrected where necessary.

*Question No. 2:* Is the proposed two-stage approach to compliance practical? Should it be modified? Are there other approaches to be considered?

*Comment:* Some commentors stated that Part II of the proposed Policy Interpretation "Equally Accommodating the Interests and Abilities of Women" represented an extension of the July

1978 compliance deadline established in § 86.41(d) of the Title IX regulation.

*Response:* Part II of the proposed Policy Interpretation was not intended to extend the compliance deadline. The format of the two stage approach, however, seems to have encouraged that perception; therefore, the elements of both stages have been unified in this Policy Interpretation.

*Question No. 3:* Is the equal average per capita standard based on participation rates practical? Are there alternatives or modifications that should be considered?

*Comment A:* Some commentors stated it was unfair or illegal to find noncompliance solely on the basis of a financial test when more valid indicators of equality of opportunity exist.

*Response:* The equal average per capita standard was not a standard by which noncompliance could be found. It was offered as a standard of presumptive compliance. In order to prove noncompliance, HEW would have been required to show that the unexplained disparities in expenditures were discriminatory in effect. The standard, in part, was offered as a means of simplifying proof of compliance for universities. The widespread confusion concerning the significance of failure to satisfy the equal average per capita expenditure standard, however, is one of the reasons it was withdrawn.

*Comment B:* Many commentors stated that the equal average per capita standard penalizes those institutions that have increased participation opportunities for women and rewards institutions that have limited women's participation.

*Response:* Since equality of average per capita expenditures has been dropped as a standard of presumptive compliance, the question of its effect is no longer relevant. However, the Department agrees that universities that had increased participation opportunities for women and wished to take advantage of the presumptive compliance standard, would have had a bigger financial burden than universities that had done little to increase participation opportunities for women.

*Question No. 4:* Is there a basis for treating part of the expenses of a particular revenue producing sport differently because the sport produces income used by the university for non-athletic operating expenses on a non-discriminatory basis? If, so, how should such funds be identified and treated?

*Comment:* Commentors stated that this question was largely irrelevant because there were so few universities

at which revenue from the athletic program was used in the university operating budget.

*Response:* Since equality of average per capita expenditures has been dropped as a standard of presumed compliance, a decision is no longer necessary on this issue.

*Question No. 5:* Is the grouping of financially measurable benefits into three categories practical? Are there alternatives that should be considered? Specifically, should recruiting expenses be considered together with all other financially measurable benefits?

*Comment A:* Most commentors stated that, if measured solely on a financial standard, recruiting should be grouped with the other financially measurable items. Some of these commentors held that at the current stage of development of women's intercollegiate athletics, the amount of money that would flow into the women's recruitment budget as a result of separate application of the equal average per capita standard to recruiting expenses, would make recruitment a disproportionately large percentage of the entire women's budget. Women's athletic directors, particularly, wanted the flexibility to have the money available for other uses, and they generally agreed on including recruitment expenses with the other financially measurable items.

*Comment B:* Some commentors stated that it was particularly inappropriate to base any measure of compliance in recruitment solely on financial expenditures. They stated that even if proportionate amounts of money were allocated to recruitment, major inequities could remain in the benefits to athletes. For instance, universities could maintain a policy of subsidizing visits to their campuses of prospective students of one sex but not the other. Commentors suggested that including an examination of differences in benefits to prospective athletes that result from recruiting methods would be appropriate.

*Response:* In the final Policy Interpretation, recruitment has been moved to the group of program areas to be examined under § 86.41(c) to determine whether overall equal athletic opportunity exists. The Department accepts the comment that a financial measure is not sufficient to determine whether equal opportunity is being provided. Therefore, in examining athletic recruitment, the Department will primarily review the opportunity to recruit, the resources provided for recruiting, and methods of recruiting.

*Question No. 6:* Are the factors used to justify differences in equal average per capita expenditures for financially

measurable benefits and opportunities fair? Are there other factors that should be considered?

*Comment:* Most commentors indicated that the factors named in the proposed Policy Interpretation (the "scope of competition" and the "nature of the sport") as justifications for differences in equal average per capita expenditures were so vague and ambiguous as to be meaningless. Some stated that it would be impossible to define the phrase "scope of competition", given the greatly differing competitive structure of men's and women's programs. Other commentors were concerned that the "scope of competition" factor that may currently be designated as "non-discriminatory" was, in reality, the result of many years of inequitable treatment of women's athletic programs.

*Response:* The Department agrees that it would have been difficult to define clearly and then to quantify the "scope of competition" factor. Since equal average per capita expenditures has been dropped as a standard of presumed compliance, such financial justifications are no longer necessary. Under the equivalence standard, however, the "nature of the sport" remains an important concept. As explained within the Policy Interpretation, the unique nature of a sport may account for perceived inequities in some program areas.

*Question No 7:* Is the comparability standard for benefits and opportunities that are not financially measurably fair and realistic? Should other factors controlling comparability be included? Should the comparability standard be revised? Is there a different standard which should be considered?

*Comment:* Many commentors stated that the comparability standard was fair and realistic. Some commentors were concerned, however, that the standard was vague and subjective and could lead to uneven enforcement.

*Response:* The concept of comparing the non-financially measurable benefits and opportunities provided to male and female athletes has been preserved and expanded in the final Policy Interpretation to include all areas of examination except scholarships and accommodation of the interests and abilities of both sexes. The standard is that equivalent benefits and opportunities must be provided. To avoid vagueness and subjectivity, further guidance is given about what elements will be considered in each program area to determine the equivalency of benefits and opportunities.

*Question No. 8:* Is the proposal for increasing the opportunity for women to participate in competitive athletics appropriate and effective? Are there other procedures that should be considered? Is there a more effective way to ensure that the interest and abilities of both men and women are equally accommodated?

*Comment:* Several commentors indicated that the proposal to allow a university to gain the status of presumed compliance by having policies and procedures to encourage the growth of women's athletics was appropriate and effective for future students, but ignored students presently enrolled. They indicated that nowhere in the proposed Policy Interpretation was concern shown that the current selection of sports and levels of competition effectively accommodate the interests and abilities of women as well as men.

*Response:* Comment accepted. The requirement that universities equally accommodate the interests and abilities of their male and female athletes (Part II of the proposed Policy Interpretation) has been directly addressed and is now a part of the unified final Policy Interpretation.

**Additional Comments**

The following comments were not responses to questions raised in the proposed Policy Interpretation. They represent additional concerns expressed by a large number of commentors.

(1) *Comment:* Football and other "revenue producing" sports should be totally exempted or should receive special treatment under Title IX.

*Response:* The April 18, 1978, opinion of the General Counsel, HEW, concludes that "an institution of higher education must comply with the prohibition against sex discrimination imposed by that title and its implementing regulation in the administration of any revenue producing activity". Therefore, football or other "revenue producing" sports cannot be exempted from coverage of Title IX.

In developing the proposed Policy Interpretation the Department concluded that although the fact of revenue production could not justify disparity in average per capita expenditure between men and women, there were characteristics common to most revenue producing sports that could result in legitimate non-discriminatory differences in per capita expenditures. For instance, some "revenue producing" sports require expensive protective equipment and most require high expenditures for the management of events attended by large numbers of people. These characteristics and others described in the proposed Policy Interpretation were

considered acceptable, non-discriminatory reasons for differences in per capita average expenditures.

In the final Policy Interpretation, under the equivalent benefits and opportunities standard of compliance, some of these non-discriminatory factors are still relevant and applicable.

(2) *Comment:* Commentors stated that since the equal average per capita standard of presumed compliance was based on participation rates, the word should be explicitly defined.

*Response:* Although the final Policy Interpretation does not use the equal average per capita standard of presumed compliance, a clear understanding of the word "participant" is still necessary, particularly in the determination of compliance where scholarships are involved. The word "participant" is defined in the final Policy Interpretation.

(3) *Comment:* Many commentors were concerned that the proposed Policy Interpretation neglected the rights of individuals.

*Response:* The proposed Policy Interpretation was intended to further clarify what colleges and universities must do within their intercollegiate athletic programs to avoid discrimination against individuals on — the basis of sex. The Interpretation, therefore, spoke to institutions in terms of their male and female athletes. It spoke specifically in terms of equal average per capita expenditures and in terms of comparability of other opportunities and benefits for male and female participating athletes.

The Department believes that under this approach the rights of individuals were protected. If women athletes, as a class, are receiving opportunities and benefits equal to those of male athletes, individuals within the class should be protected thereby. Under the proposed Policy Interpretation, for example, if female athletes as a whole were receiving their proportional share of athletic financial assistance, a university would have been presumed in compliance with that section of the regulation. The Department does not want and does not have the authority to force universities to offer identical programs to men and women. Therefore, to allow flexibility within women's programs and within men's programs, the proposed Policy Interpretation stated that an institution would be presumed in compliance if the average per capita expenditures on athletic scholarships for men and women, were equal. This same flexibility (in scholarships and in other areas) remains in the final Policy Interpretation.

(4) *Comment:* Several commentors stated that the provision of a separate dormitory to athletes of only one sex, even where no other special benefits were involved, is inherently discriminatory. They felt such separation indicated the different degrees of importance attached to athletes on the basis of sex.

*Response:* Comment accepted. The provision of a separate dormitory to athletes of one sex but not the other will be considered a failure to provide equivalent benefits as required by the regulation.

(5) *Comment:* Commentors, particularly colleges and universities, expressed concern that the differences in the rules of intercollegiate athletic associations could result in unequal distribution of benefits and opportunities to men's and women's athletic programs, thus placing the institutions in a posture of noncompliance with Title IX.

*Response:* Commentors made this point with regard to § 86.6(c) of the Title IX regulation, which reads in part:

"The obligation to comply with [Title IX] is not obviated or alleviated by any rule or regulation of any * * * athletic or other * * * association * * *"

Since the penalties for violation of intercollegiate athletic association rules can have a severe effect on the athletic opportunities within an affected program, the Department has re-examined this regulatory requirement to determine whether it should be modified. Our conclusion is that modification would not have a beneficial effect, and that the present requirement will stand.

Several factors enter into this decision. First, the differences between rules affecting men's and women's programs are numerous and change constantly. Despite this, the Department has been unable to discover a single case in which those differences require members to act in a discriminatory manner. Second, some rule differences may permit decisions resulting in discriminatory distribution of benefits and opportunities to men's and women's programs. The fact that institutions respond to differences in rules by choosing to deny equal opportunities, however, does not mean that the rules themselves are at fault; the rules do not prohibit choices that would result in compliance with Title IX. Finally, the rules in question are all established and subject to change by the membership of the association. Since all (or virtually all) association member institutions are subject to Title IX, the opportunity exists for these institutions to resolve

collectively any wide-spread Title IX compliance problems resulting from association rules. To the extent that this has not taken place, Federal intervention on behalf of statutory beneficiaries is both warranted and required by the law. Consequently, the Department can follow no course other than to continue to disallow any defenses against findings of noncompliance with Title IX that are based on intercollegiate athletic association rules.

(6) *Comment:* Some commentors suggested that the equal average per capita test was unfairly skewed by the high cost of some "major" men's sports, particularly football, that have no equivalently expensive counterpart among women's sports. They suggested that a certain percentage of those costs (e.g., 50% of football scholarships) should be excluded from the expenditures on male athletes prior to application of the equal average per capita test.

*Response:* Since equality of average per capita expenditures has been eliminated as a standard of presumed compliance, the suggestion is no longer relevant. However, it was possible under that standard to exclude expenditures that were due to the nature of the sport, or the scope of competition and thus were not discriminatory in effect. Given the diversity of intercollegiate athletic programs, determinations as to whether disparities in expenditures were nondiscriminatory would have been made on a case-by-case basis. There was no legal support for the proposition that an arbitrary percentage of expenditures should be excluded from the calculations.

(7) *Comment:* Some commentors urged the Department to adopt various forms of team-based comparisons in assessing equality of opportunity between men's and women's athletic programs. They stated that well-developed men's programs are frequently characterized by a few "major" teams that have the greatest spectator appeal, earn the greatest income, cost the most to operate, and dominate the program in other ways. They suggested that women's programs should be similarly constructed and that comparability should then be required only between "men's major" and "women's major" teams, and between "men's minor" and "women's minor" teams. The men's teams most often cited as appropriate for "major" designation have been football and basketball, with women's basketball and volleyball being frequently selected as the counterparts.

*Response:* There are two problems with this approach to assessing equal

opportunity. First, neither the statute nor the regulation calls for identical programs for male and female athletes. Absent such a requirement, the Department cannot base noncompliance upon a failure to provide arbitrarily identical programs, either in whole or in part.

Second, no subgrouping of male or female students (such as a team) may be used in such a way as to diminish the protection of the larger class of males and females in their rights to equal participation in educational benefits or opportunities. Use of the "major/minor" classification does not meet this test where large participation sports (e.g., football) are compared to smaller ones (e.g., women's volleyball) in such a manner as to have the effect of disproportionately providing benefits or opportunities to the members of one sex.

(8) *Comment:* Some commenters suggest that equality of opportunity should be measured by a "sport-specific" comparison. Under this approach, institutions offering the same sports to men and women would have an obligation to provide equal opportunity within each of those sports. For example, the men's basketball team and the women's basketball team would have to receive equal opportunities and benefits.

*Response:* As noted above, there is no provision for the requirement of identical programs for men and women, and no such requirement will be made by the Department. Moreover, a sport-specific comparison could actually create unequal opportunity. For example, the sports available for men at an institution might include most or all of those available for women; but the men's program might concentrate resources on sports not available to women (e.g., football, ice hockey). In addition, the sport-specific concept overlooks two key elements of the Title IX regulation.

First, the regulation states that the selection of sports is to be representative of student interests and abilities (86.41(c)(1)). A requirement that sports for the members of one sex be available or developed solely on the basis of their existence or development in the program for members of the other sex could conflict with the regulation where the interests and abilities of male and female students diverge.

Second, the regulation treats the general compliance obligations of recipients in terms of program-wide benefits and opportunities (86.41(c)). As implied above, Title IX protects the individual as a student-athlete, not as a basketball player, or swimmer.

Federal Register / Vol. 44, No. 239 / Tuesday, December 11, 1979 / Rules and Regulations    71423

(9) *Comment:* A coalition of many colleges and universities urged that there are no objective standards against which compliance with Title IX in intercollegiate athletics could be measured. They felt that diversity is so great among colleges and universities that no single standard or set of standards could practicably apply to all affected institutions. They concluded that it would be best for individual institutions to determine the policies and procedures by which to ensure nondiscrimination in intercollegiate athletic programs.

Specifically, this coalition suggested that each institution should create a group representative of all affected parties on campus.

This group would then assess existing athletic opportunities for men and women, and, on the basis of the assessment, develop a plan to ensure nondiscrimination. This plan would then be recommended to the Board of Trustees or other appropriate governing body.

The role foreseen for the Department under this concept is:

(a) The Department would use the plan as a framework for evaluating complaints and assessing compliance;

(b) The Department would determine whether the plan satisfies the interests of the involved parties; and

(c) The Department would determine whether the institution is adhering to the plan.

These commenters felt that this approach to Title IX enforcement would ensure an environment of equal opportunity.

*Response:* Title IX is an anti-discrimination law. It prohibits discrimination based on sex in educational institutions that are recipients of Federal assistance. The legislative history of Title IX clearly shows that it was enacted because of discrimination that currently was being practiced against women in educational institutions. The Department accepts that colleges and universities are sincere in their intention to ensure equal opportunity in intercollegiate athletics to their male and female students. It cannot, however, turn over its responsibility for interpreting and enforcing the law. In this case, its responsibility includes articulating the standards by which compliance with the Title IX statute will be evaluated.

The Department agrees with this group of commenters that the proposed self-assessment and institutional plan is an excellent idea. Any institution that engages in the assessment/planning process, particularly with the full participation of interested parties as envisioned in the proposal, would clearly reach or move well toward compliance. In addition, as explained in Section VIII of this Policy Interpretation, any college or university that has compliance problems but is implementing a plan that the Department determines will correct those problems within a reasonable period of time, will be found in compliance.

[FR Doc. 79-37955 Filed 12-10-79; 8:45 am]

BILLING CODE 4110-12-M

# EXHIBIT  E



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

JAN 1 6 1996

THE ASSISTANT SECRETARY

Dear Colleague:

It is my pleasure to send you the enclosed "Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test" (the Clarification).

As you know, the Office for Civil Rights (OCR) enforces Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex in education programs and activities. The regulation implementing Title IX and the Department's Intercollegiate Athletics Policy Interpretation published in 1979-- both of which followed publication for notice and the receipt, review and consideration of extensive comments--specifically address intercollegiate athletics. Since becoming Assistant Secretary, I have recognized the need to provide additional clarification regarding what is commonly referred to as the "three-part test," a test used to determine whether students of both sexes are provided nondiscriminatory opportunities to participate in athletics. The three-part test is described in the Department's 1979 Policy Interpretation.

Accordingly, on September 20, 1995, OCR circulated to over 4500 interested parties a draft of the proposed Clarification, soliciting comments about whether the document provided sufficient clarity to assist institutions in their efforts to comply with Title IX. As indicated when circulating the draft of the Clarification, the objective of the Clarification is to respond to requests for specific guidance about the existing standards that have guided the enforcement of Title IX in the area of intercollegiate athletics. Further, the Clarification is limited to an elaboration of the "three-part test." This test, which has generated the majority of the questions that have been raised about Title IX compliance, is a portion of a larger analytical framework reflected in the 1979 Policy Interpretation.

