ClosingArgmts1

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
2
   - - - - - - - - - - - - - - - - x
3
   SARAH LAZOR, ET AL,              :  No. 3:21-cv-00583(SRU)
4                      Plaintiffs,  :  915 Lafayette Boulevard
                                    :  Bridgeport, Connecticut
5              v.                   :
                                    :  May 20, 2021
6  UNIVERSITY OF CONNECTICUT,       :
                       Defendant.   :
7
   - - - - - - - - - - - - - - - - x
8

9

10

11            E X C E R P T   (CLOSING ARGUMENTS)

12      HEARING ON MOTION FOR TEMPORARY RESTRAINING ORDER

13

14  B E F O R E:

15      THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.
16

17

18

19

20

21

22

23              Sharon L. Masse, RMR, CRR
                   Official Court Reporter
24                 915 Lafayette Boulevard
              Bridgeport, Connecticut  06604
25             sharon_masse@ctd.uscourts.gov

1    A P P E A R A N C E S:

2

3         FOR THE PLAINTIFFS:

4             DUFFY LAW, LLC
                  129 Church Street
                  Suite 310
5                 New Haven, Connecticut  06510
              BY:   FELICE M. DUFFY, ESQ.
6

7             LAREW LAW OFFICE
                  504 E. Bloomington Street
8                 Iowa City, Iowa  52245
              BY:   CLAIRE M. DIALLO, ESQ.
9

10        FOR THE DEFENDANT:

11             OFFICE OF THE ATTORNEY GENERAL
                   165 Capitol Avenue
12                 Hartford, Connecticut  06106
               BY:   ROSEMARY McGOVERN, ASST. ATTORNEY GENERAL
13                   SHAWN L. RUTCHICK, ASST. ATTORNEY GENERAL

14

15

16

17

18

19

20

21

22

23

24

25

 1              THE COURT:  All right.  Ms. Duffy.

 2              MS. DUFFY:  Yes, Your Honor.  Is it okay if I

 3  stay back here?

 4              THE COURT:  Sure.

 5              MS. DUFFY:  So I just wanted to begin with

 6  plaintiffs are seeking a TRO to keep the team in place

 7  until at least August.  As you can see from the student

 8  athletes who are here, they have testified to the

 9  irreparable harm that will occur to them in terms of their

10  participation as an athlete, transfers, loss of coaches.

11              With respect to that, I know that the University

12  is arguing, I think in their papers the only thing they

13  were arguing, that delay should undermine their claim of

14  irreparable harm.  And in this case, as you saw from the

15  testimony, that the student plaintiffs, seven of them were

16  freshmen.  Seven of them were high school seniors at the

17  time that this was cut.  And when they were walking into

18  school or coming to school at UConn, it was during a

19  pandemic.  They didn't know if they were going to go to

20  classes.  They didn't know whether they were going to play

21  or practice.  Some of the kids had already transferred.

22  They were just trying to figure out what they wanted to do

23  and be safe for that year.  I think that was first and

24  foremost on their minds.

25              Some of them testified that they were starting

1    to get together with the captain of the team.  They needed

2    to figure out, the University had said that it was in

3    compliance, so they needed to figure out whether they were

4    or not.  They were investigating that.  They testified

5    that they talked to several different people, or at least

6    one person, about meetings about whether they were in

7    compliance or not over the fall.  And we're talking about

8    18-year-olds that had to come together and decide whether

9    or not they were going to file a federal lawsuit and find

10   the money to do it or find a lawyer that would do it

11   without money.  And by the end, I think around November,

12   December, the end of that year, they had found somebody

13   that was willing to investigate it.

14          You heard from Donna Lopiano, Dr. Lopiano, that

15   this is a unique case and a very complex case, and you can

16   see from the length of her report how it was more

17   important in this case because the gap on the EADA was 6

18   in 2018-19, the last year that there was an EADA report,

19   and that she really had to dive down into the numbers and

20   take a deep look at it, and so it took her some time.  We

21   also understood or heard from Dr. Lopiano that she was

22   jammed with expert reports and testifying.  So that took

23   some time.

24          Meanwhile, the plaintiffs, along with a

25   community, was going to the University and making requests

1    and asking them to reconsider.  The letters are attached,

2    I believe, in Exhibit A to the report.

3            And as soon as -- we also had a duty to make

4    sure we had a meritorious claim before we brought it here

5    and that we should be in a position where we can make the

6    claims we're making here.  And so by the time -- and

7    Exhibit E, I believe, is my affidavit, my declaration.  We

8    engaged in some type of conversation with the University

9    beforehand.  We tried to get the squad lists and the NCAA

10   competition records, and the hours limitations records.

11   And I think that there's no question that these plaintiffs

12   didn't sit on their hands.  They've been doing everything

13   in their power, this whole year, to row, to be good

14   students, to stay in school in a really tough time, and to

15   go forward with a case, come together and go forward with

16   a case to bring here because they care about their rowing

17   team.  You know, I think that there's no question that

18   they weren't -- they were doing everything in their power

19   to move that forward.

20           And I think, you know, the argument is that it

21   undermines irreparable harm.  I think it's quite clear

22   there's irreparable harm; and, on the other hand, there's

23   no harm to the University.  Any harm that would happen

24   from now until August 2 would be monetary, and the only

25   outlay of funds that we can ascertain is the payment of

1  the coaches' salaries to keep them in place.  And we're

2  talking about a university, I think it was the day after

3  this lawsuit was filed, announced its plans to erect a

4  $70 million ice hockey rink for non-revenue-producing

5  sports.

6         And so with respect to that, again, their harm

7  is irreparable.  They can never get back what would happen

8  this summer.  Dr. Lopiano testified at length about what

9  would happen to the program.  You heard from Coach Sanford

10 about what would happen and how many years more it would

11 set back even these two to three months.  Aside from the

12 constitutional deprivation of a civil right as female

13 athletes, if this turns out to be gender discrimination,

14 and they had to miss it because of that, that in and of

15 itself is irreparable.

