UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SARAH LAZOR, et al.,<br>    Plaintiffs,<br><br>    v.<br><br>UNIVERSITY OF CONNECTICUT,<br>    Defendant. | No. 3:21-cv-583 (SRU) |

## RULING AND ORDER GRANTING MOTION FOR
## TEMPORARY RESTRAINING ORDER

Plaintiffs, all of whom are current members of the women's rowing team at the University of Connecticut ("UConn"), move for a temporary restraining order enjoining the school from eliminating the women's rowing team. The motion follows UConn's announcement on June 24, 2020 that, purportedly because of budgetary concerns, the school would be cutting the women's rowing team and two men's sports teams. Plaintiffs contend that UConn's decision to eliminate the rowing team is in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, *et seq.* ("Title IX"), and that a temporary restraining order is needed to maintain the status quo pending a ruling on their motion for a preliminary injunction.

On May 20, 2021, I held a hearing on the motion for a temporary restraining order. Because Plaintiffs have established that they will suffer irreparable harm in the absence of injunctive relief and that there is a substantial likelihood of success on their Title IX claim, the motion is **granted**.

I.    **Standard of Review**

In the Second Circuit, the same legal standard governs motions for temporary restraining orders and motions for preliminary injunctions. *See Fairfield Cty. Med. Ass'n v. United*

*Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom. Fairfield Cty. Med. Ass'n v. United Healthcare of New England, Inc.*, 557 F. App'x 53 (2d Cir. 2014). To prevail on a motion for a temporary restraining order, the movant must demonstrate "that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (cleaned up). Irreparable harm exists "'where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.'" *United States SEC v. Daspin*, 557 F. App'x 46, 48 (2d Cir. 2014) (citation omitted).

Where a movant seeks a "mandatory preliminary injunction that alters the status quo," rather than a "prohibitory injunction seeking only to maintain the status quo," the burden of proof is more stringent. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011). In that instance, a movant must demonstrate a "clear" or "substantial" likelihood of success on the merits. *See Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008). Because the proposed injunction's impact on the status quo drives the standard, courts must first identify the "'status quo'—that is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *North America Soccer League LLC v. United States Soccer Federation*, 883 F.3d 32, 37 (2d Cir. 2018).

In this case, the "last actual, peaceable uncontested status which preceded the pending controversy" is when the rowing team was fully operative, before UConn announced that it would cut the team and before it took steps toward that end. Any injunction, therefore, would preserve the status quo and is more fairly characterized as prohibitory. *See Biediger v.*

2

*Quinnipiac Univ.,* 616 F. Supp. 2d 277, 291 (D. Conn. 2009) (characterizing as prohibitory an injunction that would restrain Quinnipiac University ("Quinnipiac") from carrying out its decision to eliminate the women's volleyball team in the upcoming academic year); *Madej v. Yale Univ.,* 2020 WL 1614230, at *5 (D. Conn. Mar. 31, 2020) (applying the lower standard when a student sought a preliminary injunction restraining Yale from implementing the student's dismissal, reasoning that the "status quo ante" was the "status quo before Yale took the alleged harmful actions," that is, prior to the student's academic withdrawal); *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133–34 (2d Cir. 1997) (describing the injunction sought as prohibitory, not mandatory, because it would restrain the NCAA from interfering with the university's decision to offer the student an athletic scholarship and to play on the basketball team); *accord Anders v. California State Univ., Fresno,* 2021 WL 1564448, at *8 (E.D. Cal. Apr. 21, 2021) ("The controversy here arises from the cutting of women's lacrosse, which necessarily means that in the relevant status quo, women's lacrosse had not yet been cut. Consequently, Plaintiffs merely seek a prohibitory injunction to 'preserve' women's lacrosse, which does not trigger the heightened standard applicable to mandatory injunctions.").

      That UConn has not recruited any student athletes, purchased equipment, or retained coaches for the 2021–2022 season does not compel a conclusion that a heightened mandatory injunction analysis is warranted. Nonetheless, because Plaintiffs can meet either burden, I will apply the higher standard.

**II. Discussion**

   A. <u>Substantial Likelihood of Success on the Merits</u>

      1. *Title IX*

Every university that receives federal funding and offers varsity interscholastic athletics to its students must comply with Title IX. Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The associated regulations, which are codified at 34 C.F.R. Part 106, include interscholastic athletics within the "program or activity" requirements of Title IX:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a).