OCR appreciates the efforts of the more than 200 individuals who commented on the draft of the Clarification. In addition to providing specific comments regarding clarity, some parties suggested that the Clarification did not go far enough in protecting women's sports. Others, by contrast, suggested that the Clarification, or the Policy Interpretation itself, provided more protection for women's sports than intended by Title IX. However, it would not be appropriate to revise the 1979 Policy Interpretation, and adherence to its provisions shaped OCR's consideration of these comments. The Policy Interpretation has

Page 2 - Dear Colleague

guided OCR's enforcement in the area of athletics for over fifteen years, enjoying the bipartisan support of Congress.  The Policy Interpretation has also enjoyed the support of every court that has addressed issues of Title IX athletics.  As one recent court decision recognized, the "three-part test"  draws its "essence" from the Title IX statute.

The draft has been revised to incorporate suggestions that OCR received regarding how to make the document more useful and clearer.  For instance, the Clarification now has additional examples to illustrate how to meet part one of the three-part test and makes clear that the term "developing interests" under part two of the test includes interests that already exist at the institution.  The document also clarifies that an institution can choose which part of the test it plans to meet.  In addition, it further clarifies how Title IX requires OCR to count participation opportunities and why Title IX does not require an institution, under part three of the test, to accommodate the interests and abilities of potential students.

OCR also received requests for clarification that relate primarily to fact- or institution-specific situations that only apply to a small number of athletes or institutions.  These comments are more appropriately handled on an individual basis and, accordingly, OCR will follow-up on these comments and questions in the context of OCR's ongoing technical assistance efforts.

It is important to outline several points about the final document.

The Clarification confirms that institutions need to comply only with any one part of the three-part test in order to provide nondiscriminatory participation opportunities for individuals of both sexes.  The first part of the test--substantial proportionality--focuses on the participation rates of men and women at an institution and affords an institution a "safe harbor" for establishing that it provides nondiscriminatory participation opportunities.  An institution that does not provide substantially proportional participation opportunities for men and women may comply with Title IX by satisfying either part two or part three of the test.  The second part--history and continuing practice--is an examination of an institution's good faith expansion of athletic opportunities through its response to developing interests of the underrepresented sex at that institution.  The third part--fully and effectively accommodating interests and abilities of the underrepresented sex--centers on the inquiry of whether there are concrete and viable interests among the underrepresented sex that should be accommodated by an institution.

In addition, the Clarification does not provide strict numerical formulas or "cookie cutter" answers to the issues that are inherently case- and fact-specific.  Such an effort not only would belie the meaning of Title IX, but would at the same time deprive

Page 3 - Dear Colleague

institutions of the flexibility to which they are entitled when deciding how best to comply with the law.

Several parties who provided comments expressed opposition to the three-part test.  The crux of the arguments made on behalf of those opposed to the three-part test is that the test does not really provide three different ways to comply.  Opponents of the test assert, therefore, that the test improperly establishes arbitrary quotas.  Similarly, they also argue that the three-part test runs counter to the intent of Title IX because it measures gender discrimination by underrepresentation and requires the full accommodation of only one sex.  However, this understanding of Title IX and the three-part test is wrong.

First, it is clear from the Clarification that there are three different avenues of compliance.  Institutions have flexibility in providing nondiscriminatory participation opportunities to their students, and OCR does not require quotas.  For example, if an institution chooses to and does comply with part three of the test, OCR will not require it to provide substantially proportionate participation opportunities to, or demonstrate a history and continuing practice of program expansion that is responsive to the developing interests of, the underrepresented sex.  In fact, if an institution believes that its female students are less interested and able to play intercollegiate sports, that institution may continue to provide more athletic opportunities to men than to women, or even to add opportunities for men, as long as the recipient can show that its female students are not being denied opportunities, i.e., that women's interests and abilities are fully and effectively accommodated.  The fact that each part of the three-part test considers participation rates does not mean, as some opponents of the test have suggested, that the three parts do not provide different ways to comply with Title IX.

Second, it is appropriate for parts two and three of the test to focus only on the underrepresented sex.  Indeed, such a focus is required because Title IX, by definition, addresses discrimination. Notably, Title IX's athletic provisions are unique in permitting institutions--notwithstanding the long history of discrimination based on sex in athletics programs--to establish separate athletic programs on the basis of sex, thus allowing institutions to determine the number of athletic opportunities that are available to students of each sex.  (By contrast, Title VI of the Civil Rights Act of 1964 forbids institutions from providing separate athletic programs on the basis of race or national origin.)

OCR focuses on the interests and abilities of the underrepresented sex only if the institution provides proportionately fewer athletic opportunities to members of one sex and has failed to make a good faith effort to expand its program for the underrepresented sex. Thus, the Policy Interpretation requires the full accommodation of the underrepresented sex only to the extent necessary to provide

Page 4 - Dear Colleague

equal athletic opportunity, i.e., only where an institution has failed to respond to the interests and abilities of the underrepresented sex when it allocated a disproportionately large number of opportunities for athletes of the other sex.

What is clear then--because, for example, part three of the three-part test permits evidence that underrepresentation is caused not by discrimination but by lack of interest--is that underrepresentation alone is not the measure of discrimination. Substantial proportionality merely provides institutions with a safe harbor. Even if this were not the case and proportional opportunities were the only test, the "quota" criticism would be misplaced. Quotas are impermissible where opportunities are required to be created without regard to sex. However, schools are permitted to create athletic participation opportunities based on sex. Where they do so unequally, that is a legitimate measure of unequal opportunity under Title IX. OCR has chosen to make substantial proportionality only one of three alternative measures.

Several parties also suggested that, in determining the number of participation opportunities offered by an institution, OCR count unfilled slots, i.e., those positions on a team that an institution claims the team can support but which are not filled by actual athletes. OCR must, however, count actual athletes because participation opportunities must be real, not illusory. Moreover, this makes sense because, under other parts of the Policy Interpretation, OCR considers the quality and kind of other benefits and opportunities offered to male and female athletes in determining overall whether an institution provides equal athletic opportunity. In this context, OCR must consider actual benefits provided to real students.

OCR also received comments that indicate that there is still confusion about the elimination and capping of men's teams in the context of Title IX compliance. The rules here are straightforward. An institution can choose to eliminate or cap teams as a way of complying with part one of the three-part test. However, nothing in the Clarification requires that an institution cap or eliminate participation opportunities for men. In fact, cutting or capping men's teams will not help an institution comply with part two or part three of the test because these tests measure an institution's positive, ongoing response to the interests and abilities of the underrepresented sex. Ultimately, Title IX provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities.

Finally, several parties suggested that OCR provide more information regarding the specific elements of an appropriate assessment of student interest and ability. The Policy Interpretation is intended to give institutions flexibility to determine interests and abilities consistent with the unique circumstances and needs of an institution. We recognize, however,

Page 5 - Dear Colleague

that it might be useful to share ideas on good assessment strategies. Accordingly, OCR will work to identify, and encourage institutions to share, good strategies that institutions have developed, as well as to facilitate discussions among institutions regarding potential assessment techniques.

OCR recognizes that the question of how to comply with Title IX and to provide equal athletic opportunities for all students is a significant challenge that many institutions face today, especially in the face of increasing budget constraints. It has been OCR's experience, however, that institutions committed to maintaining their men's program have been able to do so--and comply with Title IX--notwithstanding limited athletic budgets. In many cases, OCR and these institutions have worked together to find creative solutions that ensured equal opportunities in intercollegiate athletics. OCR is similarly prepared to join with other institutions in assisting them to address their own situations.

OCR is committed to continuing to work in partnership with colleges and universities to ensure that the promise of Title IX becomes a reality for all students. Thank you for your continuing interest in this subject.

Sincerely,

Norma V. Cantú
Assistant Secretary
for Civil Rights

Enclosure

## CLARIFICATION OF INTERCOLLEGIATE ATHLETICS POLICY GUIDANCE:
## THE THREE-PART TEST

The Office for Civil Rights (OCR) enforces Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (Title IX), which prohibits discrimination on the basis of sex in education programs and activities by recipients of federal funds. The regulation implementing Title IX, at 34 C.F.R. Part 106, effective July 21, 1975, contains specific provisions governing athletic programs, at 34 C.F.R. § 106.41, and the awarding of athletic scholarships, at 34 C.F.R. § 106.37(c). Further clarification of the Title IX regulatory requirements is provided by the Intercollegiate Athletics Policy Interpretation, issued December 11, 1979 (44 Fed. Reg. 71413 et seq. (1979)).[1]

The Title IX regulation provides that if an institution sponsors an athletic program it must provide equal athletic opportunities for members of both sexes. Among other factors, the regulation requires that an institution must effectively accommodate the athletic interests and abilities of students of both sexes to the extent necessary to provide equal athletic opportunity.

The 1979 Policy Interpretation provides that as part of this determination OCR will apply the following three-part test to assess whether an institution is providing nondiscriminatory participation opportunities for individuals of both sexes:

1.  Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

2.  Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the members of that sex; or

3.  Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a history and continuing practice of program expansion, as described above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. at 71418.

_____

[1]  The Policy Interpretation is designed for intercollegiate athletics. However, its general principles, and those of this Clarification, often will apply to elementary and secondary interscholastic athletic programs, which are also covered by the regulation. See 44 Fed. Reg. 71413.

Thus, the three-part test furnishes an institution with three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics. If an institution has met any part of the three-part test, OCR will determine that the institution is meeting this requirement.

It is important to note that under the Policy Interpretation the requirement to provide nondiscriminatory participation opportunities is only one of many factors that OCR examines to determine if an institution is in compliance with the athletics provision of Title IX. OCR also considers the quality of competition offered to members of both sexes in order to determine whether an institution effectively accommodates the interests and abilities of its students.

In addition, when an "overall determination of compliance" is made by OCR, 44 Fed. Reg. 71417, 71418, OCR examines the institution's program as a whole. Thus, OCR considers the effective accommodation of interests and abilities in conjunction with equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes to determine whether an institution provides equal athletic opportunity as required by Title IX. These other benefits include coaching, equipment, practice and competitive facilities, recruitment, scheduling of games, and publicity, among others. An institution's failure to provide nondiscriminatory participation opportunities usually amounts to a denial of equal athletic opportunity because these opportunities provide access to all other athletic benefits, treatment, and services.

This Clarification provides specific factors that guide an analysis of each part of the three-part test. In addition, it provides examples to demonstrate, in concrete terms, how these factors will be considered. These examples are intended to be illustrative, and the conclusions drawn in each example are based solely on the facts included in the example.

**THREE-PART TEST -- Part One:   Are Participation Opportunities Substantially Proportionate to Enrollment?**

Under part one of the three-part test (part one), where an institution provides intercollegiate level athletic participation opportunities for male and female students in numbers substantially proportionate to their respective full-time undergraduate enrollments, OCR will find that the institution is providing nondiscriminatory participation opportunities for individuals of both sexes.

OCR's analysis begins with a determination of the number of participation opportunities afforded to male and female athletes in

the intercollegiate athletic program.  The Policy Interpretation defines participants as those athletes:

a.    Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b.    Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

c.    Who are listed on the eligibility or squad lists maintained for each sport, or

d.    Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

44 Fed. Reg. at 71415.

OCR uses this definition of participant to determine the number of participation opportunities provided by an institution for purposes of the three-part test.

Under this definition, OCR considers a sport's season to commence on the date of a team's first intercollegiate competitive event and to conclude on the date of the team's final intercollegiate competitive event.  As a general rule, all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants by OCR.  In determining the number of participation opportunities for the purposes of the interests and abilities analysis, an athlete who participates in more than one sport will be counted as a participant in each sport in which he or she participates.

In determining participation opportunities, OCR includes, among others, those athletes who do not receive scholarships (e.g., walk-ons), those athletes who compete on teams sponsored by the institution even though the team may be required to raise some or all of its operating funds, and those athletes who practice but may not compete.  OCR's investigations reveal that these athletes receive numerous benefits and services, such as training and practice time, coaching, tutoring services, locker room facilities, and equipment, as well as important non-tangible benefits derived from being a member of an intercollegiate athletic team.  Because these are significant benefits, and because receipt of these benefits does not depend on their cost to the institution or whether the athlete competes, it is necessary to count all athletes who receive such benefits when determining the number of athletic opportunities provided to men and women.

3

OCR's analysis next determines whether athletic opportunities are substantially proportionate.  The Title IX regulation allows institutions to operate separate athletic programs for men and women.  Accordingly, the regulation allows an institution to control the respective number of participation opportunities offered to men and women.  Thus, it could be argued that to satisfy part one there should be no difference between the participation rate in an institution's intercollegiate athletic program and its full-time undergraduate student enrollment.

However, because in some circumstances it may be unreasonable to expect an institution to achieve exact proportionality--for instance, because of natural fluctuations in enrollment and participation rates or because it would be unreasonable to expect an institution to add athletic opportunities in light of the small number of students that would have to be accommodated to achieve exact proportionality--the Policy Interpretation examines whether participation opportunities are "substantially" proportionate to enrollment rates.  Because this determination depends on the institution's specific circumstances and the size of its athletic program, OCR makes this determination on a case-by-case basis, rather than through use of a statistical test.

As an example of a determination under part one:   If an institution's enrollment is 52 percent male and 48 percent female and 52 percent of the participants in the athletic program are male and 48 percent female, then the institution would clearly satisfy part one.  However, OCR recognizes that natural fluctuations in an institution's enrollment and/or participation rates may affect the percentages in a subsequent year.   For instance, if the institution's admissions the following year resulted in an enrollment rate of 51 percent males and 49 percent females, while the participation rates of males and females in the athletic program remained constant, the institution would continue to satisfy part one because it would be unreasonable to expect the institution to fine tune its program in response to this change in enrollment.

As another example, over the past five years an institution has had a consistent enrollment rate for women of 50 percent.  During this time period, it has been expanding its program for women in order to reach proportionality.  In the year that the institution reaches its goal--i.e., 50 percent of the participants in its athletic program are female--its enrollment rate for women increases to 52 percent.  Under these circumstances, the institution would satisfy part one.

OCR would also consider opportunities to be substantially proportionate when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available

4

competition to sustain an intercollegiate team.   As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution.

For instance, Institution A is a university with a total of 600 athletes.   While women make up 52 percent of the university's enrollment, they only represent 47 percent of its athletes.   If the university provided women with 52 percent of athletic opportunities, approximately 62 additional women would be able to participate.      Because   this   is   a   significant   number   of unaccommodated women, it is likely that a viable sport could be added.   If so, Institution A has not met part one.

As another example, at Institution B women also make up 52 percent of the university's enrollment and represent 47 percent of Institution B's athletes.      Institution B's athletic program consists of only 60 participants.   If the University provided women with 52 percent of athletic opportunities, approximately 6 additional women would be able to participate.      Since 6 participants are unlikely to support a viable team, Institution B would meet part one.

**THREE-PART TEST -- Part Two:   Is there a History and Continuing Practice of Program Expansion for the Underrepresented Sex?**

Under part two of the three-part test (part two), an institution can show that it has a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the underrepresented sex.   In effect, part two looks at an institution's past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion.[2]

OCR will review the entire history of the athletic program, focusing on the participation opportunities provided for the underrepresented sex.   First, OCR will assess whether past actions of the institution have expanded participation opportunities for the underrepresented sex in a manner that was demonstrably responsive to their developing interests and abilities.   Developing

---

[2] Part two focuses on whether an institution has expanded the number of intercollegiate participation opportunities provided to the underrepresented sex.      Improvements in the quality of competition, and of other athletic benefits, provided to women athletes, while not considered under the three-part test, can be considered by OCR in making an overall determination of compliance with the athletics provision of Title IX.

5

interests include interests that already exist at the institution.[3] There are no fixed intervals of time within which an institution must have added participation opportunities. Neither is a particular number of sports dispositive. Rather, the focus is on whether the program expansion was responsive to developing interests and abilities of the underrepresented sex. In addition, the institution must demonstrate a continuing (i.e., present) practice of program expansion as warranted by developing interests and abilities.

OCR will consider the following factors, among others, as evidence that may indicate a history of program expansion that is demonstrably responsive to the developing interests and abilities of the underrepresented sex:

- an institution's record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex;

- an institution's record of increasing the numbers of participants in intercollegiate athletics who are members of the underrepresented sex; and

- an institution's affirmative responses to requests by students or others for addition or elevation of sports.

OCR will consider the following factors, among others, as evidence that may indicate a continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of the underrepresented sex:

- an institution's current implementation of a nondiscriminatory policy or procedure for requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students; and

- an institution's current implementation of a plan of program expansion that is responsive to developing interests and abilities.

OCR would also find persuasive an institution's efforts to monitor developing interests and abilities of the underrepresented sex, for

---

[3] However, under this part of the test an institution is not required, as it is under part three, to accommodate all interests and abilities of the underrepresented sex. Moreover, under part two an institution has flexibility in choosing which teams it adds for the underrepresented sex, as long as it can show overall a history and continuing practice of program expansion for members of that sex.

6

example, by conducting periodic nondiscriminatory assessments of developing interests and abilities and taking timely actions in response to the results.