16         And with respect to the likely to succeed on the

17 merits of the case, Dr. Lopiano testified to this.  She

18 used the reliable web rosters generated by UConn

19 themselves to come up with her gaps.  She also testified

20 that they're as close as you can get with public

21 information to what a real gap would be, because they

22 start from the squad lists, and they don't always vary,

23 but she thinks that's a fairly reliable representation of

24 what the gap would be.

25         We used 2018-19 because it was the last year of

1  the EADA report and because there was no COVID.  2019-20,

2  there's only a few months at the end, I think, that was

3  affected by athletics and a more reliable year than the

4  '20-'21.  But with respect to that, the gaps of 38, 42, 38

5  in 2018-19, and 42 the year that they made the decision to

6  cut the women's rowing team was a gap of 42 -- I'm sorry,

7  was a gap of 32 -- that's pre-cuts -- it was a gap of 32.

8  And even based on our data now, it's 48 this year.

9           THE COURT:  There's a difference of opinion

10  between the two sides on the question of what is the

11  standard for being in compliance with respect to the size

12  of the gap.  You have taken the position, as I understand

13  it, that -- Dr. Lopiano certainly testified to this --

14  that if the gap is large enough that a viable team, of a

15  type not offered by the university, could be filled with

16  that gap, then there is noncompliance.  The University, as

17  I understand it, has taken the position that you look not

18  at what an average team of a particular sport is, but

19  rather look at the average of the university's women's

20  sports teams in determining whether the gap is smaller

21  than that average.

22           My question for both of you is:  Is there any

23  authority, I've seen obviously the 1996 clarification, but

24  is there any legal authority, any case law or other legal

25  authority that would shed light on the question of which

1  side is right?

2          MS. DUFFY:  Yes.  Most court cases have talked

3  about the standard being a viable team as informed by or a

4  frame of reference like the OCR guidance says you can look

5  at that.  Even this Court in *Biediger* found that a viable

6  team size of five was too small.  And most courts, with

7  the exception of the last court, Balow and MSU in this

8  year, have been looking at the viable team size.  Port St.

9  Cloud looks at viable team size, talks about adding a

10  nordic skiing team.  And if it makes sense, Your Honor,

11  aside from -- I mean, in the OCR they give their examples.

12  They describe this.  They make it clear that it would not

13  be sufficient to sustain a viable team, a team for which

14  there is a sufficient number of interested and able

15  students and enough available competition.  And then they

16  just say as a frame of reference for understanding that,

17  they may consider the average size of the team offered.

18  And I believe that that's the average size of the team

19  offered when you look at the NCAA, can't remember the name

20  of the report, but if you look at that, that's what they

21  were talking about, a number which would vary by

22  institution, which it could.  So I think on its face, it's

23  plain reading.

24          Plus, if you think about gender equity, it makes

25  sense.  If you're looking for a variance of zero, as

1  Dr. Lopiano talked about, what you're trying to do, if

2  you're trying to get to zero, and obviously that's hard to

3  maintain every year because of differing enrollment and

4  athletes, but she talked about that you'd go teeter-totter

5  on either side of zero between the men's and women's teams

6  if there was actual equity.  And if that's what you're

7  actually looking for, that makes sense that you would look

8  at the size of a viable team because if you had a gap of

9  20, like UConn is saying, you would never be able to

10  reach -- even get close to a zero because at 20 you could

11  just stop.  So I think it just makes sense when you're

12  talking about gender equity.  And the specific

13  hypotheticals in the OCR only talk about a viable team.

14  They don't mention the average size of the school's -- the

15  school's average size of the school's underrepresented

16  sex.

17          And then the other thing that I think is

18  important and relevant to this case is that our contention

19  is, and I believe we've provided data that suggests, if

20  not proves, that UConn is inflating its women's roster

21  sizes by adding more people that are beyond the -- the

22  actual needs of the sport, for example, in rowing -- these

23  are in our papers -- in rowing and in cross-country.

24  Cross-country has female 29, male 20, and there's no

25  physiological justification for having a different team

1   size.  And, in fact, if you're going to have a bigger team

2   size, it would likely be the men's because they run longer

3   races and they're likely to be more injured and might need

4   some more people.  And a difference of nine, if UConn --

5   we would say you should add a golf team and have real

6   varsity opportunities for female athletes, rather than

7   saying, "Oh, we already have a team, you can put a bunch

8   of runners on that, and we're going to be compliant for

9   Title IX purposes."  Those are very different

10   opportunities, and that's not what Title IX was intended

11   to do.

12          So with respect to that, if a school is actually

13   inflating its number, and as Dr. Lopiano talked about

14   becoming more artful in their way to get around some of

15   the intentions, I'd say, of Title IX and the actual

16   counting instructions, that they could inflate their

17   roster sizes, and they could create an increased gap that

18   would make it harder and harder and harder to come into

19   compliance.

20          And I also believe that in their papers that

21   they talked about requiring -- that 20 would bring them

22   within strict proportionality.  And, you know, strict

23   proportionality, it's a variance of zero.  That's what

24   we're looking for.  That's what makes sense.

25          Basically, in the end, I think it's really

1   clear.  I think the history supports it.  I think the

2   intent of Title IX supports it.  Most courts, with the

3   exception of this year, the Balow court, have looked at a

4   viable team size.  And the reason that this is becoming

5   more and more of an issue is because the gaps have been so

6   big in the past.  And as people are getting closer and

7   closer and understanding that they have to be more and

8   more compliant, that we're seeing smaller and smaller

9   gaps, and so it's coming out where you really have to --

10  the courts in the past have said, oh, there's a viable gap

11  of 32, but it's bigger than the average size, that they

12  were using it as a frame of reference.  But I really

13  believe that the average -- I believe the history of OCR

14  and what happened back then would show that the average

15  team size was meant to reflect the NCAA average team size

16  across the country.