Section 106.41(c) sets forth ten non-exhaustive factors for assessing whether an institution is offering equal varsity athletic opportunities to men and women:

1. Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

2. The provision of equipment and supplies;

3. Scheduling of games and practice time;

4. Travel and per diem allowance;

5. Opportunity to receive coaching and academic tutoring;

6. Assignment and compensation of coaches and tutors;

7. Provision of locker rooms, practice and competitive facilities;

    8. Provision of medical and training services;

    9. Provision of housing and dining facilities and services; and

    10. Publicity.

34 C.F.R. § 106.41(c). Courts also consider a "failure to provide necessary funds for teams of one sex." *Id*.

Claims of sex discrimination in athletics arising under Title IX fall into two categories based on the section 106.41(c) factors to which the claims are addressed: effective accommodation claims focus on section 106.41(c)(1), and equal treatment claims focus on sections 106.41(c)(2)–(10). *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92 (2d Cir. 2012). The instant motion specifically addresses UConn's "failure to effectively accommodate Plaintiffs' interests and abilities and provide equal athletic participation opportunities." *See* Doc. No. 2-1, at 13.

A Policy Interpretation—issued in 1979 by the U.S. Department of Education's Office of Civil Rights ("OCR") ("1979 Policy Interpretation"), which is charged with enforcement of Title IX—delineates three tests to determine whether a university is complying with the requirement to provide effective accommodation of students' interests and abilities:

1. whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;

2. where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

3. where the members of one sex are underrepresented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*See Biediger,* 681 F.3d at 92–93 (quoting the 1979 Policy Interpretation, 44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979)). Each of those prongs establishes a safe harbor for universities defending against an effective accommodation claim. *See id.*

In 1996, OCR released a clarification of the test for assessing whether a university affords substantially proportionate participation opportunities to athletes of both sexes under the first prong of the three-part standard. OCR, U.S. DOE, *Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test,* at 2–3 (Jan. 15, 1996) ("1996 OCR Clarification").

In this case, UConn relies only on the first prong of the 1979 Policy Interpretation in defending against Plaintiffs' allegations; it does not suggest that it meets the second or third prongs. I therefore address only the first prong below.

B. <u>Prong One of Title IX Compliance: Substantial Proportionality</u>

Under prong one of the three-part test, courts first determine the number of participation opportunities afforded to male and female athletes in the intercollegiate athletic program. *Biediger*, 691 F.3d at 93. Then, courts consider whether the numbers are substantially proportionate to each sex's undergraduate enrollment. *Id*. at 94.

As the 1996 OCR Clarification elucidates, exact proportionality—that is, when the ratio of male to female student athletes is equal to the ratio of male to female undergraduate students—is not required because it may be unreasonably difficult for an institution to achieve exact proportionality due to, for instance, "natural fluctuations in enrollment and participation rates." 1996 OCR Clarification. When exact proportionality is not reached, a "participation gap" exists. *See Balow v. Michigan State Univ.*, 2021 WL 650712, at *3 (W.D. Mich. Feb. 19, 2021). The "participation gap" represents the number of participation opportunities necessary to achieve exact proportionality. *Id.* A participation gap does not violate Title IX so long as

participation opportunities for each sex remain "substantially proportionate." 1996 OCR Clarification.

The 1996 OCR Clarification teaches that athletic opportunities are "substantially proportionate" at a university when "the number of opportunities that would be required to achieve [exact] proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." *See* 1996 OCR Clarification; *see also Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 111 (D. Conn. 2010), *aff'd*, 691 F.3d 85 (2d Cir. 2012) ("In addition to calculating the disparity, OCR considers other factors designed to give context and meaning to a school's shortfall of athletic opportunities for students of a specific sex. Specifically, OCR considers whether natural fluctuations in enrollment contributed to the lack of proportionality, and whether the absolute number of athletic participation opportunities that need to be created to achieve exact proportionality would be sufficient to sustain a viable athletic team."). The 1996 OCR Clarification further instructs that, "[a]s a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution." *Id*.