In the event that an institution eliminated any team for the underrepresented sex, OCR would evaluate the circumstances surrounding this action in assessing whether the institution could satisfy part two of the test. However, OCR will not find a history and continuing practice of program expansion where an institution increases the proportional participation opportunities for the underrepresented sex by reducing opportunities for the overrepresented sex alone or by reducing participation opportunities for the overrepresented sex to a proportionately greater degree than for the underrepresented sex. This is because part two considers an institution's good faith remedial efforts through actual program expansion. It is only necessary to examine part two if one sex is overrepresented in the athletic program. Cuts in the program for the underrepresented sex, even when coupled with cuts in the program for the overrepresented sex, cannot be considered remedial because they burden members of the sex already disadvantaged by the present program. However, an institution that has eliminated some participation opportunities for the underrepresented sex can still meet part two if, overall, it can show a history and continuing practice of program expansion for that sex.

In addition, OCR will not find that an institution satisfies part two where it established teams for the underrepresented sex only at the initiation of its program for the underrepresented sex or where it merely promises to expand its program for the underrepresented sex at some time in the future.

The following examples are intended to illustrate the principles discussed above.

At the inception of its women's program in the mid-1970s, Institution C established seven teams for women. In 1984 it added a women's varsity team at the request of students and coaches. In 1990 it upgraded a women's club sport to varsity team status based on a request by the club members and an NCAA survey that showed a significant increase in girls high school participation in that sport. Institution C is currently implementing a plan to add a varsity women's team in the spring of 1996 that has been identified by a regional study as an emerging women's sport in the region. The addition of these teams resulted in an increased percentage of women participating in varsity athletics at the institution. Based on these facts, OCR would find Institution C in compliance with part two because it has a history of program expansion and is continuing to expand its program for women in response to their developing interests and abilities.

By 1980, Institution D established seven teams for women.

Institution D added a women's varsity team in 1983 based on the requests of students and coaches. In 1991 it added a women's varsity team after an NCAA survey showed a significant increase in girls' high school participation in that sport. In 1993 Institution D eliminated a viable women's team and a viable men's team in an effort to reduce its athletic budget. It has taken no action relating to the underrepresented sex since 1993. Based on these facts, OCR would not find Institution D in compliance with part two. Institution D cannot show a continuing practice of program expansion that is responsive to the developing interests and abilities of the underrepresented sex where its only action since 1991 with regard to the underrepresented sex was to eliminate a team for which there was interest, ability and available competition.

In the mid-1970s, Institution E established five teams for women. In 1979 it added a women's varsity team. In 1984 it upgraded a women's club sport with twenty-five participants to varsity team status. At that time it eliminated a women's varsity team that had eight members. In 1987 and 1989 Institution E added women's varsity teams that were identified by a significant number of its enrolled and incoming female students when surveyed regarding their athletic interests and abilities. During this time it also increased the size of an existing women's team to provide opportunities for women who expressed interest in playing that sport. Within the past year, it added a women's varsity team based on a nationwide survey of the most popular girls high school teams. Based on the addition of these teams, the percentage of women participating in varsity athletics at the institution has increased. Based on these facts, OCR would find Institution E in compliance with part two because it has a history of program expansion and the elimination of the team in 1984 took place within the context of continuing program expansion for the underrepresented sex that is responsive to their developing interests.

Institution F started its women's program in the early 1970s with four teams. It did not add to its women's program until 1987 when, based on requests of students and coaches, it upgraded a women's club sport to varsity team status and expanded the size of several existing women's teams to accommodate significant expressed interest by students. In 1990 it surveyed its enrolled and incoming female students; based on that survey and a survey of the most popular sports played by women in the region, Institution F agreed to add three new women's teams by 1997. It added a women's team in 1991 and 1994. Institution F is implementing a plan to add a women's team by the spring of 1997. Based on these facts, OCR would find Institution F in compliance with part two. Institution F's program history since 1987 shows that it is committed to program expansion for the underrepresented sex and it is continuing to expand its women's program in light of women's developing interests and abilities.

**THREE-PART TEST -- Part Three:   Is the Institution Fully and Effectively Accommodating the Interests and Abilities of the Underrepresented Sex?**

Under part three of the three-part test (part three) OCR determines whether an institution is fully and effectively accommodating the interests and abilities of its students who are members of the underrepresented sex--including students who are admitted to the institution though not yet enrolled.   Title IX provides that a recipient must provide equal athletic opportunity to its students. Accordingly, the Policy Interpretation does not require an institution to accommodate the interests and abilities of potential students.[*]

While disproportionately high athletic participation rates by an institution's students of the overrepresented sex (as compared to their enrollment rates) may indicate that an institution is not providing equal athletic opportunities to its students of the underrepresented sex, an institution can satisfy part three where there is evidence that the imbalance does not reflect discrimination, i.e., where it can be demonstrated that, notwithstanding disproportionately low participation rates by the institution's students of the underrepresented sex, the interests and abilities of these students are, in fact, being fully and effectively accommodated.

In making this determination, OCR will consider whether there is (a) unmet interest in a particular sport; (b) sufficient ability to sustain a team in the sport; and (c) a reasonable expectation of competition for the team.   If all three conditions are present OCR will find that an institution has not fully and effectively accommodated the interests and abilities of the underrepresented sex.

If an institution has recently eliminated a viable team from the intercollegiate program, OCR will find that there is sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport unless an institution can provide strong evidence that interest, ability, or available competition no longer exists.

a)   Is there sufficient unmet interest to support an intercollegiate team?

---

[*]   However, OCR does examine an institution's recruitment practices under another part of the Policy Interpretation.   See 44 Fed. Reg. 71417.   Accordingly, where an institution recruits potential student athletes for its men's teams, it must ensure that women's teams are provided with substantially equal opportunities to recruit potential student athletes.

9

OCR will determine whether there is sufficient unmet interest among the institution's students who are members of the underrepresented sex to sustain an intercollegiate team.  OCR will look for interest by the underrepresented sex as expressed through the following indicators, among others:

- requests by students and admitted students that a particular sport be added;

- requests that an existing club sport be elevated to intercollegiate team status;

- participation in particular club or intramural sports;

- interviews with students, admitted students, coaches, administrators and others regarding interest in particular sports;

- results of questionnaires of students and admitted students regarding interests in particular sports; and

- participation in particular interscholastic sports by admitted students.

In addition, OCR will look at participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students in order to ascertain likely interest and ability of its students and admitted students in particular sport(s).[5]   For example, where OCR's investigation finds that a substantial number of high schools from the relevant region offer a particular sport which the institution does not offer for the underrepresented sex, OCR will ask the institution to provide a basis for any assertion that its students and admitted students are not interested in playing that sport.  OCR may also interview students, admitted students, coaches, and others regarding interest in that sport.

An institution may evaluate its athletic program to assess the athletic interest of its students of the underrepresented sex using nondiscriminatory methods of its choosing.   Accordingly, institutions have flexibility in choosing a nondiscriminatory method of determining athletic interests and abilities provided they meet certain requirements.  See 44 Fed. Reg. at 71417.   These assessments may use straightforward and inexpensive techniques, such as a student questionnaire or an open forum, to identify

---

[5] While these indications of interest may be helpful to OCR in ascertaining likely interest on campus, particularly in the absence of more direct indicia, an institution is expected to meet the actual interests and abilities of its students and admitted students.

students' interests and abilities. Thus, while OCR expects that an institution's assessment should reach a wide audience of students and should be open-ended regarding the sports students can express interest in, OCR does not require elaborate scientific validation of assessments.

An institution's evaluation of interest should be done periodically so that the institution can identify in a timely and responsive manner any developing interests and abilities of the underrepresented sex. The evaluation should also take into account sports played in the high schools and communities from which the institution draws its students both as an indication of possible interest on campus and to permit the institution to plan to meet the interests of admitted students of the underrepresented sex.

b)  Is there sufficient ability to sustain an intercollegiate team?

Second, OCR will determine whether there is sufficient ability among interested students of the underrepresented sex to sustain an intercollegiate team. OCR will examine indications of ability such as:

- the athletic experience and accomplishments--in interscholastic, club or intramural competition--of students and admitted students interested in playing the sport;

- opinions of coaches, administrators, and athletes at the institution regarding whether interested students and admitted students have the potential to sustain a varsity team; and

- if the team has previously competed at the club or intramural level, whether the competitive experience of the team indicates that it has the potential to sustain an intercollegiate team.

Neither a poor competitive record nor the inability of interested students or admitted students to play at the same level of competition engaged in by the institution's other athletes is conclusive evidence of lack of ability. It is sufficient that interested students and admitted students have the potential to sustain an intercollegiate team.

c)  Is there a reasonable expectation of competition for the team?

Finally, OCR determines whether there is a reasonable expectation of intercollegiate competition for a particular sport in the institution's normal competitive region. In evaluating available competition, OCR will look at available competitive opportunities in the geographic area in which the institution's athletes primarily compete, including:

- competitive opportunities offered by other schools against

which the institution competes; and

- competitive opportunities offered by other schools in the institution's geographic area, including those offered by schools against which the institution does not now compete.

Under the Policy Interpretation, the institution may also be required to actively encourage the development of intercollegiate competition for a sport for members of the underrepresented sex when overall athletic opportunities within its competitive region have been historically limited for members of that sex.

**CONCLUSION**

This discussion clarifies that institutions have three distinct ways to provide individuals of each sex with nondiscriminatory participation opportunities. The three-part test gives institutions flexibility and control over their athletics programs. For instance, the test allows institutions to respond to different levels of interest by its male and female students. Moreover, nothing in the three-part test requires an institution to eliminate participation opportunities for men.

At the same time, this flexibility must be used by institutions consistent with Title IX's requirement that they not discriminate on the basis of sex. OCR recognizes that institutions face challenges in providing nondiscriminatory participation opportunities for their students and will continue to assist institutions in finding ways to meet these challenges.

# EXHIBIT F



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

APR 2 0 2010

Dear Colleague:

Title IX of the Education Amendments of 1972[1] (Title IX) prohibits discrimination on the basis of sex in education programs and activities by recipients of Federal financial assistance, which include schools, colleges and universities.  Since its passage, Title IX has dramatically increased academic, athletic and employment opportunities for women and girls.  Title IX stands for the proposition that equality of opportunity in America is not rhetoric, but rather a guiding principle.

Although there has been indisputable progress since Title IX was enacted, notably in interscholastic and intercollegiate athletic programs, sex discrimination unfortunately continues to exist in many education programs and activities.  I am committed to the vigorous enforcement of Title IX to resolve this discrimination and to provide clear policy guidance to assist a recipient institution (institution) in making the promise of Title IX a reality for all.

To that end, on behalf of the Office for Civil Rights (OCR) of the U.S. Department of Education (Department), it is my pleasure to provide you with this "Intercollegiate Athletics Policy Clarification:  The Three-Part Test – Part Three."  With this letter, the Department is withdrawing the "Additional Clarification of Intercollegiate Athletics Policy: Three Part Test – Part Three" (2005 Additional Clarification) and all related documents accompanying it, including the "User's Guide to Student Interest Surveys under Title IX" (User's Guide) and related technical report, that were issued by the Department on March 17, 2005.

OCR enforces Title IX and its implementing regulation.[2]  The regulation contains specific provisions governing athletic programs[3] and the awarding of athletic scholarships.[4]  Specifically, the Title IX regulation provides that if an institution operates or sponsors an athletic program, it must provide equal athletic opportunities for members of both sexes.[5]  In determining whether equal athletic opportunities are available, the regulation requires OCR to consider whether an institution is effectively accommodating the athletic interests and abilities of students of both sexes.[6]

---

[1] 20 U.S.C. § 1681 et seq.

[2] 34 C.F.R. Part 106.

[3] 34 C.F.R. § 106.41.

[4] 34 C.F.R. § 106.37(c).

[5] 34 C.F.R. § 106.41(c).

[6] 34 C.F.R. § 106.41(c)(1).  The Title IX regulation at 34 C.F.R. § 106.41(c) provides that OCR also will consider other factors when determining whether equal athletic opportunity is available at an institution.  This Dear Colleague

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-1100
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

The "Intercollegiate Athletics Policy Interpretation"[7] (1979 Policy Interpretation), published on December 11, 1979, provides additional guidance on the Title IX intercollegiate athletic regulatory requirements.[8]  The 1979 Policy Interpretation sets out a three-part test that OCR uses to assess whether an institution is effectively accommodating the athletic interests and abilities of its students to the extent necessary to provide equal athletic opportunity.[9]  On January 16, 1996, OCR issued the "Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test" (1996 Clarification) to provide additional clarification on all parts of the three-part test, including the specific factors that OCR uses to evaluate compliance under the third part of the three-part test (Part Three).[10]

In 2005, OCR issued the Additional Clarification regarding application of the indicators in the 1996 Clarification that guided OCR's analysis of Part Three.  The accompanying User's Guide included a prototype survey instrument (model survey) that institutions could use to measure student interest in participating in intercollegiate athletics and included specific guidance on its implementation.  The Additional Clarification and User's Guide changed OCR's approach from an analysis of multiple indicators to a reliance on a single survey instrument to demonstrate that an institution is accommodating student interests and abilities in compliance with Part Three.  After careful review, OCR has determined that the 2005 Additional Clarification and the User's Guide are inconsistent with the nondiscriminatory methods of assessment set forth in the 1979 Policy Interpretation and the 1996 Clarification and do not provide the appropriate and necessary clarity regarding nondiscriminatory assessment methods, including surveys, under Part Three.  Accordingly, the Department is withdrawing the 2005 Additional Clarification and User's Guide, including the model survey.  All other Department policies on Part Three remain in effect and provide the applicable standards for evaluating Part Three compliance.

Given the resource limitations faced by institutions throughout the nation and the effect on institutions' athletics programs, I recognize the importance of assisting institutions in developing their own assessment methods that retain the flexibility to meet their unique circumstances, but are consistent with the nondiscrimination requirements of the Title IX regulation.  Therefore, this Dear Colleague letter reaffirms, and provides additional clarification

---

letter only addresses the regulatory requirement, at 34 C.F.R. § 106.41(c)(1), to effectively accommodate interests and abilities.

[7] 44 Fed. Reg. 71413 (1979).  The 1979 Policy Interpretation was published by the former Department of Health, Education, and Welfare, and was adopted by the Department of Education when it was established in 1980.

[8] Although the 1979 Policy Interpretation is designed for intercollegiate athletics, its general principles, and those of this letter, often will apply to interscholastic, club, and intramural athletic programs.  44 Fed. Reg. at 71413. Furthermore, the Title IX regulation requires institutions to provide equal athletic opportunities in intercollegiate, interscholastic, club, and intramural athletics.  34 C.F.R. § 106.41(c).

[9] As discussed in the 1979 Policy Interpretation, OCR also considers the quality of competitive opportunities offered to members of both sexes in determining whether an institution effectively accommodates the athletic interests and abilities of its students.  44 Fed. Reg. at 71418.

[10] OCR's "Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance," which was issued as a Dear Colleague letter on July 11, 2003, also reincorporated the 1996 Clarification's broad range of specific factors and illustrative examples.

on, the multiple indicators discussed in the 1996 Clarification that guide OCR's analysis of whether institutions are in compliance with Part Three, as well as the nondiscriminatory implementation of a survey as one assessment technique.

## The Three-Part Test

As discussed above, OCR uses the three-part test to determine whether an institution is providing nondiscriminatory athletic participation opportunities in compliance with the Title IX regulation.  The test provides the following three compliance options:

1.  Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

2.  Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the members of that sex; or

3.  Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a history and continuing practice of program expansion, as described above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.[11]

The three-part test is intended to allow institutions to maintain flexibility and control over their athletic programs consistent with Title IX's nondiscrimination requirements.  As stated in the 1996 Clarification, "[T]he three-part test furnishes an institution with three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics.  If an institution has met any part of the three-part test, OCR will determine that the institution is meeting this requirement."

## Part Three of the Three-Part Test — Fully and Effectively Accommodating the Interests and Abilities of the Underrepresented Sex

This letter focuses on Part Three — whether an institution is fully and effectively accommodating the athletic interests and abilities of the underrepresented sex.  As the 1996 Clarification indicates, while disproportionately high athletic participation rates by an institution's students of the overrepresented sex (as compared to their enrollment rates) may indicate that an institution is not providing equal athletic opportunities to its students of the underrepresented sex, an institution can satisfy Part Three if it can show that the underrepresented sex is not being denied opportunities, i.e., that the interests and abilities of

---

[11] 44 Fed. Reg. at 71418.

the underrepresented sex are fully and effectively accommodated. This letter provides information that guides OCR in its evaluation of compliance with Part Three and the nondiscriminatory implementation of assessments of students' athletic interests and abilities under it.

Under Part Three, the focus is on full and effective accommodation of the interests and abilities of the institution's students who are members of the underrepresented sex — including students who are admitted to the institution though not yet enrolled.[12] As stated in the 1996 Clarification, and as further discussed below, in determining compliance with Part Three, OCR considers all of the following three questions:

1. Is there unmet interest in a particular sport?

2. Is there sufficient ability to sustain a team in the sport?

3. Is there a reasonable expectation of competition for the team?

If the answer to all three questions is "Yes," OCR will find that an institution is not fully and effectively accommodating the interests and abilities of the underrepresented sex and therefore is not in compliance with Part Three.