17          THE COURT:  All right.  There's a higher

18  standard for a mandatory injunction than for a prohibitory

19  injunction.  And, obviously, almost every case can be

20  framed as either prohibitory or mandatory.  The Court can

21  prohibit UConn from eliminating the women's rowing team,

22  or it can require the restoration of the women's rowing

23  team.  What is this and what's the support for your view?

24          MS. DUFFY:  I think based on Second Circuit case

25  law that this is a request for a prohibitory injunction.

1    We're clearly seeking to maintain the status quo of the

2    women's rowing team the day before UConn made its decision

3    to announce that it would cut it and before the decision

4    was actually enacted.  In the Second Circuit the status

5    quo is the last uncontested status which preceded the

6    pending controversy.  I think that's clear.  There's a lot

7    of case law about that.

8            The women's rowing team was in existence, like I

9    said, at the time of the plaintiffs filing, which is an

10   important mark as well, they were certainly in existence

11   then, but even before the pending controversy, which was

12   the day that UConn decided to announce that it was going

13   to cut its team.  And the purpose of a TRO is to preserve

14   an existing situation and status quo until the Court has

15   an opportunity to pass upon the merits of the demand for

16   the preliminary injunction.

17           Now, the women's rowing team didn't cease to

18   exist, as UConn has said, on June 24, 2020.  They

19   practiced; they competed.  They've all testified to that.

20   They've represented UConn through 2021 in spite of their

21   potential future elimination, and there will still be --

22   and there will still be young women willing to do so next

23   year as you've seen, Your Honor, in their testimony today.

24   Describing it as reinstating the women's team does not

25   change it's currently in existence.  It just refers to

1    changing the decision to eliminate it.

2              Also, I know that Judge Hall had just done a

3    case in *Madej v. Yale University*.  It's 2020 Westlaw 161

4    4230, cites a lot of cases that I think are on point about

5    students who have been expelled or suspended from school,

6    and it went back to before they made the decision about

7    suspending the student.  That was the day that was the

8    status quo.  And in our case it's a little different

9    because the team hasn't been suspended or expelled yet.

10   They hadn't been terminated at the time we brought the

11   suit.  The decision had been made, but they hadn't been

12   terminated.  So I think there's a list of cases in there

13   that talk about preserving the status quo before the

14   decision to suspend somebody, before the decision to

15   suspend or expel somebody.  I think this is clearly on

16   point.  I think the other cases that have been looking at

17   this issue, *Ohlensehlen,* certainly held that as well.  I

18   would also say that even if it was a higher standard, that

19   we've met it here.  I don't think it is a higher standard

20   for a mandatory injunction.  I think we are just asking

21   maintain the status quo that was in existence at the time

22   we filed the lawsuit and that was in existence before you

23   made the harmful act, the change that created the pending

24   controversy.

25              THE COURT:  All right.  Thank you.

 1          MS. DUFFY:  You're welcome.

 2          So based on Donna Lopiano's -- or based on the

 3 calculations in this case, because especially based on a

 4 viable team size, in 19-2020 the gap was 42; in 18-19 it

 5 was 38 at the time that the team was cut, and our position

 6 is that's the gap that matters because a school cannot be

 7 out of compliance with Title IX when it cuts a women's

 8 team, especially if the cuts create a bigger gap.  That's

 9 not allowed under the case law.  In your case I believe

10 that you had ruled on that as well, *Choike v. Slippery*

11 *Rock, Robb v. Lock Haven*.  And because there was a large

12 enough gap for a viable team, the University of

13 Connecticut just can't cut any women's rowing team in this

14 case.  And after the -- excuse me -- after the -- when you

15 look at the cuts, what a post-cut gap would be, as UConn

16 did for 2021, in 2018-19, we're looking at 42.  In 2019 --

17 I'm sorry, in 2018-19 we're looking at 38; in 2019-20 the

18 gap is 42.  And, again, that's bigger than the gap before

19 they made the cut.

20          There is no plan -- what UConn is promising is a

21 promise to comply.  And there is no reason -- they're

22 asking us to "trust us," they're going to comply --

23 there's no evidence there's a plan in place to do that,

24 and there's no evidence there's a plan in place that they

25 would follow or be able to follow.  And a plan is not -- a

1    promise to comply is not sufficient, and especially when

2    you look at UConn, in its briefing and in its numbers, has

3    completely ignored the history of Title IX compliance.

4    When you look at the University of Connecticut, at least

5    based on our numbers that are based on the reliable roster

6    data, they have been out of compliance for at least 12 out

7    of the last 13 years, and that's not counting for

8    inflation, which we would argue would make every year out

9    of compliance and beyond the size of a viable gap.

10           And when you look at if the school is promising

11   to comply, even though they're saying there's a gap that's

12   going to be big enough to have a couple of viable teams,

13   and they have no history of compliance, there's no reason

14   that anyone would be able to trust that they would be able

15   to comply or create a plan that would comply with Title

16   IX.

17           With respect to 2020 and 2021, that's the only

18   year that defendants have argued here today, I believe,

19   and that have brought data.  While we provided roster

20   data, they provided no details that would allow us to

21   confirm the application of their COVID Title IX counting

22   methods.  They could have provided the roster data and

23   redacted everything with just the athletes' names and

24   year.  You can get that online.  That would have been

25   helpful for us to know what they were counting for this

1   year.  But, again, it's not FERPA protected, and they're,

2   in effect, asking us to trust their numbers.  They're not

3   reliable.  There's no basis for us to understand that --

4   to understand how they calculated that.  And they're

5   asking us not only to trust our numbers, but that we

6   should apply different counting rules than permitted by

7   Title IX.  And they don't even come close to assessing

8   athletic -- actual athletic participation but just "trust

9   us that we did it correctly," with no raw data or any way

10  to understand or check what they did.

11          So defendants offer no proof to support its

12  number, while we have offered proof.  Their methodology is

13  counter to known Title IX counting instructions and,

14  again, doesn't produce any reliable participation gaps.