The 1996 OCR Clarification offers examples of a viable team:

> For instance, Institution A is a university with a total of 600 athletes. While women make up 52 percent of the university's enrollment, they only represent 47 percent of its athletes. If the university provided women with 52 percent of athletic opportunities, approximately 62 additional women would be able to participate. Because this is a significant number of unaccommodated women, it is likely that a viable sport could be added. If so, Institution A has not met part one.
>
> As another example, at Institution B women also make up 52 percent of the university's enrollment and represent 47 percent of Institution B's athletes. Institution B's athletic program consists of only 60 participants. If the University provided women with 52 percent of athletic opportunities, approximately 6 additional women would be able to participate. Since 6

7

> participants are unlikely to support a viable team, Institution B would meet part one.

*Id*. Ultimately, substantial proportionality is decided on a "case-by-case basis, rather than through use of a statistical test," taking into account "the institution's specific circumstances and the size of its athletic program."[1]  *Id*.

According to UConn, because the average size of female teams at UConn for the 2020–2021 academic year (28) is greater than what they contend is the participation gap (20), the university falls squarely within the first prong's safe harbor. *See* Doc. No. 35, at 17.  UConn's argument fails to persuade.  As a preliminary matter, I reject UConn's argument that the size of "a viable team" is calculated solely by identifying the average size of female squads at the university at issue.  UConn urges me to adopt a requirement that is found nowhere in the regulatory guidance; the 1996 OCR Clarification merely provides that the average team size "may" be considered as a "frame of reference" in ascertaining the size of a viable team.  There is no indication that, as long as the participation gap is less than the university's average women's team size, the university meets prong one and complies with Title IX.  On the contrary, the determination of substantial proportionality is inherently case- and fact-specific, considering the institution's specific circumstances.

Indeed, in *Biediger*, the average size of the women's teams at Quinnipiac was not dispositive to my analysis on substantial proportionality.  Instead, it constituted only one factor that I considered in concluding that the participation gap of 38 female athletes would be sufficient to create a new, independent varsity team. *Biediger*, 728 F. Supp. 2d at 112.  In so concluding, I weighed how: (1) in 2009–10, the largest women's teams at Quinnipiac listed 30 members on their rosters; (2) the mean size for women's teams was 22 members; (3) the median

---

[1] In this case, neither party has provided meaningful evidence concerning the relative size of UConn's athletic program.  I therefore am unable to consider that factor in my analysis.

team size was 24 members; (4) the new sports team that Quinnipiac had created in an attempt to meet its Title IX obligations, competitive cheer, had 30 participants; and (5) the eliminated women's volleyball squad required only 14 players to compete. *Id.* at 112.

UConn cites to one case—*Balow v. Michigan State Univ.,* 2021 WL 650712 (W.D. Mich. Feb. 19, 2021)—that relied on the average size of the women's teams at the university in determining whether substantial proportionality was reached. But that case is not binding on me, and I respectfully decline to follow it. In its opinion, the *Balow* court referred to the average size of teams offered for the underrepresented sex as "one of the OCR's stated criteria for proportionality." *Id*. at 9. I do not agree with that reading of the 1996 OCR Clarification because it overstates the importance of the average team size. The 1996 OCR Clarification provides that a participation gap large enough to field a viable team—not the average team size—is the benchmark for determining substantial proportionality; the average size "may" be considered as a "frame of reference" in ascertaining the viable team size. For those reasons, I respectfully disagree with *Balow* to the extent that it stands for the proposition that a participation gap smaller than the average team size defines compliance with Title IX.

Moreover, I conclude that the average size of the women's teams at UConn is not an appropriate benchmark in this case, and I assign the number minimal weight for purposes of determining substantial proportionality. At the hearing, evidence was introduced plausibly suggesting that UConn had inflated the numbers on its women's rowing team. *See* Pl.'s Ex 1. Coach Jennifer Sanford, in particular, gave credible testimony that she was required to keep a minimum of 60 rowers on the women's rowing team for Title IX purposes, even though her ideal team size is 40 to 42 members. Considering the average size of a women's team at UConn would thus be counter to the goals of Title IX; it would reward UConn for artificially inflating

9

the roster size to circumvent the statute's mandate. Accordingly, I decline to give dispositive effect to the average team size in my analysis.