### A. Unmet Interest and Ability — OCR Evaluation Criteria

In determining whether an institution has unmet interest and ability to support an intercollegiate team in a particular sport, OCR evaluates a broad range of indicators, including:

- whether an institution uses nondiscriminatory methods of assessment when determining the athletic interests and abilities of its students;
- whether a viable team for the underrepresented sex recently was eliminated;
- multiple indicators of interest;
- multiple indicators of ability; and
- frequency of conducting assessments.

Each of these five criteria is described below. Following the discussion of these criteria, this section provides technical assistance recommendations for effective assessment procedures and the nondiscriminatory implementation of a survey as one component of assessing the interests and abilities of students of the underrepresented sex. This section concludes with a discussion of the multiple indicators OCR evaluates to determine whether there are a sufficient number of students with unmet interest and ability to sustain a new intercollegiate team.

---

[12] OCR examines an institution's recruitment practices under another part of the 1979 Policy Interpretation. See 44 Fed. Reg. at 71417. Accordingly, where an institution recruits potential student athletes for its men's teams, it must ensure that its women's teams are provided with substantially equal opportunities to recruit potential student athletes.

### 1. Nondiscriminatory Methods of Assessment

Under Part Three, OCR evaluates whether an institution uses processes and methods for assessing the athletic interests and abilities of its students of the underrepresented sex that are consistent with the nondiscrimination standards set forth in the 1979 Policy Interpretation. The 1979 Policy Interpretation states that institutions may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing provided:

a. The processes take into account the nationally increasing levels of women's interests and abilities;

b. The methods of determining interest and ability do not disadvantage the members of an underrepresented sex;

c. The methods of determining ability take into account team performance records; and

d. The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex.[13]

An institution should document its assessment of students' interests and abilities.

### 2. Assessments Not Used To Eliminate Viable Teams

As discussed in the 1996 Clarification, if an institution recently has eliminated a viable team for the underrepresented sex from the intercollegiate athletics program, OCR will find that there is sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport and thus there would be a presumption that the institution is not in compliance with Part Three. This presumption can be overcome if the institution can provide strong evidence that interest, ability, or competition no longer exists.

Accordingly, OCR does not consider the failure by students to express interest during a survey under Part Three as evidence sufficient to justify the elimination of a current and viable intercollegiate team for the underrepresented sex. In other words, students participating on a viable intercollegiate team have expressed interest by active participation, and OCR does not use survey results to nullify that expressed interest.

### 3. Multiple Indicators Evaluated to Assess Interest

OCR considers a broad range of indicators to assess whether there is unmet athletic interest among the underrepresented sex. These indicators guide OCR in determining whether the institution has measured the interests of students of the underrepresented sex using nondiscriminatory methods consistent with the 1979 Policy Interpretation. As discussed in the

---

[13] 44 Fed. Reg. at 71417.

1996 Clarification, OCR evaluates the interests of the underrepresented sex by examining the following list of non-exhaustive indicators:

- requests by students and admitted students that a particular sport be added;
- requests for the elevation of an existing club sport to intercollegiate status;
- participation in club or intramural sports;
- interviews with students, admitted students, coaches, administrators and others regarding interests in particular sports;
- results of surveys or questionnaires of students and admitted students regarding interests in particular sports;[14]
- participation in interscholastic sports by admitted students; and
- participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students.[15]

In accordance with the 1996 Clarification, OCR also will consider the likely interest[16] of the underrepresented sex by looking at participation in intercollegiate sports in the institution's normal competitive regions.

### 4. Multiple Indicators Evaluated to Assess Ability

As discussed in the 1996 Clarification, OCR considers a range of indicators to assess whether there is sufficient ability among interested students of the underrepresented sex to sustain a team in the sport. When making this determination, OCR examines indicators such as:

- the athletic experience and accomplishments — in interscholastic, club or intramural competition — of underrepresented students and admitted students interested in playing the sport;

---

[14] OCR evaluates all of the indicators discussed here so OCR does not consider survey results alone as sufficient evidence of lack of interest under Part Three.

[15] As discussed in the 1996 Clarification, this indicator may be helpful to OCR in ascertaining likely interest of an institution's students and admitted students in particular sports, especially in the absence of more direct indicia. However, in conducting its investigations, OCR determines whether an institution is meeting the actual interests and abilities of its students and admitted students.

An institution's evaluation should take into account sports played in the high schools and communities from which it draws its students, both as an indication of possible interest at the institution, and to permit the institution to plan to meet the interests of admitted students of the underrepresented sex. For example, if OCR's investigation finds that a substantial number of high schools from the relevant region offer a particular sport that the institution does not offer for the underrepresented sex, OCR will ask the institution to provide a basis for any assertion that its students and admitted students are not interested in playing that sport. OCR also may interview students, admitted students, coaches, and others regarding interest in that sport.

[16] See Footnote 15 above.

- opinions of coaches, administrators, and athletes at the institution regarding whether interested students and admitted students have the potential to sustain an intercollegiate team; and
- if the team has previously competed at the club or intramural level, whether the competitive experience of the team indicates that it has the potential to sustain an intercollegiate team.

Additionally, because OCR recognizes that students may have a broad range of athletic experiences and abilities, OCR also examines other indications of ability such as:

- participation in other sports, intercollegiate, interscholastic or otherwise, that may demonstrate skills or abilities that are fundamental to the particular sport being considered; and
- tryouts or other direct observations of participation in the particular sport in which there is interest.

As the 1996 Clarification indicated, neither a poor competitive record, nor the inability of interested students or admitted students to play at the same level of competition engaged in by the institution's other athletes, is conclusive evidence of lack of ability. For the purposes of assessing ability, it is sufficient that interested students and admitted students have the potential to sustain an intercollegiate team.

### 5. Frequency of Assessments

As discussed in the 1996 Clarification, OCR evaluates whether an institution assesses interest and ability periodically so that the institution can identify in a timely and responsive manner any developing interests and abilities of the underrepresented sex. There are several factors OCR considers when determining the rate of frequency for conducting an assessment. These factors include, but are not limited to:

- the degree to which the previous assessment captured the interests and abilities of the institution's students and admitted students of the underrepresented sex;
- changes in demographics or student population at the institution;[17] and
- whether there have been complaints from the underrepresented sex with regard to a lack of athletic opportunities or requests for the addition of new teams.

Further, OCR will consider whether an institution conducts more frequent assessments if a previous assessment detected levels of student interest and ability in any sport that were close to the minimum number of players required to sustain a team.

---

[17] For example, in a typical four-year institution, the student body population will change substantially each year, by approximately 25 percent annually.

### 6. Effective Procedures for Evaluating Requests to Add Teams and Assessing Participation

An institution has a continuing obligation to comply with Title IX's nondiscrimination requirements; thus, OCR recommends that institutions have effective ongoing procedures for collecting, maintaining, and analyzing information on the interests and abilities of students of the underrepresented sex, including easily understood policies and procedures for receiving and responding to requests for additional teams, and wide dissemination of such policies and procedures to existing and newly admitted students, as well as to coaches and other employees.

OCR also recommends that institutions develop procedures for, and maintain documentation from, routine monitoring of participation of the underrepresented sex in club and intramural sports as part of their assessment of student interests and abilities.  OCR further recommends that institutions develop procedures for, and maintain documentation from, evaluations of the participation of the underrepresented sex in high school athletic programs, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students.  This is the type of documentation that may be needed in order for an institution to demonstrate that it is assessing interests and abilities in compliance with Part Three.

The Title IX regulation requires institutions to designate at least one employee to coordinate their efforts to comply with and carry out their Title IX responsibilities.[18]  Therefore, institutions may wish to consider whether the monitoring and documentation of participation in club, intramural, and interscholastic sports and the processing of requests for the addition or elevation of athletic teams should be part of the responsibilities of their Title IX coordinators in conjunction with their athletic departments.  Another option an institution may wish to consider is to create a Title IX committee to carry out these functions.  If an institution chooses to form such a committee, it should include the Title IX coordinator as part of the committee and provide appropriate training on the Title IX requirements for committee members.

### 7. Survey May Assist in Capturing Information on Students' Interests and Abilities

As discussed in the 1996 Clarification, institutions may use a variety of techniques to identify students' interests and abilities.  OCR recognizes that a properly designed and implemented survey is one tool that can assist an institution in capturing information on students' interests and abilities.  OCR evaluates a survey as one component of an institution's overall assessment under Part Three and will not accept an institution's reliance on a survey alone, regardless of the response rate, to determine whether it is fully and effectively accommodating the interests and abilities of its underrepresented students.  If an institution conducts a survey as part of its assessment, OCR examines the content, implementation and response rates of the survey, as well as an institution's other methods of measuring interest and ability.

---

[18] 34 C.F.R. § 106.8(a).

Under Part Three, OCR evaluates the overall weight it will accord the conclusions drawn by an institution from the results of a survey by examining the following factors, among others:

- content of the survey;
- target population surveyed;
- response rates and treatment of non-responses;
- confidentiality protections; and
- frequency of conducting the survey.

OCR also considers whether a survey is implemented in such a way as to maximize the possibility of obtaining accurate information and facilitating responses. A properly designed survey should effectively capture information on interest and ability[19] across multiple sports, without complicating responses with superfluous or confusing questions.

OCR has not endorsed or sanctioned any particular survey; however, for technical assistance purposes, this letter contains information that an institution may wish to consider in developing its own survey.

a.  Content of the Survey

i.  *Purpose*

To ensure students understand the importance of responding to the survey, OCR evaluates whether a survey clearly states its purpose. For technical assistance purposes, an example of a purpose statement might be:

**Purpose:** This data collection is being conducted for evaluation, research, and planning purposes and may be used along with other information to determine whether [Institution] is effectively accommodating the athletic interests and abilities of its students, including whether to add additional teams.

ii.  *Collect information regarding all sports*

In addition, OCR evaluates whether the survey lists all sports for the underrepresented sex recognized by the three primary national intercollegiate athletic associations,[20] and contains an open-ended inquiry for other sports to allow students to write in any sports that are not

---

[19] Experience in sports generally is one indicator of ability.

[20] These associations are the National Collegiate Athletic Association, the National Association of Intercollegiate Athletics, and the National Junior College Athletic Association. A current list of these sports for both sexes is: baseball, basketball, bowling, cross country, fencing, field hockey, football, golf, gymnastics, ice hockey, lacrosse, rifle, rowing, skiing, soccer, softball, swimming and diving, tennis, indoor track and field, outdoor track and field, volleyball, water polo, and wrestling.

listed.[21]  OCR considers whether the survey allows students to identify their interest in future or current participation in all of the sports they identify and general athletic experience.  OCR also considers whether the survey allows students to provide additional information or comments about their interest, experience, and ability.  For technical assistance purposes, the types of questions an institution could ask regarding interest in future participation, current participation, and prior athletic experience might be:

| Sport | Interest in Future Participation: At what level do you wish to participate in this sport at [Institution]? | Current Participation: At what level are you participating in this sport? | Prior Experience: At what level did you participate in this sport or any other relevant sport in high school, college, or in another capacity? | |
|---|---|---|---|---|
| Basketball | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ | College<br>☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | High School<br>☐ Varsity<br>☐ Junior Varsity<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ |
| Lacrosse | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ | College<br>☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | High School<br>☐ Varsity<br>☐ Junior Varsity<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ |
| Other sport identified by student[22] | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ | College<br>☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | High School<br>☐ Varsity<br>☐ Junior Varsity<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ |

### iii.  Contact Information

OCR also looks at whether an institution requests contact information, to allow the institution to follow-up with students who wish to be contacted regarding their interests and abilities.

### b.  Target Population Surveyed

OCR considers the target population surveyed at the institution.  Under Part Three, OCR evaluates whether the survey is administered as a census to all full-time undergraduate

---

[21] An open-ended inquiry for other sports should be prominent or otherwise readily visible and contain a line or other mechanism for students to write in the sport for which they wish to express interest and ability.

[22] If the survey is provided in paper form, an institution should provide a surplus of rows to ensure that a respondent can provide information for all the sports for which there is interest.

students of the underrepresented sex and admitted students of the underrepresented sex.[23] Using a census of all students can avoid several issues associated with sample surveys including, but not limited to:  selection of the sampling mechanism, selection of the sample size, calculation of sampling error, and using sample estimates.  If an institution intends to administer a survey to a sample population to gauge an estimate of interests and abilities, the larger the sample, the more weight OCR will accord the estimate.

### c.  Responses:  Rates and Treatment of Non-Responses

OCR evaluates whether the survey is administered in a manner designed to generate high response rates and how institutions treat responses and non-responses.

OCR looks at whether institutions provide the survey in a context that encourages high response rates, and whether institutions widely publicize the survey; give students, including those participating in club or intramural sports, advance notice of the survey; and provide students adequate time to respond.  Generally, OCR accords more weight to a survey with a higher response rate than a survey with a lower response rate, and institutions may want to distribute the survey through multiple mechanisms to increase the response rate.

For example, for enrolled students, an institution may want to administer the survey as part of a mandatory activity, such as during course registration.  If administered as part of a mandatory activity, students also should have the option of completing the survey at a later date in order to ensure that they have adequate time to respond.  Students who indicate that they wish to complete the survey at a later time should be given the opportunity to provide their contact information to enable the institution to take steps to ensure that they complete the survey.  An institution should follow-up with those students who indicate that they wish to respond in the future.

An institution also may choose to send an email to the entire target population that includes a link to the survey.  If an institution's assessment process includes email, OCR considers whether the institution takes appropriate cautionary measures, such as ensuring that it has accurate email addresses and that the target population has access to email.[24]  OCR also expects institutions to take additional steps to follow-up with those who do not respond, including sending widely publicized reminder notices.

If institutions administer the survey through a web-based distribution system, students who indicate that they have no current interest[25] in athletic participation should be asked to confirm their lack of interest before they exit the system.  If response rates using the methods described

---

[23] For example, institutions may distribute surveys to all admitted students of the underrepresented sex with acceptance letters.

[24] OCR also evaluates whether the survey is administered in a manner designed to ensure the accurate identity of the respondent and to protect against multiple responses by the same individual.

[25] Students may have, or may be unaware of whether they will have, a future interest in athletic participation.

above are low, an institution should consider administering the survey in another manner to obtain higher response rates.

OCR does not consider non-responses to surveys as evidence of lack of interest or ability in athletics. As discussed above, regardless of whether students respond to a survey, OCR also evaluates whether students' interest and abilities are assessed using the multiple indicators described above.

### d. Confidentiality Protections

OCR also looks at whether institutions notify students that all responses as well as any personally identifiable information they provide will be kept confidential, although the aggregate survey information will be shared with athletic directors, coaches, and other staff, as appropriate. When requesting any personal or personally identifiable data, protecting the respondents' confidentiality helps to ensure that institutions obtain high-quality data and high response rates. If a student has expressed interest in being contacted when responding to the survey, an institution should continue to maintain the student's confidentiality except to the extent needed to follow-up with the student.

### e. Frequency of Conducting the Survey

As discussed above, OCR evaluates whether an institution periodically conducts an assessment of interest and abilities. In addition to the factors OCR considers when determining the rate of frequency for conducting an assessment, OCR also will consider factors such as the size of the previously assessed survey population and the rate of response to the immediately preceding survey(s) conducted by the institution, if any.

## 8. Multiple Indicators Evaluated to Assess Sufficient Number of Interested and Able Students to Sustain a Team

Under Part Three, institutions are not required to create an intercollegiate team or elevate a club team to intercollegiate status unless there are a sufficient number of interested and able students to sustain a team. When OCR evaluates whether there are a sufficient number of students, OCR considers such indicators as the:

- minimum number of participants needed for a particular sport;
- opinions of athletic directors and coaches concerning the abilities required to field an intercollegiate team; and
- size of a team in a particular sport at institutions in the governing athletic association or conference to which the institution belongs or in the institution's competitive regions.

When evaluating the minimum number of athletes needed, OCR may consider factors such as the:

- rate of substitutions necessitated by factors such as length of competitions, intensity of play, or injury;
- variety of skill sets required for competition; and
- minimum number of athletes needed to conduct effective practices for skill development.

## B. Reasonable Expectation of Competition — OCR Evaluation Criteria

Lastly, as indicated in the 1996 Clarification, OCR evaluates whether there is a reasonable expectation of intercollegiate competition for the team in the institution's normal competitive regions. In evaluating available competition, OCR considers available competitive opportunities in the geographic area in which the institution's athletes primarily compete, including:

- competitive opportunities offered by other schools against which the institution competes; and
- competitive opportunities offered by other schools in the institution's geographic area, including those offered by schools against which the institution does not now compete.[26]

If the information or documentation compiled by the institution during the assessment process shows that there is sufficient interest and ability to support a new intercollegiate team and a reasonable expectation of intercollegiate competition in the institution's normal competitive region for the team, the institution is under an obligation to create an intercollegiate team within a reasonable period of time in order to comply with Part Three.

## Conclusion

The three-part test gives institutions flexibility and affords them control over their athletics programs. This flexibility, however, must be used consistent with Title IX's nondiscrimination requirements. OCR will continue to work with institutions to assist them in finding ways to address their particular circumstances and comply with Title IX. For technical assistance, please contact the OCR enforcement office that serves your area, found at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm.

Sincerely,

Russlynn Ali
Assistant Secretary for Civil Rights

---

[26] Under the 1979 Policy Interpretation, an institution also may be required to actively encourage the development of intercollegiate competition for a sport for members of the underrepresented sex when overall athletic opportunities within its competitive region have been historically limited for members of that sex. 44 Fed. Reg. at 71418.