15  Like I said, on the other hand, we have provided web

16  roster data; they haven't.  They've provided no reason why

17  our web roster data is wrong for '18-'19 or '19-'20.  They

18  haven't even addressed those issues.  And they've provided

19  no data or any argument to show that those two years are

20  wrong or they have any gap for those years.

21          And in terms of if the Court is going to rule

22  now, versus waiting for data from them, I would argue that

23  we have met our burden to show by a preponderance that

24  there is a gap based on reliable methods, and there's

25  nothing to contest it here.  And based on that, in '19-'20

1    there is a gap, nothing to contest it, we've met our

2    burden, and we should be granted the temporary restraining

3    order because we're likely to succeed on the merits.

4              Excuse me.

5              And these are in our papers, and there's more

6    that were raised today that I don't have in front of me

7    that I have to see if I can think about, but at the very

8    least, there's very serious questions going to the merits

9    of what's happening here.  Did UConn -- what did they use

10   to make their calculation for this year?  Have they

11   inflated their numbers?  You know, which athletes did they

12   count?  Which sports did they count?  Which teams did they

13   count?  If kids weren't even enrolled in school, that's

14   clearly not what was intended by Title IX in actual

15   athletic participation.

16             And with respect to the balance of hardships

17   here for both the serious questions and also the

18   independent element that we need to prove, as I said

19   before, the harm, the balance of harm decidedly tips in

20   favor of the student plaintiffs.  If they are not

21   reinstated today, and even if they're reinstated on

22   August 2nd, it will change each of their lives

23   dramatically.  It's important enough for them to show up

24   here and be here today.  They went home on Monday, their

25   season ended, and they all came back from different parts

 1    of the country.  Others are participating on Zoom.  And

 2    they testified and told you how, in their young lives,

 3    people who have dedicated so much and sacrificed so much

 4    in high school to come, in a crazy year with COVID, even

 5    in their last year of senior high school, to come to

 6    UConn, commit to UConn, and face not having a rowing team,

 7    even for the summer, they'd lose their coaches, they're

 8    going to lose other players, some of them actually will

 9    transfer.  So the harm, that's something that can't be

10    compensated by money.  And, again, with UConn, the only

11    thing that would be at least -- the only thing is

12    monetary, and at that it's a di minimis amount.

13              Is there anything else that I can answer for

14    you?

15              THE COURT:  No.  Thank you.

16              MS. McGOVERN:  Your Honor, it's UConn's position

17    that plaintiffs are indeed seeking a mandatory injunction;

18    and, therefore, they need to comply with the higher

19    standard of demonstrating a likelihood of success on the

20    merits.  And that's where I want to start.

21              Plaintiffs' entire case is premised upon and

22    based on Donna Lopiano's report.  Dr. Lopiano's report is

23    completely based on web roster data.  There's never been a

24    representation by UConn, or any university that I'm aware

25    of, that states that the web roster is indicative of their

1    Title IX counts, and that's their Title IX compliance

2    counts.  We have presented evidence that is aggregate

3    data, and it's disingenuous for plaintiffs' counsel to

4    argue that we've provided nothing.  And efforts were made

5    to provide her data that would have been redacted but not

6    as useful to her because her expert already went through

7    and did an analysis based on the web roster data.  UConn

8    has a FERPA responsibility.  They're not able to disclose

9    FERPA-protected records without providing -- either

10   getting a court order or a subpoena for the records.  And

11   then they're required, once that does happen, to provide

12   notice to their student athletes.

13           There was extensive conversations with opposing

14   counsel.  We filed a consented motion related to that very

15   issue.  The only evidence that we're able to present here

16   today is aggregate data, and we've had a witness testify,

17   who reviewed all of the underlying data, which, as

18   Dr. Lopiano acknowledges, is the correct data for

19   determining participation counts.  You look at those squad

20   lists, you look at the CARA records, and you look at the

21   competition logs.  Ms. Fiorvanti and her staff, they did

22   that.  They verified all those numbers.  Now, we only

23   focused on 2020-21 because that's all we need to do under

24   the current case law.  We only have to show compliance in

25   one year, the current year, under prong one.

1           THE COURT:  Do you have to show compliance at

2   the time the decision was made to eliminate these teams?

3           MS. McGOVERN:  Your Honor --

4           THE COURT:  The current year, for purposes of

5   when the decision was made, was last year, not this year.

6   The current year for Title IX purposes in terms of the

7   post-elimination may be this year, but you made the

8   decision last year.  So why is that not pertinent?

9           MS. McGOVERN:  Well, the information is

10  pertinent this year.  We're one of the few schools that

11  have been sued, related to all of the different lawsuits

12  that have been brought by student athletes because their

13  universities have eliminated their sports programs, we're

14  one of the few that have had the suit brought at the end

15  of the year.  So we've had the benefit of essentially this

16  entire year.  Almost all the teams have ended their spring

17  competition.  There's a few that have not, but that's not

18  going to alter the participation counts.

19          THE COURT:  But -- all right.  The plaintiffs

20  have made the point repeatedly that you have to be in

21  compliance when you eliminate a disadvantaged gender team.

22  Do you agree with that?  Can you eliminate a women's team

23  if there is a gap at the time you make the decision to

24  eliminate?

25          MS. McGOVERN:  Well, there's disagreement as far

1    as what that means with the gap and how large the gap

2    is --

3              THE COURT:  I understand.  I'm asking you a

4    theoretical or a legal question now.  When the board voted

5    in June of last year to eliminate these teams, was UConn

6    required by Title IX to be in compliance at the time that

7    decision was made?

8              MS. McGOVERN:  No, Your Honor.  We look at the

9    data right now.  That's what's required.  That's what the

10   case law says.  We look now to see if UConn is in

11   compliance, which is at the time that they brought their

12   action.  We don't have to go back in time and look at

13   historical data.  Prong one is just -- you're allowed to

14   show compliance under prong one based on data right now.

15   That's all that's required.

16             THE COURT:  So your position is because the

17   decision was made in June, when the students were not at

18   UConn, they were necessarily going to be looking at 2021

19   because they couldn't bring a lawsuit and get the prior

20   year?  Is that what your position is?