In light of the foregoing, and after carefully reviewing the entirety of the record before me, I conclude that the participation gap is well above a viable team size even when using the participation gap numbers offered by UConn for the academic years of 2019–2020 (34.46) or 2020–2021 (20).[2] *See* App'x A; App'x C.[3] Plaintiffs' expert witness, Dr. Donna Lopiano, credibly testified that the average women's golf team in Division I had 8 members; although UConn does not offer women's golf, it does offer men's golf. In addition, according to Dr. Lopiano, the average team sizes of women's bowling, rifle, and gymnastics[4] are 10, 8, and 18, respectively. Dr. Lopiano further testified that the average team size of sand volleyball is 18 and that each of the foregoing teams are NCAA women's sports teams that UConn could have added.

UConn's participation gap of 34 female athletes for the 2019–2020 academic year and 20 female athletes for the 2020–2021 academic year is, therefore, certainly more than enough to sustain a viable team. Indeed, the participation gap of 34 for 2019–2020 would be too large even under UConn's proposed standard given that the average number of participants on a women's team for that year was 29.23. *See* App'x C.

Further, UConn has failed to proffer any evidence suggesting that natural fluctuations in enrollment, or unanticipated drops in female athletic participation, were the causes of the disparity in their athletic participation opportunities. *Biediger*, 928 F. Supp. 2d at 467. On the contrary, UConn's historical data further suggests that the university is not now, and has not

---

[2] Although both parties agree that the first prong of the 1979 Policy Interpretation demands present compliance—it considers whether participation opportunities "*are provided* in numbers substantially proportionate"—2020–2021 was an unusual year due to the pandemic's impact on college athletics. Accordingly, for purposes of deciding the instant motion, I look to the data from the 2019–2020 year as well, which UConn submitted following the hearing. I also consider the 2019–2020 academic year significant because UConn's decision to terminate the women's rowing team was announced at the end of that year, in June 2020.

[3] Appendices A, B, and C, with technical modifications, were provided by UConn.

[4] Gymnastics was previously offered at UConn.

been since 2008, complying with Title IX. Based on UConn's web roster data, which Dr. Lopiano testified is generally reliable for Title IX purposes, UConn experienced participation gaps disfavoring females every year for the past 13 years.[5] *See* Pls. Ex. 2b. That trend indicates that natural fluctuations in the student body are not to blame for the participation gap. *See Robb v. Lock Haven Univ. of Pennsylvania*, 2019 WL 2005636, at *8 (M.D. Pa. May 7, 2019) ("While this could be termed a 'borderline case' in terms of raw statistics, a glance at Lock Haven's long history of Prong One nonsatisfaction reveals that gap cannot be attributed to natural fluctuations in the student body.").

UConn mounts the defense that a participation gap percentage of less than 2% satisfies the test for substantial proportionality under the first prong of the 1996 OCR Clarification test, and that UConn's participation gap percentage is 1.33%. *See* Doc. No. 35, at 19. In *Biediger*, however, the Second Circuit declined Quinnipiac's invitation to read into the 1996 OCR Clarification a bright-line statistical test for determining substantial proportionality. *Biediger*, 691 F.3d at 106. The Court reasoned:

> While a district court outside this circuit reports finding no case in which a disparity of two percentage points or less has been held to manifest a lack of substantial proportionality, . . . we do not pursue the issue because the disparity in this case is greater than 2%, and we do not, in any event, understand the 1996 Clarification to create a statistical safe harbor at this or any other percentage. Instead, the Clarification instructs that substantial proportionality is properly determined on a "case-by-case basis" after a careful assessment of the school's "specific circumstances," including the causes of the disparity and the reasonableness of requiring the school to add additional athletic opportunities to eliminate the disparity.

*Id*. UConn's reliance on the participation gap percentage is therefore unpersuasive.

---

[5] Dr. Lopiano was unable to use more official data because it was unavailable to her at this early stage of litigation. UConn was required to obtain an order and provide notice to the impacted students before disclosing information regarding UConn's official Title IX participation counts, which precluded Dr. Lopiano from including such information in her report.