**INTERNET ARCHIVE WAYBACK MACHINE**

**June 12, 2002  NCAA.org**

**News & Publications**

**Online Publication:**

*Achieving Gender Equity:  A Basic Guide to Title IX and Gender Equity in Athletics for Colleges and Universities*

# Introduction

*No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.*

Title IX of the
Education Amendments of 1972 to the 1964 Civil Rights Act

*An athletics program can be considered gender equitable when the participants in both the men's and women's sports programs would accept as fair and equitable the overall program of the other gender. No individual should be discriminated against on the basis of gender, institutionally or nationally, in intercollegiate athletics.*

NCAA Gender-Equity Task Force

In the spring of 1992, the NCAA Gender-Equity Task Force was created in response to growing gender-equity concerns that were amplified by the 1992 NCAA Gender-Equity Study. The study indicated that despite the relatively even distribution of membership undergraduate enrollment by gender, males constituted nearly 70 percent of intercollegiate athletics participants and received nearly 77 percent of the operating budgets, 70 percent of scholarship funds and 83 percent of recruiting dollars.

In its final report in July 1993, the task force concluded that "intercollegiate athletics offer interested and able students opportunities to experience the lessons of competition, develop physical and leadership skills, be part of a team and enjoy themselves. Good intercollegiate athletics programs require competitive parity, universal and consistently applied rules, and an opportunity to participate. For many years, the NCAA has sought to assure those conditions, but there is clear evidence that it has not succeeded in providing the last one to women."

The task force issued several recommendations to NCAA member institutions, the media and the general public, one of which was the creation of a gender-equity source book for member institutions. The task force believed this book would more easily convey the highly defined legal landscape that has developed dramatically since the task force completed its work. At the same time, the task force wanted to provide resources that would help educate the membership in its efforts to provide the necessary changes in its athletics programs.

This is the third edition of the Achieving Gender Equity guide. Since the task force convened and rendered its findings, the need for a guide to the basics of Title IX continues to be extremely critical. Over the past 10 years, many female student-athletes across the country initiated lawsuits that were decided in their favor, either through court-rendered decisions or out-of-court settlements. Consequently, the Federal courts have become and continue to be the primary means through which the status and requirements of Title IX regulations have been confirmed, clarified and enforced in favor of the student-athlete.

## A Brief History

It is important to briefly retrace the path of Title IX and its positive impact on the female student-athlete. In 1972, the Education Amendments to the Civil Rights Act of 1964, upon which the 1975 regulations, the l979 policy interpretation and relevant case law are based, stated that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." The adoption of this law in 1972 facilitated tremendous and intense growth in women's athletics participation during the 1970s. By 1978, the number of female high-school student-athletes had grown from 300,000 to more than two million. Similarly, women's collegiate sports participation doubled

**I-1**

from 32,000 participants in 1971 to more than 64,000 in 1977. By 1980, however, the rapid rise in participation began to level off when Title IX protections weakened.

The United States Supreme Court removed the applicability of Title IX to athletics programs in the 1983 case of <u>Grove City v. Bell</u>. However, this decision was reversed by the United States Congress with the Civil Rights Restoration Act of 1988. The Act then was significantly strengthened by the l992 Supreme Court decision in <u>Franklin v. Gwinnett</u>. The <u>Franklin</u> decision allowed plaintiffs to recover monetary damages and attorney fees in Title IX cases. Clearly, much of the weight Title IX carries today can be attributed to the Civil Rights Restoration Act and the decision rendered in <u>Franklin v. Gwinnett</u>. Before <u>Franklin</u>, the courts could only provide injunctive relief, i.e., an order to end discrimination that was found.

Existing court rulings on Title IX, as well as findings made by the Office for Civil Rights, have never been more abundant nor more significant than in today's world of collegiate athletics. As a result, the need for compliance with Title IX requirements has never been greater. This need is apparent despite the significant growth in women's participation rates at NCAA schools. The most recent NCAA participation rate study from 1997-98 indicates that overall participation numbers in women's sports have increased from approximately 93,000 in 1990-91 to more than 135,000 in 1997-98. It should

be noted that men's participation also has increased from more than 184,000 to more than 203,000 during the same period of time.

## How This Book Helps

The first step an athletics administration must take is to form a gender-equity campus committee that will obtain a basic and working knowledge of Title IX in order to begin the task of ensuring that any athletics program is in compliance with the law.

This book is designed to help administrators and faculty achieve that goal, with seven convenient sections that have been updated from the original publication. The seven sections include:

• **Title IX Basics**
Written by former Office for Civil Rights staff member Valerie Bonnette, who also co-authored the 1990 Office for Civil Rights Title IX Investigator's Manual, this section provides an essential outline of the components of Title IX and several examples of ways in which to be in compliance with the law. The section includes many issues and questions raised by member institutions over the past few years in their efforts to comply on their campuses.

• **Current Case Law**
The NCAA's legal counsel presents an in-depth look at the critical developments in case law that have occurred in the area of Title IX, particularly during the last four years.



**• Division I Athletics Certification**

The guide's newest section summarizes the Division I athletics certification program, which focuses upon the athletics certification operating principle related to gender issues.

**• Promotion Ideas**

Promotion and publicity help create a more equitable athletics environment on campus. This section includes several promotional ideas that have been gathered from the membership, including some provided by the National Association Collegiate of Marketing Administrators and conference promotions.

**• Emerging Sports**

This section provides basic information regarding those sports that have been identified as "emerging" pursuant to legislation adopted at the 1994 NCAA Convention. These sports may be adopted by an athletics program as a way to increase participation opportunities for female student-athletes. Note that three of the "emerging" sports, women's rowing, ice hockey and water polo, became official NCAA sports with the creation of the National Collegiate Championships. Much of the information in this section was obtained from the appropriate national governing bodies. Also included is an explanation of relevant NCAA legislation regarding sport sponsorship.

**• Resources**

The last section includes a list of nonprofit legal and women's organizations, coaches associations and national governing bodies, plus a list of periodicals about women in education and athletics. Also included are the addresses and telephone numbers for the regional offices of the Office for Civil Rights. In addition, e-mail addresses, relevant Web sites and pertinent legal citations have been included.

This book is not intended to provide the lone standard by which an institution measures its compliance with Title IX regulations or a blueprint for being in compliance with the NCAA-adopted principle of gender equity. Achieving gender equity is an ongoing and evolving process that must occur according to the particular needs of each member institution in light of the needs of the female student-athlete. However, this guide should be an important first

step on the path to achieving gender equity, not only as a useful tool for those schools that have begun implementing necessary changes, but for those that require further guidance in the evaluation of their programs.

Since this guide was first published in the fall of 1994, the NCAA has conducted seven Title IX seminars to date and will continue to sponsor seminars on an annual basis. In addition, the



NCAA education outreach staff, in collaboration with the research staff, has created a women's resource center at the NCAA national office. The guide, the seminars, the resource center and the web site are just three of the services intended to provide a greater understanding

**I-3**

and a clearer perspective on the need to ensure equitable opportunities and treatment for female student-athletes at all NCAA member institutions.

For further information regarding this publication and other gender-equity concerns, please contact the NCAA Education Outreach Office at 317/917-6222 or via e-mail at mkukelhan@ncaa.org.

# Title IX Basics

by Valerie M. Bonnette*

*Good Sports, Inc., Title IX and Gender Equity Specialists***

## Introduction

"Title IX" refers to Title IX of the Education Amendments of 1972, a federal civil rights statute that prohibits sex discrimination in education programs, including athletics programs, that receive or benefit from federal funding. Since nearly all educational institutions benefit from federal funding, nearly all educational institutions must comply with Title IX. The Office for Civil Rights (OCR) within the U.S. Department of Education is responsible for enforcing Title IX. The federal regulation implementing the Title IX statute became effective July 21, 1975. On December 11, 1979, OCR issued an Intercollegiate Athletics Policy Interpretation (Policy Interpretation) to clarify the Title IX regulatory requirements for athletics programs.

The Title IX statute is the law enacted by the U.S. Congress stating the general requirements for nondiscrimination on the basis of sex. The Title IX regulation, which was written by employees of the enforcement agency and submitted to Congress for review, also has the force of law and provides greater specificity. OCR's Policy Interpretation clarifies the Title IX regulatory requirements for athletic programs and is afforded considerable defererence by courts. The Title IX regulation and the Policy Interpretation are the two major sources for specific requirements for athletics programs. OCR has also issued significant athletics policy documents which are: the Title IX Athletics Investigator's Manual (issued April 2, 1990); the "Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test;" (hereinafter referred to as the 1996 Clarification) (issued January 16, 1996, a copy of which is attached to the end of this section); and guidance regarding the award of athletics scholarships (issued July 23, 1998, to 25 institutions subject to OCR complaint investigations and disseminated nationwide in fall 1998).

"Title IX Basics" contains the author's interpretations of OCR's policies in evaluating athletics programs under Title IX and should not be considered to have the endorsement of OCR. Additionally, this text is intended as technical assistance and not legal advice. Title IX Basics highlights the most important compliance considerations and does not anticipate addressing every concern for athletics programs.

## Basic Concepts

The 1979 Intercollegiate Athletics Policy Interpretation divides athletics issues into three major categories to be analyzed for compliance: sports offerings; scholarships; and everything else, which includes 11 program areas. The three categories are:

I. Accommodation of Interests and Abilities (sports offerings).
II. Athletic Financial Assistance (scholarships).
III. Other Program Areas (everything else—11 program areas), including:
(1) equipment and supplies;
(2) scheduling of games and practice time;
(3) travel and per diem allowances;
(4) tutoring;
(5) coaching;
(6) locker rooms, practice and competitive facilities;
(7) medical and training facilities and services;
(8) housing and dining facilities and services;
(9) publicity;

* Before founding **Good Sports, Inc.,** the author was a senior program analyst with the Office for Civil Rights for 15 years and co-authored OCR's 1990 Title IX Athletics Investigator's Manual.

** Copyright 2000, 1994, **Good Sports, Inc., Title IX and Gender Equity Specialists.** All rights reserved. "Title IX Basics" is printed by the NCAA with permission of **Good Sports, Inc., Title IX and Gender Equity Specialists** and may not otherwise be reproduced in whole or in part in any form without written permission of **Good Sports, Inc., Title IX and Gender Equity Specialists.**

(10) support services; and

(11) recruitment of student-athletes.

Under each of the program areas, compliance is determined by weighing several factors, which are listed in the Policy Interpretation. In the following sections addressing each of the 13 program components, these factors have been condensed to simplify explanations.

**Overall Approach.** Determining compliance for any of the factors requires comparing the benefits provided to all men's teams to the benefits provided to all women's teams. This analysis is required because Title IX protects opportunities and benefits on the basis of sex, not on the basis of volleyball, basketball or football.



The Policy Interpretation allows institutions great flexibility in providing benefits and services to female and male athletes. This flexibility, designed to uphold the right of educators to decide how best to operate the education program that is intercollegiate athletics, makes determining compliance with Title IX especially difficult. Women's and men's teams may be provided different benefits as long as a balance of benefits in the overall women's and men's programs is provided. For example, if men's basketball has three sets of practice uniforms while women's basketball has only one set of practice uniforms, this may be acceptable if women's volleyball receives three sets of practice uniforms while men's wrestling has only one set. If women's golf has more competitive events than men's golf, this may be acceptable if men's tennis has more competitive events than women's tennis. The difficulty for administrators is keeping track of such differences and evaluating their significance.

**Nature of Particular Sports.** The Policy Interpretation also permits different benefits and services based on the nature of particular sports. For example, providing five pairs of shoes for each participant on the football team may be appropriate, but five pairs of shoes is unlikely to have the same priority for the swim team. Practicing four hours a day may sharpen the skills of the golf team, but running four hours a day is probably excessive for cross country athletes. Simply, the need for benefits and services may vary from sport to sport. Analyzing compliance entails a comparison of the extent to which benefits and services are provided based on what is needed and desired.

**Reasonable Professional Decisions.** Different benefits also may be justified by the reasonable professional decisions of coaches and other athletics personnel. For example, a coach may prefer a particular line of equipment even though it is not the most expensive.

Coaches may prefer certain recruitment areas for their sports. Professional decisions such as these are permissible. There is a very fine line, however, between professional decisions and discriminatory treatment. Coaches who recruit in a particular region or select certain equipment because of lack of funds are not making reasonable professional decisions if the result is an adverse effect on one sex. Reasonable professional decisions may determine different benefits, but only if the choices of coaches in the program for one sex are not more limited than choices of coaches in the program for the other sex.

## Analyzing Compliance

Different benefits require different analyses. The difficulty is deciding which analysis is appropriate for which benefit.

**Percentages of Athletes.** As stated in the Policy Interpretation, " [N]o subgrouping of male or female students (such as a team) may be used in such a way as to diminish the protection of the larger class of males and females in their rights to equal participation in educational benefits or opportunities. [This test is not met] where large participation sports (e.g., football) are compared to smaller ones (e.g., women's volleyball) in such a manner as to have the

effect of disproportionately providing benefits or opportunities to the members of one sex." [44 Fed. Reg. 71422 (1979)]

Often, the correct analysis for compliance involves determining whether equivalent percentages of female and male athletes are provided equivalent quality and quantities of benefits and services. From an administrator's perspective, this is complicated at institutions that offer football because football teams ordinarily have a much larger number of athletes than any other team. As a result, more women's teams than men's teams usually must be provided superior benefits and services to achieve compliance. For example, a rather common practice, and common compliance problem, is to provide men's football and basketball teams benefits that are superior to those of all other men's teams and all women's teams. If football and basketball account for half of the male participants, then half of the female participants should be provided benefits equivalent to the men's football and basketball teams. Half of the female athletes may make up three or four teams rather than two.

Number of Teams. In very few situations, analyzing percentages of athletes becomes unusually complicated because percentages ignore the nature of particular sports and the fact that some benefits are not needed by some athletes or teams. For example, certain sports such as football and softball may have a lot of equipment and need lots of storage space. Other sports, such as cross country, do not have a lot of equipment and may need little or no storage space. Where some teams do not need certain benefits, analyzing numbers of teams may be a more reasonable approach. The comparison would be how many teams for each sex that need the benefit receive the benefit. If more teams for one sex are denied the needed benefit, there is likely a compliance problem. There is also a likely compliance problem if benefits must be limited to only a few teams, and the athletes receiving the benefit represent significantly different percentages of female and male athletes.

In considering which analysis to use, always start with percentages of athletes and consider number of teams where certain teams do not need the benefit based on the nature of the sport or the reasonable professional decisions of athletics personnel. On occasion, institutions are able to provide certain benefits to all teams that want them. Where benefits are equally available to all male and female athletes, then compliance is achieved regardless of the percentages of athletes or numbers of teams that take advantage of these benefits.

## What is a Violation?

A violation of Title IX is a denial of equal athletic opportunity to students of one sex at the institution. Inevitably, this is a judgment, one that OCR has authority to make. Some judgments are more obvious than others. For example, some problems that affect equal athletics opportunities institution-wide by having a significant impact on the intercollegiate program include: not offering a team that should be offered to one sex; not offering enough scholarships to one sex; not providing enough coaches in one program; not providing facilities for teams of one sex; and spending substantially disproportionate funds for recruitment.

Many institutions often have a series of minor compliance problems. While each problem does not by itself deny equal athletics opportunity, collectively, this series of problems adds up to a denial of equal athletics opportunity. For example, women's volleyball may not have practice uniforms while all other women's and men's teams do. This is a disparity in the program area of equipment and supplies, but this is not a denial of equal athletics opportunity to women at the institution. However, a series of similar disparities affecting teams for one sex may constitute a violation.

Other considerations should be noted. The higher the percentage of athletes affected by any disparity, the more serious the problem. A problem affecting one team is not as serious as a problem affecting two teams, which is not as serious as a problem affecting all teams for one sex. Similarly, not providing socks to a team is not as serious as not providing practice uniforms, which is not as serious as not providing transportation to away contests, which is not as serious as not providing coaching, which is not as serious as the most serious problem of all—not providing the team.

## How Title IX Looks at the Money

For many factors, the analyses under Title IX consider neither the source of the funds or the costs of the benefits, but the tangible benefits provided to student-athletes. For example, providing a complete set of practice uniform clothing and accessories for a football player will cost more than completely outfitting an athlete with practice gear for cross country. To make a simple comparison between a cross country athlete and a football athlete, the Title IX comparison considers not the cost, but amount, quality and suitability. In other words, if the football player is provided every item for a practice uniform and the cross country athlete is provided every item for a practice uniform, this is equivalence for amount of equipment. If both athletes are provided high quality equipment, again, this is equivalence. If all items are suitable for the respective sports, this is compliance. The cost of the specific items is essentially irrelevant.

Proportionate Dollars. The Policy Interpretation requires that proportionate dollars be awarded for scholarships, and OCR policy considers proportionate dollars as a compliance target for recruitment expenditures and overall funds for coaches' salaries. This means if 45 percent of the participants are women, then 45 percent of the scholarship dollars, 45 percent of the total dollars spent for coaches' salaries, and 45 percent of the recruitment dollars should be awarded to the women's program.