21             MS. McGOVERN:  No.  Your Honor, my position is

22   that for UConn, in order to fall within the prong one safe

23   harbor, right now they need to show compliance right now

24   with Title IX, that they are in compliance now.

25             THE COURT:  Okay.

1          MS. McGOVERN:  Those programs that competed,

2     those teams competed in 2020-21, so I don't know why we

3     wouldn't look at the data for 2021 to determine whether

4     UConn is in compliance now.

5          THE COURT:  Well, not all the teams on the list

6     competed in 2021.  UConn -- correct me if I'm wrong --

7     UConn was shut down.  There were folks all over the

8     country Zooming in to classes from all over the place,

9     right?

10          MS. McGOVERN:  Yes, Your Honor, but there were

11     only two teams that didn't compete, and those were two

12     men's teams.  And those two teams, we counted them to be

13     consistent in counting the opt-out athletes.  They were

14     counted.  I mean, the count ends up being punitive against

15     UConn by counting those two teams, the only men's teams

16     that didn't have competition, as counted participants.

17     All the other teams that -- there were teams like

18     cross-country, for example, traditionally they're a fall

19     sport, their competition got moved to the spring.  That

20     happened with soccer as well.  I mean, so it wasn't as if

21     all the teams that would have competed in the fall had no

22     competition.

23          THE COURT:  Okay.

24          MS. McGOVERN:  Again, so we've heard from

25     Ms. Fiorvanti.  She testified that she and her staff

1    looked at the correct data, which Dr. Lopiano agrees is

2    the correct data -- the squad list, you compare it with

3    the CARA log records, and you compare it with the

4    competition records.

5            THE COURT:  So assuming that data is correct,

6    there's a current gap of 20.

7            MS. McGOVERN:  Correct.

8            THE COURT:  Why are you in compliance now?

9            MS. McGOVERN:  We're in compliance now, looking

10   at the OCR clarification, 1996 clarification about the

11   three-part test.

12           THE COURT:  Which allows the OCR, it says "may

13   consider," not shall, not must, not you're in compliance

14   if; you may consider as a factor.  Isn't that a special

15   circumstance?

16           MS. McGOVERN:  I'm sorry, which portion are you

17   referring to?

18           Your Honor, I have it.

19           THE COURT:  Okay.

20           MS. McGOVERN:  "As a frame of reference in

21   assessing the situation, OCR may consider the average size

22   team offered for the underrepresented sex, a number which

23   may vary by institution."

24           THE COURT:  Yes.  So I'm looking now at page 17

25   of your brief.

 1              MS. McGOVERN:  I am too.

 2              THE COURT:  "OCR would also consider

 3    opportunities to be substantially proportionate when the

 4    number of opportunities that would be required to achieve

 5    proportionality would not be sufficient to sustain a

 6    viable team, i.e., a team for which there is a sufficient

 7    number of interested and able students and enough

 8    available competition to sustain an intercollegiate team."

 9              So the testimony is there's an average of just

10    over eight team members on the typical NCAA golf, women's

11    golf team.  Why is this guidance not saying UConn is in

12    violation of Title IX because its gap of 20, accepting

13    everything you're saying about what the right numbers are

14    and counting 2021, and so forth and so forth, we're at a

15    gap of 20, why isn't that -- and the language you're

16    relying on goes on to say "as a frame of reference in

17    assessing this situation, OCR may consider the average

18    size of teams," etc.?

19              MS. McGOVERN:  Well, Your Honor, there are

20    several courts who have recently determined that that

21    language, acknowledging that a frame of reference can be

22    used in looking at the average squad size for the

23    underrepresented sex at the institution, so that you look

24    at the university --

25              THE COURT:  But it's talking about a frame of

1    reference.

2              MS. McGOVERN:  Exactly, exactly.

3              THE COURT:  It's not saying you comply with

4    Title IX when you have a gap of 20 and you can have a

5    bowling team with ten, or you can have a golf team with

6    eight, or the like, right?

7              MS. McGOVERN:  Your Honor --

8              THE COURT:  Let me just pitch it to you this

9    way.  If UConn had four women's teams, they had a women's

10   track team that has 53, they have a women's lacrosse team

11   that has 35, they have a women's who knows what,

12   cross-country team that has 26, 29, now the average -- and

13   those are the only three teams they have, are you telling

14   me that it would be compliant with Title IX to have a gap

15   of 25 or 30 between men and women athletes?

16             MS. McGOVERN:  Well, Your Honor, also it takes

17   into consideration the number of students that are

18   enrolled and that there's fluctuations from year to year

19   related to that --

20             THE COURT:  No, no, but --

21             MS. McGOVERN:  -- and then the size of the

22   athletic department.  It's not as if they just have four

23   teams.  They have 24 teams in this past year.

24             THE COURT:  I'm talking about women's teams.

25             MS. McGOVERN:  I understand.

1          THE COURT:  And so my point is, can a

2    university, in order to seek to be compliant with Title

3    IX, limit the number of women's teams, pump up the volume,

4    and then say, "Well, the average is so large it doesn't

5    matter that we have 35 more men athletes, assuming,

6    assuming exact proportionality in student body, that we

7    have 35 more male athletes."  I don't think you can do

8    that.  I think Title IX obligates the university, doesn't

9    it, to say, "Are there opportunities we can provide women

10   athletes to make the overall situation comparable?"

11   That's what Title IX requires, I think.

12          MS. McGOVERN:  Well, Your Honor, prong one

13   doesn't even talk about, as plaintiffs' counsel has

14   represented, the gap is supposed to be zero.  Prong one

15   talks about substantial proportionality.

16          THE COURT:  Substantial.  I agree with you.  In

17   my hypothetical, would you say that 35, a gap of 35, which

18   is less than the average women's team at that school, is

19   substantially proportional?