For the foregoing reasons, Plaintiffs have shown that it is substantially likely that UConn is not presently in compliance with Title IX's effective-accommodation mandate, and cutting the women's rowing team would only exacerbate that noncompliance by magnifying UConn's disparity in athletic participation opportunities. Relying on UConn's numbers alone, the adjusted participation gap for 2020–2021 following the cut of the women's rowing team would be 22—meaning that the participation gap for the 2020–2021 academic year would increase by 2. *See* App'x B. Plaintiffs have therefore demonstrated a substantial likelihood of prevailing on their Title IX claim that UConn fails to afford female students varsity athletic participation opportunities substantially proportionate to their enrollment.[6]

C. <u>Irreparable Harm</u>

Plaintiffs have also established that they will likely suffer irreparable harm in the absence of a temporary restraining order. Put simply, Plaintiffs are high-level college athletes. Many of them have vigorously trained throughout their formative high school years in order to compete on a Division I rowing team and would not have attended UConn but for its rowing team. If the women's rowing team were eliminated, Plaintiffs would lose the long-sought opportunity to compete at the highest level of intercollegiate sports. Even if there is an opportunity to transfer to another school to play on a Division I team—which is not the case for many due to financial circumstances, academics, or logistics—Plaintiffs will face an interruption in competition and will be forced to break into new programs with new coaches, which will necessarily hinder Plaintiffs' development as rowers. *Biediger,* 616 F. Supp. 2d at 291–92 ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer

---

[6] At some point, it may be necessary to consider competitive schedules and the opportunities available to the historically disadvantaged sex. *See* 44 Fed. Reg. at 71417. Because neither party has raised those issues, I do not consider them now.

irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis.") (collecting cases).  Rowing at UConn, moreover, has been a central part of Plaintiffs' lives, and has brought about immeasurable mental and physical health benefits.  There is a sense of community on the team, with the coaches serving as vital mentors.  Neither the continuation of their scholarships, nor any monetary sum, could repair the harm Plaintiffs would suffer if those intangible benefits are lost.

Plaintiffs' delay in filing this lawsuit does not suggest otherwise.  The Second Circuit has instructed district courts to "generally consider delay in assessing irreparable harm" on a motion for preliminary injunctive relief.  *See Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995).  In particular, the Second Circuit has observed, principally in the trademark context, that a delay may counsel against a finding of irreparable harm, on the ground the "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief."  *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (cleaned up); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").

Critically, however, the Second Circuit has recognized an exception for when a delay is adequately explained, such as when the delay is a product of good faith efforts to investigate the underlying cause of action.  *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.,* 423 F.3d 137, 144–45 (2d Cir. 2005) ("[W]e have held that a short delay does not rebut the [no longer operative] presumption [of irreparable harm in the trademark context] where there is a good reason for it, as when a plaintiff is not certain of the infringing activity or has taken additional

13

time to examine the infringing product") (citing cases where a delay of four to seven months was held to be not unreasonable); *Tom Doherty Assocs.*, 60 F.3d at 39 ("[A] delay caused by a plaintiff's good faith efforts to investigate an infringement does not rebut the presumption of irreparable harm [in the trademark context].") (citation omitted); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333-34 (S.D.N.Y. 2011) (holding that a delay was justified when it was caused by "good faith efforts to investigate the facts and law," among other things); *cf. Hornig v. Trustees of Columbia Univ. in City of New York,* 2018 WL 5800801, at *7 (S.D.N.Y. Nov. 5, 2018) (noting that "courts typically decline to grant preliminary injunctions in the face of *unexplained* delays of more than two months") (emphasis added).

In this case, there was a delay of approximately 10 months; the UConn Board voted to eliminate the women's rowing team in June 24, 2020, and Plaintiffs brought the instant lawsuit on April 28, 2021. Nonetheless, Plaintiffs' proffered reasons for the delay—namely, the logistical complications compounded by the pandemic, and counsel's extensive investigation and research into the legal and factual issues—are valid and do not weigh against a finding of irreparable harm. It is worth noting that many of the plaintiffs were teenagers who had just started college in the midst of a pandemic and were subjected to multiple quarantines. Moreover, they made efforts to resolve the case informally prior to the filing of the lawsuit.

For all the foregoing reasons, I conclude that Plaintiffs have satisfied the irreparable harm requirement.

D. Balancing of Equities

The third prong—balancing of equities—also tips in favor of Plaintiffs. Aside from the conclusory assertion that there is "no time" to prepare for another rowing season, UConn does not describe any harm that it would sustain by continuing the team until a hearing on the motion

for a preliminary injunction is conducted. *See* Doc. No. 35, at 27. If anything, the hardship would be solely financial and thus could be compensated if I later determine that a preliminary injunction should not issue. *See Warner-Lambert Co. v. Northside Dev. Corp.,* 86 F.3d 3, 8 (2d Cir. 1996).