While proportionate expenditures are required for athletic scholarships and are a compliance goal for coaches' salaries and recruitment resources, it may seem logical that spending on all benefits should be proportionate. Unfortunately, compliance is not so simple. Different teams need different benefits, and different benefits cost different amounts. More importantly, record keeping, budget allocations, and expenditures vary from institution to institution. A large, expensive equipment item such as timing systems for the women's and men's swim teams may be charged only to the women's swim team budget, creating the appearance that the women's team receives vastly superior benefits to the men's team. Furthermore, where coaches have discretion to spend their budgets as they determine appropriate, the dollar amounts attributed to specific line items of a team's budget do not guarantee

that those dollars are spent on the benefits identified in the budget line item. In short, budget figures may be manipulated to conceal discriminatory practices.

Booster Clubs, Guarantees, and Fundraisers. The donations of booster clubs or guarantees paid by other institutions may not justify differences in benefits or services to female and male athletes. If, for example, funds are donated just to football, an institution may achieve compliance by using the donated funds for football and allocating the funds that otherwise would have been budgeted for football to women's teams as necessary to provide equivalent benefits and services. The bottom line always is that the institution is responsible for compliance. An institution is not absolved of this responsibility when disparate benefits are created by donors or others.

Similarly, an institution may establish the same guidelines for fundraisers, including requirements that coaches operate fundraisers as part of their contractual duties, but different levels of success (or lack of success) may not justify disparate benefits. Usually, at institutions that permit fundraising efforts by coaches and student-athletes, fundraised monies may pay for a team's additional equipment, a special travel opportunity, or allow better modes of transportation. Often, the success of fundraisers does not create significantly disparate benefits. In those instances where fundraisers may lead to disparate benefits, administrators should identify benefits of equivalent importance that may be provided to offset disparties. Benefits of equivalent importance do not necessarily cost the same.

Coach's Discretion. Individual coaches can create Title IX compliance problems as quickly as they can violate NCAA bylaws. For example, a coach who spends scholarship dollars on equipment and supplies may jeopardize the institution's compliance with the scholarship requirements of Title IX. Since the institution bears responsibility for compliance, administrators may wish to establish guidelines where certain coaches are poor financial planners or simply make poor decisions.

Revenue-Producing Sports. Revenue-producing sports are not exempt from Title IX. An analysis of benefits provided to male and female ath-

-4

letes that excludes, for example, benefits to football or basketball participants because those sports may produce revenue, is a faulty analysis for determining Title IX compliance.

## Suggestions for Administrators

Even though Title IX permits great flexibility in providing a balance of benefits, experience shows that differences between men's and women's teams in a particular sport are rarely balanced or offset by differences for teams in other sports. Because of this, the following sections usually suggest providing equivalent benefits in the same sports for women and men and then equivalently appropriate levels of benefits for dissimilar sports. When benefits are based on the nature of sports or reasonable professional decisions, then providing benefits to the same or similar numbers of women's and men's teams is suggested. Generally, these are the simplest approaches for evaluating compliance and providing benefits. These suggestions, however, should not be considered the only compliance analyses or methods.

There is one general caution: be aware of the percentages of female and male participants receiving any benefit. For example, if every sport offered to women is also offered to men, but men are also offered ice hockey, compliance would not be achieved by matching all the benefits for women's teams to those for the men's teams and then providing superior benefits to ice hockey. The final analysis for Title IX compliance, again, involves a comparison of the total women's program to the total men's program. While team to team comparisons are suggested and should reveal differences in benefits, remember that compliance is not determined until all teams for women have been compared to all teams for men.

Institutions may choose to emphasize different sports for women and men. Since nearly all benefits should be provided to similar percentages of male and female athletes, administrators should identify the combinations of participation numbers of women's and men's teams that constitute the same percentages. For example, football and men's basketball may comprise half the male participants while basketball, volleyball, softball and tennis may constitute half the women's participants. These two men's teams and four women's teams could be

targeted to receive benefits to the same extent. Planning this initially may take time, but once a plan is established, it may be easy to follow.

## Accommodations of Interests and Abilities

The accommodation of interests and abilities is the regulatory language addressing what sports an institution offers and, more specifically, the participation opportunites available on the teams for those sports. This issue is, in civil rights parlance, the "access" issue, that is, access to the program. The accommodation of interests and abilities requires institutions to provide female and male students an equal opportunity to become a participant. The other twelve athletics program components under Title IX concern equivalent treatment after students become intercollegiate athletics participants.

Compliance is analyzed by means of a three-part test for participation opportunities and a two-part test for levels of competition. Compliance problems under the two-part test for levels of competition are unusual because institutions generally have both women's and men's teams competing at the same division level. However, the three-part test for participation opportunities is the analysis that focuses on the most serious, and one of the most common, of compliance problems.

Participation opportunities are, in effect, the number of students actually participating in the program. A participant is someone who is on the squad list and on the team as of the first date of competition. This includes walk-ons. Anybody who quits after two weeks of practice should not be counted. An athlete who competes for more than one team should be counted for every team for which he or she competes. That is, the athlete who competes on cross country, indoor track and outdoor track should be counted three times. This is a different count than that used for athletics scholarships where athletes are counted only once even when they compete on more than one team.

## Participation Opportunities

OCR's three-part test begins with the premise under test one that if the rates of men's and women's participation in the intercollegiate athletics program are proportionate to their respective rates of enrollment as full time undergraduate students, then compliance is presumed. If students of one sex are underrepresented in the program, then institution officials should assure themselves that their actions have not caused this underrepresentation, and tests two and three provide methods to demonstrate that underrepresentation is not the result of discrimination. An institution need only meet one of the three tests in order to comply, and institution officials may choose which of the three tests the institution will meet. An institution may:

(1) Provide participation opportunities for women and men that are substantially proportionate to their respective rates of enrollment as full-time undergraduate students; **or**

(2) Demonstrate a history and continuing practice of program expansion for the underrepresented sex; **or**

(3) Fully and effectively accommodate the interests and abilities of the underrepresented sex.

**1. Opportunities Proportionate to Enrollment**. Compliance with this method is the simplest to analyze as this is determined by a mathematical calculation. The rates of participation of women and men in the athletics program should be substantially proportionate to their respective rates of enrollment as full time undergraduate students. Thus, if women are 52 percent of the full-time undergraduate enrollment and men are 48 percent, then 52 percent of the athletics participants should be women and 48 percent should be men.

Permissible Variances From Proportionality. OCR does not use a statistical test or a specific percentage point difference to define substantial proportionality in regard to participation opportunities. A noted out-of-court settlement involving the California State System universities, in a suit brought under California state law and not Title IX, agreed to five percentage points as an acceptable variance; that is, if 52 percent of the full-time undergraduates are women, then women must be from 47 percent to 57 percent of the participants. Although this and other formal agreements have led many to believe that five percentage points is a legal standard, five percentage points has never been an OCR standard or defined by the courts as a Title IX standard.

OCR's 1996 Clarification provides the most definitive guidance to date regarding "substantial proportionality" as this language applies to participation opportunities. In short, if for the underrepresented sex, the number of participants that may be added to achieve participation proportionate to enrollment is sufficient to form a viable team, then the participation opportunities are not substantially proportionate to enrollment. For example, an institution has full-time undergraduate enrollment that is 52 percent women and 48 percent men. There are 300 female participants and 300 male participants in the intercollegiate athletics program for identical participation rates of 50 percent. Women are considered underrepresented because their rate of participation (50 percent) is two percentage points less than their rate of enrollment (52 percent). The number of female participants to be added to the program to acheive a participation rate that matches the rate of enrollment is 25. In effect, adding 25 female participants to the program results in 325 female and 300 male participants for a new total of 625 participants. Thus, women would be 52 percent of the participants (325 of 625) and 52 percent of the enrollment. Since the number of participants to be added ––25––is a sufficient number to form a viable team in every sport sponsored by the NCAA and all other national athletics organizations, the institution in this example would not be offering participation opportunities substantially proportionate to enrollment despite a difference of only two percentage points. In effect, this institution does not meet test one. Smaller differences than two percentage points, depending on participation rates at a specific institution, may also be found as not substantially proportionate and, therefore, not in compliance with test one.

**2. History and Continuing Practice of Program Expansion for the Underrepresented Sex**. The key to compliance with this method is to demonstrate

a continuing practice of program expansion for the underrepresented sex. If women are underrepresented, program expansion means the addition of women's teams and/or an increase in quality opportunities for women on existing teams. Program expansion does not mean: unreasonable additions of walk-ons to women's teams; cutting male participants to improve women's rate of participation; or improving benefits in other program areas such as equipment and supplies and travel and per diem allowances. There is no set standard of continuing expansion that ensures compliance, and OCR's compliance judgments under test two are made on a case-by-case basis.

OCR's 1996 Clarification states that, in regard to the underrepresented sex, OCR will consider the institution's record of adding intercollegiate teams, increasing numbers of participants, and affirmative responses to requests for additions; the existence of a policy and effective communication of the policy for adding teams; and current implementation of a plan of program expansion and any efforts to monitor developing interests. OCR's 1996 Clarification appears to suggest that failure to add opportunities for the underrepresented sex during the past several years, combined with no current plan for adding opportunities, would constitute failure to comply with test two. In 1979, when the Policy Interpretation was issued, most institutions met test two. Currently, few institutions meet this test.

**3. Fully and Effectively Accommodate the Underrepresented Sex.** Participation rates disproportionate to enrollment are common in programs offering football. Even where women are significantly underrepresented, however, institutions may comply by offering every team for women in which there is: 1) sufficient interest and ability for a viable team; and, 2) a reasonable expectation of competition for that team in the institution's normal competitive region.

<u>Determining Unmet Interest</u>. Determining compliance with this method involves determining whether there is any unmet interest on the part of the underrepresented sex, which is nearly always women. Identifying unmet interest involves a review of on-campus and feeder programs. On-campus programs include, but are not limited to, club sports, intramural sports and elective physical education courses. Feeder programs include high-school programs, junior college programs, Amateur Athletic Union programs, and community, state and regional recreational programs in the institution's normal recruitment area. A survey of enrolled students may be useful in identifying a sport in which there may be sufficient interest and ability for a team not currently offered to the underrepresented sex. However, a survey is not likely to be a defense that the current program meets test three when other evidence (participation in on-campus and/or feeder programs) suggests unmet interest.

Compliance with this third method is unlikely if there is a sport not currently offered to the underrepresented sex for which there is sufficient competition in the institution's normal competitive regions and: a club team; and/or significant participation at high schools in the institution's normal recruitment area; and/or substantial intramural participation.

## Levels of Competition

There are two ways to comply. An institution need only meet one of these two methods in order to comply. An institution may:

(1) Provide proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; **or**

(2) Demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex.

### 1. Equivalently Advanced Competitive Opportunities.

Compliance is achieved when the same or simi-

lar percentages of the total contests for women and men are at the appropriate division level. For example, if women's teams schedule a total of 142 contests, of which 11 are outside the division level, then 92 percent (131 of 142) of the women's games are at the appropriate competitive level. If 20 of the men's 183 contests are outside the division level, then 89 percent (163 of 183) of men's contests are at the appropriate competitive level. The three percentage point difference between 92 percent and 89 percent is probably insignificant. While no percentage point difference defines compliance, differences of five percentage points or more should be avoided. Differences up to five percentage points and sometimes more may be justified if coaches and athletes indicate satisfaction with the level of competition.

<u>Junior Varsity</u>. Junior varsity athletes are considered intercollegiate athletics participants under Title IX. A compliance goal is for similar percentages of male and female athletes to be provided opportunities at the junior varsity level. Differences in percentages of female and male athletes provided junior varsity opportunities may be justified by lack of interest or lack of competition. However, a much higher percentage of athletes for either sex participating at the junior varsity level could raise compliance questions regarding levels of competition. Furthermore, an institution should not plan to offer junior varsity opportunities in lieu of viable varsity level opportunities.

**2. History and Continuing Practice of Upgrading Opportunities.** Compliance is achieved when a continual improvement in scheduling better competition is demonstrated for the historically disadvantaged sex. A simple demonstration of this is to move to a higher NCAA division level. Analyzing compliance under this method is rarely necessary since most institutions comply with the first method.

# Athletics Financial Assistance

The compliance determination for athletics scholarships is based on a simple mathematical calculation. Total scholarship dollars are to be divided in proportion to the participation of men and women in the intercollegiate athletics program. In other words, if 55 percent of the

participants are men and 45 percent are women, then 55 percent of the scholarship dollars are to be awarded to men and 45 percent to women.

No other requirements are imposed by Title IX for athletics scholarships. This means that an institution has the flexibility to award as many scholarships to a team as it wants, ranging from zero dollars to full scholarships for every participant. Title IX does not impose scholarship limits by sport. The NCAA (and other national and regional athletics associations) has set maximum limits that may differ for men and women by sport and NCAA division level. Such limits are not prohibited by Title IX. Again, the only requirement imposed by Title IX is that total dollars awarded to women and men be proportionate to their respective rates of participation. The hard part of the compliance determination is figuring out who to count as participants and which dollars from any budget line items should be included.

**Participants.** The Policy Interpretation contains a four-part definition of "participant." A simplified definition, as noted in the previous section on the accommodation of interests and abilities, is that a participant is someone who is on the squad list and on the team as of the first date of competition. Also, any athlete who has been injured but is receiving a scholarship should be counted as a participant. An athlete who competes for more than one team should be counted only once. That is, the athlete who competes on cross country, indoor track and outdoor track should be counted one time only, not three times. This is a different count than that used for the accommodation of interests and abilities. This difference is because one student may only receive one scholarship.

**Dollars.** The scholarship dollars included in the calculations are those dollars awarded to participants for the regular academic year. Scholarships awarded to fifth-year students who have exhausted their eligibility, team managers, cheerleaders, etc., do not count because those individuals are not participants. Any housing and dining expenses included in the scholarship budget line items for athletes on campus when classes are not in session should be excluded from the calculations.

Housing and dining expenses and team manager awards are considered under other sections of the Title IX regulation. Fifth-year awards are considered separately. Ideally, the percentages of fifth year students and scholarship awards should match the percentages of awards and participation in the intercollegiate program. However, not all students need fifth-year awards, and this is an acceptable justification for differences. Summer term awards may also be evaluated separately. As with fifth-year awards, differences in proportionate awards may be justified by need as long as summer term awards are equally available.

**Permissible Variances From Proportionality.** In 1998, OCR refined its policy as to what constitutes "substantial proportionality" in regard to athletic scholarships. OCR's 1998 guidance explains that there is a strong presumption of compliance when institutions offer total scholarship dollars at a rate within one percentage point of women's and men's rate of participation. In other words, if women are 45 percent of the participants, then compliance is presumed if between 44 percent and 46 percent of the total scholarship dollars are awarded to female athletes. There are acceptable justifications for differences exceeding one percentage point including: the differences between in-state and out-of-state tuition, as long as such differences are not the result of discriminatory recruitment practices; actions taken to promote athletic program development; legitimate efforts to comply with the three-part test for participation opportunities; unexpected fluctuations in particpations rates; and reasonable practices in phasing-in scholarships when adding a new team.

**Suggestions.** Individual students and/or coaches may make decisions that result in scholarship dollars not being awarded. Adminstrators should aim for strict proportionality when budgeting for awards so that individual decisions do not result in variances that raise compliance questions. Title IX compliance decisions ultimately are based on the dollars awarded, not the dollars budgeted.

An occasional compliance problem is providing male participants but not female participants with summer-session and/or fifth-year awards or greater access to such awards. Administrators should ensure that summer-session and fifth-year awards are equally available and that athletes of one sex are not more discouraged, either formally or informally, than athletes of the other sex in obtaining summer-session or fifth-year awards.

## Equipment and Supplies

Determining compliance for the provision of equipment and supplies involves evaluating quality and suitability, amount and availability, and maintenance and replacement. Equipment and supplies includes everything worn by athletes from helmets to undergarments, sport-specific equipment such as baseball bats, hockey sticks, golf clubs, tennis balls, and general equipment such as travel bags, travel sweats, video equipment, water bottles, and ankle and wrist weights.

**Quality.** Compliance is achieved when the same or similar percentages of male and female athletes are provided equipment of the same quality. For example, men's football and basketball might represent 50 percent of the male athletes. If football and men's basketball have excellent equipment and supplies while all other men's teams have average equipment and supplies, then compliance is achieved when 50 percent of the female athletes also are provided excellent equipment while other female athletes have average quality equipment. Fifty percent of the female athletes may be three or four women's teams, not just two. A common compliance problem to avoid is for men's football and basketball to be provided higher quality equipment and supplies than all other men's teams and all women's teams.

**Suitability.** Suitability refers to whether an equipment item meets specifications for the sport. This is usually not a compliance concern. An occasional compliance problem is when practice or competitive uniform items made in men's sizes are provided to one or more women's teams, creating an improper fit for several athletes.

**Amount.** The simplest way to ensure compliance is to provide the same numbers of equipment items to men's and women's teams in the same sports. This includes providing the same numbers of game uniforms, practice uniforms,

warm-ups, pairs of shoes, sport-specific equipment items, and general items such as travel bags and travel sweats. For dissimilar sports, equipment should be provided to the same extent as needed or desired based on the nature of the sport. A common compliance problem arises when women's teams are provided fewer sets of game uniforms, fewer or no sets of practice uniforms, insufficient pairs of shoes, and fewer or no general equipment and supply items such as travel bags, travel sweats, video equipment and water bottles.