20          MS. McGOVERN:  Your Honor, it would depend --

21   there's factors that, you know, plaintiffs talked about

22   getting behind the data on the rosters.  We haven't gotten

23   behind the data.  There's speculation that has been made

24   relating to one or two women's teams that the rosters are

25   inflated, but --

1           THE COURT:  But that's not the point.  I'm

2    trying to press you on the legal standard.  Your view is

3    the '96 clarification sets the legal standard.  I don't

4    read that as saying you're in compliance so long as you

5    have less than the average number of women's rosters as a

6    gap.

7           MS. McGOVERN:  Well, Your Honor, I know that in

8    *Biediger,* in the original preliminary injunction

9    proceeding in 2010, you considered the average size that

10   Quinnipiac had, and you also looked at the median size

11   that they had.

12          THE COURT:  I was looking at everything I could

13   get my hands on.

14          MS. McGOVERN:  Yes, you did.  You looked at

15   everything.

16          THE COURT:  I'm trying to get my hands on

17   everything.  That's why I'm asking you for the data.

18          MS. McGOVERN:  And so at UConn we know for

19   2020-21, the average size of women's teams was 28.

20          THE COURT:  Yes.

21          MS. McGOVERN:  The median was 27.  And the

22   largest was track and field.  And, by the way, the women's

23   track and field and the men's track and field for 2020-21

24   was almost identical, and that's the largest size women's

25   team.

1          THE COURT:  Okay.  But, look, I'm getting back

2    to the standard.  Your argument is the word "may" means

3    "is sufficient," right?  You're in compliance, not you may

4    be in compliance, you are in compliance so long as the

5    average size of the women's roster is larger than the gap.

6    We heard that from your witness, in effect.

7          MS. McGOVERN:  Yes, your Honor, but it's also --

8    you know, there are three recent cases that have -- well,

9    *Fresno State*, I don't have the cite for that, it's in my

10   brief, and then *Balow v. MSU* where those Courts looked to

11   the average squad size of those universities, and

12   particularly with Michigan State University --

13         THE COURT:  Okay.

14         MS. McGOVERN:  -- they took into account the

15   very small percentage that that gap represented.  So for

16   UConn, the 20-person gap, it's 1.3 percent, and looking at

17   that in those terms, that certainly is substantially

18   proportionate.

19         THE COURT:  What did the Second Circuit hold on

20   this point in *Biediger*?  My recollection is that --

21         MS. McGOVERN:  I don't believe that the Second

22   Circuit articulated the standard relating to --

23         THE COURT:  I don't think they did directly, but

24   they upheld the consideration, and I think it went the

25   other way in terms of whether the size was large enough.

1    And they said because it's smaller than a viable team,

2    it's an acceptable gap.

3           MS. McGOVERN:  Well, Your Honor, also in

4    *Biediger*, as I'm sure you recall, there was a volleyball

5    team of 14.

6           THE COURT:  Right.

7           MS. McGOVERN:  And the gap was larger than the

8    14 members that was necessary for the volleyball team.

9    That's not the situation that we have here.

10          THE COURT:  Well, I know, but you can't, you

11   can't argue that, well, we have a gap of 20, so we can

12   eliminate any team that's less than 20 -- or more than 20,

13   right?  I mean you can't -- is that what you're saying?

14          MS. McGOVERN:  No, Your Honor.  You know, it --

15          THE COURT:  Let me just give you the bottom

16   line.  I'm looking for support.  So you've got a couple of

17   district court cases that read the 1996 clarification as

18   satisfying, the average size roster satisfying the

19   substantial proportionality.  Right?

20          MS. McGOVERN:  Yes, Your Honor.

21          THE COURT:  Okay.  And there are cases going the

22   other way.  You acknowledge that?

23          MS. McGOVERN:  So, Your Honor, I imagine -- I

24   believe they're addressed in my brief.  I don't remember

25   off the top of my head.

```
 1              THE COURT:  Okay, fair enough.  I'll go back and
 2   look at them.  All right.  I just --
 3              MS. McGOVERN:  I mean, Your Honor, if a
 4   university has to, every time they have only -- if they
 5   have a gap of ten, they have to start looking to add
 6   another team --
 7              THE COURT:  No, no.
 8              MS. McGOVERN:  Well, that's one of the scenarios
 9   that's been posited that is how a university gets into
10   compliance, is by adding another team for the
11   underrepresented sex.
12              THE COURT:  Well, they could if they wanted to,
13   but I think the testimony today was that that's one
14   option, not that they have to.  Roster management is not
15   illegal.  Roster management is an acceptable way to come
16   into compliance with Title IX.  The plaintiffs aren't
17   saying that you have to add a team every time you can.
18   They're saying that you're not in compliance when you cut
19   a team and there's a gap that is large enough to fill a
20   viable team.  And they're saying today you're not in
21   compliance because the gap is large enough to sustain a
22   viable team.
23              MS. McGOVERN:  So, Your Honor, if hypothetically
24   rowing were to be put back on the table, then you would
25   have a participation gap that flips to the other side.
```

1   Now the men are underrepresented.  And now, based on that

2   logic, you can have one of the men's teams come in and

3   make that same argument that now, UConn, you have to add

4   us.

5           THE COURT:  Absolutely.  You're exactly right.

6   And the University, if it is faced with an injunction to

7   not eliminate the women's rowing team, is going to have to

8   make decisions about does it want to restore men's teams

9   that have been cut, does it want to engage in roster

10  management, or whatever.  There will be consequences if

11  the plaintiffs win injunctive relief.  But the

12  consequences ultimately stem from a decision made by the

13  University.  And so it's going to have to make some more

14  decisions.

15          It could restore some or all of those men's

16  teams that it cut.  It could pump up the numbers and

17  really go out and recruit cross-country, men's

18  cross-country members.  It could do any number of things.

19  But that can't be a reason, the fact that there are going

20  to be consequences from a decision can't be a reason.