By contrast, it is likely that nothing will be left of the women's rowing team if I do not issue a temporary restraining order: more team members will transfer, coaches must secure positions elsewhere, and recruiting will not occur. Each passing day, Plaintiffs are losing the opportunity to develop as student athletes. This prong therefore weighs in favor of granting a temporary restraining order.

E. Public Interest

The final question that I must consider is whether the issuance of a temporary restraining order would serve the public interest. In this case, the public interest lies in vindicating Plaintiffs' civil rights as guaranteed under Title IX, which would only be furthered by a temporary restraining order. *See Quaratino v. Tiffany & Co.*, 166 F.3d 422, 426 (2d Cir. 1999) ("The public interest in private civil rights enforcement is not limited to those cases that push the legal envelope; it is perhaps most meaningfully served by the day-to-day private enforcement of these rights which secures compliance and deters future violations."); *see also Ohlensehlen v. Univ. of Iowa*, 2020 WL 7651974, at *13 (S.D. Iowa Dec. 24, 2020) ("[T]he public interest demands that [the University of Iowa] comply with federal law and in this instance that means compliance with Title IX.") (citations omitted); *Mayerova v. E. Michigan Univ.,* 346 F. Supp. 3d 983, 999 (E.D. Mich. 2018) ("[T]he public interest is best served by upholding the goals of Title IX"); *Barrett v. W. Chester Univ. of Pennsylvania of State Sys. of Higher Educ.*, 2003 WL

15

22803477, at *15 (E.D. Pa. Nov. 12, 2003) ("Promoting compliance with Title IX serves the public interest.").

Accordingly, the public interest weighs in favor of a temporary restraining order.

### III.    Conclusion

Plaintiffs have carried their burden of proving that they will suffer irreparable harm in the absence of injunctive relief and that they enjoy a substantial likelihood of success on the merits of their claim that UConn is not providing genuine athletic participation opportunities in substantial proportionality to the gender composition of its full-time undergraduate enrollment. Therefore, a temporary restraining order to prevent the elimination of the women's rowing team is necessary pending a hearing on Plaintiffs' request for a preliminary injunction. Therefore:

**IT IS ORDERED**, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, that the University of Connecticut and its agents, officers, directors, trustees, employees, and anyone acting in concert with them who receives actual notice of this order, are hereby enjoined from:

a.   eliminating UConn's women's varsity intercollegiate rowing team;

b.   involuntarily terminating the employment of the coaches of UConn's women's varsity intercollegiate rowing team[7];

c.   reducing its financial, material, or other support for UConn's women's varsity intercollegiate rowing team; and

d.   restricting or denying UConn's women's varsity intercollegiate rowing team access to facilities, coaching, training, or competitive opportunities.

---

[7] Although the coaches are not plaintiffs, this order is necessary because terminating the coaches would strike at the very core of the harm that Plaintiffs would suffer in the absence of the temporary restraining order.

This temporary restraining order shall expire fourteen (14) days from the time it issues, unless extended by further order of this court.

For the following reasons, the order shall issue without bond. UConn did not request a bond, and as I noted earlier, it does not describe any harm that would flow from the issuance of a temporary restraining order. Moreover, I find that Plaintiffs, many of whom are on scholarship, appear incapable of posting a bond.

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of May 2021 at 6:42 p.m.