**Availability.** Availability refers to accessibility and can be affected when equipment is stored where athletes have access only during certain times of day or days of the week. This becomes a compliance problem when, for example, a women's team has difficulty using equipment during nontraditional practice hours while no men's teams have this difficulty.



**Maintenance.** Maintenance includes equipment storage, team managers for handling equipment, laundry and equipment repair.

<u>Storage</u>. Some sports require minimal equipment storage while others require extensive storage space. The same or similar numbers of women's and men's teams should have storage that is equivalently adequate for the needs of the sport and in equivalently convenient locations to practice and competitive facilities.

<u>Team Managers</u>. The simplest way to comply is to assign the same number of team managers to women's and men's teams in the same sport, and provide managers with the same compensation whether they are paid scholarships or work-study funds. For dissimilar sports, managers should be provided to the same extent needed or desired based on the nature of the sport and the amount of equipment for the sport. For example, 10 managers may be adequate for football while two or three may be equally satisfactory for the volleyball team.

<u>Laundry</u>. Laundry service should be equally available to men's and women's teams. Where this is true, there is compliance even when certain teams choose not to use the service. Avoid the common compliance problems which include: institution staff do laundry for men's teams only; institution staff only have time to do the laundry for the football team and no one else; men's teams have priority so that they have clean uniforms for both morning and afternoon practices, while women's teams have clean uniforms for morning practices only.

<u>Repair</u>. Equipment repair should be handled in the same way for women's and men's teams. If a professional equipment manager attends to repairs for some men's teams, this should be true for some women's teams. A common compliance problem to avoid is for a professional equipment manager to do repairs for men's teams while women's coaches and athletes must do their own repairs.

**Replacement.** Keep it simple and establish the same replacement schedule for women's and men's teams in the same sports, be it as needed, every year, every two years, every three years, etc. For dissimilar sports, establish the same replacement schedules unless the nature of the sport justifies a difference. A common compliance problem occurs when lack of funds results in one or more women's teams keeping uniforms and other equipment items for three or four years while men's teams replace items more often.

---

# Scheduling of Games and Practice Time

This program area includes the number of competitive events; the time of day of competitive events; the number, length and time of day of

practices; preseason and postseason competition; and the season a sport is scheduled and the length of season.

**Number of Competitive Events.** The number of competitive events is counted differently under Title IX than under NCAA rules. Under Title IX, the more competition, the greater the benefit. For example, two tennis matches in one day are two competitive events, not one day of competition. All contests in the traditional and nontraditional seasons are counted, including contests against foreign teams, the U.S. national team, and other contests that may be exempt from NCAA limits. Both the number of contests and the number of days of competition should be counted to identify any differences between women's and men's teams. Preseason and postseason contests are reviewed separately, and any events considered scrimmages should not be counted.

The simplest way to comply is to schedule the same number of competitive events for women's and men's teams in the same sport. For example, if men's basketball schedules 29 games (two of which may be exempt from NCAA limits), then women's basketball should schedule 29 games. For dissimilar sports, the same percentage of the maximum allowable contests should be scheduled. For example, if football schedules 10 of the 11 games permitted, or 91 percent of the maximum allowed, and field hockey schedules 23 of the 25 contests permitted, or 92 percent of the permissible contests, the football and field hockey schedules are equivalent, the difference between 91 percent and 92 percent being negligible. A common compliance problem occurs when fewer contests are scheduled for several women's teams than men's teams, and/or when a women's team (often softball) schedules significantly fewer events than the maximum, while schedules for all men's teams are at or very near the maximum number of contests.

**Time of Day of Competitive Events.** The time of day competitive events are scheduled varies significantly and is often dependent on the nature of the sport, class schedules of athletes, and facility availability. Competitive events should be scheduled at times that are equally convenient (or equally inconvenient) for men's and women's teams. Avoid the common compliance problem of scheduling women's and men's basketball double-headers where the women's game is at a less convenient time than the men's game, limiting audience attendance and negatively affecting the women's class schedules.

**Practice Opportunities.** The simplest approach for compliance is for women's and men's teams in the same sport to practice the same or very nearly the same number of hours per week. For dissimilar sports, practices should be equivalently adequate based on the nature of the sport. For example, golf athletes may practice twice as many hours as cross country athletes because of the nature of the sports. Practice opportunities are equitable if the coaches schedule practices that are equivalently adequate for conditioning and skill development in these respective sports.

**Time of Day of Practices.** Coaches may choose to schedule practices for three hours in the afternoon or have three separate sessions during the day. Compliance problems occur usually when specific teams must squeeze in their practice time around other groups using the same facilities, and women's teams schedule practices that are shorter or at less convenient times of day such as during the dinner hour. A common compliance problem to avoid is providing men's basketball the preferred practice schedule while women's basketball and volleyball schedule less favorable times around men's basketball. If facility availability is a problem, schedules may be alternated so that facilities are shared equitably.

**Preseason Competition.** The simplest compliance method is to schedule the same sports for men and women for the same number of preseason events, while scheduling an equivalently appropriate number for dissimilar sports based on the nature of the sports. A common compliance problem is that preseason contests are scheduled for men's teams while none or fewer contests are scheduled for women.

**Postseason Competition.** The practice at most institutions is that whichever team qualifies for postseason competes in postseason. This practice is in compliance with Title IX, with one occasional exception. The occasional problem occurs for conference tournaments where all men's teams but not all women's teams qualify automatically. For example, a conference with eight member institutions provides that all

II-

eight men's basketball teams automatically qualify for the conference championship tournament, but only four women's basketball teams qualify. Under Title IX, the four institutions whose women's teams do not qualify are considered to be denying postseason competition to those women's teams. The conference should change this policy immediately. If postseason competition must be denied to any teams, this should not affect teams for one sex more than teams for the other sex.

**Season of Sport and Length of Season.** Competition should be scheduled in traditional and nontraditional seasons to the same extent for women's and men's teams. A common compliance problem is for all men's teams to compete in the nontraditional seasons while one or more women's teams are denied this benefit. One of the more common problems occurs when one individual is the only coach for women's volleyball and softball, and the teams are denied competition during the nontraditional seasons because the coach cannot handle both teams at the same time, while no men's teams have this limitation.

Season lengths should be the same number of weeks for women's and men's teams in the same sport and as appropriate to the nature of the sport for dissimilar sports. Again, conference rules create an occasional compliance problem when a season-ending tournament for women is scheduled a couple of weeks before the men's tournament in the same sport, creating a more compressed schedule for the women's teams, limiting practices and potentially limiting the number of contests the women's teams may schedule.

# Travel and Per Diem Allowances

The compliance determination involves a review of the modes of transportation; housing furnished during travel; length of stay before and after competitive events; per diem allowances; and dining arrangements.

**Modes of Transportation.** Several nondiscriminatory factors may affect modes of transportation including distance, size of the travel squad, others accompanying the team, and the amount of equipment. The most revealing comparison is when women's and men's teams of the same travel squad sizes travel the same distance; if they use different modes of transportation, it is a likely compliance problem.

<u>Distance</u>. A nondiscriminatory policy is when distance dictates mode of transportation for all teams. For example, 200 miles or less, vans and cars are used unless the size of the travel squad (for example, football) requires a bus; 200 to 500 miles, buses are used, regardless of team size; and, more than 500 miles, air transportation is used. Avoid the occasional compliance problem where women's teams are limited in the distance they may travel while men's teams are not.

<u>Travel Squad</u>. Travel squad sizes should be the same or very nearly the same for women's and men's teams in the same sport and as equivalently appropriate for dissimilar sports. A common problem to avoid is setting limits on travel squad sizes that differ for women's and men's teams in the same sport.

<u>Others Traveling With the Team</u>. Additional travelers such as coaches, trainers, sports information staff and team managers, may determine the need for a different mode of transportation. As with travel squad sizes, if limits must be set, they should be the same for women's and men's teams in the same sport. For dissimilar sports, the nature of the sport may determine whether and how many trainers should accompany the team, and the amount of equipment may determine the need for team managers to travel with the team. A common compliance problem occurs when lack of funds limits the personnel that accompany women's teams more often than men's teams.

**Housing Furnished During Travel.** Compliance is achieved when equivalent percentages of male and female travel squad athletes are assigned two to a room, three to a room, four to a room, etc., and are provided housing of comparable quality. For example, if football and men's basketball are the only men's teams assigning athletes two to a room, and they are 50 percent of the male travel squad athletes, then 50 percent of the female travel squad athletes should be assigned two to a room. Half of the female travel squad athletes may be three or four women's

teams. Additionally, hotel accommodations overall should be comparable. A common compliance problem is assigning female athletes three and four per room while male athletes are assigned two per room.

**Length of Stay Before and After Competitive Events.** The nature of the sport often determines the time of day of the competitive event, which in turn dictates when a team travels. For example, cross country meets may be scheduled for the morning, and teams may travel to the site the day before the competitive event. Golfers may play a practice round on a course before competition and, again, travel to the competitive site the day before. Avoid the occasional compliance problem where women's teams arrive shortly before a competitive event while men's teams arrive hours and sometimes the day before an event, allowing for practice, rest and/or meals.

It is common for teams to leave immediately after the competitive event with an occasional exception because of distance traveled or to take advantage of less expensive air fares. Avoid practices where women's and men's teams traveling the same distances for events at similar times of day differ in their arrival or departure times. The mode of transportation can affect arrival and departure times, and if problems are experienced by teams of one sex more than teams for the other sex, compliance problems in both factors may be the result.

**Per Diem Allowances.** The simplest way to comply is to provide the same per diem amount to all athletes. Otherwise, if some men's teams are provided with higher per diem amounts, then some women's teams should be provided the same higher per diem amounts. If the latter approach is preferred, aim for the same or similar percentages of male and female travel squad athletes to be provided this benefit. Avoid a common compliance problem where men's football and basketball are provided higher per diem allowances than all other men's and women's teams.

**Dining Arrangements.** The nature of sports and length of competition may determine when meals take place and whether pregame or postgame meals are appropriate. Compliance is analyzed by comparing the quality of the food and the establishment in which it is provided. Large team sports such as football, with the need to accommodate dozens of people at once, may make special arrangements at the hotel for meals. Golf tournaments may have special arrangements provided by the host country club. Compliance problems occur when meals for a team or teams for one sex routinely consist of much better quality food than that provided to other athletes. A common compliance problem is for men's football and basketball to be provided higher quality food or pregame and/or postgame meals that some women's teams may want but do not receive.

# Opportunity to Receive Academic Tutoring, Assignment and Compensation of Tutors

Compliance is assessed for tutor availability, tutor qualifications and experience, rates of pay and employment conditions. This program area need not be reviewed if there is no academic advisor for athletics and no separate tutoring program for athletes.

Tutoring differs from other benefits because the need or desire for the benefit is an individual and not a team decision and not dependent on the nature of any sport. Analyses of either the percentages of male and female athletes receiving tutoring or the numbers of women's and men's teams provided tutoring are generally not appropriate. The same quality of tutors must be equally available to male and female athletes. Where this is true, there is compliance even if tutors are used significantly less by athletes of one sex.

Compliance problems in tutoring are unusual. When compliance problems occur, it is usually because certain teams, often men's football and basketball, are provided with special tutoring arrangements, priority in services, or their own academic advisors who provide superior services.

**Tutor Availability.** An easy policy to ensure compliance is to set the same hours for tutor availability, such as at study hall sessions that are equally convenient for male and female athletes or for specific times throughout the day.

Another nondiscriminatory policy is to provide tutors on a first-come, first-served sign-up basis. Any special tutoring arrangements should be equally available to female and male athletes.

**Tutor Qualifications and Experience.** Tutors often are upper class students, but also may include graduate students, faculty at the institution or other professional educators. An occasional compliance problem usually involves assignment of more qualified tutors to men's football and basketball teams.

**Rates of Pay.** The simplest way to comply is to pay all tutors the same wage regardless of qualifications. However, if different rates of pay are appropriate, the compliance problem to avoid is for tutors receiving higher pay rates to be assigned to athletes or teams of one sex more than athletes or teams of the other sex.

**Employment Conditions.** This factor refers to the number of students tutored per session and/or academic term, and any terms for employment. Where differences occur in the number of students tutored per session or academic term, a compliance problem occurs when, for example, female athletes have tutoring sessions in groups while male athletes are tutored one-on-one and receive more effective tutoring.

**Other Considerations.** Some athletics academic advisors make special arrangements for athletes in registration for classes. When there is a benefit such as ensuring athletes of desired courses or sparing athletes the inconvenience of the registration process, a compliance problem arises when the arrangements are made only or more often for teams or athletes of one sex than for teams or athletes of the other sex.

# Opportunity to Receive Coaching, Assignment and Compensation of Coaches

Compliance is determined by analyzing availability, assignment and compensation of coaches.

**Availability.** Availability includes the number of coaches assigned to each team, length of contract, the percentage of time assigned to coaching, and employment conditions. Volunteer coaches should be excluded unless they receive incentives that affect their availability to teams.

Number of Coaches. A simple compliance approach is to provide the same number of coaches for women's and men's teams in the same sports and equivalent numbers for dissimilar sports. For example, if men's basketball has a head coach and three assistant coaches, then women's basketball should have the same. For dissimilar sports, coaches should be available to the same extent appropriate for the sports. For example, if the limit for head and assistant coaches is 10 for football and three for volleyball, then providing 10 coaches for football and three coaches for volleyball should be equivalent. A common compliance problem is the provision of three assistant coaches for men's basketball and two assistant coaches for women's basketball, while all other coaching assignments are equitable. A general compliance problem is that fewer women's teams than men's teams have assistant coaches.

Length of Contract. The same percentages of coaches, or percentages as close as the numbers allow, in the women's and men's programs should have the same lengths of contract. For example, the men's program may have 25 coaches while the women's program has 13 coaches. If three of the 25, or 12 percent, of the men's coaches have multi-year contracts, then two of 13, or 15 percent of the women's coaches should have multi-year contracts. If 17 of 25, or 68 percent, of men's coaches have 12-month contracts, then nine of 13, or 69 percent, of women's coaches should have 12-month contracts. If five of 25, or 20 percent, of men's coaches have nine-month contracts, then the remaining two of 13, or 15 percent, of women's coaches should have nine-month contracts. Avoid two common compliance problems where: men's coaches have 12-month contracts while women's coaches have nine-month contracts; and, some men's coaches but no women's coaches have multi-year contracts.

Percentage of Time for Coaching. The full-time equivalency analysis used by OCR to address percentage of time for coaching is known to be flawed, but no other analysis has yet been recommended by the agency. The analysis suggested here should be considered a recommendation, not a requirement.

The percentage of time that coaches may be assigned coaching duties can vary considerably, for example, 100 percent coaching duties, 50 percent coaching and 50 percent teaching, or 25 percent coaching and 75 percent administrative duties. Once the correct numbers of coaches and the same percentages of coaches with contracts of the same length have been established for the women's and men's programs, the same percentages of coaches should be assigned coaching duties for the same percentages of time. For example, if 16 of 25, or 64 percent, of men's coaches have 100 percent coaching duties, then eight of 13, or 62 percent, of women's coaches should have 100 percent coaching duties. If eight of 25, or 32 percent, of men's coaches have coaching duties for half time, then four of 13, or 31 percent, of women's coaches should have coaching duties for half time. If one of 25 men's coaches, or four percent, has coaching duties for one-quarter time, then one of 13, or eight percent, of women's coaches should have coaching duties for one-quarter time.

One approach to compliance for coaching availability is establishing the same assignments for men's and women's teams in the same sports. For example, if men's basketball has a full-time head coach with two assistant coaches who are on nine-month contracts with 50 percent of their time coaching and 50 percent of their time teaching, then the women's basketball team should have the same assignment. For dissimilar sports, coaches should be assigned to the same extent of the maximum limits for the sports (for example, using the NCAA Division I model for maximum numbers of coaches). A common compliance problem is the assignment of women's coaches to coaching duties for half of their time while men's coaches are assigned coaching duties for 100 percent of their time.

Employment Conditions. Additional duties for coaches such as teaching, administrative duties, student advisement or committee work should not affect availability of coaches in one program more than the other. Avoid the common concern where men's coaches teach racquetball and bowling while women's coaches teach more substantive courses such as kinesiology or anatomy and physiology, negatively affecting the availability of women's coaches.

Assignment. Assignment refers to qualifications. Compliance is achieved when the average years of experience is the same or similar for coaches in the women's and men's programs. The average years of college coaching experience should be determined separately. For example, if the 25 men's coaches have a total of 513 years of coaching, of which 347 years are at the college level, then men's coaches average 21 years of coaching experience with 14 years at the college level. If the 13 women's coaches have a total of 208 years of coaching experience, of which 147 years are at the college level, then women's coaches average 16 years of coaching experience with 11 years at the college level.

Differences in average years of experience may be readily justified by coaching success at the regional and national levels and general won-lost records. A coach with five years of coaching experience may be a much better coach than someone with 20 years of experience, and level of success may indicate this. Avoid the common compliance problem where coaches with little or no experience are assigned to one or more women's teams while men's coaches have significantly more experience.

Compensation. Compliance is achieved when total dollars are spent for salaries at a rate that matches women's and men's rate of participation in the athletics program. For example, if men are 55 percent of the participants and women are 45 percent, then 55 percent of the total dollars for coaches' salaries should be pro-

vided to the men's program and 45 percent to the women's program. The salaries for all head coaches, assistant coaches, and graduate assistants should be included.