21          MS. McGOVERN:  Your Honor, I'm just simply

22  pointing out that the logic that's used in plaintiffs'

23  argument, and it's not limited, as I understand it, to

24  just you can't cut teams until you're at such a point that

25  you can't add another viable team.  That's not what I

1    understand them saying.  I understand their argument

2    across the board that UConn is out of compliance if ever

3    the gap, and it would apparently be if it's ever more than

4    eight, because that's the average size of a women's golf

5    team in Division 1.

6              THE COURT:  Right.  I think that is their

7    argument.  I think the argument is that UConn has been out

8    of compliance for 12 of the last 13 years.  I think we

9    heard that expressly.  I think you're right.

10             MS. McGOVERN:  And UConn only has to show

11   compliance right now in order to have this fall into the

12   safe harbor of prong one.

13             THE COURT:  I'm sorry, I missed the first part.

14             MS. McGOVERN:  UConn only has to show that

15   they're in compliance for this year.

16             THE COURT:  That's why I'm pressing this point.

17   They're not in compliance if the rule is that the gap

18   can't be larger than the number necessary for a viable

19   team.  If that's the rule, you are essentially admitting

20   that you're not in compliance.

21             MS. McGOVERN:  The viable team, Your Honor, but

22   the benchmark that's looked at is this average squad size

23   of the underrepresented sex at the institution, not --

24   and, Your Honor, I read it and other Courts have agreed

25   with this reading that it does take into account the

1    particular institutions and acknowledging that the number

2    is going to vary from institution to institution.

3                THE COURT:  Of course it is.  Whether you're

4    talking about Ohio State or you're talking about Southern

5    Connecticut State University, it's going to be a very

6    different story because they're going to have a very, very

7    different size athletic department, number of athletes,

8    etc.  That's what they're saying.  They're saying, "Don't

9    be ridiculous and look only at the gap.  There may be

10   circumstances in which you have to take, as a frame of

11   reference, the average team size."  That's what they're

12   saying.

13               MS. McGOVERN:  Okay.  Well, Your Honor --

14               THE COURT:  It's a rule of reasonableness.

15               MS. McGOVERN:  And I think it's reasonable to,

16   again, when the framework is looking to see if there's

17   substantial proportionality --

18               THE COURT:  Right.

19               MS. McGOVERN:  -- and not perfect parity.

20               THE COURT:  Exactly.

21               MS. McGOVERN:  And the differential that UConn

22   has for this year, based on the 20-athlete gap, is

23   1.33 percent.

24               THE COURT:  Okay, right.  And I think smaller

25   percentages have been held to be in violation of Title IX.

1          MS. McGOVERN:  I have not seen that, Your Honor.

2    I haven't seen any case that has held that anything less

3    than 2 percent violates Title IX.

4          THE COURT:  Okay.  But -- all right, let's just

5    cut to the chase.  By your own evidence, if the rule is

6    what I am suggesting it is and what the plaintiffs have

7    suggested it is, by your own evidence UConn is out of

8    compliance with Title IX.  Do you agree with that?

9          MS. McGOVERN:  Based on the plaintiffs'

10   interpretation of the law, yes, which I disagree with.

11         THE COURT:  Okay.  But, I mean, the gap, using

12   the perfect numbers, the gap is 20 for this past academic

13   year.

14         MS. McGOVERN:  Correct, Your Honor.

15         THE COURT:  Right.  Okay.

16         MS. McGOVERN:  Your Honor, as far as the OCR

17   guidance is concerned, also what it doesn't say is that

18   the frame of reference for determining -- to looking at

19   viable size team is the NCAA standard for looking to see

20   what the average team size is.  They certainly could have

21   done that, but instead they left it to looking at the

22   institution's particular average.

23         THE COURT:  Oh, I agree.  I agree as far as that

24   goes.  So if a golf team, a viable golf team at UConn has

25   to be 21 because of the unique circumstances of UConn,

1    they intend to compete in two different athletic leagues

2    and a couple different continents and they need 21 players

3    so they can send them out, then, yes, I agree that's a

4    frame of reference.  UConn can't make it with an eight, an

5    eight-member golf team because of their particular

6    circumstances.  That's what that means.  But I haven't

7    heard any particular circumstances about UConn's situation

8    that suggests that the golf team has to be more than

9    eight, or that the bowling team has to be more than ten.

10          MS. McGOVERN:  But we don't know any interest

11   that exists related to any of those programs.  I mean,

12   those are all teams that, you know, it takes -- you can't

13   just go out and create a program.  You know, we heard

14   testimony about what's involved with an athletic program

15   at a university.

16          THE COURT:  All right.  Is there a history

17   anywhere in America of a university announcing that it's

18   going to have a team, a women's rugby team, a women's

19   lacrosse team, and not being able to fill the roster?

20          MS. McGOVERN:  I --

21          THE COURT:  Is that a common problem?  Is that

22   something that athletic departments are dealing with all

23   the time?  "Oh, well, you know, if we add that women's

24   rowing team, I'm just not sure anybody is going to show

25   up."  That hasn't been a problem in America, has it?

```
 1              MS. McGOVERN:  Also, Your Honor, you know, the

 2    OCR guidance, the clarification, it's not -- it could have

 3    been very specific to say exactly what plaintiffs suggest.

 4    It doesn't say that.

 5              THE COURT:  Trust me, I agree that the guidance

 6    we've gotten from OCR over the many decades has not been

 7    crystal clear.  I get that.  I've struggled with it

 8    before.  I'm struggling with it today.  But I think we

 9    also have to look, don't we, at kind of the purpose of

10    Title IX, substantial proportionality in opportunities for

11    men and women?

12              MS. McGOVERN:  Yes, and it's substantial

13    proportionality, and right now UConn has a differential of

14    1.33 percent.

15              THE COURT:  I got it.

16              MS. McGOVERN:  As I said, there's no case that

17    I'm aware of, after doing extensive research on it, that

18    has held that a number less than 2 percent falls out of

19    compliance.

20              THE COURT:  Okay.

21              MS. McGOVERN:  Also, there has been no evidence

22    of roster manipulation with the exception of Coach

23    Sanford's testimony today that she had been directed by

24    some consultant at UConn when she first started 24 years

25    ago that she had to maintain a certain level of rowers.
```

1    And, in fact, the affidavit of Adrienne Swinney completely

2    contradicts that, as well as Neal Eskin directing her that

3    she's to be providing UConn with her ideal roster size and

4    to operate her program based on her ideal roster size.