Stefan R. Underhill
United States District Judge

**UCONN ATHLETICS PARTICIPATION ANALYSIS (Title IX – Prong One)**     **APPENDIX A**

| 2020-2021 | FEMALE | MALE |
|---|---|---|
| **Total: Undergraduate Students** | 9386 | 8683 |
| **Percentage (%): Undergraduate Students** | 51.95% | 48.05% |
| **Total: Student-Athletes** | 369 | 360 |
| **Percentage (%): Student-Athletes** | 50.62% | 49.38% |
| **Participation Gap** | **20** | |
| **Average # Participants/Women's Team** | **28** | |
| **Is the participation gap to achieve strict proportionality less than the average women's team size?** | **YES** | |
| **NCAA Sports Sponsorship** | **Team Roster Size** | |
| Men's Basketball | | 15 |
| Men's Soccer | | 24 |
| Baseball | | 41 |
| M Ice Hockey | | 28 |
| Football | | 98 |
| M. Track Outdoor | | 56 |
| M. Track Indoor | | 56 |
| Men's Cross Country | | 11 |
| M. Swimming & Diving | | 16 |
| Men's Golf | | 9 |
| Men's Tennis | | 6 |
| Women's Basketball | 12 | |
| Women's Soccer | 31 | |
| Softball | 21 | |
| Volleyball | 15 | |
| W Lacrosse | 38 | |
| W Ice Hockey | 24 | |
| W Field Hockey | 27 | |
| W. Track Outdoor | 54 | |
| W. Track Indoor | 53 | |
| Women's Cross Country | 17 | |
| W. Swimming & Diving | 30 | |
| Women's Tennis | 9 | |
| W Rowing | 38 | |
| **Total** | **369** | **360** |

# APPENDIX B

**UCONN ATHLETICS PARTICIPATION ANALYSIS (Title IX – Prong One) DISCONTINUATION MODEL**

| ADJUSTED 2020-2021 | FEMALE | MALE |
|---|---|---|
| **Total: Undergraduate Students** | 9386 | 8683 |
| **Percentage (%): Undergraduate Students** | 50.3% | 49.7% |
| **Total: Student-Athletes** | 331 | 327 |
| **Percentage (%): Student-Athletes** | 50.62% | 49.38% |
| **Participation Gap** | 22 | |
| **Average # Participants/Women's Team** | 28 | |
| **Is the participation gap to achieve strict proportionality less than the average women's team size?** | YES | |
| **NCAA Sports Sponsorship** | Team Roster Size ||
| Men's Basketball | | 15 |
| Men's Soccer | | 24 |
| Baseball | | 41 |
| M Ice Hockey | | 28 |
| Football | | 98 |
| M. Track Outdoor | | 56 |
| M. Track Indoor | | 56 |
| Men's Golf | | 9 |
| Women's Basketball | 12 | |
| Women's Soccer | 31 | |
| Softball | 21 | |
| Volleyball | 15 | |
| W Lacrosse | 38 | |
| W Ice Hockey | 24 | |
| W Field Hockey | 27 | |
| W. Track Outdoor | 54 | |
| W. Track Indoor | 53 | |
| Women's Cross Country | 17 | |
| W. Swimming & Diving | 30 | |
| Women's Tennis | 9 | |
| **Total** | **331** | **327** |

**UCONN ATHLETICS PARTICIPATION ANALYSIS (Title IX – Prong One)**

| 2019-20 | FEMALE | MALE |
|---|---|---|
| Total: Undergraduate Students | 9248 | 8903 |
| Percentage (%): Undergraduate Students | 50.95% | 49.05% |
| Total: Student-Athletes | 380 | 399 |
| Percentage (%): Student-Athletes | 48.78% | 51.22% |
| Participation Gap | 34.46 | |
| Average # Participants/Women's Team | 29.23 | |
| Is the participation gap to achieve strict proportionality less than the average women's team size? | **NO** | |
| **NCAA Sports Sponsorship** | **Team Roster Size** | |
| Men's Basketball | | 15 |
| Men's Soccer | | 33 |
| Baseball | | 46 |
| M Ice Hockey | | 28 |
| Football | | 101 |
| M. Track Outdoor | | 55 |
| M. Track Indoor | | 56 |
| Men's Cross Country | | 17 |
| M. Swimming & Diving | | 28 |
| Men's Golf | | 12 |
| Men's Tennis | | 8 |
| Women's Basketball | 11 | |
| Women's Soccer | 30 | |
| Softball | 21 | |
| Volleyball | 16 | |
| W Lacrosse | 32 | |
| W Ice Hockey | 24 | |
| W Field Hockey | 25 | |
| W. Track Outdoor | 49 | |
| W. Track Indoor | 50 | |
| Women's Cross Country | 22 | |
| W. Swimming & Diving | 30 | |
| Women's Tennis | 9 | |
| W Rowing | 61 | |
| **Total** | **380** | **399** |

**APPENDIX C\*\***

**\*\*Subject to change after data for each student-athlete is cross-checked with squad lists, CARA and competition logs in the same manner that Ex. A, 2020-21 Athletic Participation Analysis data was reviewed.**