There is no percentage point difference that determines noncompliance. The purpose of this analysis is to determine whether an institution has allocated sufficient resources to provide coaches who are equally qualified and equally available to female and male athletes. In other words, the issue of compensation under the athletics provisions of the Title IX regulation is analyzed as to its effect on students and not the effect on employees. Compliance problems in compensation will not be cited unless policies or practices deny male and female athletes coaching of equivalent quality, nature or availablity. The Policy Interpretation even states that there may be unique situations in which a particular person may possess such an outstanding record of achievement as to justify an abnormally high salary. This permissible situation could result in total compensation that is not proportionate to participation.

Specific comparisons of salaries for men's and women's coaches in the same sport, such as basketball, and fringe benefits provided to coaches are issues reviewed under the employment section of the Title IX regulation and not the athletics section. OCR and the Equal Employment Opportunity Commission, which enforces Title VII of the Civil Rights Act of 1964 and the Equal Pay Act, have both issued policy stating that discrimination in coaches' compensation as it affects employees must be based on the sex of the coach, not the sex of the athletes.

## Locker Rooms, Practice and Competitive Facilities

All facilities are reviewed for availability, quality and exclusivity of use. Practice and competitive facilities also are reviewed for preparation and maintenance, and maintenance of locker rooms is considered when it affects quality.

**Locker Rooms.** Usually, compliance is achieved when the same number of women's and men's teams have locker rooms of the same quality, exclusively for their use. Calculating the percentages of athletes who receive this benefit may provide a less accurate analysis than numbers of teams because some teams (often cross country, golf and tennis, for example), or some athletes, choose not to use locker rooms even when space is available.

Quality involves a review of: adequacy for the number of athletes using the room at one time; the number, size and quality of lockers; seating; lighting; floor; numbers of commodes, sinks, showers, hair dryers and mirrors; cleanliness; space to meet or move around; lounge areas and furniture; TV, CD, stereo and VCR equipment; and special features such as refrigerators and training facilities located in the locker room.

Athletes who participate all year or have structured off-season conditioning may need the locker room all year. In less competitive programs, students may participate just during the sports season, and assigning fall and spring sports teams to the same locker room can be as equitable as providing two separate locker rooms.

Compliance problems in locker room space are common. Some common problems are: providing higher quality locker rooms to football and men's basketball teams than those provided to all women's teams; providing football and men's basketball with the only locker rooms exclusively for use of the respective teams; arranging for visiting teams to share locker rooms with women's teams but not men's teams; and assigning locker rooms to women's teams that are inconveniently located in relation to practice and competitive facilities, training rooms and other facilities while men's locker rooms are conveniently located.

**Practice and Competitive Facilities.** Compliance may be achieved when roughly equivalent percentages of female and male athletes have facilities of equivalent quality exclusively for their use. Some latitude is appropriate based on the nature of the facility and natural fluctuations in participation.

Availability of facilities may be directly related to the scheduling of facilities, and equitable scheduling may resolve compliance concerns

for facilities. Availability also takes into consideration location if a facility or facilities only for teams of one sex are off campus and inconveniently located.

Analyzing quality involves evaluating the playing surface, seating capacity, lighting, scoreboards and similar features, and accommodations for the media and concessions. The features for facilities need not be identical to be equivalent. Exclusivity generally means exclusive use at the time when practices or contests are scheduled but may refer to facilities used only by a particular team.

Some common problems to avoid are: assigning a women's team or teams to facilities of poorer quality; not providing sufficient seating capacity for women's facilities; and providing electronic scoreboards and public-address systems for men's facilities and not for women's facilities.

Maintenance of Facilities. Some facilities require maintenance by professional staff, while the little maintenance required for other facilities may be performed by coaches and athletes. The comparison is whether maintenance is equivalently adequate, based on the needs of particular sports.

A simple approach for compliance is to have maintenance staff set the same maintenance schedule for women's and men's teams in the same sport, and schedule maintenance to be equivalently adequate for dissimilar sports. For example, maintenance staff might cut the grass once a week for softball and baseball. For football, cutting the grass once a week may be as adequate as cutting it twice a week for field hockey. A common problem is having maintenance staff cut the grass and line fields more often for men's teams than women's teams, or provide priority to men's teams so that facilities used by men's teams have adequate maintenance while women's team facilities do not.

Preparation of Facilities. Compliance is achieved when facilities are prepared to the same extent necessary, based on the nature of the sports, for women's and men's teams. For example, if maintenance staff line the baseball field every day for practice, then they should do so for softball. If maintenance staff cut the grass the day before each baseball game and line the field on game day, the same arrangement should be made for softball.

The preparation of facilities for competitive events also may involve putting out benches or chairs for players, setting up scorers' tables, public-address systems and media areas. Some common compliance problems occur when women's coaches and athletes sweep floors, line fields, or set up tables and chairs for practices or competitive events while maintenance staff perform these duties for men's teams.

# Medical and Training Facilities and Services

Determining compliance involves evaluating the availability of medical personnel; availability and qualifications of trainers; availability and quality of training rooms, weight rooms, and conditioning facilities; and health, accident and injury insurance coverage.

Analyses of benefits based on percentages of athletes or numbers of teams generally are not appropriate. The nature of the sport and the likelihood for injury and coaches' reasonable professional decisions regarding the conditioning of athletes will determine services. Compliance problems are likely where benefits and services differ for women's and men's teams in the same sport. For dissimilar sports, compliance is determined by the extent to which benefits and services are provided to women's and men's teams based on needs identified by coaches, trainers and medical professionals.

Medical Personnel. Medical personnel should be equally available to female and male athletes for services such as physical examinations, evaluations of injured athletes, surgeries or other medical procedures. Also, transportation to medical assistance off campus should be equally available to male and female athletes.

The assignment of medical personnel to home games, away games and practices is dependent on the nature of the sport. The nature of the sport of football and size of the team can justify the assignment of medical staff even when no other sports have this benefit. The most common compliance problem is the assignment of a doctor to men's basketball games but not women's basketball games.

II-

**Trainers.** The major distinction for trainer qualifications is between certified and noncertified trainers. Assuming similar participation numbers, women's and men's teams in the same sport should have identical assignments of certified trainers and student trainers at home games, away games and practices. Avoid the common compliance problem where certified trainers are assigned to men's basketball but not women's basketball, or a certified trainer is available at home and away games for the men's basketball team while the women's team has a certified trainer at home games and a student trainer at away games.

Football may require more time of both professional and student training staff than other sports. However, this may not justify less effective services for female athletes. A common problem in more competitive programs that offer football and have only one certified trainer on staff is that the trainer's time is taken up almost exclusively by football. This limitation often creates both compliance and safety concerns.

**Training Rooms.** If women use one training room while men use another, the rooms should be equivalent in terms of adequacy, quality, including age and type of equipment, and accessibility to locker rooms, practice and competitive facilities. A simple approach for compliance is to allow all athletes to use all training rooms on a drop-in basis. If schedules must be set, then preferred times should be shared or alternated to ensure equitable scheduling. Avoid the common compliance problems of providing the better training room(s) to male athletes, providing men's teams priority in scheduling, and/or providing men's teams the most conveniently located training room(s).

**Weight Rooms.** Football athletes may spend more time in weight rooms and use different equipment than other athletes. Several teams may use weight rooms sparingly or not at all. Furthermore, coaches for women's and men's teams in the same sport may disagree as to the best conditioning methods for their athletes, including whether to use heavy weights. Such differences are permitted when based on reasonable professional decisions.

If female athletes use one weight room while male athletes use another, the rooms should be equivalent in quality and equivalently adequate in terms of space and equipment provided. Adequate space and equipment are evaluated by how many athletes need to use the room at one time and the extent to which desired equipment is available. The rooms do not have to be the same size and have the same equipment to be equivalently adequate.

The simplest policy for ensuring compliance is to allow all athletes to use all weight rooms on a drop-in basis. If schedules must be made, then preferred times should be shared or alternated by female and male athletes.

Strength coaches may spend considerably more time with football than other sports. This is permissible when strength coaches are available to women's teams to an extent that is equivalently adequate.

**Insurance.** Usually, insurance policies cover costs that are not covered by the student's personal insurance for those health problems, accidents and injuries related to participation in intercollegiate athletics. Generally, no premiums are charged to athletes. If athletes must pay premiums, those premiums should be the same for female and male athletes.

Gynecological Care. The only common compliance problem is the insurance policy that excludes gynecological care when health problems requiring such care are the result of athletics participation.  Such a policy violates Section 106.39 of the Title IX regulation addressing student health insurance. The policy, and perhaps insurance companies, should be changed immediately.

**Suggested Strategy.** A common complaint of female athletes is that their injuries are not taken as seriously as those of male athletes by medical and training personnel and that male athletes have priority in treatment. Female athletes may not always share these concerns and should be asked about any concerns they may have regarding treatment by medical or training staff or whether they are discouraged from using weight rooms or training rooms. Institutions have been cited for noncompliance because of unprofessional attitudes of medical and training staff that discouraged female athletes from seeking treatment.

# Housing and Dining Facilities and Services

Determining compliance requires analyzing housing and dining benefits available during the regular academic year, the provision of pregame and postgame meals, and housing and dining services provided when classes are not in session.

The provision of housing and dining facilities and services may be affected by athletes' personal choices. During the regular academic year, compliance is achieved when any special housing and dining arrangements for athletes are equally available to the same or similar percentages of female and male athletes. Where this is true, there is compliance even if athletes choose not to take advantage of the benefits available. During times when classes are not in session, compliance is achieved when housing and dining are provided to the same extent for women's and men's teams wanting to be on campus at these times.

**Housing.** Any special housing privileges available to athletes must be equally available to female and male athletes. This includes dormitories where suites or other special accommodations are provided, priority in housing assignments, stipends for off-campus housing, or unique or special off-campus housing that may be arranged with an outside agency. If any athletes stay in hotels on the night before home games, this benefit should be equally available to women's and men's teams. Where benefits are equally available, there is compliance even

when teams choose not to take advantage of these benefits.

**Dining.** If better quality or a greater quantity of food is available to any athletes, this should be available to the same percentages of male and female athletes. A common compliance problem is for football and men's basketball to be provided superior quantities and quality of food than that provided to all other athletes. If football and basketball constitute half of the male participants in the athletics program, then half of the female athletes should have this benefit available to them. This will be considered compliance even if that many female athletes choose not to take advantage of the benefit.

Some teams may choose to dine together even though food of no special quality or quantity is provided. This is not a benefit requiring equivalent accommodation.

Pregame and Postgame Meals. Special pregame and postgame meals should be equally available to female and male athletes. Again, where this is true, there is compliance even when teams choose not to take advantage of the benefits. The nature of particular sports and coaches' professional decisions about the conditioning of athletes often affect whether teams make arrangements for pregame or postgame meals. Thus, the simplest approach to analyzing compliance is usually determining which teams want such benefits and the extent to which the women's and men's teams that want the benefits actually receive them. Common compliance problems are: providing men's football and basketball pregame and/or postgame meals while no women's teams receive such benefits; and providing only football and men's and women's basketball pregame and/or postgame meals even though other women's teams want this benefit.

A variation of the pregame, postgame meals benefit is when campus dining halls serve athletes at special hours or make boxed meals available to accommodate competitive and practice schedules. This service should be equally available to women's and men's teams.

**Housing and Dining During School Breaks.** A common compliance problem for housing and dining facilities and services arises not during the reg-

ular academic year but at times when classes are not in session, such as before classes begin in the fall, at the winter holiday and spring breaks, and during other intersessions that individual campuses may have. Basically, men's teams are provided sufficient funds to be on campus during these times while women's teams are not. The most common problem occurs for the sports of football and women's volleyball. Football is provided housing and dining funds that permit scheduling the maximum number of practices before the first competitive event while the volleyball team has limited funds, is on campus for less time, and schedules significantly less than the maximum number of practices before the first competitive event.

Similar problems occur during winter holiday and spring breaks where insufficient funds limit practice and occasionally competitive opportunities for women's teams while men's teams have adequate funding. Some teams prefer to travel during winter holiday or spring breaks, and adequate travel opportunities would be analyzed under the travel and per diem program area. Some coaches, even when adequate funding is available, choose to give athletes a break at these times or plan conditioning schedules that athletes may do on their own. Therefore, determining compliance involves analyzing the extent to which the women's and men's teams that want the benefits receive them.

Even when all teams that want to be on campus during these times are able to make such arrangements, compliance problems may occur when men's teams are provided better housing in hotels while women's teams are in campus dormitories; and more per diem is provided to male athletes than female athletes.

# Publicity

Three factors are reviewed for compliance: quality and availability of sports information personnel; access to other publicity resources for men's and women's programs; and quantity and quality of publications and other promotional devices featuring women's and men's programs.

**Sports Information Personnel.** A simple compliance approach is to assign professional personnel to the same or similar numbers of women's and

men's teams to the same extent and to assign student personnel in the same manner.

Quality. The major distinction in quality of sports information personnel is between professionals and students. For purposes of compliance, all professional staff are likely to be considered equally qualified unless there is a significant difference in years of experience and demonstrated quality of work.

Availability. Demands by the media may influence the amount of time that staff spend on particular teams. Unique circumstances, such as a team or individual athlete being a national champion or an athlete being an Olympic hopeful, may create imbalances in benefits for female and male athletes for short periods of time. These imbalances are permissible if opportunities for teams for the other sex are not limited.

The availability of staff is usually measured by the attendance of sports information personnel at home games, away games, and practices. Common compliance problems include: professional staff traveling with men's teams while student staff travel with women's teams; professional staff attending home games for several men's teams while attending home games for fewer or no women's teams, or only student staff attending women's home games; and student staff attending men's games but no staff attending women's games.

**Publications.** Publications may include media guides, game programs, schedule cards, posters and press releases. Quality includes consideration of the overall size of the publication, number of pages, type of paper and cover, and color versus black and white. The quantity of publications is as much a consideration of the number of women's and men's teams that have publications as the number of any publication provided for each team.

Media Guides. Media guides of equivalent quality should be provided to the same or similar numbers of women's and men's teams. Equivalent quality does not require that the guides be identical. For example, if men's guides have more pages to accommodate statistics for the longer history for the men's teams, this is not a compliance problem. Common problems occur, however, where

men's teams are provided media guides while women's teams are not, or guides for men's teams are of much higher quality than those for women's teams.

Game Programs. Game programs of equivalent quality should be provided to the same or similar numbers of women's and men's teams. As with media guides, common problems occur when game programs are provided to some men's teams but not women's teams, or higher quality game programs are provided to men's teams.

Schedule Cards and Posters. Schedule cards and posters should be provided to the same or similar numbers of women's and men's teams. A common problem is providing these benefits to men's teams but not to women's teams.

Press Releases. A simple way to achieve compliance is to issue press releases at the same intervals for all teams that are in season. Another approach is to issue press releases for the same or similar numbers of women's and men's teams in similar quantities. A common problem is issuing releases regularly for men's teams and rarely for women's teams.

Other Publicity and Promotional Resources. Efforts to publicize, promote or market the women's and men's programs should be equivalent even if the result may not be equivalent. Avoid the common compliance problem where staff promote and publicize the men's program and make little or no efforts for the women's program.

Newspapers, Radio, and Television. Compliance is determined by the effort of institution staff to obtain media coverage for women's and men's teams and not by the result, as Title IX does not apply to the media. If the media cover men's events but refuse to cover women's events, institution staff should make continuing efforts at reasonable intervals to obtain coverage for women's events. Avoid the common compliance problem where institution staff direct all efforts at obtaining media coverage for men's teams and make no efforts to obtain coverage for any women's teams.

Support Groups. At competitive events where support groups such as cheerleaders, drill teams, the marching band or pep band are appropriate and welcome, they should be available to women's and men's teams on an equivalent basis, including home and away games.

Avoid the common problem where such groups are provided to some men's teams but no women's teams.

---

# Support Services

Compliance is determined by analyzing administrative support, clerical and secretarial support, office space, equipment and supplies, and availability of other support staff.

Administrative Support. Administrative support is difficult to quantify, and the need for support may vary significantly from team to team. Compliance is achieved when administrative support is equivalently adequate for the women's and men's programs. In other words, coaches in the women's and men's programs should spend approximately the same amount of time on administrative chores, and any administrative tasks not accomplished should not adversely affect teams for one sex more than teams for the other sex.

Common compliance problems occur when: men's teams have administrative assistants while women's teams that need them do not; and administrative staff handle travel arrangements, equipment purchases, etc., for men's teams while women's coaches handle these tasks. Also, the coaches for revenue producing sports (e.g., football and men's basketball), may report directly to the athletics director while all other coaches report to an associate athletics director. This arrangement becomes a compliance problem if access to the athletics director results in priority services or better benefits for teams of one sex.

Secretarial Support. As with administrative support, the amount of secretarial support needed is likely to vary from team to team. Again, compliance is achieved when women's and men's coaches spend the same or similar amounts of time performing clerical tasks, and any tasks not performed do not adversely affect teams for one sex than teams for the other sex.

A common compliance problem is that women's coaches generally must perform more clerical work than men's coaches. The assignment of secretarial staff specifically to the football and men's basketball teams while other teams must share other clerical support is a common situation and a potential compliance problem; how-