5         THE COURT:  I wanted to ask you about the claim

6    of delay and the impact on irreparable harm.  I understand

7    that concept, and it makes sense in certain legal

8    settings.  For example, if you have a trademark and

9    somebody goes off and is using your trademark, if you

10   don't immediately take legal action, then there may be a

11   suggestion that you're not really suffering irreparable

12   harm.  But in this context, does that suggestion apply?

13   Has the irreparable harm for any of the plaintiffs been

14   reduced because of the delay here?

15        MS. McGOVERN:  Your Honor, they've had nearly a

16   year to plan accordingly; and, instead, the lawsuit that

17   they filed occurred on the eve of their last day of

18   competition, over ten months after the announcement was

19   made that the program was going to be cut.

20        You know, yes, COVID was going on, but -- and,

21   you know, kids have had to deal with that, applying to

22   schools.  I understand that completely.  But there's a

23   whole new class that's coming in to UConn next year, and

24   hundreds of universities, thousands of universities across

25   the country.  It was not an impossible task to figure out

1    what you were going to do next.  And the manner in which

2    the lawsuit is filed on the eve of their competition

3    ending, and bringing this matter to require a TRO at this

4    point in time, where plaintiffs don't have the data that

5    is necessary to do an accurate assessment of Title IX

6    compliance, and we're prohibited from providing the

7    underlying data and now being criticized for complying

8    with FERPA and not turning that information over, it

9    appears to me to be a purposeful delay in bringing the

10   lawsuit.  There were lawsuits that were filed within two

11   months of announcements made that programs were

12   eliminated.  In Quinnipiac, ten, eleven years ago, that

13   lawsuit was brought within weeks of a decision being made.

14   And at that point in time, Quinnipiac made the

15   announcement in March that they were going to eliminate

16   the various programs at the end of that academic year.

17   But here they've had nearly an entire year before they

18   bring the action.  And everything that they're complaining

19   about is causing irreparable harm, the uncertainty, not

20   knowing what they're going to be doing, these are things

21   that they've known for ten months and have had to figure

22   out how they're going to adapt.  So, in my opinion, is it

23   inconvenient for them?  It certainly is.  But it's not

24   irreparable harm.

25            THE COURT:  Okay.

1          MS. McGOVERN:  You know, as far as the public's

2     interest related to this, whether a TRO is entered,

3     plaintiffs' counsel stated again today that there's a

4     constitutional violation that's occurring.  This lawsuit

5     has not alleged a constitutional violation.  It's alleged

6     a Title IX violation, which is very different from a

7     constitutional claim.

8          The public's interest is for UConn to comply

9     with Title IX, which it is.  It's not in the public

10    interest that a specific women's program be continued.

11    And plaintiffs, as a class related to this, they seek to

12    represent not just the women's rowing team but all women

13    who are athletes, are students at UConn now, would be in

14    the future who are athletes, so non-rowers.  How is it in

15    their interest even that a specific rowing team be

16    reinstated as opposed to, again, the public also being

17    concerned with UConn complying with Title IX and providing

18    equitable athletic participation opportunities to both men

19    and women?

20          THE COURT:  Right, but doesn't the argument cut

21    both ways?  If the public interest is in UConn complying

22    with Title IX, and if the plaintiffs demonstrate that it's

23    not in compliance with Title IX, then the public interest

24    is that UConn be enjoined from violating Title IX.  Isn't

25    it?

1         MS. McGOVERN:  Well, Your Honor, UConn can

2   comply with Title IX in ways other than reinstating the

3   women's rowing team, which, as I mentioned, would put us

4   out of compliance, based on plaintiffs' theory of a viable

5   team, on the men's side.

6         THE COURT:  I'm not sure I follow.  You just

7   said when deciding whether to enjoin -- to enter an

8   injunction I should consider the public interest.

9         MS. McGOVERN:  Correct.

10        THE COURT:  The public interest is in UConn

11  complying with Title IX.

12        MS. McGOVERN:  Correct.

13        THE COURT:  So if I decide that UConn has not

14  been in compliance with Title IX, then the public interest

15  is in enjoining them from violating Title IX.

16        MS. McGOVERN:  But the public interest isn't --

17  but not specifically related to reinstating a women's

18  rowing team.

19        THE COURT:  Well, but that's the context in

20  which the issue arises.  I'm not deciding in some abstract

21  way whether UConn complies with Title IX.  We're here

22  because a group of plaintiffs have brought a case claiming

23  that UConn is out of compliance with Title IX.  So I don't

24  see how the public interest goes one way or the other,

25  frankly.  The public interest is in enjoining UConn if

1    it's out of compliance and not enjoining UConn if it's in

2    compliance.  So it doesn't affect the outcome of the TRO.

3              MS. McGOVERN:  Your Honor, unless you have other

4    questions, I'm going to rely on my brief.

5              THE COURT:  All right, that's fine.  Anything

6    further?

7              MS. DUFFY:  Nothing from the plaintiffs.

8              THE COURT:  All right.  I appreciate everybody's

9    patience and working to get this done today.  I'll get you

10   a decision as quickly as I can.

11             I would like to receive the additional

12   information that I requested today.  I want to make sure

13   that the exhibits have been properly marked, so those that

14   were actually admitted today you should just check with

15   the clerk and make sure that all gets handled properly.

16   And have a good night.

17             MS. DUFFY:  Thank you, Your Honor.

18             THE COURT:  We'll stand in recess.

19             (Adjournment:  5:45 p.m.)

20

21

22

23

24

25

C E R T I F I C A T E

No. 3:21-cv-00583-sru

Sarah Lazor, et al v. University of Connecticut

       I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

May 23, 2021

/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
sharon_masse@ctd.uscourts.gov